Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

FILED
FEB 15 2006
U.S. COURT OF FEDERAL CLAIMS

**UNITED STATES COURT OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,

vs.

UNITED STATES OF AMERICA,

*Defendant*.

06-115C

Case No.

Judge ___________

**VERIFIED COMPLAINT FOR REPUDIATION AND BREACH OF CONTRACT, DIRECTLY-RELATED TORT AND U.S. CONSTITUTIONAL TAKINGS DAMAGES IN EXCESS OF $45 MILLION DOLLARS**

Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT
OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs,*

vs.

UNITED STATES OF AMERICA,
*Defendant.*

Case No.
Judge ______________

**VERIFIED COMPLAINT FOR REPUDIATION AND BREACH OF CONTRACT, DIRECTLY-RELATED TORT AND U.S. CONSTITUTIONAL TAKINGS DAMAGES IN EXCESS OF $45 MILLION DOLLARS**

# TABLE OF CONTENTS


I. **INITIAL SUMMARY** 1

II. **PREVIOUS RELATED CASES AND BRIEF EXPLANATION** 5

1. *Simons v. CIR*, United States Tax Court stipulated decision, dkt. No. 13016-80 5

2. *Simons v. CIR*, United States Tax Court stipulated decision dkt. No. 10312-79 5

3 *U.S. v. Simons, filed Dec. 14, 1992, 92 cv* 1071B 5

4. *U. S. v. Simons*, 129 F.3d 1386, 1997.C10.0001337 http://www.versuslaw.com 6

5. *Simons v. CIR*, 185 F.3d 875, 84 A.F.T.R.2d 99, 1999.C10.42905 http://www.versuslaw.com 6

6. *U.S. v. Simons*, http://www.kscourts.org/ca10/cases/2003/12/02-4201.htm 6

**III. PARTIES**

A. PLAINTIFFS 7

B. DEFENDANTS 7

**IV. JURISDICTION** 8

**V. STATUTES OF LIMITATION** 9

VI. **REQUIRED REQUEST FOR ABATEMENT AND REFUND WAS FILED PRIOR TO FILING THIS CLAIM** 10

**VII. RULE 9 REQUIRED SPECIFICITY IN PLEADING** 11

**VIII. STATEMENT OF FACTS** 12

*A. The First 'Agreement' between the Taxpayers and the Government* 15

*B. The First and Only Legitimate Contract - a 1983 single Global Netting Settlement Memorialized in Two U.S. Tax Court Decisions with Identical IRS-drafted Underlying Math Calculations* 19

*(a) Tax Court petitions are timely filed* 19

1. *An Express or Implied-in-fact Contract* 19

*(i) A bona fide dispute* 20

*(ii) Signature of Agents with Authority to Bind the Parties* 21

*(iii) Offer* 22

*(iv) Mutuality of Intent and Acceptance* 22

*(v) Plaintiffs' Adequate Consideration* 24

*(vi) Definite terms* 25

*(vii) Closing of the three accounts was done in a manner to accommodate the IRS computer that can not properly post global multiple year netting settlements* 26

*(viii) Government demonstrates Satisfaction and Accord* 28

*(ix) If the Government had not promised Permanent Forebearance, Plaintiffs would Not have Paid nearly $50,000* 32

*(x) Circuit Courts Have Declared Stipulated Tax Court Decisions to be Binding Contracts* 32

**IX. DAMAGES** 33

A. **FRAUD IN PERFORMANCE, REPUDIATION, AND BREACH OF THE 1983 CONTRACT FOR YEARS 1972, 1973, 1974, AND LACK OF CONTACT FOR A HANDWRITTEN DOCUMENT IN 2001** 33

1. VIOLATED DUTIES AND OBLIGATIONS OF THE GOVERNMENT 33

*a. Violations of Promissory Estoppel, the Duty to Forebear After Payment* 33

*b. Violations of the Implied Covenant of Good Faith and Fair Dealing* 34

*(ii) Lack of Accurate Record Keeping on the Computer Records* 35

*(iii) Interference with the Plaintiffs in Obtaining their Files* 36

*Administratively* 36

*Administrative Lack of adequate FOIA and Privacy Act Responses to Requests for records until about Feb. 15, 2000* 40

*(iv) Unsupported Levies and Liens without Prior Warning* 44

*(iv) Judicially Withheld Documents* 46

2. FRAUD IN THE PERFORMANCE, REPUDIATION AND BREACH OF THE 1983 CONTRACT 50

*a. Lack of Candor Regarding Written Notices and Demands* 50

*b. Lack of Notification of Abatement of all Debt in 1995* 51

*c. All Elements of Fraud in Performance are Met* 52

3. LACK OF CONTRACT FOR 2001 54

*a. Lack of Material Consideration* 55

*b. Lack of the U.S. District Court's Subject Matter Jurisdiction* 55

*c. Lack of a Signature by and Authorized Agent* 55

*d. Lack of Mutual Intent* 56

*e. Repudiation and Disregard of the Alleged 'contract' and District Court's Order* 56

*f. The Express Terms of the Handwritten Offer Were not Reflected in the Government's response to the offer* 57

4. UNJUST ENRICHMENT 59

**B. TORT DAMAGES** 61

1. ABUSE OF ADMINISTRATIVE PROCESS 61

2. ABUSE OF JUDICIAL PROCESS 64

3. SLANDER AND LIBEL 66

4. CONSPIRACY AND WILLFULNESS IN THE DAMAGES CONTAINED HEREIN 72

5. HARRASSMENT 75

**C. U.S. CONSTITUTIONAL FIFTH AMENDMENT TAKINGS CLAIMS** 76

1. SPECIFIC PLEADING IN DESCRIBING THE PROPERTY TAKEN 78

2. TAKINGS BEGINS IN THE MERITLESS TRIAL FOR CRIMINAL FRAUD IN 1979 79

3. BURDEN ON THE GOVERNMENT WAS EXTREMELY SMALL 89

4. DAMAGE TO THESE PLAINTIFFS HAS BEEN ASTRONOMICAL 91

X. PAIN AND SUFFERING 92

XI. REMEDIES FOR DAMAGES 96

XII. PRAYER FOR RELIEF 97

1. DECLARATORY JUDGMENT RELIEF 97

2.MONETARY DAMAGES 100

CERTIFICATE OF SERVICE 103

COMPLAINT VERIFICATION 104

Plaintiffs, Danny C. Simons and Sally J. Simons, ("The Simons") by and through counsel of record as undersigned, Susan Rose, pursuant to the United States Court of Federal Claims Rules (USCFC) at Rule 8 and Rule 9, hereby files this complaint seeking declaratory relief, full expectation damages relief, and all additional relief as is fair in equity and just under the law, based on the government's repudiation and breach of a fully paid 1983 global net settlement contract by ongoing and directly-related tort and Constitutional takings damages based upon the following facts and law:

## I. INITIAL SUMMARY

In biblical times, a leper was a person with unpleasant disfiguring sores. That person, through no fault of their own, suffered by being cast out of the community or compound, suffered the loss of their livelihood, suffered the loss of their future, and loss of whatever had been their passion in life, i.e. farming, carpentry, baking, or whatever one chose as their profession.

In our day in age, the government, given an overwhelming presumption of correctness, if it claims you owe them money, and issues publicly noticed levies and liens, and charges you with dishonesty and fraud, also expels you from the business city, the compound, the financial community, just as if you were a financial leper. In this case, all the fraud claims were totally

without foundation and false, and the actions of the government occurred in violation of its fidelity and fiduciary duty to those with whom it contracts. A full examination by 2 experts are attached hereto P.App. 6-51,64-66

Further, Plaintiffs were denied all the protections usually afforded the public by Congressional design and traditional notions of fair play and due process, of a timely assessment, of any written notice and demand, of any Notices of Deficiency for supplemental assessments. Plaintiffs assert now is the proper time for this honorable Court of proper jurisdiction, to bind up the Plaintiffs' wounds, and heal and make the Plaintiffs whole, with the refreshing balm of mercy, compassion and justice, as is within this Courts full jurisdictional authority.

The Plaintiffs are fully filed and paid taxpayer citizens, suffering [1] from injuries accruing from repeated government actions from about April 16, 1979 until at least about March 1, 2004. Now, without this honorable Court of proper jurisdiction declaratory judgment that there was in 1983 was a fully satisfied express or implied in fact global package contract, Plaintiffs may be subject to further harassment and collection activities based upon

[1] In summary, as early as 1803, Justice Marshall, in *Marbury v. Madison*, 5 U.S. 137, 162-3 (1803) stated in the majority opinion "If he has a right, and that right has been violated, do the laws of his country afford him a remedy? The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."

IRC Sec. 108 and anything else the government may assert, based on the presumption of the correctness of the government. [2]

The chain of accrued damages can be summarized and broken down into four simple components: **(1)** A 1979 criminal tax fraud case was brought on *false* claims with inadequate evidence. Plaintiff Mr. Simons was found not guilty for tax years 1972 and 1973. **(2)** In 1979 and 1980, the government brought *false* civil fraud charges for years 1972, 1973 and 1974 involved in two Tax Court decisions, resulting in a package global settlement agreement for all three years, dropping the fraud claims, and using income averaging to reach into a closed year. See Internal Revenue Code (IRC) sec. 1311-1314. This global package settlement was paid Nov. 7, 1983 with a payment of $49, 546.55 accepted by the IRS, for tax, IRC Sec. 1314(d) restricted interest, defined as a 'tax' in IRC Sec. 6601(e) ***for all three years***. **(3)** After five years of silence, in 1988 the IRS began collections on year 1974 separately that ultimately continued until the Plaintiffs were forced by a U.S. District Court order to pay an additional $55,000 based on the government's false claims of fraudulent transfer of properties, and false claims they must pay a debt for a falsely claimed timely assessed and

[2] Significantly, these Plaintiffs have had every tax year audited or examined since at least 1972, even though they have been very careful to file their returns through the most reputable CPA's in the area, since at least about 1979 or so and are fully filed and paid.

noticed year 1974. After Plaintiffs' full payment in 2002, and after the time for appealing the order to the U.S. Supreme Court lapsed, the government issued an additional billing in about March, 2004 for an additional $4100, and an eventual attempted refund of $24.00 that was grossly in error and refused by the Plaintiffs. **(4)** From 1988 until about February 15, 2000, all ***necessary*** records for the Plaintiffs' defense against further collections on 1974, i.e. original returns, form 872[3] statute extension form (essential for calculating dates for assessment), were withheld administratively, in litigation, and in numerous Freedom of Information Act (FOIA) and Privacy Act, CPA and attorney requests. The Notice of Deficiency was withheld until about 1996. By the time the records were produced in U.S. District Court, in 2001 after examination by tax experts, the Court refused an evidentiary hearing, eventually summarily declared the newly found documents less than credible, thus sealing the damage of the delay in the government's production further harming the Plaintiffs and their counsel's credibility. Full expectation monetary damages and declaratory relief is being sought for contract, directly-related tort and directly-related U.S.

---

[3] There is no disagreement within the circuits that under the 872 agreement contract principles apply. *Ripley v. Comm'r Ripley v. Commissioner*, 103 F.3d 332 (4th Cir.)

Constitutional Fifth Amendment takings damages. A brief explanation of the cases will assist this Court in understanding this case.

## II. PREVIOUS RELATED CASES AND BRIEF EXPLANATION

*1. Simons v. CIR,* United States Tax Court stipulated decision, dkt. No. 13016-80 for years **1972** and **1973**, entered Apr. 22, 1983 with underlying ***identical IRS drafted income averaging mathematical calculation*** documents as those of dkt. No. 10312-79, wherein years **1972, 1973**, and **1974** were all income averaged for a single global net settlement agreement intended at the time, by all parties and was fully paid by the Plaintiffs. Plaintiffs' Appendix "P. App. 12 ").

*2. Simons v. CIR*, United States Tax Court stipulated decision dkt. No. 10312-79 for year **1974** entered on Apr. 22, 1983 with ***identical underlying income averaging mathematical computation documents*** and entered the same day as the stipulated decision dkt. No. 13016-80, wherein all three tax years **1972, 1973, 1974** were all income averaged for a single global net settlement agreement intended at the time, by all parties and was fully paid by the plaintiffs. P. App.14 .

***In 1988 the IRS began collections again for only tax year 1974 and in 1992 filed an action to quiet title on the Plaintiffs properties in violation of their duty to forebear further pursuit of collections, particularly here without the requisite I.R.C. §6203assessment, and §6303 timely written notice and demand; prior written notice and demand under I.R.C.§ 6331.***

*3 U.S. v. Simons, filed Dec. 14, 1992, 92 cv* 1071B U.S. District Court, Division of Utah, Central Division, was a quiet title action resulting in a order 'declaring' in violation of 28 U.S.C. 2201, a March 21, 2001 writing, not signed or agreed to by anyone with delegated authority in the government, as a ' contract' for the Court's ordered 'settlement', and a Court ordered additional $55,000 payment for year 1974. The government objected to the final order, the Tenth Circuit Court later upheld it. The Government in violation of the order and in total disregard of a 'contract' to which it never agreed, once again billed the Plaintiffs March, 2004, after the appeals time for the U.S. Supreme Court lapsed, and Plaintiffs thought they were once again free of the government in this matter.

*4. U. S. v. Simons,* 129 F.3d 1386, 1997.C10.0001337 http://www.versuslaw.com (Tenth Circuit reversed a statute of limitations ruling of the District Court in favor of the Plaintiffs on an offer in compromise. This case stemmed from a 1992 U.S. District Court case to quiet title based upon an alleged debt stemming from tax year 1974 that was fully paid in 1983, and again collected upon beginning in 1988 and 1989 with demands under threat of enforced collection action seizure of liened properties, that they sign and offer in compromise and waiver of statutes for collection.

*5. Simons v. CIR,* 185 F.3d 875, 84 A.F.T.R.2d 99, 1999.C10.42905 http://www.versuslaw.com ( Plaintiffs' filed this action to undo the 1983 stipulated tax court decision based on what plaintiffs believed was a late issued Notice of Deficiency( P. App.60-62 ), since the IRS misrepresented to the plaintiffs that they had signed no extensions for the statutes of limitation. (P. App.137 ) Neither the form 872 extension of a statutes of limitation for assessment voluntarily signed by the Taxpayers (P. App.57-59 ) nor the Notice of Deficiency transaction codes were placed on the Individual Master File Transcript Specific Computer record (IMF) for the 1974 account. (P. Ap. 100-109)The best evidence available to the Plaintiffs at the time showed a late issued notice of deficiency, that they argued deprived the Tax Court of any jurisdiction. The tenth circuit court ruled an agreement stands without tax court jurisdiction in an unpublished decision. The form 872 was never produced to the Plaintiffs until about February 15, 2000. P. App. 126-129.

*6. U.S. v. Simons,* http://www.kscourts.org/ca10/cases/2003/12/02-4201.htm The Plaintiffs appealed the alleged U.S. District Court declared 'contract' partly based upon (a) 28 U.S.C. §2201 restrictions on District Courts using their declaratory judgment powers in IRS cases, (b) lack of subject matter jurisdiction as there had been no required (i) Internal Revenue Code 6215 written notices of original assessment, and (ii) written notices of subsequent assessment mailed or received by the Plaintiffs, and (iii) no notice of levy *prior* to the levies and liens on the Plaintiffs' property, (iv) no timely assessment for the 1974 year's account, (v) no one with delegated authority to bind the government signed the declared 'contract', (c) the government objected to the District Court's final order signifying a lack of meeting of any minds as to the 'contract', among others. The Tenth Circuit upheld the District Court. After the statutes of limitation ran for appealing the decision

to the U.S. Supreme Court, the IRS billed the Plaintiffs for approximately $4100 (P. App. 139 )in addition to the $55,000 the Plaintiffs fully paid prior to bringing the appeal, thus demonstrating their own disregard for the District Court and Tenth Circuit's opinion. (P. App.140)

## III. PARTIES

### A. PLAINTIFFS

6a. Plaintiffs Mr. and Mrs. Danny C. Simons and Sally J. Simons (Plaintiffs) are natural citizens of the United States of America residing in the State of Utah. These Plaintiffs are completely filed and paid up on all state and federal taxes. All amounts alleged owing under two alleged contracts for the year 1974 are fully paid. P. App. 51 and P. App. 140 . Plaintiffs tax social security numbers will be given to the Court and government privately upon request.

### B. DEFENDANTS

7. The Defendant United States Internal Revenue Service within the U.S. Department of Treasury is the U.S. Constitution's Article II executive agency responsible for the administration of Title 26 of the United States Code for collections of tax revenues and includes their officers, agents, assigns, and all employees or representatives of any kind as part of that agency including, but not limited to, Employees Don Thurman, Dal Lawson,

M.K. Mortensen, among other John and Jane Does, who were acting within their scope of employment, but in violation of ministerial duties.

8. The Department of Justice is the U.S. Constitution's Article II executive agency charged with upholding the laws of United States for the government and plaintiffs alike in collection of those taxes. This complaint applies to all relevant Department of Justice agents, officers, representatives, and assigns who were acting within the scope of their employment, though in violation of their ministerial duty restrictions.

## IV. JURISDICTION

9. This Court has jurisdiction over this matter pursuant to United States Constitution Article I and III, 28 U.S.C. § 1491(a) [4], the Federal Court Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992), 28 U.S.C. 1346 (a)(2), and the Tucker Act, 28 U. S. C. 1491(a) for express and implied-in-fact contracts, involving amounts over $10,000, as here.[5] I.R.C.

[4] See *United States v. Testan*, 424 U.S. 392, 400, reh'g denied, 425 U.S. 957 (1976) (citing Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-06, 372 F.2d 1002, 1009 (1967)); see also *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States*, 33 Fed. Cl. 474,478 (1995),aff'd,79 F.3d 136 (Fed. Cir. 1996).
[6]*See Glendale Fed. Bank v. United States*, 239 F.3d. 1374, 1380 (2001). Expectation damages are generally measured by the "loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus... any other loss, including incidental or consequential loss, caused by the breach...." *Bank of Tex. F.S.B. v. United States*, 50 Fed. Cl. 645, 654 (2001) (citing Restatement (Second) of Contracts § 347 (1981)).

§ 7422(a); 28 U.S.C. §1346(a)(1), 1491(a): *Marks v. Commissioner*, 947 F.2d at 986 n.2; *Tadros v. Commissioner*, 763 F.2d 89, 91 (2d Cir. 1985). The claims set forth herein are grounded in liquidated and unliquidated damages, including contract and directly-associated U.S. Constitutional due process and takings and directly-associated tortuous continuous and full expectation damages. [6]

## V. STATUTES OF LIMITATION

10. The statutes of limitations for filing a U.S.C. F. C. complaint for contract violations with the Federal government is six years 28 U.S.C. §2501 (1994). Plaintiffs assert their claims are timely under the continuing claims doctrine. [ 7] Moreover, "[u]nder federal law governing statutes of

---

[6]See also *Summit Contractors, Inc. v. United States*, 22 Cl. Ct. 54, 56 (1990) ("[T]he court has repeatedly asserted jurisdiction over claims based on tortuous breach of a government contract.") This Court's authority over tort claims is limited to where the plaintiffs' tort claim is "'entirely dependent on, and in fact evolves from the contract.'" *CTA Incorporated. v. United States*, 44 Fed. Cl. 684, 698 (1999) (quoting *Dureiko v. United States*, 42 Fed. Cl. 568, 582 (1998)). See also *Edwards v. United States*, 19 Cl. Ct. 663, 669 (1990). Where the plaintiff has stated breach of contract claims, lack of contract, and unjust enrichment, "'the fact that the alleged breach is also tortuous does not foreclose Tucker Act jurisdiction." *Wood v. United States*, 961 F.2d 195, 198 (Fed. Cir. 1992) (citation omitted).

[7]Under the continuing claims doctrine, a court looks to see whether the government owes a continuing and ever-present duty to the plaintiffs. For the continuing claim doctrine to apply, the Plaintiffs claims must be "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."

limitation, a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991). The *final acts* occurring necessitating a full statement of claim occurred when the IRS once again billed the Plaintiffs in March, 2004 for year 1974 in violation of the 2002 District Court ordered decree ( P. App. ), for about $4100 dollars (P. App. ), and then attempted to refund about $24.00 (P. App. ), March, 2004 that Plaintiffs did not accept due to gross error for what was owed to them.

11. Additionally, the litigation *initiated by the government* was ongoing until about 2004, further tolling the statutes of limitation.

## VI. REQUIRED REQUEST FOR ABATEMENT AND REFUND WAS FILED PRIOR TO FILING THIS CLAIM

12. On March 16, 1991 Taxpayer asked for refund and abatement and is denied on March 29, 1991. On or about March 12, 2004, Plaintiffs duly filed the prerequisite administrative request for refund and abatement on IRS designated and required form 843 more than six months prior to bringing this action, even though the Plaintiffs are characterizing this case under contract principles and contract law and directly associated

---

*Brown Park Estates-Fairfield Development Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997). The statute of limitations may nevertheless be tolled if a claim is inherently unknowable. See, *Brown v. United States*, No. 91-898I. (Fed. Cl. 12/08/1998) .

Constitutional and common law tort claims, not a statute tax case. The use of the form 843 does not constitute any admission by the Plaintiffs that what was paid in 1983 was for anything other than a *settlement* amount *under contract* to resolve a dispute in 1983, for three years, '72,'73'74, based on an IRS declared lack of the Plaintiffs' liability, the Plaintiffs desire to end a dispute based on false claims of fraud, lift ongoing levies and liens and get on with life, to no avail. 26 U.S.C. § 7422(a) (1988). [[8]] P. App. .

## VII. RULE 9 REQUIRED SPECIFICITY IN PLEADING

12. This Court under RCFC 8, requires simple pleading. However, RCFC at Rule 9(b) requires specific pleading as to a claim founded upon fraud or mistake. *Giesler v. United States*, No. 96-554C (Fed. Cl. 09/15/1999) 1999.USCC.0000059 <http://www.versuslaw.com>¶ 64,67.

13. RCFC at Rule 9(c) mandates a denial of performance shall be treated with particularity for contract (Rule 9(c) and inverse condemnation or takings claims Rule 9(h)(7) wherein the contract and property taken shall be described with particularity, among other sections applicable under RCFC at Rule 9. Therefore, in accord with RCFC at Rule 9, and the continuing claims doctrine, the Plaintiffs plead their claims with particularity. *Information*

---

[8] *Computervision Corporation v. United States*, No. 90-284T (Fed.Cl. 09/09/2004)

*Systems & Networks Corp. v. United States*, No. 04-385 C (Fed.Cl. 03/31/2005) 2005.USCC.0000077< http://www.versuslaw.com> [26].

## VIII. STATEMENT OF FACTS

14. Paragraphs 1-13 are incorporated herein. The Plaintiffs odyssey with the IRS began in or about 1977 when the government determined Mr. Simons was a high profile leader, politically and in the Real Estate profession and that his career of accomplishments, and social status, both of which he had a property interest in, were expendable and available for the government to use, to demonstrate its power for persons not willing to pay taxes. The government promised Mr. Simons verbally that they would indeed make him and example to ensure that all knew and understood they must pay their taxes. The claims against Mr. Simons were unsupported by the evidence and he was found 'not guilty' of criminal tax fraud charges in July 1979.

15. Mr. Simons was a leader in the Presidencies of Salt Lake Board of Realtors, A national director for the Utah Association of Realtors, Vice President of the Utah association of Realtors, the past president of the Apartment Association of Utah and a National director, and was active and successful in the Land Use Act Referendum as against Governor Calvin Rampton. His elected Professional offices, proven professional leadership

in all areas of real estate, activity in the Republican party as a volunteer holding a multitude of offices, volunteer service in the community, combined with his companies' high volume of sales [about 700 residential homes, new and used in one year], commercial and industrial sales, and property development activity, substantial office staffs.

16. Needless to say, his company Simons and Company, during the time of the government's purposefully publicized indictments about April 1979, fell apart due to the serious false and unsupported criminal tax fraud charges, publicity, and levies and liens on Plaintiffs properties. Managers and agents, top producers, left to form their own successful companies, clients left with projects and contracts that were pending, and Mr. Simons was left to compete with competitors he trained to be industry leaders.

17. Plaintiff Mr. Simons was found '***not*** guilty' by a jury, of criminal tax fraud or not reporting income, in U.S. District Court, District of Utah, July 1979, but the property liens placed on their properties were not immediately lifted. The government was not finished with them.

18. Again, as the District Counsel's office states, without adequate evidence, the government pursued them with false claims of civil fraud memorialized in civil Notices of Deficiency and a form 872 signed by the Plaintiffs in 1978, for year 1974.

19. Only after a several hour discussion with Special Agent Greenwood who worked on the failed criminal case, wherein IRS personnel convinced him that fraud claims should be dropped due to lack of evidence, were the Plaintiffs and their tax professionals allowed to work with the appeals office to try to resolve this government dispute involving non recourse promissory notes and the fully accounted for escrow money handled by Mr. Simons business.

20. While the District Counsel's decision states that Mr. Simons executive secretary changed her story, the fact is, it is more likely she was misunderstood. If records supported the government's claims [which they did not], and if indeed she changed her story inconsistent with those records, she would have probably been charged with perjury at the time, and was not. The government absolutely lacked the records and evidence to prove civil or criminal fraud.

21. Plaintiffs' business records were examined for weeks, in the Plaintiffs' business office, by his permission, by Revenue Agent Karen Engstrom and later by CID personnel, yet those records supported no charges of criminal or civil tax fraud. (P. Ap. 28 ).

22. In working out a final PACKAGE settlement in 1982-1983, for all three tax years 1972, 1973 and 1974, the Plaintiffs were paying to stop the

dispute, the government was accepting money to stop the dispute, with government drafted documents, and by submitting to accepting a liability (for settlement purposes only) the plaintiffs were also giving up their civil claims for malicious prosecution for the government's failed criminal trial. The settlement was to be 'global' and for all claims of all parties. The government broke that deal.

### *A. The First 'Agreement' between the Taxpayers and the Government*

23. Paragraphs 1-22 are incorporated herein. Consistent with Rule 9, the terms of that contract are being spelled out with specificity.

24. Until about February 15, 2000, the government denied the existence of any signed form 872 agreement, most particularly in 1991 to a FOIA and/or Privacy Act request. (p. app. 137-138 ) Withholding of this document from the Plaintiffs and their tax professionals made it impossible for them to show anyone that any claimed 'debt' for year 1974 [fully paid in 1983] was never timely assessed in order to accommodate the IRS computer.

25. On February 17, 1978, the Plaintiffs signed a form 872 statute of limitations extension of the assessment date for tax year 1974, necessary to

trigger a liability to the government [9], until a time certain. (P. App. 57-59).

26. The document states "Danny C. Simons and Sally J. Simons…and the District Director of Internal Revenue…. Consent and agree…." (id )

27. The time certain for assessment was "April 15, 1979 except that if a notice of deficiency in tax for any such period(s) is sent to the taxpayer(s) on or before that date, then the time for assessing the tax shall be further extended for the period in which the assessment is prohibited, and for 60 days thereafter." id

28. Lee Smith, "Chief, Technical Branch" signed the form 872 on Feb. 28, 1978, under the stamp of "Roland V. Wise" "District Director of the Internal Revenue" having delegated authority to sign this document found in Delegation Order dated March 8, 1951 Treas. Reg. § 301.6502- 1(a)(2)(i); *United States v. Cook*, 494 F.2d 573 (5th Cir. 1974); However, the IRM requires that "any IAs that extend beyond the original CSED must be approved by a Branch Chief." IRM 5.14.1.7(7); 5.14.6.2(1)(c).

---

[9] "The assessment is the official recording of liability that triggers levy and collection efforts". *Hibbs v. Winn*, 2004 U.S. LEXIS 4175,*25;124 S. Ct.2276. 26 U.S.C. 6203.

29. The document was kept in IRS records as the IRS FOIA/Privacy Act bates stamped "000271" demonstrates and at all times the government IRS and Department of Justice personnel had access to this document as it was kept in Special Procedures function.

30. Plaintiffs acknowledge the form 872 is not a contract *per se*, but is a mutual agreement of the Plaintiffs with the IRS for this extension to further examine the Plaintiffs records, with the statutes ending at a time certain, rather than under any other statutes.

31. Plaintiffs assert that their 872 is a signed and binding 'agreement' to which all courts since 1975, examining the form 872, hold both parties, persons and the government to its terms of 'mutual assent'. [[10]]

---

[10] There is no disagreement within the circuits that under the 872 agreement the IRS had only 60 days to do an assessment and contract principles apply. *Ripley v. Comm'r Ripley v. Commissioner*, 103 F.3d 332 (4th Cir. 1996). *Hough v. Commissioner of Internal Revenue,* No. 10661-97 (U.S.T.C. 09/25/2000) 2000.USTC.0000186 <http://www.versuslaw.com> ¶ [34] ("In determining the validity of a consent to an extension of the period of limitations,contract principles are important, and we look to objective manifestations of mutual assent to determine the existence of such an agreement. See sec. 6501(c)(4); Schulman v. Commissioner, 93 T.C. 623, 639 (1989); Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983)."); *Walsonavich v. United States*, 335 F.2d 96 (3rd cir. 1964); *Senger v. United States*, 245 F.Supp. 109 (Del. 1965). Saltzman, IRS PRACTICE AND PROCEDURE (Warren, Gorham & Lamont: 1991 ed. (with current supplement), par. 5.03[4][a], p. 5-24.

32. The term "agreement" means a manifestation of mutual assent. *Piarulle v. Commissioner*, 80 T.C. 1035, 1042 (1983).

33. At no time did the Plaintiffs exhibit any desire to reform this agreement and the Plaintiffs' records show no other statements suggesting they waived the binding terms of this agreement, as they were denied this record from about 1988 through 2000 after their records had been destroyed, and without knowledge of it, Plaintiffs could not repudiate or reform it.

34. This form shows, with the original returns obtained about Feb. 15, 2000, with the Notice of Deficiency, that for further collection purposes for year 1974 after the Plaintiffs full payment in 1983 for all three years, that ***there was no timely assessment*** made after the Tax Court decision was entered, and the account was closed in October, 1983 with a zero balance owing.

35. An accompanying form 4089, unsigned, showing the amounts being claimed as owed accompanied the form 872, identifying a civil fraud penalty under IRC Sec. 6653(b).

36. In 1991, the government specifically disavowed the existence of any signed extensions by the Plaintiffs, and thereby sought to collect on the year 1974 based on a statutory, rather than time certain agreement, to say a timely assessment had been made.

37. The Plaintiffs, their professionals and the Court relied upon the government's fraudulent or mistaken representation that no extension had been signed by them, of course, to only the government's advantage, until it was finally produced in the year 2000 from a FOIA Privacy Act response.

38. The government had the records, had a duty to review the records, and truthfully inform the Plaintiffs that in fact they had signed a form 872.

39. The tax id no on the records of the Plaintiffs is 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/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, address 9016 S. 1300 E. Sandy, Utah 84070

### *B. The First and Only Legitimate Contract - a 1983 single Global Netting Settlement Memorialized in Two U.S. Tax Court Decisions with Identical IRS-drafted Underlying Math Calculations*

#### *(a) Tax Court petitions are timely filed*

40. Paragraphs 1-38 are incorporated herein. The IRS issued a Notice of Deficiency ( P. App. 60-62 ) claiming a penalty of tax fraud, on April 16, 1979, since the form 872's time certain April 15, 1979 was a Sunday, and was received on April 17, 1979 by Mrs. Simons. P.App.

41. On July 13, 1979, 3 days within the 90 day limit of the Notice of Deficiency, when assessments were prohibited as per the form 872, the Plaintiffs timely filed their U.S. Tax Court petition docket no. 10312-79.

42. After the about July, 1979 U.S. District Court verdict of not guilty for alleged criminal fraud, the IRS pursued the Plaintiffs with a Notice of Deficiency claiming civil fraud claims for years 1972 and 1973 in year 1980.

43. Plaintiffs timely filed U.S. Tax Court petitions within 90 days of this Notice of Deficiency docketed as 13016-80 for tax years 1972 and 1973. Year 1972 was beyond the statutes of limitation.

***1. An Express[11][ or Implied-in-fact Contract [12]***

[11] A valid express contract consists of "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997), cert. denied, 118 S. Ct. 156 (1997) (citing Thermalon Indus., Ltd. v. United States, 34 Fed. Cl. 411, 414 (1995) *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991); *Fincke v. United States*, 230 Ct. Cl. 233, 244, 675 F.2d 289, 295 (1982))).

[12] Implied-in-fact contracts are established in the absence of express contracts by the Plaintiffs claiming elements of a contract, including offer, acceptance, consideration, mutuality of intent, and definiteness of terms. *Girling Health Sys., Inc. v. United States*, 949 F.2d at 1146-47 (citing Tree Farm Dev. Corp. v. United States, 218 Ct. Cl. 308, 319, 585 F.2d 493, 500 (1978); *Fincke v. United States*, 230 Ct. Cl. at 244, 675 F.2d at 295 (citing Baltimore and Ohio R.R. Co. v. United States, 261 U.S. 592 (1923)); *Shearin v. United States*, 25 Cl. Ct. 294, 296 n.5, aff'd, 983 F.2d 1085 (Fed. Cir. 1992). The government official who allegedly formed the contract had actual authority to bind the government. *City of El Centro v. United States*, 922 F.2d at 820 (citing Juda v. United States, 6 Cl. Ct. 441, 452 (1984) (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947))); *Shearin v. United States*, 25 Cl. Ct. at 297 (citing Radioptics, Inc. v. United States, 223 Ct. Cl. 594, 612, 621 F.2d 1113, 1123 (1980); *Housing Corp. of Am. v. United States*, 199 Ct. Cl. 705, 711, 468 F.2d 922, 925 (1972)).

44. Paragraphs 1-42 are incorporated herein. Consistent with Rule 9 the essential components of the contract will be pled with specificity.

45. The Plaintiffs' expert CPA Bryan Bolander after reviewing the Plaintiffs' files, found that there was a valid, fully paid global settlement in 1983 for year 1972, 1973 and 1974 inseparable by year. (P. App. 6-11 )

46. Even without all the records, Attorney Trish White argued similarly in a settlement discussion document, ultimately to no avail. (P. App.64-66 )

***(i) A bona fide dispute***

47. The District Counsel's decision shows that the Tax Court cases were subject to a *bona fide* dispute regarding if the Plaintiffs did or did not owe the government money, with the government seriously questioning the Plaintiffs' liabilities and the government's ability to prove their case, and was the proper subject to a legitimate settlement agreement. (P. App.28 )

48. This dispute was supposed to end with 2 stipulated U.S. Tax Court decisions formally entered upon their respective dockets on April 22, 1983 (P. App. 12-18 ) signed the same day, with *identical* IRS-drafted underlying mathematical computational documents as drafted by the IRS for all three years, 1972, 1973 and 1974, as is required by the U.S. Tax Court.(P. App. 18-22).

***(ii) Signature of Agents with Authority to Bind the Parties***

49. Both stipulated decisions were signed on the same day, April 5, 1983, by Howard Landa, authorized to so sign them by the Plaintiffs, and by Richard A. Jones, District Counsel for the IRS who had delegated authority to sign the documents and bind the government pursuant to Delegation Orders No. 150-25 dated March 8, 1951; No. 60 ¶ 1 effective Nov. 26, 1979; 26 CFR 301.7701-9 for 1983; and No. 190 effective March 21, 1982 ¶ 2, also as per 26 USC 7452, IRM 35.10.1.1.2.2 among other grants of authority statutory and regulatory and policy grants of authority.

50. Proof that these two stipulated Tax Court decisions were an *express* contract is found in the following written instruments as follows:

a. Both IRS-drafted stipulated decisions drafted state "**Pursuant to the agreement of the Parties…**" (P. App. 12-16 ).

***(iii) Offer***

b. The Plaintiffs offered to settle all parties claims, including their own, with a 'package settlement' 'inseparable by year' in at least two letters sent to the IRS District Counsel's office January 11, 1982 (P. App.22 ) and again January 15, 1982 (P. App.25 ) for an amount equating to about $49, 588 by attorney Howard Landa, the authorized representative of the Plaintiffs.

c. The Plaintiffs were assenting to amounts owed for settlement purposes and to stop the government from years of pursuit based on false claims. Settling was cheaper than ongoing levies and liens and ongoing litigation and bad publicity.

d. Plaintiffs understood at all times that upon payment all collections would stop, all false charges would cease.

***(iv) Mutuality of Intent and Acceptance***

e. The IRS demonstrated its mutuality of intent and acceptance in the District Counsel's decision acknowledging "Though the cases have not been formally consolidated before the Tax Court, they do invoive the same taxpayers and substantially the same issues, and will therefore ***be treated together for purposes of settlement***. Two settlement documents will, however, be prepared for filing with the Court." Emphasis added. P. App.

f. Acceptance is also shown when the IRS ***unified*** the cases mathematically and legally by the IRS-drafted mathematical computations showing all three years were being income averaged, so as to allow the Government to reach into a closed year, 1972, and make adjustments for all three years as is allowed by the mitigation

provisions of the IRS code IRC sec. 1311-1314. (P. App. ). It was a 'package settlement' as offered, inseparable by year.

g. When the IRS reaches into a closed year however, only 'restricted' or limited interest, as found in IRC sec. 1314(d) and sec. 6601(e) can apply and these restrictions are inherent in the use of the mitgation provisions. The drafters of the mathematical computations did not mark what statutes for interest applied (P. App.16-22 ), restricted interest is defined as a 'tax' in IRC Sec. 6601(e), and were inherent in the income averaging of a closed tax year.

h. Acceptance is also shown by the IRS remaining silent for five years after the Plaintiffs' 1983 $49,546.55 payment for all three years, tax, restricted interest, and penalties. P. app. 51

*(v) Plaintiffs' Adequate Consideration*

i. Plaintiffs were VERBALLY told what to pay for all three years tax, restricted interest, and penalties of $49, 545.55, as memorialized on the Plaintiffs' business card, from a phone conversation with collections Revenue Officer Dal Lawsen, for an amount less than the Plaintiffs' earlier offered estimated amount estimated $49,588 amount offered. (p. app. 141 ) Revenue Officer Dal Lawsen was acting within the scope of his employment. Plaintiffs fully paid the

$49, 545.55 as instructed (P. App. 51 ) for all three years, tax, restricted interest, and penalties on about November 7, 1983.

j. A CPA certified calculation by the Plaintiffs shows how the $49,546.55 accounted for full payment of tax, interest and penalties for all three years to within .07 cents of what they paid, using eight factor factoring tables at the time. P. App. 52

k. Gail Anger, a respected ex-IRS appeals officer's affidavit witnesses as to how the IRS seldom correctly posts to the computer multiple year settlements, and that for anyone to come within 7 cents of what was paid, for a multiple year settlement, that included income averaging and using eight place factoring table calculations, was 'astronomically impossible' unless the IRS calculated the amounts identically at the time of collection. P. App. 119-122

***(vi) Definite terms***

l. Plaintiffs assert all terms within the stipulated decision are 'definite', as being mutually understood by the parties at the time.

m. The Government may say the term 'statutory interest' in the stipulated decisions is not definite, but in fact, the underlying IRS-drafted mathematical computations make the term definite as inherent in the income averaging to reach into a closed year, *only* IRC. Sec.

1314(d) restricted interest, and not the later argued 6601(a) interest could apply, equally an amount as calculated by the taxpayers of $49,545.55 for all three years, 1972, 1973, 1974.

*n.* The Internal Revenue Manual Part 8 Appeals Chapter 7 8.7.1.1.2 (04-06-1999) states "Any interest that is computed from other than the normal start and stop dates is 'restricted'. There are two reasons interest is restricted. A. when conditions exist in which the computer cannot make an accurate determination of the amound and B. special provisions in law which limit or prohibit interest under certain conditions." Id. "The APS [Appeals Processing Section ] or ESP [Examination Support and Processing] function will make the interest computations. " The Restricted interest computer transaction code 340 is found throughout the 1974's account, and that code holds all notices as found in the Service Center Replacement System policy of 1985. Given the necessity of management oversight for applying restricted interest, its application would not likely be in error.

*o.* Later when collections began anew, the restricted interest code applies regularly to subsequent alleged assessments, signifying that someone was looking at records and understood regular interest was not applicable to the 1974 account.

***(vii) Closing of the three accounts was done in a manner to accommodate the IRS computer that can not properly post global multiple year netting settlements***

51. Paragraphs 1 through 49 are incorporated herein. It is necessary to describe how the accounts for all three years were closed with specificity so as to understand how 1974 came to become collected upon once again and how the government repudiated and breached its contract.

52. The IRS computer is virtually incapable of accurately posting global netting multiple year settlements due to the tax codes built into the computer, and usually drives collections. [[13]]

53. One statute built into the computer based upon its common usage is IRC sec. 6601(a) interest calculating interest all the way back to the due date of the return. Id.

54. The statutes that were required to be used here, under Congressional restrictions of IRC Sec. 1314(d) had to be IRC Sec. 6601(c) as it read at the time, wherein interest only accrues from the date of written notice and demand for payment, and is defined as part of the term 'tax'. An entirely different date for interest accrual than that of 6601(a), for an amount that can

[13] See, ***Netting of Interest on Tax overpayments and Underpayments, report to Congress, 1997,*** http://66.102.7.104/search?q=cache:KAPWrIHBKc8J:www.treas.gov/offices/tax-policy/library/10neting.pdf+IRS+global+netting+of+interest+computer&hl=en

not be readily deducted in the future because it is statutorily defined as a 'tax'.

55. Therefore, Plaintiffs assert that logically, to accommodate the IRS computer, prior to the Plaintiffs' full November, 1983 payment, the IRS closed year 1972 as past the statutes of limitation on its computer records, and closed 1974's year, just one working day after Plaintiff Mr. Simons verbally agreed to pay the $49,545.55, based upon computer records showing 1974 was closed out with zero owing, restricted interest codes, closing codes, disposal codes, all codes holding notices as found in the Service Center Replacement System policies of 1985.

56. Plaintiffs claim that the technical closing of 1974 was done, so as to allow the full payment for all three years to go into the only remaining open year, 1973, with embedded full computer 6601(a) interest, thus leaving all three years closed after full payment was received, and the computer satisfied with its built in full interest statutes.

57. Simply put, it didn't matter if 1974 was closed with restricted interest, because if payment was not forthcoming, the IRS could try to collect on the open remaining year 1973 with full interest, and get paid essentially the same amount, once a late payment penalty of over about $2000 is added in, as was done, to make up for the difference between the full settlement

amount for all three years with restricted interest, and what would have actually been owed for only year 1973 without a settlement, or income averaging, with full interest.

***(viii) Government demonstrates Satisfaction and Accord [14]***

58. The Plaintiffs on Nov. 7, 1983 fully paid the verbally collected $49,546.55 in a check the IRS accepted and cashed. The technical computer closing of 1974 to accommodate the computer and post the payment for all three years, was done by the IRS doing an *intentionally late assessment* on the account with management approval as shown by:

(i) an internal document form 2859 Request for Quick or Prompt Assessment [15] showing that *with management approval* the assessment statute expiration date was calculated as "07-19-83" and the assessment was ordered for "07-25-83" after the IRS' own calculated statute expiration date.

---

[14] Accord and satisfaction relies upon "'proper subject matter, competent parties, meeting of the minds of the parties, and consideration.'" *Brock & Blevins Co. v. United States*, 170 Ct. Cl. 52, 59 (1965) (quoting Nevada Half *Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir. 1949)). Usually, accord and satisfaction is a "'mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.'" Id.

[15] Quick Assessment is given when the assessment Statute expires prior to the 90 day limit on assessments made after a Tax Court decision is entered. IRS handbook 5.1 4.11

(ii) Both stipulated decisions show Plaintiffs "waive the restriction contained in I.R.C. §6213(a) prohibiting assessment and collection of the deficiency (plus statutory interest) [here only the restricted statutory interest of IRC sec. 1314(d) or 6601(e)] until the decision of the Tax Court is final." (P. App. 12-16 ) Immediate assessment could have been accomplished with the Plaintiffs' permission.

(iii) 3 days remaining on 90 day period for filing the tax Court decision (7-13-79) after the 4-16-79 Notice of Deficiency, plus 60 days from the date of the time certain in the form 872, makes the exact expiration date for assessment 63 days from the entering of the stipulated decisions on the Tax Court dockets of April 22, 1983 and that date is Friday, June 24, 1983 as the final date for all assessments for tax year 1974 to legally establish a liability for that year for further collections.

(iv) Any 'assessment' for only 1974 with full interest as if there were no 'package settlement', was done July 25, 1983 as intentionally ordered with management approval, and would leave no balance owing on the 1974 account. The statute bar for further collections fell.

(v) The intentional late assessment closing should have made all further collections on the account fail, as (1) no written notice of assessment and demand for payment would issue for year 1974, (2) the computer would hold all notices as shown by hold code 3 [as it read at the time], disposal and closing codes, and (3) would essentially prevent Plaintiffs from being subjected to further collections on the statutorily worthless account.

t. All three years were closed, with 1972 past the statutes, 1974 with a late assessment, and 1973 with full 6601(a) satisfaction that included an additional about $2000 late penalty never agreed to by the Plaintiffs, and of which they were never notified.

(i) Computer records as late as June 1990 show the word 'closed' on the 1974 account.

(ii) A computer 'closing' of an account can not occur without management oversight of multiple levels in the year 1983.

u. Plaintiffs paid as instructed, all three years were closed, and silence ensued as to any further collections on these accounts for five blessed years, but should have continued indefinitely under satisfaction and accord.

59. The likelihood that the accounts were closed, in the above fashion, to accommodate the IRS computer, when records were readily available to the government service center personnel at the time, and when closings of the account required about four management layers of approval at that time, makes these closings probably correct actions, and not actions taken in error.

***(ix) If the Government had not promised Permanent Forebearance, Plaintiffs would Not have Paid nearly $50,000***

60. If Plaintiffs would have known that the $49,545.55 payment was for only five years of suspended collection on any one of the three years, or that one year, 1974, would be treated separable, contrary to their offer and District Counsel's decision, they would never have agreed to such a settlement and not made full payment as instructed.

***(x) Circuit Courts Have Declared Stipulated Tax Court Decisions to be Binding Contracts***

61. At least two courts have also found that since the stipulated decisions are formal documents entered into the Tax Court, and were drafted by the IRS, they are 'contracts' and thus, any ambiguities as to 'statutory interest' should be read for the Plaintiffs. *See*, *Hurt v. United States*, 70 F.3d 1261(4th Cir.1995);*Anthony v. United States*,987 F.2d 670(10th cir.1993).

62. Based upon the foregoing, in 1983 there was an express or implied in fact contract that established duties and obligations on the Government under principles of contract.

# IX. DAMAGES

## A. FRAUD IN PERFORMANCE, REPUDIATION, AND BREACH OF THE 1983 CONTRACT FOR YEARS 1972, 1973, 1974, AND LACK OF CONTACT FOR A HANDWRITTEN DOCUMENT IN 2001

63. Paragraphs 1-62 are incorporated herein. Pursuant to Rule 9 the omissions of the government in performance of the contract and for fraud will be pled with specificity.

64. The 1983 Contract was repudiated and breached by violations of the following duties and obligations of the government equating to affirmative misrepresentation to the Plaintiffs, to the government itself, to the Courts and to County Recorders offices, by intent or mistake, that the Plaintiffs owed money for tax year 1974, and that no global settlement existed in 1983, upon which Courts relied to the Plaintiffs detriment.

### 1. Violated Duties and Obligations of the Government

***a. Violations of Promissory Estoppel, the Duty to Forebear After Payment***

65. Paragraphs 1 62 are incorporated herein. Under Rule 9 the duty to forebear further collections after full payment is plead with specificity.

66. The Contract doctrine of promissory estoppel, the promise to stop collections upon full payment of a claimed debt, is found in Sec. 90 of the Restatement of Contracts.

67. Revenue Officer Dal Lawsen, and the District Counsel's office promised no further collection for the three years 1972, 1973 and 1974 once full payment of the $49,546.55 was made.

68. The governments duty under promissory estoppel is permanent, ongoing and comports with the government's duty to deal honorably with the Plaintiffs regarding this contract and did not do so after collections actively began in 1988. *Anthony, supra.*

69. This promise to leave the Plaintiffs alone was repudiated and breached in 1988 when collections for tax year 1974 began anew, then levies and liens for year 1974 were issued and continued until about 1994 and later, and beginning on December 14, 1992, the government filed a complaint to quiet title for levies and liens on debts the government falsely alleged were owed for the year 1974, until at least 2004, resulting in yet another $55,000 payment for year 1974 by failing to timely disclose the Plaintiffs' records.

***b. Violations of the Implied Covenant of Good Faith and Fair Dealing [16]***

[16] *Centex Corp. v. United States*, No. 96-494C (Fed. Cl. 07/06/2001) 2001.USCC.0000133 <http://www.versuslaw.com> ¶[133]. ( "All contracts,

70. Paragraphs 1-67 are incorporated herein. Pursuant to Rule 9, these violations are pled with specificity.

71. The government's further collection efforts on year 1974 violated all the government's ongoing duties and obligations to treat the Plaintiffs with good faith and fair dealing.

72. On about 7/11/88 the government failed in its duties to stop collections once Revenue Officer Don Thurman knew of the 1983 settlement for all three years, once Special Procedures function who had the Plaintiffs records knew of the settlement, once the Service Center having all the document locator numbered (DLN files) knew of the settlement, once the District Counsel M. K. Mortenson did not do his duty to ensure all written notices and demands had timely issued and been mailed and received, prior to the December 14, 1992 filing of a collections suit by the government for year 1974, no matter how the government chose to post the Plaintiffs' payment.

73. Further, the government failed in this duty by not giving the plaintiffs a receipt for payment, not notifying the Plaintiffs of any debt owed

---

including government contracts, contain an implied covenant of good faith and fair dealing.")

in writing to protect them in the event of further collection attempts, among other acts enumerated below.

***(i) Lack of Accurate Record Keeping on the Computer Records***

74. The government had a duty to maintain accurate records for the Plaintiffs particularly on the computer readouts, and failed to do so by omitting any transaction codes and corresponding Document Locator Number (DLN) files for the Notice of Deficiency, form 872, 1988 levies issued prior to and without the notice of intent to levy issued in January 1989. See GAO Report GGD-83-103(Sept. 1, 1983)( "IRS officials readily admit that without a DLN, the possibility of locating a document is almost non-existant. Further, no return or document ...can be processed to a master file without a DLN." (P. App. 115-116 ) The Plaintiffs defective computer readout omitted any reference to the key documents of a notice of deficiency, filing of a tax court petition, the form 872 setting assessment (see fn. 10) dates to a time certain, upon which further government collection was based. It served primarily only the government's purposes.

***(ii) Interference with the Plaintiffs in Obtaining their Files***

75. The government had a duty under contract principles of fair dealing and honesty, to give to the Plaintiffs, and their tax professionals, all their records regarding the 1974 tax year and 1983 settlement, so the Plaintiffs tax

professionals could explain administratively and in litigation why they did not owe any money for year 1974.

***Administratively***

76. The notes of Revenue Officer Thurman on shows he had the Plaintiffs original records including the District Counsel's explanation of the settlement, and copied those notes, and purposely did not give them to the Plaintiffs, or their tax professionals, while at the same time (1) subjecting them and their CPA to summons, and (2) while subjecting them to threats of enforced collection activity that included levy and seizures, if the Plaintiffs did not produce the records [which he already had], and did not sign a form 900 waiver and Offer in Compromise for an extension of further *alleged* statutes of limitation, as shown in his notes:

i. On 6-15-88 Revenue Officer Don Thurman received the Taxpayers' original return and file and had it copied. (P. App.68 )

ii. On 7-11-88 Revenue Officer Don Thurman noted that the "Info shows case went to tax court & District Council agreed to settle by clearances of major penalties & minor tax changes. Apparently 1972 and 9173 are closed satisfied. Appears to be no open issues on 1974." Emphasis added. (P. App.68 )

iii. 8-2-88 Revenue Officer Don Thurman is notified by the Taxpayers professional Dennis Larsen that 1972-1974 were paid by payment of about $50,000. Officer notes "Case does not appear to have been pursued actively by IRS coll. Ever." Notes the computer code 520 and closing code 85 on the 1974 account. Code 520 and closing code 85 holds notices according to the Service Center Replacement System manual.

iv. On 7/26/88, the Plaintiffs were seeking their records, with CPA Dennis Larsen and "Appears tp is wealthy & paying little or no tax", and the case was not 'pursued by IRS coll ever" (P. App.68 )'

v. On 8/10/88 that the payment of $49,545.55 was posted to the "30-7312" account,

vi. On 8/21/88 [sic] that the Plaintiffs and CPA were summoned to produce records, that he had few assets, and that when the "tp would not sign the waiver (900)" to allow further extension of allegedly applicable statutes, the Revenue Officer "Warned of possible suit or other enforcement... Direct action against assets" and

vii. On 9/1/88 notes CPA is seeking records "Told the CPA I will proceed with ECA (Enforced Collection Action), levy, summons etc. If he [CPA] gets all info together he will call." P. App. 69-74

viii. On 9/8/88 Revenue Officer Thurman notes he fully understood the importance of the Plaintiffs records, did not divulge their existence nor offer them to the Plaintiffs' CPA. "Dennis Larsen chewed on my ear for a long time with all the teasons why I shouldn't take ECA [enforced collection action] on assets or summons TP for CIS. …Told him without any evidence that bal due [at this time about $60,000], is in eroor I may proceed with ECA. He sd tp will fight it in court. I sd on what basis & if that what he wants to do.". emphasis added. P. App. 69-74

ix. On a date unknown, as to further collections, a note by Don Thurman at the Red Lion hotel on an unenumerated date, shows he spoke with 'Dal' and documented how "Dal sd- Could do on IMF [Individual Master File computer records] easily" . P. App. 75-76

x. No Revenue Officer notes after Don Thurman ceased working on the case reflected any other Revenue Officer having

access to the Plaintiffs original records, only the IMF computer readout.

xi. On 9-21-1988 General manager reviews and orders levy and summons to be requested 'ASAP'. Identifies the case as a statute case where collections close 7-25-88 69-74

77. 7/10/90 Revenue Officer Taylor documents that Problems Resolution Officer 7/10/90 Debra Mardenlou has an inquiry from the taxpayer. P. 77

78. Aug.30, 1990 Debra Mardenlou gives case back and says that she isn't going to do anything on the case. It is not clear if she has seen the original records or only the IMF. id

79. The documenting of numerous conversations and meetings showing the Plaintiffs are consistently telling the IRS personnel that the year 1974 is paid, that Revenue Officer Thurman is threatening them with liens, seizures, summons if they do not find them, or sign statute extensions, are frustrating because as early as July, 1988, Revenue Officer Thurman had the Plaintiffs originals, documentation as to settlement for three years 1972, 1973 and 1974, and *absolutely did not give their records to them*, choosing instead to constantly threaten and harass them, and while also filing levies and liens he understood they lacked evidence for showing they were in error.

80. All the foregoing violates any principles of good faith and fair dealing, inherent in the government's duty to protect its citizens and as a continuing contract obligation.

***Administrative Lack of adequate FOIA and Privacy Act Responses to Requests for records until about Feb. 15, 2000.***

81. By way of honesty and fair dealing, the government had a duty to minimally inform the Plaintiffs that their records were being kept in the office on organizational charts of the IRS at the time, so FOIA and Privacy Act requests could be directed to this office, and failed to do so in responses to all the Plaintiffs FOIA and Privacy Act requests as dated in government responses:

i. Oct. 22, 1990 Taxpayer appeals to Sandy Moreland of the automated collections branch explaining he fully paid for tax year 1974 and 1982 to no avail.

ii. Taxpayer under Privacy Act asks for all documents kept in his IMF file and all collection file notes and it is denied on May 16, 1991.

iii. May 13, 1991 taxpayers send FOIA request to district director asking for all assessment certificates pertaining specifically to them and all summary records of assessment, copies of all assessments, copy of all documents

disclosing the dates of assessment and documents disclosing the type of tax. Refused on May 24, 1991 referring taxpayers to the Ogden Service Center.

iv. May 13, 1991 taxpayers asking for all documents kept in the system of records known as the Individual Master File. District Director asks for time extension on May 24, 1991.

v. May 26, 1991- Taxpayers appeal denial of May 13, 1991 request for records and ask for all indexing, itemization, and detailed justification for withholding the records.

vi. May 29, 1991 District Director responds to March 16, 1991 and May 14, 1991 Privacy Act requests by asking for clarification.

vii. May 20, 1991 taxpayers send FOIA request to District Director asking for copies of delegation orders for the persons filing levies.

viii. May 20, 1991 taxpayers send FOIA request asking for information referring to assessments and the form 23 c and form 3552, and UTL 49 listing and form 8758.

ix. June 4, 1991Taxpayers respond to District Director's request for clarification asking again for all documents kept in their IMF file.

x. June 6 1991 Director of service center asks for an extension of time and advises of appeal rights.

xi. June 6 1991 Director of service center asks for an extension of time and advises of appeal rights.

xii. June 25, 1991 District of the service center says they have the wrong social security numbers.

xiii. July 10, 1991 District Director explains they can not respond to the taxpayers requests of June 25, 1991.

xiv. July 11, 1991 District Director denial of records and request for time extension.

xv. September 16, 1991 Department of treasury acknowledges August 26 , 1991 letter and that statutes are about to run for responding.

xvi. Sept. 26, 1991 Dist. Dir. States that he has reviewed the file and found a final demand was mailed 7/30/90 for year 1974. No such notices were issued as the computer readout demonstrates there were hold codes and restricted interest 340 codes, that would prevent notices from being mailed, none were produced to the

Plaintiffs or their attorney at any time. See Service Center Replacement Policy for 1985.

xvii. 2/24/1992 Dept. of Treasury finds no records responsive to the January 24, 1992 request or Dec. 12, 1991 request.

xviii. 6/23/1992 Director of Service Center denies records and refers taxpayers to using FOIA instead of privacy act.

xix. 7/30/1992 request for abatement is denied as it is taxpayer initiated for income taxes.

xx. 8/11/1992 request of July 19, 1991 is denied as no records being responsive exist.

xxi. 8/14/1992 request of May 26, 1991 appeal of foia denial is denied as the ogden service centers address was provided. "as no agency records were withheld there are no records to consider for purposes of a FOIA appeal."

xxii. May 14, 1996 Department of treasury denial of records as they pertain to personal information .

xxiii. Oct. 22, 1996 Dept. of treasury denial of FOIA. States records are kept in either the District office or Service center and Rocky Mountain will comply, [but did not].

xxiv. Nov. 7, 1996 Service center states that any records responsive to a Oct. 14, 1996 FOIA request are to be found in the district office in Denver. but employee information may be withheld.

xxv. February 15, 2000 the IRS special procedures function mails nearly the entire 1974 file to the Taxpayers showing (a) original return, (b) form 872 setting date for assessment until a time certain, (c) notice of deficiency, (d) District Counsel's decision and letters from Mr. Simons attorney offers of settlement, (e) no written notices and demands except for the Notice of Levy in 1989 after levies had already been filed.

***(iii) Unsupported Levies and Liens without Prior Warning***

82. Paragraph 1-79 is incorporated herein. The statutes requiring a timely assessment to trigger a 'tax' debt were ignored as levies and liens, despite the time certain and intentional late assessment to close year 1974 was ignored and is herein pled with specificity under Rule 9.

83. Levies and liens, without prior written notice of the levies, and prior written notice of the liens, as threatened initially by Don Thurman, were applied to the Plaintiffs' properties without records to rebut the IRS claims they owed, and the IRS ignoring the restrictions of IRC Sec. 1314(d), and applying full 6601(a) interest to a late assessed alleged tax -- as follows:

i. On or about 10/18/88 Notice of Levy to American First Credit Union, First Security, and Valley Bank. (P. App.81-84 ) Original records still denied the taxpayer.

ii. 1-10-89 Plaintiffs are mailed a notice of intent to levy claiming Plaintiffs owed $61, 399. 66 after the levies were in place, so properties could not be further mortgaged to pay the amount, even if the Plaintiffs wished to use their properties at the time to pay this alleged debt. P. App. 80

iii. As of Nov. 2, 1994, tax liens were requested to be released. The TRW report shows that there were no less than **13 liens** filed on the Plaintiffs properties between 6-28-88 and generally 12-10-90, although some dates of liens were redacted from this TRW credit report. (P. App. 85-95 )

iv. The only bad credit suffered by the Plaintiffs was due to the federal tax liens, first begun in 1979, with one that was not released until the year 1982, pending Plaintiff Simons' cooperation in the 1983 settlement, all begun anew in 1988.

v. By about 1995, most of the liens were released.

***(iv) Judicially Withheld Documents***

84. Paragraphs 1-83 are incorporated herein. The Department of Justice has duties under the federal rules of civil procedure and the rules of professional conduct to produce documents in litigation that are material to the case before the Court and do reasonable research so as to state facts accurately.

85. Judicially, in U.S. District Court, District of Utah, case dkt. No. 92cv1071B, begun 12-14-1992, to quiet title to the foregoing liened properties, the Plaintiffs were denied their original returns, denied the form 872 that they had signed, and denied all written notices and demands, with the exception of a notice of intent to levy in Jan. 1989, and another, also issued after the fact, in 1990, most produced finally on or about February 15, 2000 from Special Procedures function. See affidavit of Attorney Trish White, now Dean of the Arizona State Law School. P. App.123-124

86. The Department of Justice knew where the records for the year 1974 were located, were aware of the two stipulated decisions, and with any due diligence, saw the District Counsel's decision showing all three years would be treated together for purposes of settlement, along with the income averaging documents and at all times in litigation had access to the Plaintiffs' file, as finally disclosed about February 15, 2000 as shown by:

i. On 14 November 1996, the Department of Justice faxed a request to Bob Varra, of the Special Procedures function in Cheyenne, Wyoming stating "Dan Simons claims he made full payment of the 1974 tax liability by paying $49,546.55 on Nov. 7, 1983. There were other liabilities involved (1972 and 1973) that are not part of this lawsuit..... I need a calculation. I have enclosed a Tax crt. Decision for 1974. Please have whoever makes this calculation start with the Tax Court decision." At this point, the Department of Justice was separating out the 1974 tax year from the 1972 and 1973 tax year, despite the income averaging. P. App. 63

ii. The calculation prepared on or about 6-30-96 faxed to Special Procedures function on or the same day, showed an alleged amount owing of close to about $116,755.61 while notifying Special Procedures function that the year 1974 was entirely separate from the other three, and a computer readout would show zero was owing on the account as of about August 1995, which information was not conveyed to Attorney White or the Court. (p. App.63-66 )

87. The understanding of Attorney Trish White as to lack of records is further documented as to what she had been told as to the Plaintiffs records

in a settlement discussion document dated October 16, 1996 wherein she states,

> **"Unfortunately, the IRS has apparently destroyed all of the documentation associated with the negotiation of Mr. And Mrs. Simons' liability for 1973 and 1974. This seems to include the original returns, all of the notes taken by the IRS personnel in connection with the examination of those returns, as well as any internal record of what settlement offers were made along the way by either party. This of course makes everyone's task immeasurably more difficult and is responsible for turning this taxpayer's 1983 effort to pay his 1973 and 1974 liability in full into an extraordinary costly and infuriating experience. "** P. App.63-66 .

88. Attorney White also asserts "the interest component of the settlement was a part of the agreed on total. It was not an additional amount to be calculated under a provision of the code." As she notes, by characterizing the amount to be paid as more of a tax, and less interest, the payment of interest would not be as deductible in the future, and to the government's advantage. P. App. id

89. Attorney White's settlement document also contains an identical fax number at the top as the calculation faxed to Special Procedures function showing the same 1996 transmittal date. id

90. At the time the DOJ attorney Kirk Lusty was obtaining an 'independent calculation' to give Plaintiffs' counsel and the Court in 1996, the manual calculation did not accurately reflect the 1995 IRS abatement of all debt owed for year 1974. p. app. 67 and P.Ap. 100-109

91. Special Procedures function had a duty to clarify these issues with the Department of Justice attorney Kirk Lusty, as the case was moving to the Appeals Court and apparently did not, or alternatively, they did, and the Department of Justice attorney did not candidly convey this clarification or records showing a late assessment, lack of debt, or abatement of IRS claims in 1995, to the Plaintiffs' attorneys.

92. Good faith and fair dealing was violated in all of the actions designated above in paragraphs 1-91 for which Plaintiffs seek damages.

## 2. FRAUD IN THE PERFORMANCE, REPUDIATION AND BREACH OF THE 1983 CONTRACT [[17]]

93. Paragraphs 1-92 are incorporated herein. Aside from the above fraudulent withholding of documents, and false claims against the Plaintiffs by the government, the Plaintiffs under rule 9 plead further fraud or mistake in the repudiation, breach and performance with specificity.

### *a. Lack of Candor Regarding Written Notices and Demands*

94. One prerequisite to collecting a debt, is a timely written notice of assessment and demand for payment. None exists for 1974.

---

[17] Four elements are necessary to be claimed to show fraud in performance 1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. Landmark II, 46 Fed. Cl. at 274 (quoting BMY-Combat Sys., 38 Fed. Cl. at 128 (citations omitted)).

95. No timely written notice of assessment or demand for payment was given the Plaintiffs, nor receipt, for the November payment of $49,546.55, disallowing the Plaintiffs to show how the money they paid applied to all three years.

96. The Justice Department and M.K. Mortenson, of the District Counsel's office had a duty to ensure the written notices and demand for payment, TIMELY issued, existed, and failed to do so, prior to filing the complaint for collection for year 1974, in Dec. 14, 1992.

97. The government in its filed complaint asserted there had been timely written notice and demand.

98. The lack of verifying a material prerequisite to suit was intentional, or in the alternative, recklessly mistaken with wanton disregard of the plaintiffs interests, and was compounded by the lack of production of the notices [non existent], lack of candor to Plaintiffs, their attorneys and CPA and the Court in failing to declare that they never existed, and lack of production of the original returns and form 872, and affirmative misrepresentation that the Plaintiffs had never signed an extension, also intentional or reckless, upon which the Plaintiffs and tax professionals and Court reasonably relied, to the Plaintiffs ultimate detriment.

***b. Lack of Notification of Abatement of all Debt in 1995***

99. On 8-7-1995, all debt was abated on the Plaintiffs' computer readout. P. App. 100-109

100. On 9-15-1995 a lien release was filed.

101. The Department of Justice and Treasury department did not inform the Plaintiffs, their counsel or the Court, that all debt claimed by the IRS for year 1974 was abated in 1995.

102. The debt, was reestablished on the Plaintiffs' computer file in the 31st week of 2001, using the previous 8-7-1995 date as reference, "per inst DOJ Jeff Snow (202-307-6605)." P. App. 110-111.

103. In 2001, when the District Court, without an evidentiary hearing, was demanding settlement be made, the Court and Plaintiffs were relying upon the presumption that the IRS was still seeking a payment, and relied upon the silence of the Department of Justice Attorney Snow as to the abatement of all debt in 1995.

104. At this point in 2001, the key evidence being relied upon by the Court for further collection, the defective computer record, appears to be manipulated by the DOJ attorney litigating the case, by ordering an abated debt to be placed back on the 1974 account.

105. The withholding of information and formal notification to the Plaintiffs, their professionals, and the Court, that all debt was abated, was

intentional, or recklessly mistaken, was reasonably relied upon, and to the Plaintiffs' detriment.

### *c. All Elements of Fraud in Performance are Met*

106. Paragraphs 1- 106 are incorporated herein.

107. Plaintiffs assert that each of the specifically pleaded dates and actions in the foregoing paragraphs, a long ongoing pattern of misrepresentation, deceptions, upon which the Plaintiffs, tax professionals and Court relied, as shown by

a. the government's criminal trial based on false and unsubstantiated claims of fraud in July 1979;

b. the governments false civil claims of fraud and resulting Tax Court litigation ending in 1983;

c. the government's false claims of fraudulent conveyance and claims of amounts owing for year 1974 resulting in baseless liens and levies for 1974, and meritless civil litigation in District Court resulting in the ordered payment by the Plaintiffs of $55,000 for a Court ordered alleged 'settlement', that was repudiated in 2004 by the government's additional billing of the Plaintiffs;

d. while administratively and judicially withholding from the Plaintiffs and their professionals those records that could have stopped the further collection actions on the 1983 contract.

108. Intent to deceive or reckless and wanton pursuit of the Plaintiffs is shown by, all the foregoing specifically enumerated actions.

109. Attorney White's reliance on the assertion of missing records is found in her settlement document (P. App. 64-66 ), no form 872 was sought after its existence was denied in 1991, and only in a single last try to see if there were any records the government may have overlooked, do we find in a FOIA Privacy Act response from Special Procedures function on about Feb. 15, 2000 that every issue the government used to pursue the Plaintiffs was without foundation.

110. The Court's reliance is founded upon the Court's demand for settlement, rather than trusting documents put forth eight years after the beginning of litigation.

111. County recorders relied on the levies and liens as accurately stating an amount being owed for year 1974.

112. Plaintiffs helpless to show the government was in error by the INTENTIONALLY withheld documents in 1988, signed offers of compromise, and a form 900 waiver, as they had no alternative to

rely on the government's assertions in order to try to prevent threatened seizures of their property. All the foregoing demonstrates justifiable reliance on the assertions of the government.

113. The levies, liens, (P. App. 81-95 )Court orders and the Court's infuriated claim that it was the Plaintiffs feuding with the government because they refused to pay more, and disbelief of their evidence that it took at least eight years of litigation to obtain after 12 years of sustained collection activity, and ultimate further payment of $55,000, all demonstrates direct detriment to the Plaintiffs fulfilling all the elements of fraud in performance.

114. Based upon the foregoing, Plaintiffs claim full expectation money damages for each of the government's violation of a duty of fidelity in contracting with the Plaintiffs, as itemized above, and Plaintiffs are seeking full expectation damages, as will be spelled out more specifically below.

### 3. Lack of Contract in 2001 and Thereafter

115. Paragraphs 1-114 are incorporated herein. Since a contract is alleged by a U.S. District Court, the particulars of that alleged contract and why it is not a contract, will be pled with specificity in accord with Rule 9.

116. All necessary elements of an express or implied in fact contract are missing for the 2001 handwritten instrument declared in 2002 as a contract.

***a. Lack of Material Consideration***

117. It was entered without a debt owing so the only material consideration the government could give for a $55,000 is to do what it was legally bound to do already, stop collections under promissory estoppel, and which they violated with after the fact further billing in March 2004.

***b. Lack of the U.S. District Court's Subject Matter Jurisdiction***

118. The Court issuing the order to settle, without an evidentiary hearing, (1) had no authority to use its declaratory powers in a government alleged 'tax' case to declare a handwritten offer to settle a 'contract' under 28 USC 2201, (2) had no subject matter jurisdiction over collecting any amounts for the government without timely written notice and demand, (3) without a timely assessment to trigger a debt after the statute bar fell in 1983, and (4) that were never owed as having already been paid. [arguments all ignored by the Tenth Circuit Court].

119. At the time of the handwritten offer, March 2001, the IRS computer records showed no Plaintiff liabilities.

***c. Lack of a Signature by and Authorized Agent***

120. The Court ordered handwritten offer to settle of March 21, 2004, was never signed by anyone having authority to bind the Department of Justice.

***d. Lack of Mutual Intent***

121. The Department of Justice did not have mutual intent with the Plaintiffs, essentially redrafted what the handwritten offer stated omitting the fact that the offer was for a 'global' settlement, and objected to the District Court's order based on the Court-declared 'contract'.

***e. Repudiation and Disregard of the Alleged 'contract' and District Court's Order***

122. After full payment was made, the government ignored the District Court order abating all future foreseen and unforeseen claims of the government, and once the time for appeal to the U.S. Supreme Court lapsed, billed the Plaintiffs for about an additional $4100 that was then abated, when the government tried to give the Plaintiffs about a $24 dollar erroneous refund.

***f. The Express Terms of the Handwritten Offer Were not Reflected in the Government's response to the offer***

123. The upper portion written by the government identifies the claims to be terminated upon full payment of $55,000, " in a 'worldwide' settlement (All claims in any way related to the matters in this case (Thurmond, Lusty, Lawson, etc.). Pl. App.130

124. The bottom portion written by the Plaintiffs' counsel Rappaport identifies "all IRS claims against the Simons (Dan & Sally & all the Defendants named in this case #2 92 cv 1071B will be forever discharged,

released & extinguished- an any & all liens assessments etc. shall be released if they have not already been released." P. App. 130

125. Both parties left an option to have a summary judgment hearing, "if department does not accept", or "if Simons payment is not made" the motions for summary judgment would be set.

126. The document was signed by Dan C. Simons, government attorney Jeffrey Snow, and attorney S. R. Schildmeyer (current counsel).

127. On May 25, 2001 the Department of Justice did not accept the offer mirroring the terms as the Department memorialized the offer omitting the terms 'worldwide settlement', referenced only the claims in 'this case' as being satisfied, and were not willing to extinguish **all** claims and ***potential*** claims by the defendants Thurmond, Lusty, Lawsen, etc." P.App. 131-132

128. Without extinguishing all claims of all parties, there was no "worldwide" settlement, and Plaintiffs may have remained open for further collection efforts.

129. A summary judgment hearing was set again.

130. The Court accused these Plaintiffs, as defendants, of feuding with the IRS, had no evidentiary hearing to test their evidence, disbelieved their evidence as submitted with their motion though the bates stamp numbers were on a very large percentage of the evidence submitted, and openly

declared the *hand written instrument* of March 21 a binding 'contract', and ordered a payment of $55,000 to be made, and gave permission for them to appeal.

131. Plaintiffs paid another $55,000 for year 1974.

132. A final order was entered extinguishing all claims past, present and future, foreseen and unforeseen, of the government and all its employees and assigns as against the plaintiffs, while saying nothing about the Plaintiffs' claims against the government being extinguished.

133. **Except**, about March, 2004, (P. App. 139) *after the date of the appeal to the Supreme Court ran*, the government again billed the Plaintiffs for about $4100 in violation of the Court's order, demonstrating a lack of unequivocal acceptance by the government, and essential aspect of contracts.

134. The government was always in a far superior bargaining position, particularly with a Court disbelieving evidence suddenly produced about TWELVE years after the renewed 1988 collections began for year 1974, after the Plaintiffs had been denied those records for so long.

135. Based on the foregoing, any written instrument declared a settlement contract in 2001 fails, and *arguing in the alternative*, if it was a 'contract', it was fully breached with further billing of the Plaintiffs in direct contradiction of the District Court's final orders

136. *Plaintiffs are greatly concerned about future yearly audits and future harassment and further false charges against them, given the government's pattern of total disregard for statutory and contract principle protections for the Plaintiffs, unless this Court declares the 1983 contract to be legitimate, fully satisfied, and orders that Plaintiffs are to no longer be pursued or harassed for any reason.*

137. All elements of express or implied in fact contracts as enumerated above, fail for any 2001 alleged handwritten contract. Plaintiffs seek damages as enumerated more precisely below.

**4. UNJUST ENRICHMENT**

138. Paragraphs 1-115 are incorporated herein.

139. Based upon all the foregoing, Plaintiffs paid the 1983 $49,546.55 contract and the 2001 $55,000 Court alleged contract, both that unjustly enriched the government.

140. In the first instance, the government took the payment, but did not provide its consideration of permanent forbearance of collection activities for the years involved, thereby enriching itself, at the expense of the Plaintiffs receiving nothing but pain and deprivations in return for their reliance upon the government's alleged agreement.

141. For the 2002 payment, there was no consideration for the government to give, other than to stop collections, which they already had a ministerial non discretionary duty to so do based on no debt owing at the time for the tax year the government was collecting upon.

142. In both instances, Plaintiffs seek monetary damages as enumerated more specifically below.

## B. TORT DAMAGES

143. Paragraphs 1-142 are incorporated herein.

144. Plaintiffs assert that these claims arise not from 'interference with contract rights' based upon some discretionary function, but arise from the government's outright *breach of contract*, and established contractual and ministerial duties that are mandatory for the government to observe.[18]

145. The tort claims stated herein, are directly related to and inseparable from the breach of contract and lack of contract claims, and are therefore within this Court's jurisdiction, and fall within the contract exemption for sovereign immunity found in the Federal Tort Claims Act.

---

[18] See *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002) ("It is well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the United States Court of Federal Claims to the extent that damages exceed $10,000.").

## 1. ABUSE OF ADMINISTRATIVE PROCESS

146. Paragraphs 1-145 are incorporated herein. Since the administrative process is based on ministerial duties, to protect citizens, the violation of those duties in an abuse of administrative process will be pled with specificity.

147. Abuse of process is the use of process for a purpose for which it was not designed. *See Gilbert v. Ince*, 981 P.2d 841, 845 (Utah1999).

148. Based upon the foregoing specifically enumerated acts, the administrative process was never designed to collect money or property rights or to harm persons based on their appearance of wealth, their ability to pay, when a debt was fully satisfied as happened here.

149. The administrative process was not designed to place levies and liens on property without prior written notice and demand and FAIR opportunity to be heard, foreclosed due to withholding of records, as here.

150. Based on the foregoing, the government employees involved administratively, acted in omission of the government's duty to have IRS personnel examine all the Plaintiffs claims they did not owe, review their files, and minimally produce their records or tell them of their location, and did not, and halt all collection activity on a fully satisfied account.

151. The administrative process was misused to deny all substantive due process for Plaintiffs whose professionals were helpless to understand what was occurring on the account, until 2000, when a Court tired of the litigation, ordered a settlement, rather than making findings of fact on the Plaintiffs finally disclosed records, resulting in further payment of $55,000 to their ultimate material detriment.

152. All threats of seizure, all liens, all levies, as enumerated above, with the Revenue Officer's knowledge of the evidence the Plaintiffs needed to meet their burden, refusal to give them that evidence contained in their records, all subjected the Plaintiffs to an unnecessary administrative process, that violated them irreparably in ways they can not recover.

153. The Revenue Officer's manager, the service center, Special Procedures function (holding the records) all should have reviewed their master file and non master file records to ascertain if the Plaintiffs had any legitimate debt with the government and did not, and intentionally proceeded or with reckless disregard of the Plaintiffs' interests, went ahead, knowing the Plaintiffs without their records could not meet their burden.

154. All documents signed by the Plaintiffs, such as a form 900 waiver and offer in compromise, were done under the duress of threats of seizure and liens and levies, while Revenue Officer Don Thurman knew his

withholding of their records would deny them the opportunity to prove the government in error.

155. Every day the government had the Plaintiffs' records, each day they did not disclose their whereabouts or the actual records, each day collections on a paid contract continued when it could have stopped immediately, was a new injury from an abuse of the administrative process.

156. Plaintiffs seek declaratory judgment and monetary full expectation damages as identified more particularly below, for every day their original returns, their file, their form 872 was withheld from them administratively, and collections could have stopped and did not particularly from 7-11-1988 until 2-15-2000 when they were finally produced.

## 2. ABUSE OF JUDICIAL PROCESS

157. Paragraphs 1-154 are incorporated herein. Since particular duties were omitted, these violations will be specified with particularity under rule 9.

158. On about December 14, 1992, the government filed a complaint seeking to quiet title to properties, based upon an alleged debt and levies and liens for tax year 1974. U.S. District Court dkt. No. 92cv1071B, District of Utah, Central division.

159. Mr. Kirk Lusty, Department of Justice Attorney filed the complaint.

160. The Department of Justice Attorneys have a duty of candor to the tribunal, to opposing parties, and to the Court as found in the Federal Rules of Civil Procedure and the Utah and American Bar Association Rules of Professional Conduct.

161. In filing the complaint, the Department of Justice was acting in omission of the government's duty by contract to stop collections.

162. The Department of Justice either failed to do its Rule 11 research, the District Counsel failed to obtain the prerequisite written notices and demands that were actually non existant, or having done its research, failed to notify the Court that there had been a late assessment for year 1974 and nothing was owing.

163. Minimally there was a duty to turn over to the Plaintiffs all the records held by Special Procedure Function, the whereabouts of which Attorney Lusty was very familiar as shown by his fax to Mr. Villa in 1996.

164. The duty to notify the District Court of the IRS abatement of all the claimed debt as per candor to the tribunal, as shown on the Plaintiffs' computer readout, was violated in the settlement discussions of 1996, the ongoing appeal in 1996, and again in 2001 prior to the Court ordering a settlement.

165. A pattern of the government's abuse of the judicial process toward the Plaintiffs spanning about 25 years, while withholding their records for twelve years so they were defenseless against the presumption of government correctness, is found in a) the government's false fraud criminal claim underlying the government's 1979 criminal case, (2) the false claims of tax fraud to force the Plaintiffs into Tax Court for more baseless civil litigation for three more years, including liens and levies; (3) and the false claims of 'fraudulent transfer' of properties for a false claims that year 1974 was unpaid, and (5) finally repudiation of the District Court's order 2002 supposedly protecting the Plaintiffs, by further billing and activity on the 1974 account, all constitute a pattern of abusing the judicial processes that has continued from 1979 until the present.

166. Any and all documents signed by the Plaintiffs were signed under the duress of an abusive administrative or judicial proceeding that was outside its own subject matter jurisdiction and that was discarded and further repudiated by the government with a further billing of the Plaintiffs.

167. The Judicial Processes were never intended for such purposes.

168. Plaintiffs are seeking declaratory relief, and full expectation money damages for each day the U. S. District Court action proceeded based upon

collection for tax year 1974, with withheld records, as described more specifically below.

### 3. SLANDER AND LIBEL

169. Paragraphs 1-168 are incorporated herein.

170. Utah defines libel *per se* as a "malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule. 45-2-2(1) *West v. Thomson Newspapers*, 872 P.2d 999 (Utah1994).

171. Defamatory words falling into any one of four categories are considered slander per se in Utah. *Allred v. Cook*, 590 P.2d 318, 320 (Utah 1979)( "(1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office; and (4) charge of the unchastity of a woman." )

172. Utah also requires that the relater either knew the statement was false or made it with recklessness in verifying its accuracy.

173. The levies and liens were an omission of the government's duty to refrain from collection, and to ensure that liens and levies are based upon a bona fide legitimate lawful claim.

174. They are written printed instruments filed in County recorders offices as public records, for the specific reason of broadcasting to the public and all interested parties, that the government has claims on the Plaintiffs' property, here false claims for the year 1974.

175. They are records of allegations of the government against the Plaintiffs, in these liens and levies, and the false charges of fraudulent conveyance of properties, essentially charging the Plaintiffs with a false debt and false claims of fraudulent conveyance of property, as to the Plaintiffs history of any tax debt with the government for 1974, is "incompatible with the exercise of a lawful business profession" drawing into question the Plaintiffs' reputation of honesty in its dealings with their government.

176. Revenue Officer Thurman was aware of Plaintiff Mr. Simons' partnership interest in Alpine Ltd. and Geodyne, documenting this business interest on 1-24-1989 (P. App.69-74 ) and debts on some of his property holdings.

177. Revenue Officer Thurman fully understood the liens and levies negatively impacted the Plaintiff Mr. Simons' business relations and caused him great stress and frustration.

178. The liens and levies in violation of the 1983 contract, negatively impacted the Simons' earning ability in that (a) persons involved in real estate, looking for a developer for projects, or any transactions involving substantial sums of money, would be aware of these public records, and would not come to him for their real estate needs; (b) Banks he regularly did business with, were fully aware of the levies; (c) he was on the board of Valley Bank Mortgage and when his term ended, he was not invited to serve again; (d) his attempts to develop land, or pledge the properties for security for developments failed due to these levies and liens; (f) he and Mrs. Simons suffered embarrassment as they became aware that their son, Dan Simons Jr., with the same name, and a highly reputable businessman in his own right, had to make affidavits saying he was not his father so as to obtain credit to purchase a car or mortgage property or otherwise conduct his own business affairs; (g) people in the community made statements to Dan Simons Jr. about his father's 'tax problem'; and (h) previous business associates verify that the real estate community equated Mr. Simons with IRS problems due to the years of ongoing levies and liens.

179. Mr. Simons had consistently wished to develop the Traverse Ridge property, and made plans for doing so, including, with the partnership, arranging for building a road to the top of the mountain to facilitate further development.

180. Plaintiff Mr. Simons was fully conversant with the building codes, had drawn plat maps for streets, analyzed the building costs for waterlines, sewer lines, gas mains, street lighting, the need for any variances, prior to the levies and liens, including preparing a *Performa* for selling and developing the property. P. App. 142

181. Plaintiff Mr. Simons business associates in the partnership, pre-existing the liens and levies, were aware of his desire to develop the property and how the liens and levies hampered him from doing so.

182. Had Mr. Simons been able to pledge even some of his property without the needless levies and liens, beginning in 1988 through 1994 (when the levies began to be released), he could have purchased another deceased partners share of the partnership, giving him a 2/3rd interest, controlling the partnership wherein he could have possibly begun some development of small plots, leading to larger and larger developments over a span of years.

183. It is impossible to put a precise definite dollar value on damage to the intangible interests of Mr. Simons' reputation and property interests in

further opportunities for sales, development, etc. foreclosed due to the liens and false charges that he was not paying his taxes, violating also a legacy of honesty and integrity in his dealings with the government that he sought to build.

184. Unquestionably, the government's *false* claims, were intended to cause Plaintiffs' damage, and prevent the Plaintiffs from making a viable living, so they would conceivably rapidly pay all the government was falsely claiming they owed for year 1974 about over $50000 in about 1990.

185. Traverse Ridge is not completely developed and just a portion of the developed property is understood to be worth over approximately $150 million dollars.

186. Well publicized printed indictments in 1979 based on false criminal charges, leading to very serious damage to the Plaintiffs' Simons and Company, were only compounded and prolonged unnecessarily due to the Government's breach of a contractual duty to stop collections after the 1983 full payment, and resulting unfounded levies and liens for 1974 and public civil claims also false charging fraudulent conveyances for amounts never due for year 1974, from family trusts and conveyances set into place years before the IRS claimed they were fraudulent.

187. Due to the failure, repudiation, or breach of the 1983 settlement, the Plaintiffs claims against the government are viable back to the false 1979 published criminal indictment.

188. Plaintiff Simons had full expectations and definite plans he had begun carrying out, for being the developer of Traverse Ridge, and other entering into business relations for other developments, to be able to freely practice his profession without government interference, and was subjected to false public written instruments regarding the 1974 tax debt, both . administratively and judicially, that held the Plaintiffs in a bad false light, that directly interfered with their professional ability to earn a living, based upon the full capability of his career experience, knowledge, talent, and business, political and social interest, all of which he had a vested property interest invested therein.

189. Plaintiffs seek declaratory judgment relief and full expectation monetary damages for each and every day of damages from the liens and levies issued in violation of the government's fiduciary duty with those with whom they contract, that should and could have been stopped before they began, especially had Plaintiffs had their records, that slandered and libel the Plaintiffs, with or without per se damages, as will be enumerated with more particularity below.

## 4. CONSPIRACY AND WILLFULNESS IN THE DAMAGES CONTAINED HEREIN

190. Paragraphs 1-189 are incorporated herein. These charges will be pled with specificity as they stem from the government's violation of their duty not to violate the 1983 contract with further collections.

191. The IRS manages a tax account from various interlinked sites: (1) District office; (2) Service Center; (3) Appeals office; (4) Special Procedures function, with various management levels in those departments.

192. Policies and regulations govern how an account is 'closed' on the computer, something occurring on the 1974 account in 1983 and again in 1995.

193. An account can not be 'closed' without multiple levels of approval and communications between the various departments.

194. Error in closing an account on the computer to further collections is not likely.

195. Likewise, reopening an account to collections on the computer, appears to have been done at or near the time of the Service Center Replacement System policy, nationally, by the simple flick of a computer switch, unsuspending closed accounts with a TC 520

litigation suspension code, as on year 1974's account, and not requiring management oversight.

196. However, once an account is again subject to collections, as here, human beings become involved.

197. The discussion of Revenue Officer Don Thurman and 'Dal' at the Red Lion hotel as to how collections were easier on the IMF [ without the records of the Plaintiffs] showed agreement between at least two persons, possibly Dal Lawson the previous collection revenue officer of the 1983 $49,546.55 as to how to proceed at the expense of the Plaintiffs without disclosing records to them or others in the administration that might evidence how the liens and levies were in error, and Revenue Officer Don Thurman had erred.

198. Either the government was right when it closed the account in 1983 with all the records and persons familiar with the account, and again in 1995, or the government was correct when collections began again in 1988, but it can't be correct both times.

199. Plaintiffs assert that the mistake was discovered in 1988, but because the Revenue Officer Thurman noted the Plaintiffs appeared wealthy, they were considered appropriate persons to pay further amounts, regardless of any legitimate liabilities.

200. It likewise goes beyond all credulity to believe that the attorneys in the District Counsel's office and the attorneys for the Department of Justice did not do their required research in determining that there were no timely written notices of assessment or demand for payments made on the account, and that there were no timely assessments, and no Notices of Deficiency for supplemental assessments, subsequent to the 1983 late assessment… all a prerequisite to filing the judicial complaint.

201. Administratively, judicially, in FOIA responses, if the Plaintiffs original returns, form 872, and Notice of Deficiency were harmless, and would not have shown the government was in error, why weren't they produced immediately, when the 7/11/88 notes show Don Thurman knew where they were, and the 1996 fax to Bob Villa in Special Procedures by Attorney Kirk Lusty shows he knew where they were located. There is no excuse why the government did not produce these records to the Plaintiffs.

202. The withholding of records turned administrative and judicial proceedings into processes designed to protect fellow government personnel from identification of errors they made on the Plaintiffs

1974 account, for which the Plaintiffs may have sought damages to the detriment of these government personnel.

203. Plaintiffs seek declaratory judgment and full expectation damages for all their claims in this complaint specifically due to the intentional, or willful and wanton reckless disregard of their rights and property interests, and the manner in which they were consistently subjected to these deprivations over about a quarter of century in omission of and in violation of the government's duty of fidelity to those with whom it contracts, as enumerated more specifically below.

**5. HARRASSMENT**

204. Paragraphs 1-203 are incorporated herein.

205. All the foregoing acts, coupled with the yearly examinations and audits of their tax returns, and constitute harassment that only exacerbated the damages of all the claims in this complaint.

206. Plaintiffs seek declaratory judgment and full expectation damages due to the foundationless pursuit of them for a quarter of a century based on false claims.

**C. U.S. CONSTITUTIONAL FIFTH AMENDMENT TAKINGS CLAIMS**

207. Paragraphs 1-206 are incorporated herein.

208. Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over U. S. Constitutional Fifth Amendment Takings Claims for amounts greater than $10,000. *See Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1383 n.10 (Fed. Cir. 2000).

209. Notably the IRS has one policy from 1982, 35.10.7. 4 (1982), specifying specific interest to be included in the stipulated decision, that was not done in the 1983 stipulated decisions or underlying work documents, as can be negotiated between the IRS and taxpayers via IRS policy 8.7.1.1.2, so as to avoid any confusion as to amounts agreed to be paid.

**210.** The Policy likely attributable to the further collections on a settled debt for year 1974 is found as follows:

> IRM 35.8.6.2.1
> Service Offer in Compromise Cases "If an offer in compromise is submitted by a petitioner while the petitioner's case is pending in the Tax Court, a stipulation of the full amount of the deficiencies and penalties (those determined in the statutory notice or those redetermined on the merits by agreement of the parties) should be obtained from the petitioner. The reason for requiring the stipulation of the full amount, as determined or as redetermined in such cases, is to protect the Service's ability to collect additional amounts pursuant to a collateral agreement in the event the financial status of the petitioner should change. Also, the Service could seek collection of the full liability if the petitioner defaults on the payments."

**211.** This policy has no foundation in statute or regulation, mandates an ambiguity in the stipulated decision, so as to allow later collection for a 'full' amount, after settlement for an agreed 'lesser' amount is paid, but when the person can pay more.

212. Plaintiffs charge that this policy, 35.8.6.2.1facially and as applied violates traditional contract law, is vague as to whom it applies, always places the individual in a lesser position than the government in negotiations because the government is reserving the right to repudiate a settlement without warning and at any time, and swallows the Congressional design of laws protecting the contracting individuals from further government collection actions, its application varies on subjective determinations unknown to the contracting individual, is unpredictable in application, lacks statutory or regulatory underpinnings, and constitutes a takings of these Plaintiffs' property interests in the contract of settlement upon which the government later collected claiming the taxpayer appeared wealthy but was paying little taxes.

213. Notably, five years after full payment of the 1983 contract, the Revenue Officer noted the Taxpayer appears wealthy but is paying little or no taxes. P. App. 68

### 1. SPECIFIC PLEADING IN DESCRIBING THE PROPERTY TAKEN

214. This Court's Rule 9 charges the Plaintiffs with describing with specificity the 'property' that was taken.

215. This Court is to determine the practical meaning of the term 'property' as found in the U.S. Constitution's Fifth Amendment, wherein it states "nor shall private property be taken for public use, without just compensation."

216. The government took the Plaintiffs property right in a valid contract and the government's inherent promissory estoppel and other contractual obligations under the 1983 contract. *Lynch v. United States*, 292 U.S. 571, 579 (1934) (valid contracts are property within meaning of the Taking Clause). Also, intangible property rights protected by state law also fall within the takings clause protections.

217. Under Utah's Constitution a 'takings' occurs when a person is deprived of a vested property interest without due process of law. The Utah Supreme Court states the Constitution of Utah, Article I, Section 7 means " either a court nor other judicial tribunal may deny a person a constitutional right or deprive such person of a vested interest in property without any opportunity to be heard. To do so constitutes takings of property without due process of law." *Celebrity Club Inc. v. Utah Liquor Control Commission*, 1982.UT.271 <http://www.versuslaw.com>, 657 P.2d 1293. With the

records withheld from the Plaintiffs and not produced in a timely fashion until about February 15, 2000, there simply was no due process to be found in the deprivations based upon government's actions, most in relation to the breach of the 1983 global settlement contract.

### 2. Takings Begins in the Meritless Trial for Criminal Fraud in 1979

218. Based upon the enumerated acts above the takings began in 1979 with the criminal tax fraud trial wherein the District Counsel memorialized the government lacked the evidence to support the charges, criminally or civilly.

219. Prior to the indictment of April 1979, the government Special Agent Oldem, when serving criminal trial associated papers upon Mr. Simons, stated "Mark my words Mr. Simons, you are a high profile real estate broker, and if the IRS can make an example of you, it will."

220. At that point, the government was notifying Mr. Simons that his entire career of life's accomplishments, his career's potential and expectations, and all the business associations, social and political associations, awards and all the achievements, volunteer positions, professional offices he held, and close associations with professional organizations, financial institutions, and Republican party associations, were

suitable for the government's use to enforce the public's adherence to the tax laws.

221. If Mr. Simons had a strictly 9 to 5 job at a fish market, or some other employment not associated with the entrustment to him of other's money and financial welfare, and not been a high profile leader, the government use of him as an 'example' for others to pay taxes, would not have been as effective for the government's purposes.

222. The false civil fraud claims led to the 1983 contract, that was repudiation, carried out fraudulently, and breached, leading to this case.[19]

223. The Plaintiffs' full 'expectation' interests in a life without false claims is best found in the Plaintiff Mr. Simons' life, as a pattern of conduct best demonstrating his potential, and demonstrating his investment in his professional livelihood, as follows;

a. By the time Mr. Simons was about 23 years old, he had his first real estate sales position with Bettilyon Realty in June of 1959.

b. He then became the sales manager with Capson Investment Company for eight years.

---

[19] Logically, if two persons break a leg due to support a government purpose, and are rendered crippled, and one is an average person and the other a champion marathon runner using his legs to make his living, the damages rendered for the use of each person's leg will differ. Here, the Plaintiff was an outstanding marathon runner.

c. At about 32 years old he received the Salesman of the year award for the Salt Lake Board of Realtors, and he became a broker and began his sole proprietorship of and was the president of Real Estate Consultants.

d. He also served: at age 38 President of the Salt Lake Board, age 43 as president of the Utah Association of Realtors, age 44 as Regional Vice President of the National Association of Realtors. He was the chairman of several committees at the National Association of Realtors. From age 31 forward he attended the National Association Meetings and chaired effectively every committee of the National Association of Realtors, including the powerful Federal Taxation Committee. The National Association of Realtors is the largest trade association in the Nation and had about 900,000 members at the time,

e. at about age 34 to 40, he was the National Director of the National Apartment Association, State Director of the Utah Association of Realtors, President of the Utah Apartment Association, and was broker and president of his own company.

f. In addition to the offices in 'd' above, at age 35 he became Vice President of the Salt Lake Board of Realtors, President of the Utah

Apartment Association (again) while being the broker and president of his own company.

g. At about age 36, he became the National Director of the National Association of Realtors, and was broker and president of his own company, Board Director Salt Lake Board of Realtors, while still working as the broker and president of his own company.

h. At about age 38, President of the Salt Lake Board of Realtors, age 43, President of the Utah Association of Realtors, about age 46 Regional Vice President National Association of Realtors, Rocky Mountain Region, also on President Reagan's advisory committee, and in 1982 at the age of about 45, he was Chairman of the Environment Energy and Development subcommittee of the Legislative Committee of the National Assn. of Realtors.

i. At age 40 he also received the Realtor of the year award from the Utah Association of Realtors and was at age 44 Regional Vice President for the National Association of Realtors in 1981, representing the states of Wyoming, Colorado, New Mexico, Arizona, Nevada, and Utah..

j. He served as Chairman of Utah, Salt Lake, and National committees.

k. His company with a staff of about 65 agents joined with Bettilyon Realty wherein he was the broker and president of Bettilyon and Simons Realtors.

l. He then became the broker and President of Simons and Company by the time the indictments were issued about April, 1979.

m. He also was a licensed Real Estate Appraiser and belonged to Realtors National Marketing Institute, Farm and Land Institute, National Association of Real Estate Appraisers, REA, National Association of Review Appraisers, CRA, American Institute of Real Estate Appraisers, International Council of Shopping centers, Retail Merchants Association.

n. His brokerage companies generally obtained the top or near the top statewide volumes of sales, and handled residential, commercial, investment and real estate, wherein he also purchased, sold, remodeled, apartments and shopping centers nationwide, and developed residential, commercial and industrial properties, served on boards of companies and Valley Bank Mortgage Company, organizing Geodyne and Alpine ltd. partnerships that owned Traverse Ridge, a project he consistently wished to develop but

could not due directly to the government's actions in breach of the 1983 contract.

224. While liens and levies and obligations to pay don't generally constitute a takings, when they arise without foundation, and here in breach of a contract, their damages constitute a takings of one of the sticks of property rights, ie to mortgage, pledge or otherwise freely use all the sticks in the bundle of property rights for each and every piece of land or bank account levied or liened, particularly without prior notice or a pre-deprivation hearing. Every property liened for year 1974 was a taking of the greatest right of all, the ability to use the property to capitalize other projects and earn a living in a profession to which he had dedicated his life.

225. When the government actions are not based upon adequate facts or evidence, but are carried out to make the person an example so others will be convinced to pay their taxes, to cover government employee errors or to collect moneys no other citizens would have to pay and bear a greater and unequal burden in financing the government than others, the government acts have little adequate nexus to the proper purpose of the use of governmental police powers, and constitute a takings nonetheless.

226. The government took the Plaintiffs' property interest in their own records and in a 1983 valid contract as entrusted to and held by the government.

227. The government took the Plaintiffs property interest in the unencumbered use, as regulated by the Utah Department of Commerce, Department of Professional licensing, of all real estate license and brokerage activities without being diminished or restricted by public and published, false liens and levies, false criminal and civil charges resulting in permanent harm to the Plaintiffs' business future, and intentionally doing so by not providing him with the records necessary to defend himself. See, *Celebrity Club Inc. v. Utah Liquor*, 1982.UT.271 <http://www.versuslaw.com>, 657 P.2d 1293.

228. The government took the Plaintiffs' property interest in pursuing the profession of their choice. This is the type of interest that is 'essential to the orderly pursuit of happiness of free men." and subject to a government taking, only after a prior notice and fair hearing. *See, Meyer v. State of Nebraska*, 1923 U.S. LEXIS 2655,*14-16;262 U.S. 390. [[20]]

---

[20] "The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary

229. The government took Plaintiff Mr. Simons' property interest in his entire career at all levels of his involvement.

230. The government took Plaintiff Simons youthful vigor, at a time he was just beginning to enter what would have been the ultimately most productive years of his live, probably multiplying his influence, property holdings, projects exponentially.

231. The government took Mr. Simons reputation and potential for holding government office, in serving as a political appointee of the Utah governor on blue ribbon committees involved with land use and water rights, was a lifetime member of Real Estate Pac Committees, counseled President

---

encroachment -- to minimize substantively unfair or mistaken deprivations of property, ......The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions....If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. "This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone." *Stanley v. Illinois*, 405 U.S. 645, 647. The right to a *prior* hearing has long been recognized by the Supreme Court under the Fourteenth and Fifth Amendments" [, even when recovery provisions allowed recovery afterward.]
*Fuentes v. Shevin*, 92 S. Ct. 1983, 407 U.S. 67, 84-89 (U.S. 06/12/1972) *See*, *Sniadach v. Family Finance Corp*., 395 U.S. 337; *Bell v. Burson*, 402 U.S. 535; *Stanley v. Illinois*, 405 U.S. 645, 647 (This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone").

Reagan, senators and congressmen regarding property rights, advising state senators and legislators, serving in nearly every volunteer Republican political office within the County organization, all of which influenced and assisted his business and professional interests in which he had a property interest, as well as his the ability to impact legislation for society's good.

225. The government took an untarnished record of leadership relied upon by Plaintiff Simons when he was entrusted with the development of youth in sports teams, wherein he attempted to teach the young ladies and gentlemen leadership skills, and had winning teams as their coach, only to know that these young ladies and gentlemen were aware of the government's FALSE charges against him for dishonesty. He also coached all of his five-son's baseball, basketball, and football teams. He was also involved with the first 5-children in 4-H.

232. The government took his property interest in his otherwise unencumbered ability to pledge properties he owned to secure funds to purchase additional membership shares in Geodyne and Alpine Ltd. (businesses he organized), when a partner died, that would have increased his profitability in and improved his chances of developing Traverse Ridge.

233. The government took his otherwise free ability to the property rights and ability to contract to develop Traverse Ridge, and other development

projects, as could easily have occurred without the criminal trial and desire to use Mr. Simons as an example, and without years of ongoing levies and liens.

234. Mr. Simons expected realistically an unlimited future in real estate, enjoyment of his name and reputation and their ability to do consistently increasing volumes of business, and increasingly larger developments, and increasing numbers of partnerships locally, nationally and internationally, while creating a legitimately earned legacy for his children and grandchildren, while being a productive asset to society--- *without* the *false* criminal charges, and without the false civil charges, and false claims in levies and liens, and false claims in a U.S. District Court, resulting in years of ongoing, frustrating, tedious, unnecessary litigation again beginning in 1992, that continuously published false claims that he owed the government money, and further, had fraudulently conveyed property to avoid paying the government, that is likewise false.

235. Plaintiff Mrs. Simons profession of choice for most of this time was a homemaker.

236. Mrs. Simons has a property interest in her husband's professional progress as she kept his home, raised his children, did the cooking and cleaning for the family, so as to support her husband's efforts in real estate,

and in creating a legacy for their children and grandchildren, creating a secure environment for their upbringing and future for the family.

237. Mrs. Simons has a property interest in her profession of choice, no less than Mr. Simons, and had every expectation of her ability to create a quiet, financially secure home and future for their eight children, and creating a tranquil loving atmosphere where she and her family could feel peaceful and safe and secure so as to be able to devote time to the pleasures and rewards of their hard work.

238. Plaintiffs were often and for years fearful of answering the door bell or a knock on the door for fear, as Revenue Officer Thurman promised repeatedly, that the IRS was coming with possibly armed agents to seize their home for enforced collection activity.

239. Family tensions regarding fears of what the government was going to choose to do next to the Plaintiffs impaired the goals Mrs. Simons had every expectation of enjoying.

240. Plaintiff Simons, without the years of ongoing collection after 1983, was positioned in the community for selection to fill a State Senator's seat, similarly as a fellow Realtor Al Mansell, actually did. At least one performa on Traverse Ridge in the early 90's, shows its worth to be about $150,000,000 million dollars. And such a large development would have

taken years to develop with ever increasing land values exceeding that amount. Today, lots are going for about $200,000 and there are about 3000 of them. Plaintiff Simons, had he been able to be the developer for this project, as he had entered into business relations to do, and arranged for the building of a road that was put into place on the property to expedite development, by simply being able to buy his fellow partner's share and controlling interest in the partnership, [prohibited by the liens and levies], he would have had profits easily exceeding $45 million dollars in this one project alone.

### 3. Burden on the Government was Extremely Small

241. The burden on the government was extremely small, only pursue a Plaintiff citizen based upon accurate facts and records that adequately support the government's claims. The next step was equally small and mandatory, keep a deal, which the IRM policy 35.8.6.2.1 5 does not provide for, if a couple of years after a settlement agreement, the citizen appears wealthy but is paying little taxes. The next burden is light, do not use the government's police powers of levies and liens, until a person has previous notification of levies and liens, and then only for a bona fide debt, and not in violation of contractual pledges to stop all collection activity.

### 4. Damage to These Plaintiffs Has Been Astronomical

242. The damages to the Plaintiffs legitimate expectations in the future, expectations of greater and greater successes, are astronomical and directly related to the accomplishments and directions the Plaintiff was going when the government destroyed the property interest of the Plaintiffs in those expectations, not once, but CONTINOUSLY over a quarter of a century.

243. By about 1988, one of the most productive real estate professionals in the state prior to the indictments of 1979 based on false criminal claims [District Counsel's decision], according to Revenue Thurman's notes, was living primarily off mortgage loans on their properties and some real estate activity.

244. By 1992, at the time of the District Court trial based on false claims he owed and false claims he had fraudulent conveyed he and his wife's property to family trusts, he had sold his office on Redwood Road in Salt Lake City, and was working from his home without a staff.

**245.** Plaintiffs seek declaratory judgment and full expectation and compensation damages for taking Plaintiffs careers, taking all their realistic expectations, and taking all business, and property holdings, all for the governments uses of using the Plaintiff Mr. Simons as an example for ensure public adherence to tax laws, and then continual deprivations of levies and liens, based upon information and belief, for the purposes of protecting

employees who made errors, who intentionally or recklessly did not act with due regard for the government's contractual promises, and to secure further payment on an account that was entirely debt free and satisfied, because by policy and by the Revenue Officer's subjective opinion, they were wealthy and paying little or no taxes.

## X. PAIN AND SUFFERING

246. Paragraphs 1-245 are incorporated herein.

247. Pain and suffering for damages here can be likened to cutting off a hand of a concert pianist who has dedicated their lives to playing a piano. What compensation can there be for the destruction of an artist's grand passion in their lives?

248. Like any artist, these Plaintiffs were just as passionate about, and had a vested interest in Mr. Simons' talents for communication, sales, creative development of land and business possibilities, his profession, his career, his earning abilities, his desire to make a productive contribution to society nationally, regionally, and locally, and to which he devoted virtually all his energies, thoughts, efforts, and designs, in a profession dependant upon his reputation for honesty and integrity in the business financial arena where he was entrusted with other's money and financial affairs.

249. The Plaintiffs suffered

a. the damages of being subjected to the most powerful agencies on earth, the IRS, and Department of Justice, under threats of summons and seizures, through no fault of their own, other than that they were successful, without the ability to obtain redress or prevent them from continuing their pursuit of happiness recognized by Courts as intrinsic to man's pursuit of happiness in an orderly fashion;

b. The days and nights of watching your wife and children worry, wondering if armed agents would also actually seize their home and other properties, afraid to answer the door;

c. The life of one living with a complete lack of personal, professional, financial, political, mental and emotional security that occurs when statutes, regulations, processes in litigation designed to ensure protection of the Plaintiffs were ultimately discarded administratively and judicially;

d. The frustration and pain of knowing the more they sought to associate with others in real estate projects, as is a common practice for real estate professionals, the more the levies and liens and ongoing civil claims would be broadcast and known;

e. The pain of knowing you have done nothing the government is accusing you of, and yet you can not prove it to the government or courts, because, as you find out 12 years later, the government had your records and refused to turn them over, while Revenue Officer Don Thurman documented the Plaintiffs' financial stresses, and documented his threats to the Plaintiffs regularly, and finally documented how he discussed collecting on only the computer readout and how he knew the Plainfiffs required evidence of the government's error to succeed in fighting the government;

f. The pain of horrible embarrassment of knowing banks and financial institutions upon whose boards you served or associated with, knew that levies were on their bank accounts and liens on their properties;

g. The pain of watching their children aware of the stress and possibility of the government taking their home, attempt to function in a family home atmosphere with a cloud of unknown threats and actions that could result in the loss of their home as based as they know now, on lies by their government against them;

h. The sleepless nights of worry about a financial challenges they thought were resolved, based on reasons not given, without any fault of their own, and based on false claims, having no records to defeat them;

i. The deprivation of thousands of hours of productive time and work days that would otherwise contribute to making a living and achieving goals, that instead were spent having to go to appointments, do document research, meet with CPAs or attorneys to figure out how to clear their name and property titles, meet payments of monstrous bills from attorneys and CPAs, when all that time, effort, money for attorneys and cpas, could have so easily been avoided..... then discovering, the government knew all along that the government claims were false,

j. The pain and stress of preparing for retirement, and creating a legacy to pass to one's children and grandchildren, only to see their property holdings taken over with levies and liens for a payment never owed;

k. The humiliation of having to cash checks and pay bills with western union or other money orders, for fear of having money

in bank accounts that can be seized, WITHOUT warning or notice, as precisely was done in 1988 in three banks or credit unions;

l. And finally, living in an economic prison, without cause, that they were well aware others in the business community were aware of, and yet, on a daily basis they understood they could not escape because no one was listening.

## XI. REMEDIES FOR DAMAGES

**250.** Paragraphs 1-249 are incorporated herein.

250. Plaintiffs assert that all the damages and losses, tangible and intangible, enumerated in the foregoing paragraphs, are damages equally applicable and separate from each of the Contract or Tort or Takings areas, for which the Plaintiffs are entitled to declaratory and monetary judgment relief for each of their claims, separately and jointly, with prejudgment interest, as liquidated or unliquidated damages, as this honorable Court may judge as fair in equity and just under the law.

## XII. PRAYER FOR RELIEF

### 1.*Declaratory Judgment Relief*

252. Plaintiffs seek declaratory judgment relief from this honorable Court of proper jurisdiction,

a. That in 1983 the Plaintiffs and Government entered into a binding global netting Contract for settlement of a bona fide dispute for years 1972, 1973 and 1974, wherein all the elements of a contract, including satisfaction and accord were met;

b. That all further actions on the account were barred under contract, Constitutional and statutory and regulatory protections;

c. That the IRM policy 35.8.6.2.1

Facially and as applied, has no foundation in law, violates traditional common law aspects of contract law, provides for lack of unequivocal acceptance of a settlement contract, makes the law unpredictable and arbitrary, and its application here has constituted a Fifth Amendment takings;

d. That any and all subsequent documents signed by the Plaintiffs and the government after the 1983 full payment for all three years, 1972, 1973 and 1974 are a legal nullity due to the plaintiffs' signature under the duress of unwarranted government actions that lacked foundation in fact and law,

denial of due process, fraud or reckless and wanton disregard for the Plaintiffs rights;

e. That the withholding of the Plaintiffs documents originally in 1988 through about Feb. 15, 2000 showing the prerequisites of timely assessment, written notice and demand, and a legitimate debt owing for U.S. District Court jurisdiction and for continued administrative collections, is inexcusable, and therefore all further actions by the government after the full 1983 payment were either intentional or made with wanton disregard for the Plaintiffs' contract, statutory, regulatory, and Constitutionally protected property interests and rights;

f. That (1) the IRS District Counsel admitted that the records show there was a lack of liability for the government claimed criminal fraud in 1979 and in the civil Notices of Deficiency issued in 1979 and 1980, and (2) that all further government collection activities for year 1974, after the 1983 payment, especially with the denied existence of the form 872, and withheld records, were all based on false claims in regards to the year 1974, (3) and constituted (a) fraud in the performance, repudiation, and breach of the 1983 contract, (b) lack of the

2001 District Court declared contract for $55,000, unjust enrichment, (c) lack of unequivocal acceptance of the 2001 alleged 'contract' along with (d) abuse of administrative and (e) judicial processes, (4) all of which slandered and libeled the Plaintiffs, their property interests, tangible and intangible, by way of (a) conspiracy and willfulness of government employees in order to hide the falsity of the government's claims, (b) recklessly and with wanton disregard for the Plaintiffs legally contractually and statutorily protected rights, all directly related to the Contract;

g. That the unfounded claims against the Plaintiffs, without the due process of the Plaintiffs and their professionals having their records to meet their burden of proof, as were always within the government's possession and readily available to management and District Counsel and Department of Justice employees, and the false criminal claims beginning the entire collection processes without a nexus to the legitimate use of the government's criminal prosecutorial powers, constituted a Takings of Plaintiffs' property without due process, for which

there is to be just compensation, as protected by the United States and Utah Constitutions.

h. That Plaintiffs are entitle to their full expectation damages in their careers, family life, reputations, property, liberty interests and their right to be left alone, and that all further actions by the government by way of harassment or anything to do with year 1974 are hereby barred forever.

### 2. ***Monetary Damages***

253. Paragraphs 1-252 are incorporated herein.

254. Plaintiffs pray for their full expectation damages under any one claim, or all together, separately or jointly, in a total amount of no less than $45 million dollars, to be determined at trial, that includes compensation for money paid under the 1983 contract and 2001 court order, including prejudgment interest, compensation for all their attorneys fees and Court costs and other professional fees, and liquidated and unliquidated damages, with all employees of the government, named and unnamed John and Jane Does, named jointly and severally liable.

255. "What a person is, what he wants, the determination of his life plan, of his concept of the good, are the most intimate expressions of self-determination, and by asserting a person's responsibility for the results of

this self-determination we give substance to the concept of liberty." C. Fried, Right and Wrong, 146-147 (1978). This self determination when combined with years of development and work also constitutes personal property interests in a person's career, and that career's future. See also Fried, Correspondence, 6 Phil. & Pub. Aff. 288-289 (1977) (the concept of privacy embodies the "moral fact that a person belongs to himself and not others nor to society as a whole") These interests were all damaged, abused and taken, and had they not been damaged, abused or taken based particularly on false claims, and withheld records, without due process, Plaintiffs very likely would have had earnings and assets exceeding $45 million dollars, probably national and international holdings, and/or held political office and certainly attained national leadership positions in the National Real Estate organizations.

256. The Plaintiffs pray for the Court to find the Plaintiffs are entitled to full expectation compensation for their tort damages that are based directly on the fraud in performance, repudiation, and breach of contract, and violation of promissory estoppel, constituting a quarter of a century of abuse of the administrative and judicial processes, harassment, that basically ruined their lives and destroyed all the dreams and plans they had every expectation to enjoy, and pray for relief in the amount of $5,000 a day for

each and every day the government had the Plaintiffs records, could have stopped the collection processes, could have prevented the levies and liens, and further subjected them to false criminal and civil claims that they owed the government money, beginning about July 15, 1979 when they were acquitted and the government should have left them alone, until at least about March 14, 2004 when the government last billed them for about $4100, all likewise damaging irreparably the Plaintiffs, who suffered without any fair and full pre deprivation hearing. This amount is about $45 million dollars and is allowed under the principles of contract and full compensation for the torts associated therewith, and within the damage limits of the Federal Tort Claims Act, for each and every daily offense.

257. The Plaintiffs pray for compensation for their takings damages in the amount of at least $45 million dollars or greater as enumerated above, for the irreparable harms and destruction by the government to one of the very top Real Estate businesses and careers in Utah, in a manner, that never allowed the Plaintiffs to mitigate their circumstances and regain what was lost due to false original criminal claims and then ongoing collections in violations of contract fiduciary duties, and withheld records by the government.

258. The Plaintiffs pray for full expectation contract damages for each or all claims separately or jointly, for the amount of $45 million dollars or greater due to the breach resulting in the inability of the Plaintiff to develop Traverse Ridge and other developments, known and unknown, directly related to the fraud in performance, repudiation and breach of their fully paid 1983 contract.

259. Plaintiffs include in these amounts for each tort, contract or takings claims, complete reimbursement of all the money paid for the 1983 violated contract, and 2001 alleged contract, and all the attorneys fees, and other costs and compensation for these professionals hundreds of hours of time spent trying to defend the Plaintiffs, and the Plaintiffs hundreds of hours of work, time, thought, effort spent defending themselves against the government's false claims, instead of dedicating the time to their professional endeavors and productivity.

260. Plaintiffs further pray for any and all other relief under the Contract and United States Constitution as this honorable Court may determine to be fair in equity and just under the law, so as to make the Plaintiffs whole for their damages, pain and suffering, as is within the mercy, compassion and justice authority of this Court of proper jurisdiction.

So Signed this 14 day of February, 2006

Susan Rose 2/14/06
Susan Rose, Utah bar no. 7985
(filed in this Court under the name Susan Schildmeyer)
Attorney for Danny C. and Sally J. Simons
9553 S. Indian Ridge Drive
Sandy, Utah 84092

CERTIFICATE OF SERVICE

A true and correct copy of this Verified Complaint with document attachments as ~~one~~ 2 original and 14 copies, is being mailed by U.S. Mail or courier to the United States Court of Federal Claims on this 14 day of ~~January~~ Feb, 2006.

Susan Rose
Susan Rose, Attorney for the Plaintiffs.

# COMPLAINT VERIFICATION

I Dan Simons, hereby state under penalty of perjury, that to the best of my belief and knowledge, all the facts in this complaint as to my achievements, career expectations, false claims of the 1979 criminal trial, the 1983 contract, false civil claims for the year 1974 ending only in 2004, the pain, suffering, and deprivation, are correct. Damages were compounded by the government not providing me all my records until about 2000, whereas without all my records, which the government reported to me were destroyed when, with full accessibility within the government, they were actually withheld, my Tax Professionals, as is supported by their affidavits, could not determine the governments reasoning for 1974 collections and defend me in a timely and credible fashion.

So Signed this 14 ____ day of February, 2006

Danny C. Simons

County of Salt Lake
State of Utah

I, Shawn Mueller __notary public, hereby state that on this 14th day of February, 2006, Danny C. Simons appeared before me with a government picture ID, and signed the above Complaint Verification in my presence.

So Signed this 14th day of February, 2006

SHAWN MUELLER
Notary Public
State of Utah
My Comm. Expires Jul 30, 2009
8100 S State St Midvale UT 84047

Notary Public

My commission expires on the 30 day of July, 2006