Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT
OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,
vs.
UNITED STATES OF AMERICA,
*Defendant*.

Case No. 06-115
Judge Susan Braden

# Proposed Findings of Fact for

**PLAINTIFFS' RCFC RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT**

## PROPOSED FINDINGS OF UNCONTROVERTED FACT

*Form 843 Placed the Government on Notice*

(1) Prior to filing of this suit, in about March of 2004, the Simons filed a form 843 asking for return of contract amounts, and Court ordered amounts, plus penalties and interest. (P. Am. Complt. App. pg. 3-4b.)

*The Simons Filed Their Return Timely with an Extension*

(2) The Simons filed their 1974 Tax return on "6/11/75" with an extension. (P. Am. Complt. App. pgs. 31, 102-111 [at 103])

(3) According to the government's Individual Master File on 10/9/1975 an additional 809.36 was paid by the Simons and the IRS civilly closed the year out. (P. Am. Complt. App. pg. 103)

(4) Under 26 U.S.C. 6501(a) the government has three years to assess a tax liability from the time the return is due. Here, this Assessment Statute Expiration Date [ASED] was 6/11/1978.

(5) On about February 24, 1979 the United States received a signed form 872 allowing the Government additional time to assess a deficiency, until "April 15, 1979" unless a "notice of deficiency in tax… is sent to the Taxpayer(s) …. Then the time for assessing the tax shall be further extended for the period for which assessment is prohibited, and for 60 days thereafter. (P. Am. Complt. App. pg. 57-59 at 58).

(6) The IRS' Mr. Lee Smith, Chief of the Technical Branch, signed the form 872 document on February 27, 1978. Id.

(7) Chiefs of Technical Branches have delegated authority to sign and accept the form 872. [[1]]

**DEFECTIVE IMF COMPUTER READOUT**

(8) The IMF computer readout lacks a Transaction Code 560 that indicates an extension of time, as for a form 872 consent to extend the statutes of limitations for assessments on a taxpayer's account until a time certain. (attachment pg. 5) (P. Am. Complt. Ap. pg. 103)

(9) A Notice of Deficiency for Tax Year 1974 was issued on April 16, 1979, a Monday, and was received by the Simons. (P. Am. Complt. Ap. pg. 60 and 61).

(10) The IMF computer readout lacks a Transaction Code 494 that indicates a Notice of Deficiency was issued. ( attachment pg. 4) (P. Am. Complt. Ap. pg. 103)[counsel's notes are on this page].

(11) The Transaction code 582 for a 1988 lien is missing (Id. at 105)

(12) No listing of a 1989 notice of intent to levy in the stat notice section (Id. at 110).

(13) No listing of any Notice of Deficiency in the stat notice section (Id. )

(14) The IRS computer is programmed with statutes and can only calculate interest with 26 U.S.C. 6601(a) interest all the way back to the return due date making posting of settlements with 'restricted' interest to the computer a 'complete impossibility'.[[2]] (P. am. Complt. App. 120).

---

[1] Delegation Order dated March 8, 1951Treas. Reg. § 301.6502- 1(a)(2)(i); *United States v. Cook*, 494 F.2d 573 (5th Cir. 1974); However, the IRM requires that "any IAs that extend beyond the original CSED must be approved by a Branch Chief." IRM 5.14.1.7(7); 5.14.6.2(1)(e)

[2] 26 U.S.C. 6601(a) reads as follows:

(15) The limitations of the computer in 1983 made posting netting of interest very nearly impossible, and enormously difficult at best. **[3]** The IRS particularly addresses how the rules worked prior to 1986.

> "Certain interest is statutorily prohibited or is limited to specific time periods as a matter of law. These "*restricted interest*" computations can be particularly complex for large corporate taxpayers, which commonly have multiple carrybacks and carryovers of different credits and deductions over any given period of years and are subject to multi-year audits. ***As will be discussed in more detail below, the IRS does not have the capability to perform all restricted interest computations automatically on its Master File system.*** Instead, many of these complex calculations must be performed manually (i.e., using stand-alone computer or calculator systems with data manually inputted)." Emphasis added.

***Netting of Interest on Tax overpayments and Underpayments, report to Congress, 1997***

at pg. Pg. 8. ( Attached pg. 7-8)

(15a) The IRS keeps two sets of books , master file and non master file. (Id. )

**A 1983 CONTRACT**

(16) The Simons Contract consists of six elements:

a. the IRS' District Counsel's decision memorializing the acceptance of the Simons offer and terms of the agreement for all three tax years 1972, 1973, and 1974,

---

(a) General rule
If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.
(2)
(B) The last date prescribed for payment of the first installment shall be deemed the last date prescribed for payment of any portion of the tax not shown on the return.

[3] See, ***Netting of Interest on Tax overpayments and Underpayments, report to Congress, 1997***, http://www.ustreas.gov/offices/tax-policy/library/t0neting.pdf

b. the Simons' offer to settle showing offers nearly perfectly mirroring the District Counsel's decision and showing negotiations,

c. the IRS drafted two tax court decisions including the IRS drafted underlying Tax Court rule 155 computational documents inseparable from the Tax Court decisions that unify all three years by income averaging and that were identical for all three years,

d. signatures of persons with proper authority to sign the documents and bind the parties,

e. Collection and Payment of the only amount collected for all three years of $49, 546.55, and

f. The statutes regarding Tax Court decisions, assessments and notices and demand to issue thereafter, that the IRS used to initially foreclose further collections.

(17) Satisfaction and Accord lie in paying what was asked, within less than 30 days after the time it was asked, and the IRS closing all three years' accounts on its computer.

**A DISTRICT COUNSEL'S DECISION**

(18) In January 26, 1983, the IRS issued a District Counsel's decision (P. Am. Compl. App. pg. 28-30) that identified the following:

a. The Simons were issued "a statutory notice [ of deficiency] for years 1972, 1973 and a second statutory notice for 1974" (P. Am. Compl. App. pg. 28).

b. The Simons "petitioned the Tax Court for a redetermination of the liabilities set forth on both of these statutory notices of deficiency." (Id.)

c. Mr. Simons was 'acquitted' of IRS criminal charges involving years 1972 and 1973. (id).

d. Both statutory notices of deficiency charged the Simons with civil tax fraud. (id).

e. "Though the cases have not been formally consolidated before the Tax Court, they do involve the same taxpayers and substantially the same issues, and will therefore **be treated together** **for purposes of settlement**. Two settlement documents will, however, be prepared for filing with the court" (id) (emphasis added).

f. There was a delay in resolving these cases because of a fraud penalty claim, whereby the cases were sent to appeals, but due to the fraud penalty, no settlement could be obtained [until the fraud claim was conceded]. (id)

g. IRS agent Greenwood who had been an 'advocate of criminal charges against Mr. Simons' after several hours discussion [with IRS counsel] 'suggested that the Government would not be able to win even the fraud penalty in a civil action.' (Id.)

h. "The fraud penalties for all three years are being conceded". (id. at pg 29)

i. "The statute of limitations bars assessment of additional tax for the year 1972 absent proof of fraud."

j. For purposes of settlement, the Simons and government gave up concessions to achieve settlement, as follows:

   i. The government conceded for year 1972 approximately $9000 dollars in promissory notes as non deductible, even though he could prove it was not income received in 1972 (Id. 29).

   ii. For 1973, the government reduced the amount of commissions received by about $29,500, and the Simons showed that about $21, 500 of this amount "was properly reported in subsequent years" (id. 29).

   iii. The Appeals officer agreed to "an $8000 decrease" (id)

   iv. The Simons agreed to the opening of the 26 U.S.C. 6501 three year assessment time to six years, by consenting to a 25% omission. (id).

   v. For 1974 the adjustments in the statutory notice were agreed to except (a) loan payoff deductions would be recharacterized as short-term capital loss, (b) the disallowed business expense would increase from $17, 324. 64 to $18, 260.93 [a change of only $924.29 cents].

(k) For years 1973 and 1974, the Simons agreed to consent to a negligence penalty. Id. 29-30.

(l) "We now feel that the foregoing represents a fair and equitable resolution of this case. The Appeals Office has reviewed this decision and agrees with the determinations and recommendations made herein." Id. at pg. 30

(m) The document is signed by "Richard A. Jones District Counsel"

(n) Mr. Jones had delegated authority to sign the District Counsel's decision. [[4]]

**LETTERS OF THE SIMONS OFFER**

(19) The Simons attorney signed a January 11, 1982 letter to the District Counsel's office to a Mr. Ron Gardner. (P. Am. Complt. App. pg. 22).

(20) "I decided to deliver to you this proposal of settlement" (P. Am. Complt. App. 22.

(21) The Simons offered a "settlement proposed … as a package and not separable on a year by year basis." [The District Counsel agreed to treat all the years together.'] (id.)

(a) 1972 would be closed due to the expiration of the statutes for assessment. (P. Am. Complt. App. pg. 23)

(b) the fraud penalty would be dispensed with for years 1973 and 1974 and the Simons would consent to '5% negligence penalty". Id. [The District Counsel's decision agrees.]

---

[4] Delegation Orders No. 150-25 dated March 8, 1951; No. 60 ¶ 1 effective Nov. 26, 1979; 26 CFR 301.7701-9 for 1983; and No. 190 effective March 21, 1982 ¶ 2, also as per 26 USC 7452, IRM 35.10.1.1.2.2 among other grants of authority statutory and regulatory and policy grants of authority

(22)On January 15, 1982, the Simons' attorney sends Mr. Simons a letter informing Mr. Simons of the proffered 'settlement proposal',

(a) informing Mr. Simons that the settlement proposal was submitted to the regional director of the IRS. (P. Am. Complt. Ap. 26)

(b) the amount suggested is about $49, 588 that includes "payment of taxes and negligence penalty of a total of $31, 588 and payment of interest which I estimate to be $18,000, (interest is deductible)." Id at 27. This total is approximately **$49, 588.00.**

(c) "As a result of the settlement, you could have carryforward or current write-offs of approximately $53,000 for the years after 1974." Id.

(23) The amount collected was eventually $49,546.55, less than about $40 dollars difference, with about $11,000 dollars less interest that was deductible.

**ONE CONTRACT IS FORMED WITH TWO TAX COURT DECISIONS**

(24) On April 5, 1983, Simons' representative and IRS District Counsel Richard Jones signed the two Tax Court decisions on the same day, and entered those decisions into the Tax Court record on April 22, 1983 (P. Am. Complt. App. 12 and 14) as follows:

(a) Docket No. 13016-80, tax years 1972 and 1973 (P.Am. Complt. App. 12)

(b) Tax year 1972 showed no adjustment in income tax and no penalty, exactly as the letters of offer and District Counsel Decision show. (id)

(c) Tax year 1973 shows a deficiency of $23, 573 in taxes and a penalty of $1,179.00 (id)

(d) Docket No. 10312-79 shows for year 1974 a tax of $17, 071.00 (P. Am. Complt. Pg. 14)

(e) There was an additional $854.00 in penalties for 1974. (id)

(f) Both Tax Court decisions also had the identical U.S. Tax Court Rule 155 computations as drafted by the IRS that combined all three years factually and legally, by income averaging and going into the closed tax year of 1974 for adjustments. (P. Am. Complt. App. 16-20. )

(g) The rule 155 computations are inseparable from the Tax Court decisions themselves as they are required to be submitted with stipulated decisions by the Tax Court rule 155. (P. Am. Complt. App. 9)

(25) The Simons also agreed “It is stipulated that effective upon the entry of the decision by the Court, petitioners waive the restriction contained in I.R.C. 6213 prohibiting assessment and collection of the deficiency (plus statutory interest) until the decision of the Tax Court has become final.” (P. Am. Complt. App. 13 and 15. )

(26) CPA Bryan Bolander, current president of the Utah CPA association, analyzed the entire account and original returns and found in a sworn statement, “in looking at the original return and all the other documents mentioned above, the adjustments made to the 1973 and 1974 tax liability appear to be properly made. Calculation amounts flow through correctly between all the forms. Additionally, the District Counsel’s decision follows the IRS work documents

and approximates a Taxpayer Counsel's settlemtn letter written approximately a year earlier. " (P. Am. Cmplt. Ap. pg. 7 par. 1)

(27) Additionally, CPA Bryan Bolander also found that none of the documents as drafted by the IRS contains any reference to specific statutory interest, not likely to be an oversight with two IRS persons working on the documents. (P. Am. Complt. Ap. pg. 9)

(28) The IRS is authorized by Congress to abate interest if it is in the interest of the government and collections under 26 U.S.C. 6404.[[5]]

(29) The IRS documents the fraud penalties were without foundation and delayed Appeals resolution of the case. (P. Am. Complt. Ap. 28).

---

[5] 26 U.S.C. Sec. 6404. Abatements

"(a) General rule
The Secretary is authorized to abate the unpaid portion of the assessment of any tax or any liability in respect thereof, which -
(1) is excessive in amount, or
(2) is assessed after the expiration of the period of limitation properly applicable thereto, or
(3) is erroneously or illegally assessed……

(e) Abatement of interest attributable to unreasonable errors and delays by Internal Revenue Service
(1) In general
In the case of any assessment of interest on -
(A) any deficiency attributable in whole or in part to any unreasonable error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial or managerial act, or
(B) any payment of any tax described in section 6212(a) to the extent that any unreasonable error or delay in such payment is attributable to such an officer or employee being erroneous or dilatory in performing a ministerial or managerial act,
the Secretary may abate the assessment of all or any part of such interest for any period. "

**IRS' VARIOUS FORMS OF 'STATUTORY' INTEREST**

(30) Congress has enacted several forms of 'statutory interest'.[[6]] (Attachment pgs. 7-8)

**AMOUNTS OF THE COMBINED TAX COURT DECISIONS**

(31) The combined amounts of the Tax Court decisions are as follows:

0 for year 1972

$23, 573.00 tax for year 1973 Tax Court dkt. no. 13016-80

$17,071.00 tax for year 1974 Tax Court dkt. no. 10312-79

$1,179.00 penalty for 1973

$ 854.00 penalty for 1974

TOTAL TAX = $40, 644. TOTAL PENALTIES= $2033.
The combined amount of taxes and penalties as drafted by the IRS is $42,677.
(P. Am. Complt. App. 16)

---

[6] Also, Congress states, " In the case of an adjustment resulting from an increase or decrease in a net operating loss or net capital loss which is carried back to the year of adjustment [here 1972], interest shall not be collected or paid for any period prior to the close of the taxable year in which the net operating loss or net capital loss arises." [for 1972, it would close for collections 1979 .]
26 U.S.C. 1314(b)
Also, Congress has determined under 26 U.S.C. 6601(e)(2)(A)
"(2) Interest on penalties, additional amounts, or additions to the tax
(A) In general
"Interest shall be imposed under subsection (a) in respect of any assessable penalty, additional amount, or addition to the tax only if such assessable penalty, additional amount, or addition to the tax *is not paid within 21 calendar days* from the date of notice and demand therefor (10 business days if the amount for which such notice and demand is made equals or exceeds $100,000), and in such case interest shall be imposed only for the period from the date of the notice and demand to the date of payment".

## INTEREST CALCULATION

**(32)** Interest was either a) abated due to IRS delay in refusing to release baseless fraud claims (P. Am. Complt. App. pg. 28), or b) netted ( due to gov. conceding over $35,000 in income for year 1973) (P. Am. Complt. App. pg. 29) while claiming thousands in amount due and a 25% omission for 1973 [id), as shown by the following:

a. The January 11 and 15, 1982 letters of the Simons' counsel to the IRS shows they were working on a settlement and consenting to pay for settlement. (P. Am. Complt. Ap. pg. 22 & 25)

b. By February 1, 1983 the IRS had drafted the underlying work documents that combined all three tax years by income averaging. (P. Am. Complt. Ap. 16).

c. The above time span is roughly about 1 year and one month.

d. Prior to January 1, 1983, simple interest applied. Rev. Proc. 83-7. (P. Am. Complt. Ap. pg. 56)

e. CPA tax expert Henry Van Tiendren, reviewing the IRS rev. Proc. 83-7, its eight place factoring tables, and the amount of payment the Simons paid for the 1983 Tax Court decisions $49, 546.55 (P. Am. Complt. Ap. 141), finds, that using the combined tax and penalty amounts, and calculating simple interest for 12 months from January to December 1982 at 16% simple interest, we arrive at a total of $6503.82 (P. Am. Complt. Ap. 52 and 53)

f. Using 11% compounded interest for one month, from January to February, 1983, the date of the work documents, we add another $365.80. (id)

g. Together, the amount equals ***$6869.62*** in interest.

h. Adding $42,677.00 and $6869.62 we arrive at **$49,546.62** total (id) for all three years, tax, interest, additions to tax all combined, just seven cents off of the amount collected verbally and paid on about Nov. 9, 1983, of $49,546. 55.(P. Am. Complt. Ap. pg. 141).

i. Mr. Van Tiendren verifies this calculation by affidavit, as sound and reasonable by a Certified Public Accountant experienced in working with the IRS. (P. Am. Complt. App. 52-56a at 52).

j. Mr. Gail Anger, a 23 yr. Veteran IRS appeals officer, verifies by affidavit that " for a multiple year agreement, it will be nearly impossible, if not astronomically rare, for an indificual to calculate the amount paid, using the statutes of the time, and using the 8 place factoring tables used for calculations, to arrive at a number within. 07 cents of what was paid, unless the IRS used the same calculations at the time the amount to be paid was arrived at. " (P. Am. Complt. App. 121)

   a. Interest is mandatory 'unless specifically prohibited by law or by mutual agreement" ( P. Am. Complt. Ap. 112)

   b. Interest computations are done by Appeals processing function, or Examination Support and Processing function. (id) [Notes are by counsel].

   c. Netting of interest from amounts owed and amounts conceded can always occur. (Attachment pg. 7-8)

**THE IRS COLLECTS $49,545.55 ONE TIME IN OCTOBER 1983**

(33) On 10-20-1983, IRS officer Dal Lawsen called upon Mr. Simons when Mr. Simons was away from his office, leaving his card for Mr. Simons to call him the next day, Oct. 21, 1983. (P. Am. Complt. App. 141.)

(34) Mr. Simons called the next day, October 21, 1983 a Friday, and was told to pay $49, 546.55 for all three years for everything, taxes, interest, penalties. (id)

(35) Mr. Simons paid the IRS $49,545.55 on about Nov. 7, 1983. (P. Am. Complt. 51).

(36) The 1972 account was closed by statutes. (P. Am. Complt. Ap. 12)

(37) The 1974 account <u>was closed one day</u> after Mr. Lawsen obtained Mr. Simons agreement to quickly pay the $49,546.55. (P. Am. Complt. App. 104)

(38) The Computer readout as late as “27 Jul 1989” reads ‘closed’. P. Am. Complt. Ap. 62a).

(39) At the time of payment, only one tax year, 1973, was open on the computer into which the payment could post. (P. Am. Complt. Ap. 98, 9 last par.)

(40) The Master File computer will seek out the accounts owing when payment is made automatically. ( ATTACHMENT pg. 8)

(41) When the 1973 tax year was credited with the payment with interest all the way back to the date of the return, it was closed. (P. Am. Complt. Ap. 9-10, 98)

(42) All three years were now closed on the computer, no matter how the IRS credited the payment for all three years formally. (P. Am. Complt. Ap. 10).

(43) Under the Simons calculation, the entire amount is only off by 7 cents. (P. Am. Complt. Ap. 52, 53.)

(44)To account for payment within only 7 cents for three years using income averaging and the eight place factoring tables of rev. proc. 83-7 ( P. Am. Complt. Ap. 52-59) is 'nearly impossible, if not 'astronomically rare'…unless the IRS used the same calculations at the time the amount to be paid was arrived at." (P. Am. Complt. Ap. pg. 121) according to the 23 year veteran ex- IRS Appeals Officer Gail Anger's affidavit.

(45)The way it was credited to 1973 was over $2000 off by use of penalty codes that the Simons never agreed to in the Tax Court decisions. (P. Am. Compl t. Ap. 98).

**IN 1983THE IRS TOOK STEPS TO PREVENT FURTHER COLLECTIONS**

(46) Part of the Stipulated decisions are two key statutes that are a prerequisite to collecting the amounts agreed upon by the government and its citizens inherent in the agreement:

(a) Once a Tax Court decision issues, the IRS must do a 'timely assessment' and then issue a written notice and demand.**[7 ]**

(b) The 'assessment' must be done prior to the date agreed upon, as per 26 U.S.C. 6501(b)(4)(A). **[8]**

---

7 Sec. 6215. Assessment of deficiency found by Tax Court
(a) General rule
26 U.S.C. 6215(a)
"If the taxpayer files a petition with the Tax Court, the entire amount redetermined as the deficiency by the decision of the Tax Court which has become final **shall** be assessed and shall be paid upon **notice and demand** from the Secretary."

8 "Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon."

(c) Within 60 days after the 'assessment', the Secretary 'shall' give or mail a *written* notice to the person as per 26 U.S.C. 6303.

*The IRS Does a Purposefully Late Assessment*

(47) The IRS did an 'assessment' for year 1974 on July 25, 1983. (P. Am. Complt. App. 104)

(48) An internal document form 2859 Request for Quick or Prompt Assessment [[9]] shows that *with management approval* the assessment statute expiration date was calculated as "07-19-83" and the assessment was ordered for "07-25-83" after the IRS' own calculated statute expiration date. (P. App. 5[the words 'after ASED' in the employee IDRS number box is counsel's].

(49) Both stipulated decisions show Plaintiffs "waive the restriction contained in I.R.C. §6213(a) prohibiting assessment and collection of the deficiency (plus statutory interest) [here only the restricted statutory interest of IRC sec. 1314(d) or 6601(e)] until the decision of the Tax Court is final." (P. App. 13 &15 ) Immediate assessment could have been accomplished with the Plaintiffs' permission. [P. App. 13 &15]

(50) As per the form 872 date, the Tax Court petition filed with 3 days remaining on 90 day period for filing the Tax Court decision (7-13-79) after the 4-16-79 Notice of Deficiency, plus 60 days from the date of the time certain in the form 872 [P. App. 58], makes the exact expiration date for assessment 63 days from the entering of the stipulated decisions on the Tax Court dockets of April 22, 1983

---

[9] Quick Assessment is given when the assessment Statute expires prior to the 90 day limit on assessments made after a Tax Court decision is entered. IRS handbook 5.1 4.11

and that date is Friday, June 24, 1983 as the final date for all assessments for tax year 1974 to legally establish a liability for that year for further collections.

(51) Any 'assessment' for only 1974 with full interest as if there were no 'package settlement', as was done July 25, 1983 (P. Am. Complt. Ap. pg. 104) with 'restricted interest' Transaction Code 340, (Attachment Doc. 6209 pg. 4) as intentionally ordered with management approval, (P. Am. Complt. Ap. 5) would leave ZERO balance owing on the 1974 account, allowing it to be closed with ZERO owing, as it was October 24, 1983, with a Transaction Code 300 (*attachment* doc. 6209 pg. 5) one working day after agreeing to pay the $49, 546.55 (P. Am. Complt. Ap. 141).

*No Timely Written Notice and Demand*

*(52)* Hold codes 2 and 3, (HC) on the Simons computer readout, on the following dates, 9/10/1979, showing ZERO owing after the 4/16/1979 Notice of Deficiency; 9/19/1983; 10/24/1983; 3/18/1985; 8/20/1990; 11/05/1990; 9/9/1991; prevented any written notices from being mailed (Attachment doc. 6209 pg. 6) (P. Am. Complt. Ap. 103, 109).

(53) The Simons received their amounts owed by verbal communication from Revenue Dal Lawson on October 21, 1983 (P. Am. Complt. Ap. pg. 141) not by written notice and demand for any of the years.

(54) If Mr. Lawsen would have left a written notice when he called on Oct. 20, Mr. Simons would have had no need to write the amount on the calling card when he called him back on October 21, 1983. \

(55) The IRS did not attempt any further collection on the account until 1988.

## TOLLING OF THE STATUTES OF LIMITATION

(56) The Simons could not 'state a claim' with evidence, or 'know' for any kind of certainty what happened on their account without key documents. (P. Am. Complt. App. 9, 123Par. 9).

(57) Mr. Bryan Bolander, current President of the Utah Association of CPAs, has reviewed the account states under penalty of perjury,

> 'without the original returns, there can be no way in which anyone can piece together the elements of the puzzle of reconstructing the agreement that is the basis for the 1972, 1973 and 1974 decisions without making the erroneous assumptions that have been made in regards to the 1974 account. "

(P. Am. Compl. App. 6-11 at 9)

(58) CPA Bolander also states (P. Am. Complt. Ap. at 9) that there are seven pieces of evidence necessary to understanding what occurred:

(a) the decisions that 'are inseparably connected by the IRS drafted underlying work documents (P. Am. Complt. App. pgs. 12-20),

(b) "the original 1974 tax returns" (P. Am. Complt. App. pg. 31),

(c) "the District Counsel's decision stating the IRS agreed to treat all three tax years together, though they would formally be entered as two stipulated Tax Court Decision documents." (P. Am. Complt. App. pg. 28),

(d) Letters from counsel to the "IRS stating this was a package settlement", (P. Am. Complt. Ap. pgs. 22-27),

(e) The computer readouts showing the full payment went into only year 1973's account (P. Am. Complt. Ap. pg. 95-99),

(f) The underlying work documents not mentioning 'interest' (P. Am. Complt. Ap. pg. 16) though a slot was provided for doing so,

(g) The cashiers check . (P. Am. Complt. App. 9, 51, 141).

(59) An accurate computation of the assessment statute expiration date is impossible without the form 872 that sets the date, to a date certain. (P. Am. Complt. Ap. 58).

**CONCEALMENT OF DOCUMENTS**

(60) Of the eight identified documents listed above in Par. 61 and 62, the IRS and DOJ did not divulge the (a) original returns; (b) form 872; (c) district counsel's decision until after about February 15, 2000 (P. Am. Complt. App. pg. 127)

(60) The administrative record and federal district court records show the following were never produced because they did not exist: (a) any accurate IMF computer readout; (b) any completely accurate certificates of assessments showing zero assessments on the account; (c) any *timely* written notices of assessment and demands for payment pursuant to any assessments for the years 1973 and 1974; (d) any written notices and demands issued *prior* to the 1988 levies; e) no notices of deficiency for supplemental assessments; f) no administrative findings as to if or why the Simons were alleged to still owe for year 1974; g) no Court formal findings the Simons owed further for 1974, or did not pay for all three years, or upon what basis.

(62) The Affidavit of Patricia White, current Dean of the Sandra Day O'Connor School of Law at Arizona State University, as Mr. Simons previous counsel, asked the Department of Justice for the Simons' original returns, and notices of assessment, and never received them and "was never able to determine from any document which she examined what the underlying substantive tax issues were

which lead to the determination of a deficiency assessed against the taxpayer". (P. Am. Complt. Ap. pg. 123)

(63) The Simons CPA Dennis Larson, by affidavit, received "no information as to what code sections or regulations were being used for their collection effort, why there was a five-year silence of no collections after payment for the settlement amount or documents from the IRS. " (P. Am. Complt. Ap. pg. 117-119 at 118).

(64) CPA Larsen reports he prepared the Simons returns, and " no billings or other correspondence from the IRS was received during that time by my office or by the Taxpayer to give any other indication the payment was for any other amount." (id)

(65) A twenty three year Appeals officer, Gail Anger, by affidavit, found that the IMF itself was undependable as a source of information as to what had occurred on the account as the account showed in 1983 –0- (zero) owing, and again in 1995 it showed –0- owing, and then it showed tens of thousands owing after it showed zero owing. This condition makes the IMF undependable for showing the Simons owed, but also for 'knowing' what the IRS was doing on the account, without the original files. (P. Am. Complt. App. pg. 119-122 at 121-22).

(66) The IRS Revenue Officer Thurman on 7-11-88 a) obtained the original file, b) copied the original file, c) noted "District Counsel agreed to settle by clearance of major penalties & minor tax changes" and d) noted " 1972 & 1973 are closed satisfied. Appears to be No open issues on 1974", (P. Am. Complt. Ap. 68) e)also notes "told him [Simon's cpa] without any evidence that bal due is in error I must proced with ECA [enforced collection action] He sd TP will fight it in

court. I sd on what basis & if that is what he wants to do." On 9/8/88 (Aplt. Am. Complt. Ap. 71a). Mr. Thurman understood the importance of the Simons and their tax professionals having their records.

(67) Mr. Thurman documents that the Simons and their CPA were looking for their records to give to Mr. Thurman on 8-17-88 P. Am. Complt. Ap. 70, and 8-18-88 (id.), 9/1/88 (P. Am. Complt. Ap. 71a), 11/21/88 (P. Am. Comp. Ap. 72), 11/12/89 (P. Am. Comp. Ap. 73)

(68) Mr. Thurman notes a conversation with 'Dal' who said, " could do on the IMF easily" "don't need to prove insolv." (P. Am. Complt. Ap. pg. 75)

(69) Mr. Thurman, having the original file in his possession, not giving it to the Simons or their CPA or lawyer who were looking for the records, noted that "Case does not appear to be pursued actively by IRSC ever" (8/2/88)(P. Am. Complt. Ap. pg. 69) and "Appears TP is wealthy & paying little or no tax." (7/26/88) (P. Am. Complt. Ap. pg. 68)

(70) Without the form 872 and Notice of Deficiency having any Document locator number, the Simons tax professional could not know of their existence or whereabouts (P. Am. Complt. Ap. pg. 116)

(71) Yet, Mr. Thurman had the original file. (P. Am. Complt. Ap. pg. 68) '

(72) DOJ attorney Kirk Lusty who brought the claims into District Court also knew where the documents were (P. Am. Complt. Ap. pg. 63) but did not disclose the original returns or notices of assessment. (P. Am. Complt. Ap. 124, 125).

(73) On Dec. 14, 1992, the IRS filed a Complaint to quiet title to property the Simons and family trusts owned, by seeking to foreclose tax liens. (P. Am. Complt. App. pg. 181).

(74) The United States stated that 'despite timely notice and demand' made on assessments listed for year 1974 beginning as 7-25-83. (P. Am. Complt. App. pg. 183). This statement is untrue.

(75) The U.S. certificate of assessments omits the zero assessment of 10-24-1983 as found with a tc 300 on (P. Am. Complt. Ap. 104) and does not inform the Court that the hold codes prevent mailing of any notices, and late assessments logically would not generate notices of amounts due, and the District Court was never notified by the government of ZERO owing after 1995.

(76) All other assessments listed 3-18-85, 8-20-90, 11-05-90, 4-15-91, 9-09-91 had be made manually, and consisted of a TC 340 interest assessment that is a 'restricted interest' code that holds notices, (Attachment Service Center Replacement System Phase III Implementation "SCRS" PG. 10, 4) and an accompanying TC 290 code, with HC (Hold Code) 3 that holds notices from being mailed. (Attachment IRS ADP AND IDRS document 6209 pg. 1.)

(77) Records show that the account was 'closed' at least until 27 Jul 1989 (P. Am. Complt. Ap. 62a, and was opened Aug. 1991 (id. at 62b)

(78) The document showing a late assessment was done on the 1974 account with managers approval (Id. at 5) was withheld until after about Feb. 15, 2000.

(79) The Simons and their tax professional Dennis Larsen, Patricia White and this Counsel were incapable of knowing or understanding how the Simons fully paid,

why they fully paid, what the issues of the 1983 contract were, why the collection efforts against them for year 1974 were outside the statutes and thus depriving the District Court of jurisdiction, until after about Feb. 2000 when the government finally disgorged all the foregoing essential documents.

(80) The government factually had a fiduciary duty of contract to deal honorably and fairly with the Simons.

**THERE WAS NO 2001 CONTRACT OR AGREEMENT**

(81) There was no meeting of the minds that a debt was owed, and the District Court made no formal findings that a debt was legally owed.

(82) If the 1983 contract was fully satisfied, then the government could give no mutual consideration for the payment, because they were already obligated by 26 U.S.C. 7122 to forebear collection.

(83) On March 21, 2001, the District Court ordered the Simons to make an offer to the Department of Justice to settle all claims and they did.

(84) Department of Justice Attorney Jeffery Snow drafted the top portion of a handwritten document. (P. Am. Complt. Ap. pg. 130).

(85) Mr. Simons attorney Richard Rappaport drafted the paragraph at the bottom.

The handwritten offer reads as follows:

"1. Snow to recommend to his superiors a "worldwide" settlement (all claims in any way related to the matters in this case (thurmond, Lusty, Lawson, etc.) For a cash payment of $55,000 on behalf of [?] offeror Dan C. Simons, by cashier's check, to the Deparment of Treay 30 days after notification of offer's acceptance.
2. If the Department does not accept, Plaintiffs' motion for summary judgment will be [ set?] for argument.
3. If Simons' payment is not made, Plaintiffs' Motion will be [set? ] for argument.
4. Upon payment all IRS claims against the Simons (Dan & Sally & all the defendants named in this case 2:92cv10718 will be forever discharged,

released, extinguished- and any and all lines assessments etc. shall be released
if they have not already been released.
[Signed Dan C. Simons Jeffrey Snow Susan R. Schildmeyer] "
(P. Am. Complt. App. pg. 130)

(86) March 21, 2001 Department of Justice attorney Jeffrey Snow informed the Court he had no delegated authority to bind the government. (P. Am. Complt. App. 222).

(87) The Department of Justice rewrote the offer, eliminating resolution of ALL claims involving the government employees Thurmond, Lusty, Lawsen etc.. (P. Ap. Complt. App. 131)[notes on this document are by counsel].

(88) The government objected to the proposed order based on the handwritten document that extinguished all the government claims admitting the government was 'clarifying' what it meant by 'worldwide', which differed from the clear wording of the handwritten offer. (P. Am. Complt. Ap. 206-206a)

(89) On June 18, 2002, Mr. Snow assured the Court that the government was willing to accept Mr. Simons amount but left a copy of the acceptance in his hotel room. (P. Am. Compl. Ap. 227).

(90) The District Court relied on Mr. Snow's verbal assertion, and 'Declared' the handwritten document to be an 'agreement.'(P. Am. Complt. Ap. 228)

(91) The District Court demanded Mr. Simons pay the $55,000. (P. Am. Complt. Ap. 229) and threatened summary judgment for the government and a finding of 'frivolous' and 'merit less' counter claims. Id.

(92) The Simons were without proof they did not owe for about 8 years, and did not know a late assessment had been done on the account until 2000, and

the Court was not going to believe them at this late date. (P. Am. Complt. Ap. 230)

(93) June 27, 2002 Mr. Simons unwillingly did pay, *as ordered*, the $55,000. (P. Am. Complt. Ap. 140)

(94) The Appeals Court did not believe the Simons, ignored all jurisdictional arguments, and denied the Simons relief in an unpublished opinion. *U.S. v. Simons*, http://www.kscourts.org/ca10/cases/2003/12/02-4201.htm

(95) After the statutes of limitation ran for filing an appeal with the Supreme Court, the IRS sent the Simons another bill for over $4000 for year 1974, in March, 2000. (P. Am. Complnt. App. pg. 139- 139a).

**(96)** The Simons had to have legal help to assist in getting the bill removed (P. Ap. Complt. Ap. pg. 1).

**(97)** Now, the Simons are possibly vulnerable for a government 'forgiven' alleged debt, 26 U.S.C. 108, with a government that has already reworded a handwritten offer, opposed any District Court judgment, and in violation of any District Court judgment, once again billed the Simons in March 2004.

**(98)** Unless this Court accepts jurisdiction, declares the 1983 a *bona fide* satisfied contract, and declares the 2001 District Court orders to be void, as lacking subject matter jurisdiction, and any alleged 2001 agreement to fail for lack of mutual consideration by the government.

**(99)** At no time in the administrative or District Court action were there any timely notice of the 1983 assessment and timely demand for payment, *prior*

written notice of intent to levy to the levies, ever produced by the government to the Court or to the Simons and their tax professionals. (P. Am. Complt. Ap. 117-118, 123-125, 126-129).

**(100)** The IMF Computer record shows the IRS again closed the 1974 account with ZERO owing in 1995 (P. Am. Complt. Ap. 110).

**(101)** The Department of Justice readjusted this evidentiary record prior to the 2002 District Court order to pay, on 7-20-2001 by 'DOJ Jeff Snow' inputting a litigation 520 code and reestablishing the $76, 236.91 debt with a TC 609, backdating the transaction to 8-07-1995. (P. Am. Complt. Ap. 110-111).

**MR. AND MRS. SIMONS DUE DILIGENCE IN TRYING TO ACQUIRE THEIR RECORDS AND SEEK HELP**

(102) Mr. Simons sought help through the Problems Resolution Person, to no avail. (P. Am. Complt. Ap. 77, 118).

(103) 12/20/88 Mr. Simons documents his efforts in trying to find his records to Mr. Thurman (P. Am. Complt. Ap. 79)

(104) The Simons CPA Dennis Larsen asked for the history and "did not receive it" and "received no information as to what code sections or regulations were being used for their collection effort, why there was a five year silence of no collections after payment for the settlement amount." (P. Am. Complt. Ap. pgs. 118)

(105) Attorney White received nothing that informed her as to the nature of the basis for a deficiency determination, and asked. (P. Am. Complt. Ap. pgs. 123, 125)

(106) Mr. and Mrs. Simons wrote many FOIA and Privacy Act requests wherein they received the following responses with P. Am. Complt. Ap. page references:

a. July 11, 1991 "If you do not agree [to extension of time to Find documents] you have the right to consider this a denial." 163

b. "16 Sept. 1991…FOIA Appeal…The office of Chief Counsel, Disclosure Litigation Division received your letter… the statutory Period for response expires Oct. 4, 1991" 164

c. "September 26, 1991" "I have reviewed your account and verified that the letters were sent to you as required by law." 165

d. Simons are given some forms relating to tax liens and a Delegation order "forms relating to Levies…. " but not To the individual employees. 166

e. "24 Feb 1992" Dept. of Treas. Appeal response. Both the Ogden Service Center and Salt Lake District Office responded That there were no records responsive to the Simons request Therefore **<u>'there was no denial of records"</u>** 167

f. "2 April 1992" the statutory period for appeal has passed. 168

g. "June 23, 1992" Privacy Act appeal response, person must "Specifiy the name and location of the particular system of records"169 (i)Special Procedures function is not on any IRS public org. charts.

h. "30 Jul 1992" Appeal response for FOIA request, "We should point out that I.R.C.§ 6404(b) specifically excludes any taxpayer

initiated request for abatement of income taxes. …We have checked our IDRS terminal, and there are no abatements pending for you account for the years you were questioning.” 171

j. “Aug 11 1992” “…a search was conducted, but no records responsive to your request were located.” 172

k. “Aug 14, 1992” FOIA appeal response telling Simons to contact the Ogden Service Center and no agency records have been withheld. 173

l. “28 Oct 1992” Mrs. Simons’ FOIA appeal. “The statutory period for a response has expired….there are ample administrative and judicial procedures and safeguards to review the Service’s activities and afford you with due process.” [ not without key documents withheld] 174-75

m. “May 11, 1996” the Department of Treasury appeal responds to Mrs. Simons’ letter of “October 23, 199<u>1</u>” providing her with redacted Document 176

O. “Oct 22 1996” Appeal response, “Records concerning the processing, assessment, examination, collection and investigation of tax accounts are maintained in the Service Center or District Office in which such actions took place. “ [no one states that Records are in Special Procedure function” ] 177-178

p. “Nov. 7, 1996” IRS service center unsigned FOIA response

stating they found no records and they should inquire at the

Rocky Mountain District Office. 179

(107) **The government also informed Mr. Simons that there were <u>no consents for extensions of time signed by him, or they were destroyed</u>. (P. Am. Complt. Ap. 137-138) compare (P. Am. Complt. Am. 58) not disclosed until 2000 ( P. Am. Complt. Am. 127)**.

**<u>DAMAGES</u>**

Mr. Simons notarized verification of the Complaint is an affidavit of damages as attached at the end of the original complaint and the pro forma of Traverse Ridge (P. Am. Complt. Ap. 145-147) documents the validity of the following information:

a. The Plaintiffs' full 'expectation' interests in a life without false claims is best found in the Plaintiff Mr. Simons' life, as a pattern of conduct best demonstrating his potential, and demonstrating his investment in his professional livelihood, and the meticulousness of his business affairs, as follows;

   a. By the time Mr. Simons was about 23 years old, he had his first real estate sales position with Bettilyon Realty in June of 1959.
   b. He then became the sales manager with Capson Investment Company for eight years.
   c. At about 32 years old he received the Salesman of the year award for the Salt Lake Board of Realtors, and he became a broker and began his sole proprietorship of and was the president of Real Estate Consultants.

d. He also served: at age 38 President of the Salt Lake Board, age 43 as president of the Utah Association of Realtors, age 44 as Regional Vice President of the National Association of Realtors. He was the chairman of several committees at the National Association of Realtors. From age 31 forward he attended the National Association Meetings and chaired effectively every committee of the National Association of Realtors, including the powerful Federal Taxation Committee. The National Association of Realtors is the largest trade association in the Nation and had about 900,000 members at the time,

e. At about age 34 to 40, he was the National Director of the National Apartment Association, State Director of the Utah Association of Realtors, President of the Utah Apartment Association, and was broker and president of his own company.

f. In addition to the offices in 'd' above, at age 35 he became Vice President of the Salt Lake Board of Realtors, President of the Utah Apartment Association (again) while being the broker and president of his own company.

g. At about age 36, he became the National Director of the National Association of Realtors, and was broker and president of his own company, Board Director Salt Lake Board of Realtors, while still working as the broker and president of his own company.

h. At about age 38, President of the Salt Lake Board of Realtors, age 43, President of the Utah Association of Realtors, about age 46 Regional Vice President National Association of Realtors, Rocky Mountain Region, also on

President Reagan's advisory committee, and in 1982 at the age of about 45, he was Chairman of the Environment Energy and Development subcommittee of the Legislative Committee of the National Assn. of Realtors.

i. At age 40 he also received the Realtor of the year award from the Utah Association of Realtors and was at age 44 Regional Vice President for the National Association of Realtors in 1981, representing the states of Wyoming, Colorado, New Mexico, Arizona, Nevada, and Utah.

j. He served as Chairman of Utah, Salt Lake, and National committees.

k. His company with a staff of about 65 agents joined with Bettilyon Realty wherein he was the broker and president of Bettilyon and Simons Realtors.

l. He then became the broker and President of Simons and Company by the time the indictments were issued about April, 1979.

m. He also was a licensed Real Estate Appraiser and belonged to Realtors National Marketing Institute, Farm and Land Institute, National Association of Real Estate Appraisers, REA, National Association of Review Appraisers, CRA, American Institute of Real Estate Appraisers, International Council of Shopping centers, Retail Merchants Association.

n. His brokerage companies generally obtained the top or near the top statewide volumes of sales, and handled residential, commercial, investment and real estate, wherein he also purchased, sold, remodeled, apartments and shopping centers nationwide, and developed residential, commercial and industrial properties, served on boards of companies and Valley Bank Mortgage Company, organizing Geodyne and Alpine ltd. partnerships that owned

Traverse Ridge, a project he consistently wished to develop but could not due directly to the government's actions in breach of the 1983 contract.

o. Traverse Ridge is not completely developed and just a portion of the developed property is understood to be worth over approximately $150 million dollars.

(104) Mr. Simons had a lifetime vested in the use of his Professional Real Estate licenses to which he had property rights

(105) Mr. and Mrs. Simons had a property right in the 1983 contract itself.

(106) The IRS admits the falsity of their criminal fraud claims (P. Am. Complt. Ap. 28).

(107) There is no evidence of any government action taken against Mr. Simons secretary that the government alleges 'completely reversed her story'. If she gave false information to the government, no action was taken and the IRS admits its record supports none as the Court barred some evidence the government tried to admit and it would not likely be admitted civilly. (P. Am. Complt. Ap. pg. 28, 29).

(108) After the criminal trial fiasco, the Simons were attempting to rebuild their business, as shown by the 1983 date on the pro forma for traverse ridge. (P. Am. Complt. Ap. 144)

(109) The only bad credit on the Simons was the IRS tax liens resulting from the IRS refusal to forebear collections. (P. Am. Complt. Ap. 85-87)

(110) The Simons CPA informed Mr. Thurman of the need to release liens so Mr. Simons could "operate freely in the real estate business". (P. Am. Complt. Ap.70)

(111) The Simons wife and children were afraid to answer the door bell for years in fear it was the IRS coming to seize their property (Complaint verification), as Rev. Officer Mr. Thurman threatened to do on the following dates:

a. 8/18/88 "Warned of ECA if not resolved levy, seizure, summons". (P. Am. Complt. Ap. 70)

b. 8/17/88 "Warned of ECA …) id.

c. 9/1/88 'Told him I will proceed with ECA, levy summons, etc." Id. at pg. 71a

d. 9/8/88 "…Dennis Larsen chewed on my ear for a long time with all the reasons why I shouldn't take ECA on assets or summons… told him without any evidence bal due was in error I must proceed with ECA" . Id.

e. 11/21/88 "Warned of possible suit or other enforcement…" Id. pg. 72)

f. 1/12/89 "…. Otherwise I proceed with ECA" Id. pg. 73

g. The IRS had levied all the Simons' bank accounts on about 10/18/88 (P. Am. Complt. Ap. 81-84 without a PRIOR notice of levy issued 1/10/89 (P. Am. Complt. Ap. 80).

h. When Mr. Simons signed the offer in compromise he had no ability to use his bank accounts, could not practice freely in real estate business, and was being threatened with seizure of all the land held in his name and by the family trusts. He could not take out loans on the liened properties. Complaint verification.

(112) The Plaintiffs suffered

a. the damages of being subjected to the most powerful agencies on earth, the IRS, and Department of Justice, under threats of summons and seizures, through no fault of their own, other than that they were successful, without the ability to obtain redress or prevent them from continuing their pursuit of happiness recognized by Courts as intrinsic to man's pursuit of happiness in an orderly fashion;

b. The days and nights of watching your wife and children worry, wondering if armed agents would also actually seize their home and other properties, afraid to answer the door;

c. The life of one living with a complete lack of personal, professional, financial, political, mental and emotional security that occurs when statutes, regulations, processes in litigation designed to ensure protection of the Plaintiffs were ultimately discarded administratively and judicially;

d. The frustration and pain of knowing the more they sought to associate with others in real estate projects, as is a common practice for real estate professionals, the more the levies and liens and ongoing civil claims would be broadcast and known;

e. The pain of knowing you have done nothing the government is accusing you of, and yet you can not prove it to the government or courts, because, as you find out 12 years later, the government had your records and refused to turn them over, while Revenue Officer Don Thurman documented the Plaintiffs' financial stresses, and documented his threats to the Plaintiffs regularly, and finally documented how he discussed

collecting on only the computer readout and how he knew the Plainfiffs required evidence of the government's error to succeed in fighting the government;

f. The pain of horrible embarrassment of knowing banks and financial institutions upon whose boards Mr. Simons served or associated with, knew that levies were on their bank accounts and liens on their properties;

g. The pain of watching their children aware of the stress and possibility of the government taking their home, attempt to function in a family home atmosphere with a cloud of unknown threats and actions that could result in the loss of their home as based as they know now, on lies by their government against them;

h. The sleepless nights of worry about a financial challenges they thought were resolved, based on reasons not given, without any fault of their own, and based on false claims, having no records to defeat them;

i. The deprivation of thousands of hours of productive time and work days that would otherwise contribute to making a living and achieving goals, that instead were spent having to go to appointments, do document research, meet with CPAs or attorneys to figure out how to clear their name and property titles, meet payments of monstrous bills from attorneys and CPAs, when all that time, effort, money for attorneys and cpas, could have so easily been avoided….. then discovering, the government knew all along that the government claims were false,

**j.** The pain and stress of preparing for retirement, and creating a legacy to pass to one's children and grandchildren, only to see their property holdings taken over with levies and liens for a payment never owed;

**k.** The humiliation of having to cash checks and pay bills with western union or other money orders, for fear of having money in bank accounts that can be seized, WITHOUT warning or notice, as precisely was done in 1988 in three banks or credit unions;

**l.** And finally, living in an economic prison, without cause, that they were well aware others in the business community were aware of, and yet, on a daily basis they understood they could not escape because no one was listening.

**MALICE AND FRAUD, HARRASSMENT, ABUSE OF ADMINISTRATIVE AND JUDICIAL PROCESSES, DENIAL OF A FAIR AND IMPARTIAL HEARING DUE PROCESS**

(113) All the foregoing facts, are specific as to subjecting Mr. Simons to a criminal trial without adequate evidence (P. Am. Complt. Ap. 28)

a. subjecting the Simons civilly to baseless fraud claims, (id)

**b.** subjecting the Simons to full payment of the 1983 contract (P. Am. Cmplt. Ap. pg. 6-11, 52, 53) that the IRS acknowledges the Simons consented to amounts no really owed due to the lapse of the statutes of limitation (Id at. 29), the petitioner's concession to 'promissory notes', not income received (id. ), the government conceded the Simons did not owe any taxes on $29,500 in commissions that were properly reported in later

years for year 1973 (id), and the government gave up another $8000 in income through the Appeals office (id), and then not keeping the deal.

**c.** subjecting the Simons to levies (id. 81-83 without **prio**r notice of levies (id. 80),

**d.** subjecting the Simons to numerous liens (Id. 85-95),

**e.** subjecting the Simons to continued collections and litigation when the assessment had been done late (id. at 5, 57-59) and no written notices and demands had been sent to them, or received by them, and the IRS knew, and DOJ knew, the assessment for 1974 was late by having the original file (Id. at pg. 68 and (62a).

**f.** Subjecting the Simons to a disastrous public credit history for years and years when nothing was owed for 1974. (id. 85-87)

**g.** Subjecting the family to fears of seizure (Complaint verification) and (P. Am. Complt. Ap. at 70,71a, 72, 73)

**h.** Subjecting the Simons to years of needless stress, apprehension, draining of energy, time, and financial resources based on the pretense that the Simons continued to owe for 1974. (id)

**i.** To continue the ruination processes for Simons and Co. and the Simons reputation for honesty that the baseless criminal trial already damaged. (id)

(114) All the foregoing, worked to deny the Simons of any fair hearing, in or out of Court, and denied them of property rights to freely alienate their property and to freely use Mr. Simons real estate licenses and certifications for his

business' capital development, and in fact did prejudice the District Court. (P. am. Complt. Ap. 230)

(115) The concealment of records, and the affirmative misrepresentation that the Simons owed additional amounts for year 1974, violated a fiduciary duty of trust by contract, and duty to deal fairly and honestly with the citizen, and violated the fiduciary relationship with the citizen through contract, and Federal Rules of Civil Procedure at Rule 26 in discovery.

(116) The withholding of records and affirmative claims the Simons owed, was not accidental, when both Revenue Officer Don Thurman, DOJ Attorney Lusty and Snow had access to the key documents necessary for the Simons defense and those documents were not released, especially when Mr. Lusty asked for them from special procedure function. (Id. at 68, 63, 110-111).

(117) The form 843 was submitted to obtain <u>all the money paid under the contract</u>, and all attorneys and tax professional and other fees and costs, as per a contract for all three years. (P. Am. Complt. Ap. 3)

(118) The Simons claims are not for 'taxes' but for money paid to settle a dispute that the government recognized was not really owed as 'taxes' (P. Am. Complt. Ap. 29) but was being paid for settlement.

(119) Conspiracy results when Rev. Officer Thurman meets and discusses collection without the records using only the IMF (P. Am. Complt. Ap. 75-76)

(120) Finally, the IRS service center on March 1, 2002 admits there is only one timely assessment on the 1974 account, and that assessment as highlighted by

the IRS was done in 1975. See highlighted copy page and legible unhighlighted identical page. ( Id. at 100-109 at pg. 100, 109, 110)

(121) But for Department of Justice Attorney Jeffery Snow ordering, in 2001, the IRS to replace a debt on the IMF (P. Am. Comp. Ap. 110-111) extinquished on the IMF on 8-7-1995 (P. Am. Complt. Ap. 110) with an expiration of the statutes code TC 608 (attachment 5a) , their was no debt the Simons owed.

**AMOUNTS OF DAMAGES**

(122) The verification of the original complaint shows that the projected earnings of Mr. Simons without the taint of years of levies and liens ongoing from about 1978 through 1982 for year 1975 held on the properties until the Simons 'cooperated' in settlement of the 1972-1924 tax years, and then liens from about 1988 through 1996 ( see tc 583 lien release P. Am. Complt. Ap. 110)(Attachment pg. 5) with the Traverse Ridge property that he could have developed without the levies and liens, is in the multiple millions to be ascertained upon further discovery for specific amounts.

(123) The liens and levies in violation of the 1983 contract, negatively impacted the Simons' earning ability in that (a) persons involved in real estate, looking for a developer for projects, or any transactions involving substantial sums of money, would be aware of these public records, and would not come to him for their real estate needs; (b) Banks he regularly did business with, were fully aware of the levies; (c) he was on the board of Valley Bank Mortgage and when his term ended, he was not invited to serve again; (d) his attempts to develop land, or pledge the properties for security for developments failed due

to these levies and liens; (f) he and Mrs. Simons suffered embarrassment as they became aware that their son, Dan Simons Jr., with the same name, and a highly reputable businessman in his own right, had to make affidavits saying he was not his father so as to obtain credit to purchase a car or mortgage property or otherwise conduct his own business affairs; (g) people in the community made statements to Dan Simons Jr. about his father's 'tax problem'; and (h) previous business associates verify that the real estate community equated Mr. Simons with IRS problems due to the years of ongoing levies and liens.

(124) Mr. Simons had consistently wished to develop the Traverse Ridge property, and made plans for doing so, including, with the partnership, arranging for building a road to the top of the mountain to facilitate further development, a small section of which is worth an estimated millions today.

(125) Plaintiff Mr. Simons was fully conversant with the building codes, had drawn plat maps for streets, analyzed the building costs for waterlines, sewer lines, gas mains, street lighting, the need for any variances, prior to the levies and liens, including preparing a *Performa* for selling and developing the property. P. App. 142

(126) Plaintiff Mr. Simons business associates in the partnership, pre- existing the liens and levies, were aware of his desire to develop the property and how the liens and levies hampered him from doing so.

(127) Had Mr. Simons been able to pledge even some of his property without the needless levies and liens, beginning in 1988 through 1994 (when the levies

began to be released), he could have purchased another deceased partners share of the partnership, giving him a 2/3rd interest, controlling the partnership wherein he could have possibly begun some development of small plots, leading to larger and larger developments over a span of years.

(128) It is impossible to put a precise definite dollar value on damage to the intangible interests of Mr. Simons' reputation and property interests in further opportunities for sales, development, etc. foreclosed due to the liens and false charges that he was not paying his taxes, violating also a legacy of honesty and integrity in his dealings with the government that he sought to build.

(129) Unquestionably, the government's *false* claims, were intended to cause Plaintiffs' damage, and prevent the Plaintiffs from making a viable living, so they would conceivably rapidly pay all the government was falsely claiming they owed for year 1974 about over $50000 in about 1990.

(130) Traverse Ridge is not completely developed and just a portion of the developed property is understood to be worth over approximately $150 million dollars.

(131) Well publicized printed indictments in 1979 based on false criminal charges, leading to very serious damage to the Plaintiffs' Simons and Company, were only compounded and prolonged unnecessarily due to the Government's breach of a contractual duty to stop collections after the 1983 full payment, and resulting unfounded levies and liens for 1974 and public civil claims also false charging fraudulent conveyances for amounts never due for year 1974,

from family trusts and conveyances set into place years before the IRS claimed they were fraudulent.

(132) Due to the failure, repudiation, or breach of the 1983 settlement, the Plaintiffs claims against the government are viable back to the false 1979 published criminal indictment.

(133) Plaintiff Simons had full expectations and definite plans he had begun carrying out, for being the developer of Traverse Ridge, and other entering into business relations for other developments, to be able to freely practice his profession without government interference, and was subjected to false public written instruments regarding the 1974 tax debt, both administratively and judicially, that held the Plaintiffs in a bad false light, that directly interfered with their professional ability to earn a living, based upon the full capability of his career experience, knowledge, talent, and business, political and social interest, all of which he had a vested property interest invested therein.

(134) Plaintiffs seek declaratory judgment relief and full expectation monetary damages for each and every day of the government's refusal to forebear collection, each and every day there were levies and liens formally on the Simons' property.

(135) Mrs. Simons suffered the stress of watching her husband struggle to economically survive for himself, for her, and for their eight children, while she was carrying on the mothering and homemaking duties, and later working part time, for years, never knowing if her family's home would be seized, if

their property for the family and for retirement would be seized and auctioned off.

(136) The payment of $49, 546.55 is totally lost for the five years of good it did in getting the IRS to forebear collections, and with interest, the amount is going to approximate about several hundred thousand dollars at this time.

(137) The Simons tax professional fees and court costs range about over approximately about $500,.000 at this time.

(138) The $55,000 payment is likewise lost as the IRS billed the Simons again, and the Simons may well be liable for further payments for a forgiven 'alleged' debt for year 1974, that can be construed as income under 26 U.S.C. 108, possibly.

(139) Logic, Reason, informs the Court that the business experienced Mr. Simons would never have paid $49, 546.55 unless they were assured there were no further collections to be made on the account.

(140) There is no evidence that the 1983 agreement of two tax court decisions unifying all three years with their identical underlying IRS work documents are anything other than an 'agreement'.

(141) Logic and Reason equally inform this Court that no Real Estate professional of the caliber of Mr. Simons, who was seeking to develop property, buy and trade and sell properties, is going to risk not being able to do so, nor risk his family's home, and family's properties, by paying anything less than a full amount exactly as requested by the IRS at the time or oral collection on October 21, 1983.

(142) Finally, logically if the Simons paid twice, the Simons fully expected to be left entirely alone after both payments and were not, and in all likelihood, will not be in the future. (P. Am. Complt. Ap. 139).

(143) There is absolutely no evidence that Mr. and Mrs. Simons have done anything to injure the government in regards to these tax years, and by this case, they are not seeking in any manner to destroy the IRS' ability to collect its fair amount of taxes by this suit.

(144) Each and every day the IRS had a lien on the Simons property and levy on Bank account, there were maximum damages of $3000 for each one.

(145) The Simons were refused a refund in 2004, except for about 23 dollars, (P. Am. Complt. Ap. 139).

**A PRIVATE UNDISCLOSED POLICY REVERSED A LITIGATION FREEZES ON CLOSED ACCOUNTS NATIONALLY UNSUSPENDING THEM FROM COLLECTION FREEZES**

(146) In 1983, when the IRS and Simons were in agreement, the IRS closed the 1974 account on the Master File computer on 10-24-1983 with a TC 300 human exam indicator, (P. Am. Compl. Ap. 104, attachment pg. 4. ) hold code 2 that holds notices (attachment pg. 1) and with a disposal code 1 indicating: "Disposal Codes 01 and 02 are used when no adjustments are proposed/processed to any type of return. Item 41 is required on all IMF cases with Disposal Code 01 and 02." Attachment pg. 1b.

(147) Such a disposal code is appropriate if nothing is owing on the account due to a late assessment, here done with manager approval (P. Am. Complt. Ap. 5)

(148) Prior to this closing however, the IRS placed a litigation freeze code, tc 520 on the account, on 9-5-1983 (P. Am. Complt. Ap. 104, attachment pg. 5) with a litigation freeze code of –W (P. Am. Complt. Ap. 1a).

(149) The account would have remained suspended from automatic collections with the litigation freeze indefinitely, except that in 1984, the IRS adopted the Service Center Replacement Policy that ordered "If a TC 520 is present with a CC [closing code] other than 72, 73, 74 contact special procedures function for disposition of the case…. If the case is closed or SPf has no record of the case and the CC is other than 72, 73, 74, input tc 521. " Attachment pg. 13, P. Am. Complt. Ap. pg. 134-135.

(150) A TC 521 un-suspends the account from the litigation freeze (Attachment pg. 5) and it was input on the Simons account on 12/31/ 1984 (P. Am. Complt. Ap. 104).

(151) Just four months later, it appears a restricted interest TC 340 was placed on the account for about 6, 332.07 (id. 104) with a hold code 3 (id. pg. 105) that holds all notices. Attachment pg. 1.

(152) The 1984 Service Center Replacement Center Phase III implementation (Attachment pg. 9-13) policy was never published in the federal register and overrides the Congressional bar on collections found in 26 U.S.C. 7121, among other statutes. Essentially, with the flip of a computer switch, nationally, all closed accounts with a litigation suspension freeze codes and closed codes like the Simons were reopened for examination or for further activity.