Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT**
**OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,
vs.
UNITED STATES OF AMERICA,
*Defendant*.

Case No. 06-115
Judge Susan Braden

**PLAINTIFFS' REPLY TO THE DEFENDANTS' OPPOSITION TO THE PLAINTIFFS' MOTION TO STRIKE THE DEFENDANT'S RULE 12 MOTION TO DISMISS,**

NOW COME THE PLAINTIFFS, by and through undersigned counsel, under RCFC 7 and Rule 12(f) to reply to the Defendants opposition to the Plaintiffs motion to strike the Defendants Rule 12 Motion to Dismiss, as based upon the memorandum of fact and law in support thereof as attached hereto.

So Signed this 5th day of June, 2006

_______________________________
Susan Rose, Utah Bar. No. 7985
*Counsel for the Plaintiffs*
9553 S. Indian Ridge Drive
Sandy, Utah 84092
(801) 545-0441
susan_rose@comcast.net

Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT**
**OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,
vs.
UNITED STATES OF AMERICA, Case No. 06-115
*Defendant*. Judge Susan Braden

**MEMORANDUM IN SUPPORT OF THE PLAINTIFFS' REPLY TO THE DEFENDANTS' OPPOSITION TO THE PLAINTIFFS' MOTION TO STRIKE THE DEFENDANT'S RULE 12 MOTION TO DISMISS**

## TABLE OF CONTENTS

I. **The Government stipulates to the fact that there are two contracts at issue, both involving over $10,000, but falsely claims the Simons are attacking both of them (D. Brf. 6)** …………………………………..2

II. **The Governments core position is baseless and misleading and the government knows it, as it misrepresents the Plaintiffs' position to the court.** ….3

**III. The Simons do challenge the validity of the 2001 handwritten document the government calls a contract.** ……………………………………………………5

IV. **A Consent Decree can be attacked if it is void for lack of subject matter jurisdiction.** ……………………………………………………………………….5

V. **The government's position as to the use of Rule12(f) and 7 is bogus as well and prohibited by judicial estoppel.** ……………………………………………………7

VI. **Equitable Tolling is wholly justified here, based upon not only concealed records, but also for the false claims, baseless liens and levies, an offer in compromise signed under duress, bad faith litigation and usurpation of the District Court's authority, to successfully profit the government at the Simons expense. .9**

**CONCLUSION**……………………………………………………………………18

**PRAYER FOR RELIEF** …………………………………………………………19

## TABLE OF AUTHORITIES

*Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992)……………………………16

*Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000)……….…………..11

*Bowen v. City of New York*, 476 U.S. 467, 481-482 (1986)………………………..11

*Carney v. U. S. , 462 F.2d 1142, (1972)*……………………………………………..6

*Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991)…………10

*Holmberg* v. *Armbrecht*, 327 U.S. 392, 397 (1946)……………………………………11

*Hurt v. U. S.* 70 F.3d 1261 (4th Cir. 1995)……………………………………………16

*Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 488 (1966)……………7

*Kurio v. U. S.*, 429 F. Supp. 42, 1970.STX.0000028<http://www.versuslaw.com> 13-14

*Larouche v. Department of the Treasury*, No. 91-1655, 2000 WL 805214
(D.D.C. Mar. 21, 2000)…………………………………………………………...8

*Lins v. United States*, 231 Ct. Cl. 579, 582, 688 F.2d 784, 786 (1982),
cert. denied, 459 U.S. 1147 (1983)…………………………………………………...10

*Nager Elec. Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 751
(1966), reh'g denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)…………………………10

*Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964)………………10

*Quinault Allottee Ass'n v. United States*, 453 F. 2d 1272, 1274 n.1 (Ct. Cl. 1972) 7

*Ripley v. Commissioner*, 103 F.3d 332 (4th Cir.) 1996.C04.43538
<http://www.versuslaw.com>; 103 F.3d 332 ¶¶31,32. …………………………...….5

*Pauley Petroleum, Inc. v. United States,* 591 F.2d 1308, 1315 (Ct. Cl. 1979)………7

*Pigford v. Veneman*, 215 F.R.D. 2, 4 n.1 (D.D.C. 2003)……………………………8

*United States v. Feinberg* [67-1 USTC ¶9176], 372 F. 2d 352 (3d Cir. 1965),
aff'd on rehearing en banc, 372 F. 2d 352, 359 (1967). ……………………………5

*United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962)…………………………………6

*U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592 (Fed. Cir. 1995)…………9

*Woodrum v. Southern Railway Co*., 750 F.2d 876, 1985.C11.41890
http://www.versuslaw.com ¶47……………………………………………………………7

28 U.S.C. § 1346(a)(2)),

RCFC 1 1

RCFC 11 18

RCFC 12(f) 1,8,9

RCFC 7 1,8,9

U. S. Attorneys Civil Resource Manual 47 Court of Federal Claims litigation.
http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title4/civ00047.htm…

(1 Corbin §86; 1 Williston §72)……………………………………………5

NOW COME THE PLAINTIFFS, by and through undersigned counsel, under RCFC 7 and Rule 12(f) to reply to the Defendants opposition to the Plaintiffs motion to strike the Defendants Rule 12 Motion to Dismiss, as based upon the memorandum of fact and law as follows:

As an initial matter, the most important RCFC Rule is Rule 1. All other rules are to be construed for the purposes of Rule 1 to promote a 'speedy' and 'just' processing of a case. If a party is able to filing into the Court that contain material that is 'irrelevant' or 'harrassing' or casts a party or counsel in a false light, then the pleading will result only in prolonged and unnecessary litigation that wastes the Court's limited resources.

Often Motions to Strike are characterized as time wasters. However, if they stop initially a practice of placing before this Court 'fantasy' legal arguments that consist of irrelevant case law not on point or false allegations unsupported by the evidence, that opposing counsel has a duty to research, and either admit or deny, then litigation is simplified and expedited tremendously. No party should be made to bare the burden of unwinding such filings to preserve the truth, a Court's duty to determine, unnecessarily. Such is merely the type of 'harrassment' that the motion to strike was designed to eliminate from all further consideration. It keeps the issues simple. There simply is no excuse for the government to not know the facts when the Simons have provided over 200 pages of their administrative and Court files referenced by page to facts. Reasonable inquiry, obliged by RCFC Rule 11, becomes very simple and reasonable. All the research has been done and provided to the government. If there is a dispute, the government can identify easily the document or information or evidence that is in error. That has not been done in the government's motion to dismiss. Instead untruthful, bare allegations, with

inappropriate law not on point, has been provided to confuse the issues and waste the Courts time, and obliterate the Simons's rights if the Court relies on it.

**IV. <u>The Government stipulates to the fact that there are two contracts at issue, both involving over $10,000, but falsely claims the Simons are attacking both of them (D. Brf. 6).</u>**

*1983's Contract*

1. The Simons are not attacking the validity of the 1983 multiple year 1973, 1974 and 1972 package settlement agreement to resolve a dispute (P. App. pg. 28, 22), memorialized in two Tax Court decisions (P. App. pg. 12-15), based upon identical underlying IRS drafted Tax Court Rule 155 computations attached to each as mandated (P. App. pg. 16-20) that interlink all three years mathematically and legally by income averaging.

2. The government doing RCFC Rule 11 reasonable inquiry knows this, AND knows the Simons fully paid. The Simons provided the government with all their records to show them as referenced by page numbers in the verified amended complaint. [[1]]

---

[1] The Simons marshall their evidence of a contract and full payment in 1983 with : **a)** Expert report of CPA Bryan Bolander, current president of the Utah Association of CPA's, **b)** provision of the District Counsel's decision (P. app. pg. 28); **c)** their original return for 1974 (P. App. pg. 31); **d)** their letters of offer to settle all three years as a package inseparable by year( P. App. pg. 22, 25); **e)** their calculation showing how the $49, 546.55 that was collected one time on October 21, 1983 by Rev. Officer Dal Lawsen, and paid about Nov. 8, 1983, fully satisfied the entire three years, using Rev. Proc. 83-7 with its eight place factoring table, coming to within .07 cents of what was paid, for all taxes, penalties, and restricted interest (P. App. pg. 52), **f)** the Computer readouts for 1974 (P. App. pg. 100) and 1973(P. App. pg. 97-99) showing that one working day after Mr. Lawsen's obtaining Mr. Simons' agreement to pay the entire amount, the IRS closed the account with a TC 300 and zero assessment and a TC 340 restricted interest code, and Hold Codes 2 and 3 that would prevent notices from issuing (P. App. pg. 104) and the placing of the entire payment with over about $2000 in additional penalties unknown to the Simons at the time into 1973's file, leaving all three years, on the computer closed out; **g)** the form 872 extending the statutes of limitation until a time certain, (P. App. pg. 58), and an internal quick assessment request form

V. **<u>The Governments core position is baseless and misleading and the government knows it, as it misrepresents the Plaintiffs' position to the court.</u>**

3. The government's assertion in the Motion to Dismiss and in its response that the government did nothing wrong (d. mot. To dismiss. Pg. 10), and in their response to the motion to strike that the Simons did not pay a Tax Court deficiency (d. resp. brief. Pg. 6); and the statement that the Simons do not identify any conduct of the government that tricked them into allowing a deadline for filing a claim under the Tucker Act as early as 1988 (d. brf. Pg. 10) (countered by government's recognition of the Simons claims of withholding evidence and falsely claiming they owed d. brf. Pg. 12), are all bare allegations that are unfounded on any evidence whatsoever. As such, these assertions attempt to obtain this Court's reliance to eliminate and further harm, and damage the reputation of the Simons who fully paid all along, complicate the litigation beyond what is necessary and so their entire response and motion to dismiss is based on a falsehood and should be stricken without further consideration.

4. Since the government admits there was a 1983 contract, and if it was fully paid, then the breaches of the fiduciary duty to forebear further collections should be redressed with the Simons. Significantly, not one piece of evidence on the planet exists showing the Simons did not fully pay for all three years in 1983, or the government would have produced in the last 25 years of collection activity. It is no longer a question of fact.

---

signed by a manager, showing the assessment would be purposely after the Assessment Statute Expiration Date (P.App.pg. 5) so not only would the 1974 account be ZERO 'd out, there could be no further collections on the 1974 account, standing alone **h)** the information that the IRS computer is incapable of posting unique settlements and netting of interest to the master file computer accurately, due to statutes programmed into it. (P. App. pg. 119-121) and the government's report Netting of Interest on Tax Overpayments and Underpayments Attached app. pg.7 showing netting of interest as in multiple year computations, or as here where claims are identified and forgiven at the same time (P. App. pg. 29), is impossible on the computer.

5. The Simons expressly fact by fact, document by document show a chain of continuous breaches from 1988 through even now the current disavowal of the Simons full payment, by the IRS threatening repeatedly enforced collection actions, seizure, levy, lien, (P. App. pg. 71a-74) to make the Simons sign an offer in compromise, while demanding records the Simons did not have, but the government not only had, but copied. (P. App. pg. 68), and later had access to in litigation (P. app. pg. 63). The levies were placed on their bank accounts in 1988 (P. App. pg. 81-83) before they received the obligatory prior notice of intent to levy (P. App. pg. 80) and similarly with the initial lien in 1988 (P. app. pg. 85) . These were the basis for the 1992 quiet title action (P. App. pg. 180) file for year 1974.

**VI. <u>The Simons do challenge the validity of the 2001 handwritten document the government calls a contract.</u>**

4. The Simons do challenge the handwritten 2001 document as an agreement as 1) it was not signed by a person with delegated authority (P.App. pg. 222);[[2]] 2) it was 'declared' a binding agreement by a District Court with absolutely no declaratory judgment authority under 28 U.S.C. 2201 and 2202 (p. App. pg. 228-230); 3) the DOJ rewrote the handwritten document redefining a key word 'worldwide', to exclude some parties and issues (P. App. pg. 207), and then objected to a judgment based on the handwritten document (P.App. pg. 209), showing a lack of unequivocal acceptance and no meeting of the minds (1 Corbin §86; 1 Williston §72. ); 4) the very foundational prerequisite for a District Court's jurisdiction is a timely assessment (26 U.S.C. 6213,

---

[2] The Government is bound to a contract compromising a tax controversy only if the contract was expressly approved by the appropriate Government officials precisely in the manner required by statute, 26 U. S. C. §7122. See, generally, *United States v. Feinberg* [67-1 USTC ¶9176], 372 F. 2d 352 (3d Cir. 1965), aff'd on rehearing en banc, 372 F. 2d 352, 359 (1967).

6501), and here there were none [[3]]; 5) equitably the 1983 contract was paid, so what possible material consideration such as forebearance can the government give… none.

VII. **A Consent Decree can be attacked if it is void for lack of subject matter jurisdiction.**

5. An Appellate Court has no more jurisdiction than the District Court. Congress has determined only one Court in this Country is to hear contract claims involving the United States, ***exclusively***, and that is this Court under what is known as the Tucker Act. Under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2)), this Court's exclusive jurisdiction over claims against the United States for amounts exceeding $10,000 "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort." Id. And "the district courts shall *not* have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." Id. Congress also expressly bars District Courts from using their Declaratory Judgment powers "with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986." 28 U.S.C. 2201(a).

6) When more than $10,000 in damages is claimed, in a contract dispute, the Court of Federal Claims *possesses exclusive jurisdiction* in these cases. 28 U.S.C. § 1491. Agreements comprising tax litigation are 'contracts' and contract rules apply. Here, there

---

[3] *Ripley v. Commissioner*, 103 F.3d 332 (4th Cir.) 1996.C04.43538 <http://www.versuslaw.com>; 103 F.3d 332 ¶¶31,32. The form 872 was withheld until Feb. 15, 2000.

are two in question, one in 1983 (P. App. pg. 12-21) and in 2001, (P. App. pg. 130) . See, *United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962).

7) The government relies on *Carney v. U. S. , 462 F.2d 1142, (1972)* for saying this Court can not declare the District Court actions void. D. brief pg. 5. As the government says, "Congress has not amended the Tucker Act since the Court of Claims decision in Carney to grant this Court the "independent and substantive equity jurisdiction" which would be necessary to declare a district court judgment void. Carney, 462 F.2d at 1144." Df. Brf. Pg. 5. It did not need amendment.

8) The assumption that this Court has no equity jurisdiction is an "ancient but inaccurate shibboleth." *Quinault Allottee Ass'n v. United States*, 453 F. 2d 1272, 1274 n.1 (Ct. Cl. 1972). The Court does not have the to grant specific equitable remedies, but "[t]his principle does not preclude the courts from exercising equitable powers as an incident of our general jurisdiction" *Pauley Petroleum, Inc. v. United States,* 591 F.2d 1308, 1315 (Ct. Cl. 1979) (citing *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 488 (1966)) (internal citations omitted). Plaintiffs in this case ask nothing more of this Court than the exercise of its equitable power incident to their claim for moneydamages against the federal government, a claim which lies squarely within this courts contract law jurisdiction. This is in error. In *Woodrum v. Southern Railway Co*., 750 F.2d 876, 1985.C11.41890 http://www.versuslaw.com ¶47, the 11th Circuit found that a District Court could not entertain a Rule 60 motion for fraud unless the Court had initial jurisdiction. ".... Rule 60(b) itself, for by its terms the Rule only preserves otherwise existing jurisdiction, but does not create it anew."

Id. With proof of a lack of jurisdiction in the District Court, in a Rule 60 motion, the District Court could arguably be unable to rule on it, as per Woodrum's analysis.

As the government notes, "When the prior judgment is attacked in a different court, "The new Court must be one having 'independent and substantive equity jurisdiction" as the action is equitable in nature." Citing Carney." D. brief pg. 4.

This Court, by the Little Tucker Act, has 'independent and substantive' exlcusive authority to declare purported '*contracts*' as declared by the District Court as a basis for a judgment, valid or void.

Did the government know this. Yes, it did, so the representation to the Court is to misuse this Court's resources and to waste the Plaintiffs. With harassing litigation of the type barred by Rule 11.

"Although the general rule is that jurisdiction is established at the time of filing, there is precedent that a claim which is for less than $10,000 when filed but is accruing so that it will be for more than $10,000 at the time of judgment is within the exclusive jurisdiction of the Court of Federal Claims. Goble v. Marsh, 684 F.2d 12 (D.C. Cir. 1982). It is settled that a plaintiff may remain in the district court under the Tucker Act even if his damages exceed $10,000 as long as he waives all recovery in excess of $10,000. E.g., Stone v. United States, 683 F.2d 449, 451 (D.C. Cir. 1982)."
U. S. Attorneys Civil Resource Manual 47 Court of Federal Claims litigation.

http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title4/civ00047.htm.

If this Court turns the case back to the District Court, upon motion to the District Court, it Will have to return the case to this court, or the Plaintiffs can appeal into the Federal Circuit Court. The government's position is countered by their own manual.

V. **<u>The government's position as to the use of Rule12(f) and 7 is bogus as well and prohibited by judicial estoppel.</u>**

9) While the language of Rule 12(f) refers to striking pleadings, the Court has authority under the rule to strike inappropriate matter in other filings, as well. *Pigford v. Veneman*,

215 F.R.D. 2, 4 n.1 (D.D.C. 2003) ("Although Rule 12(f) applies by its terms only to 'pleadings,' courts occasionally have applied the Rule to filings other than those enumerated in Rule 7(a) of the Federal Rules of Civil Procedure.") (citing *Cobell v. Norton*, No. 96-1285, 2003 WL 721477 (D.D.C. Mar. 3, 2003)); *Larouche v. Department of the Treasury*, No. 91-1655, 2000 WL 805214 (D.D.C. Mar. 21, 2000) (striking declaration that contained information that was irrelevant, speculative and redundant under Rule 12(f) and Rule 56(e)).

10) In *Pigford*, the Court relied on its "liberal discretion" under Rule 12(f) to strike scandalous and unsupported allegations made by plaintiffs' class counsel against a Department of Justice lawyer in a response filed in connection with a motion to reopen late claims. Id. at 4-5. The Court also found that "'the filing of a document containing such language is one form of harassment prohibited by Rule 11,'" and relied on that independent authority to strike class counsel's response to the motion to strike, in which scandalous accusations were repeated. Id. (citation omitted); see also Fed. R. Civ. P. 11(b) (attorney filing papers certifies that the papers are, inter alia, not being filed "for an improper purpose, such as to harass"). Thus, Plaintiffs' uninformed argument that Rule 12(f) does not apply to filings other than pleadings has been expressly rejected by Courts, and the Department of Justice was fully aware of this point of law. Its only conceivable purpose would be an attempt to mislead the Court.

Lest this Counsel be charged with plagerism, the foregoing arguments were raised successfully by the government in the Norton v. Cobell brief they filed and were reproduced here with much of the government’s own wording. **Attachment pg. 14-15**. http://www.usdoj.gov/civil/cases/cobell/docs/txt/12112003_reply.txt)

"Judicial estoppel" applies when a party takes a later position that is inconsistent with a former position in the same dispute, on which the party had been successful and had prevailed based on the former position. See *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592 (Fed. Cir. 1995) (party is estopped from taking an opposite procedural position in a second case involving the same patent, after being successful with the contrary position in an earlier case. This argument that the Simons could not move the Court to strike under Rules 12(f) and 7 were in bad faith, and the government knew this.

VI. **<u>Equitable Tolling is wholly justified here, based upon not only concealed records, but also for the false claims, baseless liens and levies, an offer in compromise signed under duress, bad faith litigation and usurpation of the District Court's authority, to successfully profit the government at the Simons expense.</u>**

11. The government says, gee, no one gets the statutes tolled because the government withheld their records. D. br. 10-11. The statute of limitations for a claim against the United States 'arises' or begins to run when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment . . . .'" [[4]] Moreover, "[u]nder federal law governing statutes of limitation, a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991). The *final acts* occurring necessitating a full statement of claim occurred when the IRS once again billed the Plaintiffs in March, 2004 for year 1974 in violation of the 2002 District Court ordered decree ( P. App. 215-216 ), for about $4100 dollars (P. App. 139-139a), and then attempted to refund about $23.17

[4] *Nager Elec. Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 751 (1966), reh'g denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)); *Lins v. United States*, 231 Ct. Cl. 579, 582, 688 F.2d 784, 786 (1982), cert. denied, 459 U.S. 1147 (1983); *Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964).

(P. App. 139-139a ), March, 2004 that Plaintiffs returned due to gross error for what was owed to them.

12. Here, 'all events <u>necessary to fix the Government's liabilit</u>y' occurred when the District Court denied the Simons challenge to its jurisdiction on July 31, 2002 (P. App. pg. 215-216), relying on the government's assertions, and denying the Simons' late discovered new evidence, and the Dec. 2003 Tenth Cir. ruling denying relief.

13. And prior to the 2002 payment, was the 2000 disgorgement of the Simons' agency file for year 1974, showing key documents had been concealed from the Simons and their tax professionals and the District Court. (P. App. pg. 117-118; 123-125; 126-127). The Simons action here is timely filed within six years of this date.

14. Likewise, another event, fixing the government's liability, occurred, when the DOJ replaced a debt on the IRS computer readout that expired 60 days after the March 28, 1995 final judgment, in 1995 (P. App. pg. 110, Attachment pg. 5a) when the Federal Rules of Appellate Procedure Rule 4, 60 day statute of limitations for government to file a notice of appeal of a March, 1995 judgment in favor of the Simons, ran. P. App. pg. 110-111; 193-194). It was further fixed, when DOJ attorney represented to the District Court that the DOJ had fully accepted a 2001 'handwritten' offer upon which the District Court relied. P. App. pg. 227. The record of the District Court shows the typewritten alleged 'acceptance' of a 'handwritten' offer (P. App. pg. 130, to pay for a 'worldwide' settlement for all claims against everyone (P. app. pg. 221-222), redefined 'worldwide' so as to not apply to all parties and all claims, (P. App. pg. 131, 207-208). By law, no contract could form. *Corbin, Williston, supra* at pg. 5.

15. The District Court stated in regards to any 2001 alleged deal, "it was not what the Department of Justice wanted" (id. pg. 228), and understood that Jeffery Snow's signature on the handwritten offer would not bind the government (P. App. pg. 222), and saw the government's objection to any order based on the 'handwritten' document (P. App. pg. 205-206b), saw the Department of Justice's typewritten rewording of the handwritten offer, narrowing the term 'worldwide' dramatically (P. App. pg. 207-208), the government's objection to any judgment based on a handwritten document (P. App. pg. 209), the Simons response showing they raised their jurisdictional claims and had not preferred settlement and were merely paying as ordered, (P. App. pg. 209-213), and then the IRS' complete disregard of any alleged 'agreement' or District Court's judgment, by its March, 2004 further billing of the Plaintiffs for $4100 dollars after their obedient $55,000 payment. (P. App. 139-139a) All the foregoing shows a lack of unequivocal acceptance necessary for a ' meeting of the minds'. *Kurio, infra,* Corbin, Williston *supra*. The District Court's finding that "there is no dispute that each party to this action agreed to the settlement agreement "(P. App. pg. 203-205) is simply in error. P. App. pg. 205-206b compare with 219-220, and 205.

16. The question then arises as to what conditions 'toll' the statutes of limitation such that a citizen may bring a claim against the government after the six year time frame. There are six circumstances that will toll the statutes of limitation: (1) when there has been fraud or concealment of information (*Holmberg* v. *Armbrecht*, 327 U.S. 392, 397 (1946)), equitable tolling occurs (P. App. pg. 68, 63, 118-119, 123-125, 126-129); (2) the continuing claims doctrine, *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000) where in each of the breaches is a new claim in a chain of events, (3) when an internal

policy, unpublished, is illegal and claimants were not on notice to the policy as part of the cause for their legal injury (*Bowen v. City of New York*, 476 U.S. 467, 481-482 (1986)), here the Service Center Replacement System Phase III Implementation policy nationally, with a flip of a switch so to speak, reversed litigation freeze TC 520 (Appendix pg. 5) with closing codes of 85, as was on the Simons closed account (P.App. pg. 104) to unsuspend them from collections, which occurred Dec. 1984). This policy was not published, not in the federal register, and was worded in computereze so it was hidden as a way for the Simons to explain their account;. (4) equitable estoppel, the 'laundering' of a false claim the Simons owed into a 'legitmate' debt by the government's misuse of the District court's authority, so the IRS may make new claims under 26 U.S.C. 108, and claims may continue for another ten years, if not by current personnel, by later personnel; ((5) the deprivation to the Plaintiffs of any decision, order, or judgment administratively, or in District Court explaining facts and conclusions of law in an *impartial* tribunal ( P. App.pg. 228-130) untainted from their late produced evidence; (6) the 2004 refusal of the government to give the Simons anything other than a $23.17 refund, rejected by the Simons as in error after again billing the Simons in March, 2004 (P. App. 139-139a) in violation of any District Court's orders.

17. There is no dispute that the Simons met the prerequisites of this Court by filing a form 843, rebate of all the money owed to them by the government under 'contract', not taxes. P. App. pg. 3. The IRS gave the Simons $23.17 refund, and Simons filed here for redress. P. App. pg. 139-139a, 4.

***Equitable Tolling Due to Fraud or Concealment of Documents***

18. As with the Kurios, in *Kurio v. U. S.*, 429 F. Supp. 42, 1970.STX.0000028<http://www.versuslaw.com> the Simons original returns were vital and the best evidence, with the District Counsel's decision, as to what occurred in the 1983 settlement agreement. As well noted by Rev. Thurman when he records that he stated to the Simons CPA Dennis Larsen, "…that without evidence the bal due was in error I must proceed with ECA. " (P. App. pg. 71a)

> "The returns sought by plaintiff from the Government were material and relevant because they were the best evidence of the facts on which this issue turned. [ P. App. pgs. 9, 123] They were immediately accessible to all participating IRS and Justice Department personnel, any of whom could have determined their location by computer search in the regional Service Center or the National Computer Center and obtained them by oral request. [P. App. pg. 63, 68]. See Treas. Reg. §§ 301.6103(a)-1(e), -1(h). They were sought by plaintiff through duly ordered, established, and well understood discovery procedures [and FOIA and Privacy Act requests]. Nevertheless, they were not furnished and this increased plaintiff's burden of proving his case beyond that contemplated by the Congress and the courts. In effect, plaintiff was deprived the opportunity of satisfying his burden of proof on an important part of his case."

*Kurio v. U. S.* , ¶39 [notes by Plaintiffs].

19. Once the government filed its 1992 complaint,

"The Government as a litigant is, of course, subject to the rules of discovery." [citations omitted]. The Government therefore had no right to ignore plaintiff's discovery demands. {P. App. pg. 123-125]. Moreover, as representatives of the Government, all personnel connected with the litigation, including counsel, had an obligation "to be frank and fair and disclose all the facts." [citations omitted].

*Kurio*, ¶37

21. 20. As with *Kurio*, once **"**the mistakes were finally discovered, the Government [and District Court] failed promptly to admit them. The resulting snarl is now before the Court for resolution.*"* *Kurio* ¶ 15.

22. The District Counsel's decision is vital to understanding the Simons were not 'owing taxes', but consenting to payments to settle the dispute by a contract involving over $10,000. [[5]]

23. The CPA reviewing the agreement could understand and track through the amounts and numbers to verify the actual agreement agreed with offers and acceptance and finally payment – **only**- with this District Counsel's Decision, and the Original returns, and letters of offer of settlement for a 'package' agreement inseparable by year, and the IRS underlying work documents that. (P. App. pg. 8-9). Here, the CPA found all the numbers and issues track through, and the IRS never mentioned interest in any of their documents, not likely to be an oversight. P. App. pg. 24. These documents also show the Simons were consenting to amounts either reported later, or not received in the year the IRS claimed, and to allowing the government to reach into a stat closed year, and consenting to a negligence penalty, for 'purposes of settlement.' P. App. pg. 27-29. No evidence showed how the Simons were paying 'taxes', so much as money to resolve a dispute. P. App. pg. 9-10. The CPA relied on documents concealed until 2000.

---

[5] There is some credence to this view, as the District Counsel's decision states for 1972, ' Though the taxpayer would be able to prove that most of the $18, 460.16 in promissory notes was not received that year [1972], he is conceding the non deductibility of those notes for purposes of settlement.' (P. App. pg. 29). For 1973, the District Counsel states, " The respondent agrees to reduce the dollar amount for commissions, received by the petition in 1973 by $29, 500.00. The petition was able to show in the criminal case that $21,500.00 of this amount allegedly received in 1973 was properly reported in subsequent years. It is highly unlikely that the government could now prove that this $21,500.00 should be included in the commission income for 1973. There is also an $8000 decrease agreed to by the Appeals Officer in his Supporting Statement. In addition, the petitioner has consented to the negligence penalty under 6653(a)." (id.) For 1974, the Simons consented to a minor negligence penalty and the changes in taxes on form 886-A (P. App. pg. 17) as referenced in the District Counsel's Decision (P. App. pg. 30, is only $1647. Notably, the form 5278 as drafted by the IRS for the Tax Court's Rule 155 computation, shows it is a 'settlement' computation. (P. App. pg. 17).

25. Revenue Officer Don Thurman had minimally the original returns and District Counsel's decision in 1988. Revenue Officer notes on 6-18-88 "Also recd Orig. of 7412 return- 1 ½ inches thick –copy & return later- Sent to RO Aide to copy." (P. App. pg. 68). On 7-11-88 the Rev. Officer notes show "Return copied- Info shows case went to tax court & District Council agreed to settle by clearance of major penalties & minor tax changes. Apparently 1972 & 1973 are closed satisfied. Appears to be no open issues on 1974". (P. App. pg. 68). Rev. Officer Thurman did not give these documents to the Simons Tax Professionals, while affirmatively asserting the Simons owed for tax year 1974, and under the duress of threats had them sign an offer in compromise. **[[6]]**

26. The Revenue Officer knew and understood that without the Simons evidence of the IRS being in error, the Simons could not prove the IRS was in error. P. App. pg. 71a. Department of Justice Attorney Kirk Lusty who filed the 1992 complaint for collection of the year 1974, also had access to the Simons records and did not produce their original returns, any notices of assessment. P. App. pg. 63, 123, 125. And Rev. Officer Thurman notes a meeting where 'Dal sd, could do easily [collections] on IMF'. (P. App. pg. 76). If

---

[6] a. 8/18/88 "Warned of ECA if not resolved levy, seizure, summons". (P. Am. Complt. Ap. 70)

a. 8/17/88 "Warned of ECA …) id.
b. 9/1/88 'Told him I will proceed with ECA, levy summons, etc." Id. at pg. 71a
c. 9/8/88 "…Dennis Larsen chewed on my ear for a long time with all the reasons why I shouldn't take ECA on assets or summons… told him without any evidence bal due was in error I must proceed with ECA" . Id.
d. 11/21/88 "Warned of possible suit or other enforcement…" Id. pg. 72)
e. 1/12/89 "…. Otherwise I proceed with ECA" Id. pg. 73
f. The IRS had levied all the Simons' bank accounts on about 10/18/88 (P. Am. Complt. Ap. 81-84 without a PRIOR notice of levy issued 1/10/89 (P. Am. Complt. Ap. 80).

the withheld documents did not show the government in error, then there would have been no harm in releasing them.

**The Simons' Due Diligence in Obtaining their Records**

27.. The Simons Tax Professionals sought and had a right to their records,[7]*Kurio supra. Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992); *Hurt v. U. S.* 70 F.3d 1261 (4th Cir. 1995). (the government has a duty to deal honorably with its citizens.)

29. Additionally, the Simons made numerous FOIA and Privacy Act requests. (P. App. pg. 163-179). It is evident from the record they produced that they were misled in to believing (a) there were no extensions signed by them. Compare P. App. pg. 137-138, with 58. (b) their were no responsive records in either the Service Center or District Office (Id. pg. 167), (c) they requested their record under the wrong statute, (Id. pg. 169), (d) and were told that 26 U.S.C. 6404 expressly prohibits any taxpayer initiated requests

[7] The Simons show previous CPA at the time in 1983 and again in 1988, Dennis Larsen states by affidavit that he asked for the history of the account and never received it (P. App. pg. 118) and that he met with the Problems Resolution person and that he "received no information as to what code sections or regulations were being used for their collection effort, why there was a five year silence of no collections after payment for the settlement amount, or documents from the IRS. … Every attempt was consciously made to provide Revenue Officer Don Thurman with information he needed. " P. App. pg. 118. The Simons letter to Rev. Officer Don Thurman likewise shows his belief that Mr. Thurman had no documents and he was trying to provide Mr. Thurman with what Mr. Thurman was demanding. (P. App. pg. 79) The Simons previous counsel, Patricia White, current dean of the Sandra Day O'Connor School of Law at Arizona State University, likewise attests by affidavit that she asked for the original and amended returns for 1972, 1973 and 1974, and written notices of assessment to no avail. "Throughout the period during which Affiant represented Mr. Simons, Affiant was never able to determine from any document which she examined what the underlying substantive tax issues were which led to the determination of deficiency assessed against the Taxpayer. " P. App. pg. 123, 125. Current counsel attests by affidavit that the original returns, proof of a late assessment for tax year 1974, District Counsel's decision was not received until after about Feb. 15, 2000 as a result of a FOIA/Privacy Act request to Special Procedures function of the IRS. (P. App. pg. 127, 128). After the box of documents where the IRS was disgorging the Simons' administrative file was received, tax experts reviewed the file, taking additional time to understand the meaning of the documents. Id.

for abatement and on the Computer there was no evidence of any requests for abatement pending for 1974, (Id. pg. 171), (e) and the Problems Resolution person, Revenue Officers, DOJ attorneys, IRS offices and service centers, all failed to inform the Simons to look in Special Procedure function. (P. App. pgs. 117-118, 122-129, and163-179.) Special Procedures function was not listed on public IRS organization charts. Not only is record concealment onerous, but the Simons made claims of affirmative misrepresentations upon which they could not know their claims.

30. Only after Feb. 15, 2000 could the Simons and Tax Professionals understand fully what documents were withheld, and that the IMF computer readout was defective, and that the certificate of assessment (required under 26 U.S.C. 6215) provided in a 1992 District Court action, P. App. pg. 182-183, a legal gateway to the Courts, begins with a 7-25-1983 statutorily late assessment, due to the lack of the posting of a form 872 extension TC 560 on the computer and lack of production of the form 872 under FOIA/Privacy Act or in discovery, along with the necessary and essential original returns, and district counsel's decision explaining the deal. Attachment pg. 5, 9.

31). Mr. Thurman records "Dal sd- could do on IMF easily". In other words, the defective computer readout could be used for collections rather than the records, that Rev. Officer Thurman had, copied, dis not disclose, along with other personnel, beginning in June of 1988.(P.App.pg. 68)

32). Concealment, purposeful or negligently, also occurred by not posting key transactions to the Simons' computer master file, thereby making it defective. Missing from the Master File are the codes for the Notice of Deficiency, TC 494, the signed extension of the statutes of limitation TC 560, the 1988 levies and liens, TC 582, such

that Tax Professionals reviewing the Computer readout would not know precisely what was happening to the Simons administratively. (See P. App. pg. 100-109) . Attachment pg. 4-5. According to the GAO, without these codes, and corresponding Document Locator Number, the Simons could not request their production from the IRS offices. (P. App. pg. 116, 129). Notably, finally on March 1, 2002, the IRS admits that there is only one notice issuance date, that being in 1975, for which the Simons promptly paid. (P App. pg. 100, 109, 110) . Hold codes through out the 1974 computer readout hold notices, (id. ) (attachment pg. 1). Restricted interest codes TC 340 throughout the 1974 account likewise hold notices. (Id.) (attachment 4, 10).

RCFC at Rule 11 reads as follows:

**(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

**(1)** it is not being presented for any improper purpose, such as to *harass* or to cause unnecessary delay or needless increase in the cost of litigation;

**(2)** the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

**(3)** the allegations and other factual contentions have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

**(4)** the denials of factual contentions are warranted on the evidence, or, if specifically so identified, are reasonably based on a lack of information or belief.

## CONCLUSION

Base upon the foregoing, the Simons reply that their motion to strike a disengenous and ill founded Motion to Dismiss based on unfounded bogus arguments, inaccurate facts so numerous as to no be able to be fully listed in these 20 pages, legal positions proffered that contradict within the same document, legal arguments the government successfully raised in prior litigation, are, on their face, filed for the improper purpose of depriving a

legitimately harmed tax payer citizens, privy to contract with the United States, from obtaining nothing more than their monetary damages. There is not one reason legitimately given this Court as to why in fairness and justice it should dismiss the Simons' complaint, why it did not state its claims with specificity, why tolling of the statutes is not wholly justified, why this Court is not the proper court, all presented in Byzantine design of baseless facts, inapplicable law, that would require about a hundred pages to unwind. The government filings are causing an unnecessary delay in this Court's performance under Rule 1, to hold the government to task for its actions that the Simons had no ability to identify and know enough to state a claim until at least after Feb. 15, 2000, by contract.

**PRAYER FOR RELIEF**

For about 25 years or more the Simons have been held out to be dishonest, a fraud, someone who isn't right with their government, and it is scandalous, untrue, and absolutely should not be continued here. They have a duty to themselves and family for the children and grandchildren to clear their name. As an officer of the Court, this filing is to notify the court that litigation in violation of Rule 11 is occurring. The government's $23.17 refund, is at least the IRS' acknowledgement that a refund is due. There is no other Court on the face of the earth authorized by congress to hear claims arising from government stipulated two contracts. Based on the foregoing, the Simons ask this Court to strike all the government's baseless, misleading, disingenuous, unsupported by evidence, harassing, scandalous Motion to dismiss, and to strike their response, made in this Court, and hold the government to dealing frankly and forthrightly with this Court, admitting the Simons paid for their 1983 contract, and that there can be

no other after or this Court will be supporting the government profiting from their breach. The Simons, are hard working taxpaying citizens that kept their deal in 1983 and have been nothing short of legally thrashed by a government unrestrained by any laws due to concealment of their records, baseless bare allegation pleadings and documents created administratively based on nothing short of deception, scandalous to their reputation, and they further pray for this Court to provide them with all the relief they are entitled to have in equity and under the law, including sanctions for having to file this motion.

So Signed this 14th day of June, 2006

______________/s/_________________

Susan Rose, Utah Bar. No. 7985
*Counsel for the Plaintiffs*
9553 S. Indian Ridge Drive
Sandy, Utah 84092
(801) 545-0441susan_rose@comcast.net

It is understood by Counsel that this case is an electronic file case and service to opposing counsel will be performed by the Court.

# ADP and IDRS Information

# 2003

Department of the Treasury
**Internal Revenue Service**
Document 6209 (Rev. 7-2003)
Cat No. 61462O

**(5) Hold Codes**

Use this code with TC 29X or TC 30X (Doc Code 54 or 47) when it is desired to prevent or delay the issuance of a refund and/or notice, such as when a particular adjustment action is cycled, or when a correction is being made to an account without the taxpayer's knowledge. Valid codes are:

| Code | Action |
|---|---|
| 0 | No Hold Code |
| 1 | If net module balance after posting is credit, holds credit until: Doc. Code 24 or 34 posts, TC 820 or 830 posts, TC 29X or 30X posts, Doc. Code 51 with secondary TC 300 posts, or total module balance becomes zero or debit. Set — K freeze. |
| 2 | Same as "1" but holds notice and credit. |
| 3 | prevents the issuance of the adjustment notice for the adjustment transaction on which it is entered. It does not prevent the issuance of any other notice. |
| 4 | Same as "1" except that a notice will not be issued at any time. MFT 61 and 63 only: suppresses CP243 |
| 5 | MFT 61, 63 only: suppresses CP 243. If both hold Codes 4 and 5 should be used, use hold Code 4. |

**(6) Priority Codes**

These codes must be used in order to post adjustments (Doc Code 47 or 54) to the Master File when certain module conditions exist. Failure to use the priority code when specified will cause the transactions to unpost, causing erroneous notices, refunding or billing especially in cases where multiple adjustments and/or credit transfers are being processed. If an adjustment needs a priority code it may indicate that Collection, Examination, or Statute should be consulted. It may also question the validity of a tax abatement, i.e. an abatement of tax on a return with a Collection Field Function Secured Return Code, no math error code, and the module is in Status 60 is questionable insofar as the return-

**Any line marked with # is for official use only**

| Freeze Code | File | Freeze Condition and Explanation | Freeze Release |
|---|---|---|---|
| W— | I/B/A | The claim pending freeze is set when a TC 470 is posted to a balance due module. The freeze is also set on IMF with TC 840 (if TC 150 without CCC "O" is present and no 29X/30X is present) or TC 976/977. No closing code or CC 90 prevents offset in. Module freeze. BMF MFT 02 only: releases in 52 weeks or TC 472 CC 98, or TC 295, or when total module balance is zero or credit. | See 470 Closing Code Chart in Chapter 11. BMF: MFT 02 only TC 470 CC 98 carry back claim received. Prohibits offsets. |
| —W | I/B/A | The litigation pending freeze is set by TC 520 with the appropriate closing code. TC 520 with CC 70, 84, 75-81, suspends running of the CSED unless a TC 550, TC 552 or TC 522 is posted with a later transaction date. Refunds/offsets and credit elects are frozen except under certain conditions (See Section 11.08(6)). | TC 521/522 with the appropriate closing code. Also, reestablish CSED on Chapter XI cases, after plan confirmation by inputting confirmation date with appropriate TC. |
| —X | I/B/A/ | (1)TC 150 coded '0' without a TC 840 already posted. (2)TC 840 (except B.S. 9XX with Julian date less than 400) if no TC 150 present. (3)TC 840 (except B.S. 9XX with Julian date less than 400) if TC 150 without CCC "O" provided module balance is debit. (4)Module contains overpayment but contains CCC "L' or "W' without second name line in the entity. (5)(IMF) A taxpayer claims an overpayment of estimated tax credit of XXXXX or more. (6)TC 840 posts to MFT 13 module creating a debit balance. XXXXXXXXX # | (1)(4)(5) TC 840. (1)(5) TC 29X with priority code 8. (2) TC 150 or 841 equal to TC 840. (3) TC 29X with priority code 8 (except B.S. 2XX IMF); TC 30X with priority code 8; status 22, 24, 26 or 60; module balance becomes zero or credit; 20 cycles (IMF) or 20 cycles (BMF) have elapsed. (6) a) module balance becomes zero or credit, or b) subsequent posting of TC 29X/30X (TC 241) with priority code 8 |
| X— | A | The manual assessment freeze is set when a module is in credit status and a CCC "X" is present. | When net module balance becomes zero or debit. |
| X— | I | Million Dollar Refund Freeze. Restricts offset. | Module balance becomes zero or debit or with posting of a TC 840. |

**Any line marked with # is for official use only**

1ao

## 7 *Disposal Codes*

These two digit codes are used to indicate the disposition of an examination. The codes are assigned by the Examination Division.

Disposal Codes 01 through 04 and 07 through 13, pertain to examined returns.

Disposal Codes 03, 04 and 07 through 13 are used when an adjustment is proposed/processed to change:

(a) Tax, penalties, or refundable credits for taxable returns.

(b) Income/loss or special allocation items for non-taxable returns.

Disposal Codes 01 and 02 are used when no adjustments are proposed/processed to any type of return. Item 41 is required on all IMF cases with Disposal Code 01 and 02.

Disposal Codes 20 through 99 pertain to non-examined returns.

Disposal Codes 03, 04, 08, 09, 10, 12 and 13 are valid for partial assessments.

**(1) Examined Disposal Codes**

01 **No-change with Adjustments**— Applies to non-change examined returns (even if a 30-day or 90-day letter was issued) if there is an adjustment to the tax base data such as income or deduction items but no change in tax liability or refundable credits. The following are examples of no-change with adjustment examinations:

Delinquent returns secured by the examiner and forwarded to the campus for processing. This includes delinquent return pickups that result in a zero tax liability.

Claims disallowed in full.

Income tax examination when taxpayers are issued an examination report Form 4549 and Letter 1156 (DO/IO), or Form 1902 when "Other" is checked on the reverse of Form 4700 (See IRMs 4.10.7 and 4.10.8).

Estate or gift tax cases when offsetting adjustments result in no change in tax liability. This includes gift tax cases when Letter 942 (C/DO) is issued to taxpayers (see IRM 4.10.9).

Excise, trusts and estates, or employment tax cases when offsetting adjustments to tax base data and/or credits result in no change in tax liability.

Disqualified 1120 DISC/IC-DISC election.

02 **No change**— Applies to Examination which do not necessitate the issuance of a report because there were no adjustments or no changes in tax liability (or proposed tax changes fell below the tolerance level in LEM IV) to:

Tax, penalties, or refundable credits for taxable returns

Income/loss or special allocation items for non-taxable returns. Form 4700, Examination Planning and Workpaper, should have Letter 590 checked.

03 **Agreed**— Applies only to returns if an agreement is received prior to the issuance of a 30-day or 60-day letter. Also applies to claims allowed in full and agreed claims partially allowed.

04 **Agreed**— Applies only to returns if an agreement is received after the issuance of a 30-day or 60-day letter. Office Audit (Org 2XXX), should use DC 03/not DC 04.

07 **Appealed**— Returns closed to Appeals before issuance of a 90-day letter, FPAA or FSAA.

**Any line marked with # is for official use only**

1B

# Transaction Pocket Guide

I = IMF
B = BMF
E = EPMF
A = IRAF
P = PMF
N = NMF
* = Computer Generated
# = TC posts to NMF only
N/A = Not added to NMF when transferre
D = Debit
C = Credit

Department of the Treasury
**Internal Revenue Service**
Document **10978** (2/99)
Catalog Number 27288Q

**2**

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 150* | | I/B/E/A/P/N | D | Tax Assessment-Return |
| 150* | | I/A | | Entity Created by TC150 |
| 151 | | E/A | | Reversal of TC 150 or 154 EPMF IRAF-Report Suppression |
| 152* | | I/A | | Entity Updated by TC150 |
| 154 | | E | | Posting of Form 5330 Tax Data |
| 155 | | E | | Form 5500 Sched. B |
| 156 | | E | | EPMF Second Letter |
| 157* | | B | | Schedule A |
| 159 | | I | | Settlement Data |
| 160 | | I/B/A/N | D | Manually Computed Delinquency Penalty |
| 161 | | I/B/A/N | C | Abate Delinquency Penalty |
| 162 | | I/B/A | | Failure to File Penalty Restriction Deletion |
| 166* | | I/B/A | D | Delinquency Penalty |
| 167* | | I/B/A | C | Abate Delinquency Penalty |
| 170 | | I/B/N | D | ES Tax Penalty |
| 171 | | I/B/N | C | Abate ES Tax Penalty |
| 176* | | I/B | D | Generate ES Tax Penalty |
| 177* | | I/B | C | Abate Generated ES Tax Penalty |
| 180 | | B/N | D | Deposit Penalty (FTD) |
| 181 | | B/N | C | Abate Deposit Penalty (FTD) |
| 186* | 180 | B | D | Generated Deposit Penalty (FTD) |
| 187* | 181 | B | C | Abate Deposit Penalty (FTD) |
| 190 | 340 | I/B/A | D | Manually Assessed Interest Transferred In (See TC 370) |
| 191 | 341 | I/B/A | C | Abate Assessed Interest-Transferred In (See TC 370) |

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 196* | 340 | I/B/A | D | Generated Assessed Interest |
| 197* | 341 | I/B/A | C | Abate Assessed Interest |
| 200 | | I/A/N | D | Identification Number Penalty |
| 201 | | I/A/N | C | Abate TC 200 |
| 234 | | B/N | D | Manual Daily Delinquency Penalty |
| 235 | | B/N | C | Abate TC 234/238 |
| 238* | 234 | B | D | Generated Daily Delinquency Penalty |
| 239* | 235 | B | C | Abate Daily Delinquency Penalty |
| 240 | | I/B/A/N | D | Miscellaneous Penalty |
| 241 | | I/B/A/N | C | Abate Misc. Penalty |
| 246* | 240 | B | D | Form 1065 - Missing Information |
| 247 | | B | C | Abates TC 246 |
| 270 | | I/B/A/N | D | Failure to Pay Tax Penalty (Manual) |
| 271 | | I/B/A/N | C | Abate FTP Tax Penalty (Manual) |
| 272 | | I/B/A | | FTP Tax Pen. Restrict Deletion |
| 276* | 270 | I/B/A | D | FTP Tax Penalty |
| 277* | 271 | I/B/A | C | Abate FTP Tax Penalty |
| 280 | | I/B/A/N | D | Bad Check Penalty |
| 281 | | I/B/A/N | C | Abate Bad Check Penalty |
| 286* | 280 | I/B/A | D | Generated Bad Check Penalty |
| 287 | | B | C | Abatement of Bad Check Penalty |
| 290 | | I/B/A/N | D | Additional Tax Assessment |
| 291 | | I/B/A/N | C | Abate Prior Tax Assessment |
| 294 | 290 | I/B | D | Adjusts TC 295 or 305 |
| 295 | 291 | I/B | C | Tax decrease with int. date |

3

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 298 | 290 | I/B | D | Additional Assess with Int. Date |
| 299 | 291 | I/B | C | Abate Prior Tax with Int. Date |
| 300 | | I/B/A/N | D | Examination Tax Assessment |
| 301 | | I/B/A/N | C | Abate Prior Tax Assessment |
| 304 | 300 | I/B | D | Examination Adjust TC 305 or 295 |
| 305 | 301 | I/B | C | Exam tax decrease with int. date |
| 308 | 300 | I/B | D | Additional Tax Assess with Int. Date |
| 309 | 301 | I/B | C | Abate TC 308 |
| 310 | | I/N | D | Penalty - Failure to Report Income from Tips |
| 311 | | I/N | C | Abate TC 310 |
| 320 | | I/B/A/N | D | Fraud Penalty |
| 321 | | I/B/A/N | C | Abate Fraud Penalty |
| 336* | | I/B/A | D | Interest Assessment |
| 337* | | I/B/A | C | Abate Assessed Interest |
| 340 | | I/B/A/N | D | Restrict Interest Assessment |
| 341 | | I/B/A/N | C | Restricted Interest Abatement |
| 342 | | I/B/A | | Interest Restricted Deletion |
| 350 | | I/B/A/N | D | Negligence Penalty |
| 351 | | I/B/A/N | C | Abate Negligence Penalty |
| 360 | | I/B/A/N | D | Fees and Collection Costs |
| 361 | | I/B/A/N | C | Abate Fees and Collection Costs |
| 370 | N/A | I/B/A | D | Account Transfer-in |
| 380 | N/A | I/B/A | D | Overpayment cleared manually under $1 |
| 386* | N/A | I/B/A | D | Overpayment cleared under $1 |

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 388* | N/A | I/B/A | D | Statute Expiration Clearance to Zero Balance & Removal |
| 389* | N/A | I/B | C | Reversal of Statute Expiration |
| 400 | | I/B/A/N | C | Account Transfer-out |
| 402 | | I/B/A/N | D | Account Re-Transferred-in |
| 420 | N/A | I/B/E | | Examination Indicator |
| 421 | N/A | I/B/E/A | | Reverse Examination Indicator |
| 424 | N/A | I/B/E | | Examination Request Indicator |
| 425* | | I | | Reversed TC 424 |
| 427 | | B | | Requests Returns from SERFE File or SEPRE File |
| 428* | | I/B/E | | Examination of Appeals Case Transfer |
| 429 | | I/B | | Request AIMS Update from MF |
| 430 | | I/N | C | Estimated Tax Declaration |
| 430* | | I | | Entity Created by TC 430 |
| 431* | | I | | Nullification of Estimated Tax |
| 432* | | I/A | | Entity Updated by 430 |
| 446* | | I/B/A/E | | Merged Transaction Assessment Indicator |
| 450 | | I/B/A | D | Transferee Liability |
| 451 | | I/B/A | C | Reversal of TC 450 |
| 459* | | B | | Prior Quarter Liability |
| 460 | | I/B/A/E/P | | Extension of Time for Filing |
| 462 | | I/B/A/E | | Correction of TC 460 |
| 463 | | I/B | | Waiver to File on Mag Tape |
| 464 | | I/B | | Reversal of TC 463 |
| 470 | | I/B/A/N | | TP Claim Pending |
| 471 | | I/B/A/N | | Reversal of TC Claim Pending |

4

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 598 | | I/B/E | | Satisfying Transaction-Shelved |
| 599 | | I/B/E | | Taxable Return Secured |
| 600 | 606 | I/B | C | Underpayment Cleared Manually Under $5 |
| 604 | | B/I | | Assessed Debit Cleared |
| 605 | | B/I | | Generated Reversal of TC 604 |
| 606* | | I/B/A/N | C | Underpayment Cleared Under $5 |
| 607* | | I/B/A/N | D | Reversal of Underpayment Cleared |
| 608* | | I/B/A/N | C | Statute Expiration Clearance |
| 609* | | I/B/A/N | D | Reverse Statute Expir. Clearance |
| 610 | | I/B/N | C | Remittance With Return |
| 611 | | I/B/N | D | Bad Check With Return |
| 612 | | I/B/N | D | Correction of TC 610 Processed in error |
| 620 | 670 | B | C | Initial Installment Payment |
| 621 | 671 | B | D | Bad Ck for Installment Payment |
| 622 | 672 | B | D | Correction of 620 Processed in Error |
| 630 | 800 | I/B | C | Manual Application of Appropriation money |
| 632 | 802 | I/B | D | Reversal of Manual Application of Appropriation Money |
| 636* | 800 | I/B | C | Separate Appropriations Refundable Credit |
| 637* | 802 | I/B | D | Reversal of Separate Appropriation Refundable Credit |
| 640 | | I/B/A/N | C | Advanced Payment of Determined Deficiency |
| 641 | | I/B/A/N | D | Bad Check on Advanced Payment |
| 642 | | I/B/A/N | D | Correction of TC 640 Processed In error |

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 650 | | B/N | C | Federal Tax Deposit (FTD) |
| 651 | | B/N | D | Invalid FTD (Bad Check) |
| 652 | | B/N | D | Correction of TC 650 Processed in error |
| 660 | 430 | B | C | FTD |
| 660 | 450 | I/B | C | Estimated Tax Payment |
| 661 | | I/B/N | D | ES or FTD Bad Check |
| 662 | | I/B/N | D | Correction of TC 660 Processed in error |
| 666* | 700 | I | C | ES Credit Transfer-In |
| 667* | 820 | I | D | ES Debit Transfer-Out |
| 670 | | I/B/A/N | C | Subsequent Payment |
| 671 | | I/B/A/N | D | Bad CK-subsequent Payment |
| 672 | | I/B/A/N | D | Correction of 670 Processed in Error |
| 678 | 670 | B | C | Credit for Treasury Bond |
| 679 | 672 | B | D | Reversed TC 678 |
| 680 | | I/B/A/N | C | Designated Interest Payment |
| 681 | | I/B/A/N | D | Bad Check Interest Payment |
| 682 | | I/B/A/N | D | Correction of 680 Processed in Error |
| 690 | | I/B/N | C | Designated Penalty Payment |
| 691 | | I/B/N | D | Bad Check Designated Penalty |
| 692 | | I/B/N | D | TC 690 Error Correction |
| 694 | | I/B/A/N | C | Designated Payment of Fees and Collection Costs |
| 695 | | I/B/A/N | D | Reverses TC 694 |
| 700 | | I/B/A/N | C | Credit Applied |
| 701 | 702 | I/B | D | Reverse TC 706 |
| 702 | | I/B/A/N | D | TC 700 Error Correction |

5

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 598 | | I/B/E | | Satisfying Transaction-Shelved |
| 599 | | I/B/E | | Taxable Return Secured |
| 600 | 606 | I/B | C | Underpayment Cleared Manually Under $5 |
| 604 | | B/I | | Assessed Debit Cleared |
| 605 | | B/I | | Generated Reversal of TC 604 |
| 606* | | I/B/A/N | C | Underpayment Cleared Under $5 |
| 607* | | I/B/A/N | D | Reversal of Underpayment Cleared |
| 608* | | I/B/A/N | C | Statute Expiration Clearance |
| 609* | | I/B/A/N | D | Reverse Statute Expir. Clearance |
| 610 | | I/B/N | C | Remittance With Return |
| 611 | | I/B/N | D | Bad Check With Return |
| 612 | | I/B/N | D | Correction of TC 610 Processed In error |
| 620 | 670 | B | C | Initial Installment Payment |
| 621 | 671 | B | D | Bad Ck for Installment Payment |
| 622 | 672 | B | D | Correction of 620 Processed in Error |
| 630 | 800 | I/B | C | Manual Application of Appropriation money |
| 632 | 802 | I/B | D | Reversal of Manual Application of Appropriation Money |
| 636* | 800 | I/B | C | Separate Appropriations Refundable Credit |
| 637* | 802 | I/B | D | Reversal of Separate Appropriation Refundable Credit |
| 640 | | I/B/A/N | C | Advanced Payment of Determined Deficiency |
| 641 | | I/B/A/N | D | Bad Check on Advanced Payment |
| 642 | | I/B/A/N | D | Correction of TC 640 Processed In error |

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 650 | | B/N | C | Federal Tax Deposit (FTD) |
| 651 | | B/N | D | Invalid FTD (Bad Check) |
| 652 | | B/N | D | Correction of TC 650 Processed In error |
| 660 | 430 | B | C | FTD |
| 660 | 430 | I/B | C | Estimated Tax Payment |
| 661 | | I/B/N | D | ES or FTD Bad Check |
| 662 | | I/B/N | D | Correction of TC 660 Processed in error |
| 666* | 700 | I | C | ES Credit Transfer-In |
| 667* | 820 | I | D | ES Debit Transfer-Out |
| 670 | | I/B/A/N | C | Subsequent Payment |
| 671 | | I/B/A/N | D | Bad CK-subsequent Payment |
| 672 | | I/B/A/N | D | Correction of 670 Processed in Error |
| 678 | 670 | B | C | Credit for Treasury Bond |
| 679 | 672 | B | D | Reversed TC 678 |
| 680 | | I/B/A/N | C | Designated Interest Payment |
| 681 | | I/B/A/N | D | Bad Check Interest Payment |
| 682 | | I/B/A/N | D | Correction of 680 Processed in Error |
| 690 | | I/B/N | C | Designated Penalty Payment |
| 691 | | I/B/N | D | Bad Check Designated Penalty |
| 692 | | I/B/N | D | TC 690 Error Correction |
| 694 | | I/B/A/N | C | Designated Payment of Fees and Collection Costs |
| 695 | | I/B/A/N | D | Reverses TC 694 |
| 700 | | I/B/A/N | C | Credit Applied |
| 701 | 702 | I/B | D | Reverse TC 706 |
| 702 | | I/B/A/N | D | TC 700 Error Correction |

**5A**

Report to the Congress on

# NETTING OF INTEREST ON TAX OVERPAYMENTS AND UNDERPAYMENTS

Department of the Treasury
Office of Tax Policy

April 1997

6

PERIOD.--Such interest shall be allowed and paid as follows:

(1) CREDITS.--In the case of a credit, from the date of the overpayment to the due date of the amount against which the credit is taken.

(2) REFUNDS.--In the case of a refund, from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days.

Interest running in either direction has, since 1982, been compounded daily. IRC § 6622(a).

The running of interest in either direction can be suspended for various reasons. For example, if the Commissioner makes notice and demand for the payment of taxes, and the tax is paid within 21 calendar days after the date of the notice and demand (10 business days if the amount due exceeds $100,000), then interest is not imposed for the period after the date of the notice and demand. IRC § 6601(e)(3) (as amended by TBOR 2). Similarly, the Government is not liable to the taxpayer for interest on an overpayment if the overpayment is refunded or credited within 45 days after the due date for filing the return of such tax, or if the Government otherwise pays a taxpayer's claim for refund within 45 days after it is filed. IRC §§ 6611(e)(1), (e)(2).

Interest computations can be substantially complicated by the presence of carryover tax attributes from another tax year. For example, if a net operating loss deduction is carried back to a tax year pursuant to section 172, or a credit is carried back pursuant to section 39, interest on a resulting overpayment in the carryback year will generally not begin to run until the due date of the return for the credit or loss year. IRC § 6611(f). Likewise, if an underpayment for one tax year is reduced due to such a carryback from another year, interest is still due on the full underpayment amount up through the due date of the return for the credit or loss year and on the reduced underpayment amount only after that date. IRC § 6601(d).

Certain interest is statutorily prohibited or is limited to specific time periods as a matter of law. These "restricted interest" computations can be particularly complex for large corporate taxpayers, which commonly have multiple carrybacks and carryovers of different credits and deductions over any given period of years and are subject to multi-year audits. As will be discussed in more detail below, the IRS does not have the capability to perform all restricted interest computations automatically on its Master File system. Instead, many of these complex calculations must be performed manually (i.e., using stand-alone computer or calculator systems with data manually inputted).

__IRS administration of these rules before 1986__

As noted above, section 6402(a) of the Code permits the IRS to credit a taxpayer's overpayment of one tax liability against a liability for another tax. The Treasury Regulations have long provided for the crediting of overpayments against underpayments in accordance with this provision. The pertinent regulation, Treas. Reg. § 301.6402-1, provides:

The technician performs the analysis using a transcript of the taxpayer's account and the report of any adjustments that are being, or have been, made. Data from those sources that are needed for the interest computation are input into a separate computer program that is not part of the IRS's Master File system for tracking taxpayer accounts. Technicians be familiar not only with the interest rules in the Code, regulations, and Internal Revenue Manual, but also with the nuances of the Master File, the IRS's Non-Master File system, and the stand-alone interest computation computer programs. After the calculations are performed off-line, the net interest amount is entered as a separate adjustment on the taxpayer's Master File account. Because of the special conditions that required manual interest computations in the first place, a special code is entered with the net interest adjustment to prevent the computer from erroneously making automatic adjustments to that account in the future. Thereafter, any future interest computations that involve that tax year must also be performed manually.

***Offsetting***

Offsetting arises whenever an overpayment is determined with respect to one tax year (or liability) and may be applied to an outstanding liability for another year pursuant to section 6402(a). As discussed above, there is a special interest computation rule for such situations, section 6601(f) of the Code. As this rule operates, if an overpayment is actually applied against an underpayment, interest is calculated only on the net outstanding balance for the period (and amount) of the overlap. In effect, therefore, both the underpayment and overpayment interest rates for the overlapping period and offsetting amount are zero. Interest is charged (or paid) only on the net balance.

By law, an offsetting situation involves at least two unsettled tax accounts, one an overpayment and one an underpayment. As with annual interest netting, offsetting is performed both systemically by the IRS computers and manually by technicians. The Master File is programmed to search for outstanding liabilities (tax-due accounts) for the same taxpayer whenever it shows a credit (overpayment) available for that taxpayer. This search is performed every time an overpayment arises, whether for individual or business taxpayers, literally millions of times each year.

Whenever an offset can be systemically performed, the Master File system also computes the appropriate interest on all the affected accounts, in accordance with the special rule of section 6601(f). The taxpayer in such a situation will receive a statement explaining the adjustments, including the interest computation. Again, in such situations, the interest computations do not require any manual calculation or additional resources, and the computations are routinely accurate and reliable based on the information on record.

However, there are frequently conditions under which an offset cannot be systemically performed. Many of these conditions relate to the same kinds of legal issues that prevent automatic annual netting, such as the applicability of restricted interest rules with special interest starting and ending dates. Other situations include the bankruptcy of the taxpayer or statutes of limitations that are about to expire. Offsetting frequently arises in extremely complex cases involving multi-year audits for large corporations. In such cases there may be numerous adjustments to each account, some issues that are agreed and others that are unagreed, partial tax payments or refunds, and many resulting periods of overlapping indebtedness. These cases, which present the greatest challenges in calculating interest, almost always involve one or more of the conditions that require the calculations to be done manually rather than by the computer system.

Although offsetting interest computations use essentially the same procedures that were described above for annual interest netting, there are additional layers of complexity at each step due to the fact that more tax periods and transactions are at issue. Simply performing the analysis requires a sophisticated understanding of all the adjustments that may be made to the taxpayer's account under the Code, such as the carryforward and carryback rules and the restricted interest rules, as well as familiarity with the IRS's various computer systems. The analysis and computations in offsetting cases are thus usually performed by GS-8 and GS-9 technicians who are assigned the most complex interest calculations. Performing offsetting interest calculations can take a significant amount of time for even the best-trained IRS personnel. Gathering the data, performing the necessary legal and computational analysis, and

4

SG-290

# Manual Supplement

Department of the Treasury
Internal Revenue Service

August 7, 1984

Expiration Date: August 7, 1986
Implementation Date: (See Section 2)

Balance notices

## Service Center Replacement System (SCRS) Phase III Implementation

### Section 1. Purpose

This Supplement contains general information, implementation dates and instructions for the Service Center Collection Branch (SCCB) to use during and after implementation of the Collection SCRS computer programs. These instructions will supplement and/or supersede existing instructions in the Manual for processing SCCB work.

### Section 2. Scope

SCRS Phase III program implementation is scheduled to be piloted in the Memphis Service Center beginning August 7, 1984, and will be effective in all other service centers when Phase III SCRS is implemented nationwide. The information and procedures in this Supplement will be effective in the service center when the new programs are implemented. During the pilot period, Memphis Service Center will have to refer to both this supplement and the manual for procedural guidance. Each procedural section in this supplement references a section in the Manual which is superseded. Complete procedures are included in the Supplement section for the superseded Manual reference. For nationwide implementation all service centers will refer to both this supplement and the manual until these procedures are incorporated in the manual.

### Section 3. General

.01 Several significant changes will take place when the new programs are implemented. The most significant changes are shown below.

1 The IDRS balance due notices (Forms 3967(c), 4868, 4840, 4873 and their Spanish versions) will be replaced by new Forms (8124/8124SP, 8125/8125SP and 8126/8126SP). NMF balance due notices will continue to be generated on the old forms.

2 The capability will be available on IDRS to input a taxpayer's home or other telephone number to the Taxpayer Information File (TIF) when processing balance due or return delinquency cases. The telephone number will post to the TIF, be available for research through terminal inquiry, and carry over to the Automated Collection System (ACS) if the case goes to Taxpayer Delinquent Account (TDA) or Taxpayer Delinquency Investigation (TDI) status. When appropriate, SCCB personnel should input telephone numbers provided by the taxpayer to IDRS.

3 The Taxpayer Delinquency Investigation Notice File (TDINF) will be eliminated and all return delinquency notice and TDI information will be present on the TIF. The Delinquency Investigation Research File (DIRF) will also be eliminated and return delinquency notice research can be performed through command code TDINQ.

4 Most balance due modules will receive a systemically generated IDRS fourth notice to meet the certified mail requirements. This will include cases that are now accelerated to TDA because of certain primary codes or via input of a status 22 request. The TDA will be delayed until four weeks after the fourth notice is issued. Cases that now accelerate to TDA because of input of STAUP 51 (undelivered mail) will also have a fourth notice issued prior to TDA issuance. This notice will be coded with the literal (UNDL) to identify the notice should it also be returned undelivered. No action is needed on undelivered notices with this coding. Refer to Attachments 1 and 2 for the revised notice and TDA issuance criteria.

5 TDI requests (Form 4884) can be input through IDRS via Command Code TDIRQ instead of the Direct Data Entry System (DDES). This will expedite processing of these cases. IMF requests have a prerequisite of a TC 474

Distribution:
IRM 5(16)00

IR Manual

9

input to the module before the request is input through TDIRQ.

6 TDI or return delinquency notice transfers out of the Memphis Service Center will not be possible until all other centers are operating under the new SCRS programs. Location code and address changes may be input to IDRS; however, the account will remain on the Memphis data base until nationwide implementation, at which time the account will transfer to the new center.

7 Return delinquency cases will no longer accelerate to TDI if a TC 148 code is present (Primary Codes Q, P, W, E, T, U, N, S, or L). A fourth notice will be issued followed by a TDI four weeks later. Refer to Attachments 3 and 4 for the revised notice and TDI issuance criteria.

## Section 4. Balance Due General

(Supersedes 5(18)22.21)

.01 The IDRS Review Notice Register will be run on Sunday nights and all notices appearing on the listing will be sequenced at the front of the batch. A daily register will be run each night after that listing notices that have had pending transactions that day. Notices could appear on the register for other reasons also.

.02 The register is produced by IDRS file analysis during the weekend update prior to the date on which notices must be processed for mailing.

.03 Notice records on the register are printed in the same sort sequence, by sequence number as the notices to facilitate pulling the notices. Totals for each type of notice issued and the total selected are printed at the end of the register.

* .04 Notices are selected if one of the conditions listed below is found. One Selection Category Code will be listed in the CATEGORY Register column for each type of condition found for the notice module.

1 Tax module status change from status 20, 21, 56, 58 or 64 (2nd/3rd/4th default notice * statuses), by input of IDRS Command Code or pending a status change transaction code. Example: 47 STATUS UPDATE.

2 The tax module has an open IDRS case control, opened before the notice was generated. Example: 18606021 IRRQ AB.

3 Tax module contains a TC 840 transaction not followed by a subsequent TC 846, 29x or 30x transaction. Example: MANUAL REFUND.

4 Tax account has a service center reject payment credit transaction pended to the entity module (TC 610, 620, 640, 660, 660, 670, 680, 690 or 694 with amount greater than .00–). Example: REJ 640 CY 8241.

5 A condition within the account prevents a computer generated interest and/or FTP Penalty computations. Example: INT/FTP RESTRICT. * 340 rest/int. holds notices pg 4 attachment

6 The accrued interest in the module is greater than $100,000. Example "CHECK INTST".

7 The accrued FTP Penalty in the module is greater than $100,000. Example "CHECK FTP".

8 The assessed module balance is greater than $10,000,000.00. Example: "CHECK AMOUNT".

9 Tax module contains a TC 914 (TC 914 or 916 posted to another module) transaction code.

10 Tax module contains a TC 534 (potential statute expiration) transaction code.

.05 The notices will be reviewed for operational errors; incomplete or incorrect name and address data, incomplete or incorrect zip code data, erroneous or extraneous data, outrageous amounts, etc. Research accounts and retype notices with corrected data. Notify the IDRS Control Staff if the account must be corrected on the IDRS file.

.06 At minimum, review at least ten of each type of notice generated from each file (IMF/BMF). Notify IDRS Control Staff if systemic error may have affected all notices of one type from one or more files.

.07 Accounts are subjected to register analysis only if a notice is present on the IDRS Notice tape. Error conditions may be encountered which prevent analysis of a notice module, in which case the notice will be listed on the register with one of the following error category codes: NO ACCOUNT; NO TAX MODULE; NO IDRS STATUS; NO TC 150; NO ANF NOTICE; LENGTH ERROR; READ ERROR; REALTIME RESERVE; "OTHER ERROR".

.08 Research the notice module on IDRS. If the module is found and all appears to be in order, determine if any of the conditions for selection are met and take appropriate action if necessary. If conditions are not found, release the notice. Also, notify the IDRS Control Staff so that action may be taken to identify the problem with register analysis.



10

.09 If the notice module is not found on IDRS, or the module has no IDRS status or no TC 150, IMMEDIATELY contact the IDRS control Staff before taking further action or releasing the notice.

.10 Other functions will determine that a notice which generated may be incorrect and should be corrected or deleted. Upon notification, the notice should be pulled for necessary action. If a freeze is required, determine and input the number of cycles needed.

## Section 5. Processing Notices with "Centralized Authorization File" Indicators

(Supersedes 5(18)22.22)

.01 "Centralized Authorization File" indicator consists of two digits. These digits identify the last service center which input the indicator to the master file. The literal "CAF" will appear if there is a power of attorney in the Centralized Authorization File.

.02 Balance due notices with these indicators are sorted by the computer in front of all other notices with the same CP number for each file (IMF, BMF, IRAF).

.03 After reviewing the notices with a CAF indicator, photocopy the notice. Research photocopies of notices with a CAF indicator on IDRS to determine the name and address of the representative.

.04 In cases where the indicator on the notice is for another service center, the photocopy of the notice will be forwarded to the correspondence function in the proper service center.

.05 If IDRS indicates code N (representative receives notices), annotate the representative's name and address beneath the taxpayer's First nameline on the notice. In some cases two representatives may receive copies of notices.

.06 If IDRS indicates the Power of Attorney is for a blind trust, annotate the representative's name and address on the original notice. Do not send any notice (502, 503, 504) to a taxpayer involved in a blind trust.

.07 With the implementation of Phase III of SCRS a duplicate notice will be printed for those taxpayers with a POA on file that will reflect the representative's name and address. If the taxpayer's records on CAF indicated a POA was filed but there is not address for the representative, the duplicate notice will show the first name line of the taxpayer and an "*" at the beginning of the second name line and the remainder of this field is blank. Research IDRS and enter the representatives name and address on an envelope; insert the duplicate notice in the envelope for mailing to the representative. If a representative is not found on CAF, destroy the duplicate notice.

.08 Route all completed notices for mailing.

## Section 6. IDRS Review Notice Procedures

(Supersedes 5(18)22.23)

.01 Upon receipt of the IDRS Review Notice Register, research the notice tax modules on IDRS to determine if the notice should be modified or voided. Note: For all notices on the register, the purge indicator following the notice number in the IDRS Tax Module Notice History Section (normally zero) will have been changed to a two(2).

1 If the tax module status has been changed, void the notice if the new status is other than 50. *

2 If the account has a reject (RJ) status pending payment credit, destroy the notice.

3 For notices selected under the Manual Refund category, determine if the current debit balance was created by a manual refund (TC 840). If so, assure that associated abatement or credit transactions have pended or posted and that no erroneous refund situation exists.

a If abatement and/or credit transfer has been initiated but did not pend to the module before the notice was issued, void the notice and freeze the module for one cycle to the same notice status. *

b If erroneous action was taken to resolve the balance due (abatement not made, credits not transferred), initiate a request for corrective adjustment on IDRS. Void the notice and input a freeze for three cycles.

c If an erroneous refund situation exists, prepare Form 1725 (Routing Slip) to initiate erroneous refund recovery case per IRM 3(15)50, 3(15)(129)0, 3(15)(148)0 and 3(17)(42)0. Void the notice and input a freeze for 15 cycles.

d when preparing Form 1725, attach the voided notice and note freeze action. If corrective action or refund recovery case has already been initiated, void notice, freeze module, and forward notice to case assignee with these actions noted.

4 During the review process, if it is noted that a transaction has pended to the tax module



11

since the notice was generated, first determine if the notice should be voided for any reason other than change in the module balance. If the IDRS module balance has changed since the notice was generated, void the notice even if not full paid. If the notice is voided and is a final notice input a freeze for three cycles for the same notice.

a If there is a pending abatement of tax, penalty or interest (note effect of TC 180/170 as in (a) above), void the notice. If there will still be a balance due after adjustment and notice is a final notice, input a freeze for three cycles and for the same notice. TREAT ALL PN 977 AND IMF PN 978 AS PENDING ABATEMENT.

b If the pending transaction is an unpostable, obtain the DLN and research in Unpostable or Nullified Unpostable function to assure transaction is to be posted to the module before modifying or voiding the notice because of the transaction. Freeze the module for the number of cycles required to correct and request the same notice.

c If the notice is a Notice of Past Due Installment Payments, review all notices for the entity, rather than only the module listed on the register and determine if the payment agreement should be reinstated.

5 If the tax module has an open IDRS case control assigned to the SCCB or the Adjustment function, contact the tax examiner to determine if the notice should be issued. Input a freeze if the notice is to be voided.

a If the tax examiner cannot be contacted, analyze the tax module condition, taking into account all historical information available on IDRS. If the notice is to be voided, input the freeze.

b at the option of the Service Center Collection Branch Chief, other functional areas that establish control bases may be contacted if deemed appropriate, and IDRS prints of the controlled modules may be retained.

c periodically, conduct a review of all functional areas that establish open control bases that are reflected on the IDRS Review Notice Register and determine if there are any problem areas.

6 For notices selected under the category INT/FPT RESTRICT, manually compute to the second Monday following the date on the notice the amount of accrued interest (if there is a TC 340 in the module) or the amount of failure to pay tax penalty (if there is a TC 270 in the module). Type these accruals in the appropriate spaces on the notice and show the Total Amount Due. Assess these accruals via input of TC 340 (for interest) and/or TC 270 (for failure to pay tax penalty).

7 For notices selected under the categories CHECK INTST, CHECK FTP or CHECK AMOUNT, research the module on IDRS. If the module is found and all appears to be in order, release the notice.

8 For notices where a TC 534 is present, research IDRS to determine if the statute for expiration has expired on any portion of the balance due. Input TC 534 for the expired amount (this may be zero). Correct the notice when a portion to the balance has expired.

9 For notices where a TC 914 is present (TC 914 or 916 posted to another module) contact the Special Procedures function to determine if the notice should be mailed. Special Procedures will contact the agent responsible for the open case and advise SCCB of the appropriate action to take.

10 For notices selected under multiple categories, take all categories into account. Selection sequence is: Status Change; Manual Refund; Restricted Interest and FTP Penalty; Reject Payment; Case Control.

.02 If it is not possible to make a determination or retype the notice in time for normal mail operations, input a freeze for one cycle to the same notice status.

### Section 7. Continuous Wage Levy (668-W)

(Supersedes 5(18)23,67)

.01 Receive entire case file, including the TDA and Form 668, part 7 if filed, via Form 3210. Both the TDA and Form 3210 will be noted "Continuous Levy IA."

.02 Load on IDRS as an agreement using locator number 0009 and suppress the payment reminder notice. Also suppress the default notice. Compute the projected balance due using a proposed payment amount (amount to be received monthly based on levy payments already received) to determine the full payment cycle. Input a review date at least one month prior to the full pay cycle. However, if the account will be full paid within the next month, send Form 668A (Conditional Release) to advise employer of the remaining balance due. Treat levy source(s) and other information



12

.08 Resolve Questionable W–4 transcripts for "NO IMF ENTITY" and "NO TIN" cases. Prepare Form 4884 with selection code 84 and return the transcript to the Questionable W–4 Transcript Suspense File.

**Section 22. Transcript Analysis**
(Supersedes 5(18)67.2)

.01 Reason Code 38—A freeze or hold condition is present in the module. See LEM 3(27)(68)0 for freeze codes. Analyze the transcript to determine the freeze condition.

1 If a TC 480 is present, and the offer is still pending, destroy the Diag Q Transcript. If TC 480 is present and no offer is pending, reverse TC 480 using appropriate transaction code.

2 If a TC 780 is present, check with the offer technician to see if all required actions have been taken by input of a TC 788. If required actions have not been taken, destroy the Diag Q Transcript.

3 If a TC 470 with CC 99 is present, determine from the filing requirements if the entity is a government agency or instrumentality. If the entity is not a government agency or instrumentality, research and/or contact Collection Office function to determine if the module should remain frozen. If the freeze condition should be released, or if unable to determine, input TC 472 with CC 99. If the entity is a government agency or instrumentality and the Diag Q Transcript is type 1–5, destory the transcript with no action. If the Diag Q Transcript is type 6–8, input TC 472 with CC 99.

520 holds notices

4 If a TC 520 is present, and the CC is other than 72, 73 or 74, contact Special Procedures function for disposition of case.

a If the case is open and the CC is 71, 72, 73, 74 determine if the CSED should be extended. If the case is closed or SPI has no record of the case and the CC is other than 72, 73, 74, input TC 521.

b On CC 76 cases contact District Counsel for disposition. If District Counsel has no record of the case input TC 521.

c If the CC is 72, or 74 research the AIMS file. If the status code is 90 (closed) and a TC 421 is in the module input TC 521.

d If AIMS show no data for the module of the Diag Q transcript but shows other related modules, input TC 521 to the transcript module and refer the open TC 420 module to the Examination function.

e If no data on AIMS and SPI has no record of the case route the transcript on Form 3210 to the Appeals function or District Counsel for disposition. On appeal cases write full name on the transcript.

f If the case is an Active Appeals Case on AIMS (status 80–89) add history item to IDRS showing active case. If Appeals function and/or District Counsel has no record of the case, input TC 521.

g If the module shows a credit balance and a TC 820 freeze is in another module, process as in .014 above. If the module shows a credit balance and is in status 06, process in accordance with procedures in IRM 5(18)37.(18).

.02 Reason Code 56–BMF and IMF. Module contains a settled return, not 53'd, CC not equal to 01–09, has at least one unexpired CSED, and MF status is 13, 14, 18, 20 or 21 and IDRS status is not 23 or 99.

1 If the IDRS status is 53 caused by input of a TC 530 or the IDRS status is 60 or 64 (installment agreement), destroy these transcripts with no action.

2 If the IDRS status is 89 caused by input of TC 470 with closing code 90 or 93 or if status is 47 caused by the input of a TC 470 input TC 472 to release the freeze.

3 If the IDRS status is 48, caused by input of STAUP and if the module did not update because of a freeze condition, see IRM 5(18)67.1:(2)(e). Release freeze or route to functional area responsible for releasing freeze. If the module is within 6 months of the CSED destroy the transcript.

4 If the Diag Q Transcript is a type C and the IDRS status is 19–89 (Except 23, 29 or 53), the CSED has expired. Examine the transcript. If the data is invalid, notify the IDRS Control function. If the data is valid process as in .03.

.03 Reason Code 58—The tax module contains a settled return and the MF status is 22, 26, 58 or 60, is not 53'd and the module has at least one expired CSED. Process as in .021 and .022 above. If the Diag Q Transcript is a Type C, and shows an open control base route the transcript to functional area with the open control base. If it is in other than notice status, forward the transcript to the ARC (Collection) on Form 1725, Routing Slip, for information and any action deemed necessary. If no control data is available or the module is in notice status process in accordance with procedures in IRM 5(18)28.1.



13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,
Plaintiffs,
v.
)
)
)
)
)
)
GALE A. NORTON, Secretary of the )
Interior, et al.,
)
)
)
Defendants.
)

DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO STRIKE PLAINTIFFS' REPLY AND NOTICE OF SUPPLEMENTAL INFORMATION SUBMITTED IN SUPPORT OF THEIR CONSOLIDATED MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants respectfully submit this reply memorandum in further support of their motion to strike the reply brief and "notice of supplemental information" filed by Plaintiffs in support of their motion for a temporary restraining order and preliminary injunction.1 In their opposition brief,2 Plaintiffs misconstrue the law governing motions to strike, and concede that the notice they filed, consisting of a letter from a New Jersey Congressman to the Attorney General, is devoid of 1 Plaintiffs' Reply To Interior Defendants' Opposition To Plaintiffs' Consolidated Motion For A Temporary Restraining Order And Preliminary Injunction (Oct. 24, 2003) ("Plaintiffs' Reply"); Plaintiffs' Notice Of Supplemental Information In Support Of Plaintiffs' Consolidated Motion For Temporary Restraining Order And Motion For Preliminary Injunction (Oct. 28, 2003) ("Plaintiffs' Notice").

2 Plaintiffs' Opposition To Defendants' Motion To Strike Plaintiffs' Reply And Plaintiffs' Notice Of Supplemental Information Submitted In Support Of Their Consolidated Motion For A Temporary Restraining Order And Preliminary Injunction And Plaintiffs' Request For The Court To Consider Sanctions Sua Sponte For Filing A Frivolous Motion (Dec. 1, 2003) ("Plaintiffs' Opposition"). Case No. 1:96CV01285 (Judge Lamberth) any legal or factual weight that could make it relevant to this motion. The motion to strike should be granted.

ARGUMENT

As argued in Defendants' moving papers,3 neither Plaintiffs' Reply nor Plaintiffs' Notice is authorized by Local Civil Rule 65.1(c), which governs the briefing of preliminary injunction applications and expressly contemplates only an application and **[pg 14]**

opposition, unless leave is sought. See LCvR 65.1(c).4 Moreover, even if such filings were permitted under the rule, both the reply and the notice suffer from independent defects that require that they be stricken. Plaintiffs' Reply is rife with false personal attacks that violate Federal Rule 12(f), as well as the rules of civility that are supposed to govern litigation before this Court. Defendants' Motion to Strike at 2-4; see LCvR 83.8(b)(6)(v) (requiring counsel to be familiar with the D.C. Bar Voluntary Standards for Civility in Professional Conduct). With respect to Plaintiffs' Notice, it consists only of the personal opinions of a New Jersey Congressman and, as such, has no legal or factual relevance to the application before the Court. Defendants' Motion To Strike at 4. These defects require that both Plaintiffs' Reply and Plaintiffs' Notice be stricken.
In response, Plaintiffs raise two arguments. First, Plaintiffs argue that, notwithstanding the specific briefing requirements for preliminary injunction applications set forth in Local Civil Rule 3 Defendants' Motion To Strike Plaintiffs' Reply And Plaintiffs' Notice Of Supplemental Information Submitted In Support Of Their Consolidated Motion For A Temporary Restraining Order And Preliminary Injunction (Nov. 17, 2003) ("Defendants' Motion To Strike").
4 Local Rule 65.1(c) requires that a preliminary injunction application be supported by all affidavits on which plaintiff intends to rely, and that the opposition be filed, with all supporting affidavits, within 5 days after service of the application. 2
65.1(c), the general briefing rules of Local Civil Rule 7(d) apply to such applications. Plaintiffs' Opposition at 2. Second, Plaintiffs contend that Rule 12(f) authorizes striking only a pleading, not a reply or a notice. Id. at 2-3 n.3. As to the substance of their "notice," Plaintiffs do not dispute that it lacks even marginal factual or legal relevance to the preliminary injunction application. See id. at 3 (stating that "Plaintiffs simply provided information to this Court" concerning the opinions of a New Jersey Congressman). Plaintiffs' Notice and Plaintiffs' Reply Should Be Stricken Under Local Rule 65.1 I. Local Civil Rule 65.1(c) reflects a conscious effort by the Court to delineate, in a manner distinct from the general motions provisions of Rule 7, the form and timing for briefing preliminary injunction applications. Thus, for example, while Rule 7(b) allows an opposition to a motion to be filed within 11 days of service of the motion, Rule 65.1(c) requires an opposition to a preliminary injunction application to be filed within 5 days of service of the application. Given the specific requirements enumerated by the Court for preliminary injunction applications, it is illogical to conclude that a reply brief on such an application, nowhere authorized in Rule 65.1, is permitted under Rule 7. It is less plausible, still, to conclude that a "notice of information" or other invented filings may be submitted (without limitation on number, type or timing) in purported support of a preliminary injunction application, notwithstanding the fact that the Court specifically itemized the briefing it wished to permit on such an application.5 Had the Court wished to invite reply briefs (or notices attaching irrelevant information) in the preliminary injunction context, there is every reason to believe that it would have explicitly done so in Rule 65.1, and included appropriate timing provisions governing such submissions. It did not.
5 Indeed, Plaintiffs do not argue that their notice is authorized by any rule. 3
II. Contrary To Plaintiffs' Statement Of The Law,
Federal Rule 12(f) Is Not Limited To Pleadings
Plaintiffs' second argument is equally unavailing. This Court has recognized that,**[pg.15]**

while
the language of Rule 12(f) refers to striking pleadings, the Court has authority under the rule to strike inappropriate matter in other filings, as well. Pigford v. Veneman, 215 F.R.D. 2, 4 n.1 (D.D.C. 2003) ("Although Rule 12(f) applies by its terms only to 'pleadings,' courts occasionally have applied the Rule to filings other than those enumerated in Rule 7(a) of the Federal Rules of Civil Procedure.") (citing Cobell v. Norton, No. 96-1285, 2003 WL 721477 (D.D.C. Mar. 3,2003)); Larouche v. Department of the Treasury, No. 91-1655, 2000 WL 805214 (D.D.C. Mar. 21, 2000) (striking declaration that contained information that was irrelevant, speculative and redundant under Rule 12(f) and Rule 56(e)).
In Pigford, this Court relied on its "liberal discretion" under Rule 12(f) to strike scandalous and unsupported allegations of racism made by plaintiffs' class counsel against a Department of Justice lawyer in a response filed in connection with a motion to reopen late claims. Id. at 4-5.
The Court also found that "'the filing of a document containing such language is one form of harassment prohibited by Rule 11,'" and relied on that independent authority to strike class counsel's response to the motion to strike, in which scandalous accusations were repeated. Id. ciitation omitted); see also Fed. R. Civ. P. 11(b) (attorney filing papers certifies that the papers are, inter alia, not being filed "for an improper purpose, such as to harass"). Thus, Plaintiffs' uninformed argument that Rule 12(f) does not apply to filings other than pleadings has been expressly rejected by this Court.
4
It bears mention that this latest episode of derogatory name calling carries on a now wellestablished practice by Plaintiffs. It has recently been held that such a seedy form of litigation has no place in this Court:
[Class counsel's] charges of racism are plainly scandalous within the meaning of the Rule, in that they 'improperly cast[ ] a derogatory light' on a dedicated government attorney who has done his best to navigate the deep and murky waters of this litigation. The accusations are indefensible and have no place in filings with this court.
Because the accusations of racism in the [class counsel] filings are unsupported by facts or evidence, constitute a form of harassment, and are scandalous, the Court will grant defendant's motion to strike [class counsel's] Response Regarding Mail Delays and sua sponte will strike [class counsel's] Response to the Motion to Strike, based both on Rule 11 and Rule 12(f) of the Federal Rules of Civil Procedure. Pigford, 215 F.R.D. at 4-5 (citation omitted). Yet, in this litigation, virtually every document filed by Plaintiffs is littered with the same unsupported and indefensible personal attacks that have no purpose other than to "improperly cast a derogatory light" on anyone associated with the Defendants.6 To allow Plaintiffs to continue this pattern with reckless abandon, and without consequence, makes a mockery of the rules that were specifically promulgated to prohibit such conduct. The Court should exercise its authority under those rules to put an end to the practice in this litigation.
6 Plaintiffs' brief in opposition to the motion to strike is no exception. See Plaintiffs' Opposition at 3 (referring to opposing counsel's behavior as "deviant"); id. at 4 (falsely
stating that opposing counsel "lies to this Court and violates court orders"). **[pg. 16]**

5

III. Plaintiffs Concede That Their Notice Lacks Any Legal
Or Factual Relevance To The Application Before The Court

Plaintiffs do not contest that the letter they filed, in which a New Jersey Congressman expresses his personal opinions concerning this litigation to the Attorney General, is neither factual evidence nor legal authority that could have any relevance to their application for a preliminary injunction. See Plaintiffs' Opposition at 3-4 (conceding that the notice "simplyprovided information" and "merely informs this Court" concerning the personal views of a congressman). That Plaintiffs continue to defend the submission of the letter in spite of this concession is unsupportable; that they move for sanctions against Defendants for seeking to strike this irrelevant material is frivolous.7 Plaintiffs' Notice should be stricken, and the sanctions request denied.8

7 Plaintiffs' motion for sanctions takes the familiar form of a boilerplate paragraph at the end of their opposition brief asking that the Court to "sua sponte" award them such relief.

See Plaintiffs' Opposition at 4. Apparently unaware (or heedless) of the fact that the term "sua sponte" refers to action on the Court's own initiative, these requests are a transparent attempt to avoid the requirements for seeking sanctions under Federal Rule 11 and, therefore, they violate that rule. On that basis as well, their request is defective.

8 Insofar as the sanctions motion is made with respect to Defendants' request that the Court strike Plaintiffs' Reply, it is equally baseless for the reasons discussed supra in Sections I and II.

6

CONCLUSION

For each of the foregoing reasons, and for the reasons set forth in Defendants' Motion To Strike, Plaintiffs' Reply and Plaintiffs' Notice should be stricken. Because Plaintiffs' Opposition includes a lengthy quotation of the irrelevant letter attached to their notice, and also repeats Plaintiffs' own improper derogatory remarks, their opposition brief should be stricken as well. See Pigford, 215 F.R.D. at 4-5 (sua sponte striking class counsel's response to motion to strike).Defendants therefore request that the Court issue an order striking Plaintiffs' Notice, Plaintiffs' Reply, and Plaintiffs' Opposition, and denying Plaintiffs' request for sanctions.

Dated: December 11, 2003

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Associate Attorney General
PETER D. KEISLER
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director
/s/ Sandra P. Spooner
SANDRA P. SPOONER
D.C. Bar No. 261495
Deputy Director **[pg.17]**

JOHN T. STEMPLEWICZ
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202) 514-7194
7
CERTIFICATE OF SERVICE
I hereby certify that, on December 11, 2003 the foregoing Defendants' Reply
Memorandum in Further Support of Their Motion to Strike Plaintiffs' Reply and Notice
of
Supplemental Information Submitted in Support of Their Consolidated Motion for a
Temporary
Restraining Order and Preliminary Injunction was served by Electronic Case Filing, and
on the
following who is not registered for Electronic Case Filing, by facsimile:
Earl Old Person (Pro se)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530
/s/ Kevin P. Kingston
Kevin P. Kingston
8

## APPENDIX LIST OF EXHIBITS


| | | |
|---|---|---|
| 1. | Power of Attorney | 1-2 |
| 2. | Form 843 | 3-4b |
| 3. | Form 2859 showing manager supervised late assessment | 5 |
| 4. | Analysis of Danny C. and Sally J. Simons 1974 Tax Court Stipulated Agreement by expert CPA | 6-11 |
| 5. | Stipulated Tax Court decision of April 22, 1983 For years 1972, 1973 | 12 |
| 6. | Stipulated Tax Court decision of April 22, 1983 For year 1974 | 14 |
| 7. | IRS-drafted underlying work documents for Both stipulated Decisions | 16 |
| 8. | Letter of January 11, 1982 | 22 |
| 9. | Letter of January 15, 1982 | 25 |
| 10. | District Counsel's Decision | 28 |
| 11. | 1974 Original return | 31 |
| 12. | 1983 Cashier's Check for $49,546.55 | 51 |
| 13. | CPA certified Calculation as to how the $49,546.55 Fully satisfied all three tax years 1972, 1973, 1974 | 52 |
| 14. | FORM 872 to extend time for 1974 assessment to a A time certain | 57-59 |
| 15. | Notice of Deficiency for year 1974 | 60-62 |
| 16. | Computer readout showing year 1974 'closed' "27 Jul 1989" | 62a |
| 17. | Computer readout showing 1974 "one open case" 8 Aug. 1991" | 62b |
| 18. | Fax of Kirk Lusty to Special Procedures function Dated 14 Nov. 1996 showing he knew where the Plaintiffs records were | 63 |
| 19. | Attorney Trish White's Settlement document faxed To Special Procedures function by Kirk Lusty | 64-66a |
| 20. | Calculation of IRS Personnel for 6-15-96 for year 1974 When all debt had been abated on the IRS computer Account for 1974 in 1995, faxed by Kirk Lusty to SPf | 67 |
| 21. | Revenue Officer notes showing: | |
| | a. 7/11/88 obtained original records and copied showing settlement for all three years "Appears no open issues on 1974" | |
| | b. states 'tp appears wealthy & paying little or no tax" | 68 |
| | c. consistent threats of liens, seizure, levies and seeking records to give Thurman | 69-74 |
| 22. | Thurman's Red Lion notes memorializing conversation With 'Dal' as to how collection is easier on the IMF | 75-76 |
| 23. | Revenue Officer Taylor notes that the Problems Resolution Person said she would do nothing | 77 |
| 24. | 12/20/88 letter to Don Thurman regarding looking for records from Dan Simons | 79 |

24. 1/10/89 Notice of intent to levy issued after the levies 80
25. 10/18/88 Levies predating the Notice 81-83
26. Liens on the Simons' properties 85-95
27. Letter to Parker Nielson from Dan Simons documenting
The immediate harm of the 1979 criminal indictment 96
28. 1973 IMF computer readout showing posting
of entire 1983 payment with full interest 11/8/83 97-99
29. March 1, 2002 letter from Department of Treasury
Including a highlighted IMF for 1974
Verifying the only timely assessment with written
Notice was 10/6/1975 as highlighted by the Treasury
Department 100-109
30. Service Center records showing that a debt for 1974
Abated was replaced on 7-20-1001 by Department
Of Justice Attorney Snow's orders 110-111
31. POLICIES OF IRS
a. 8.7/1.1.2 defining interest 112
b. 35.10.7 interest on stipulated decisions 113-114
c. GAO dln numbers and dln files 115-116

32. Affidavits
a. CPA Dennis Larsen as to how he was
Requested records and were not given any 117-118
b. Ex Appeals Officer Gail Anger 119-122
c. Attorney Patricia White 123-124
33. Attorney White's written request for documents in
Litigation in District Court 125
34. Affidavit of Susan Rose 126-129
34. March 21, 2001 handwritten offer to settle 130
34. Letter from the Department of Justice
That rewords the Plaintiffs' offer and does not
Mirror the offer 131-132
35. Service Center Replacement System Policy 133-135
35. Lien for year 1975 that IRS refused to remove
Unless Plaintiffs cooperated in settlement 136
Removed Aug. 1982 after offer of settlement
36 letter stating no extensions had been signed by the
Plaintiffs 137-138
37. March 2004 billing of the plaintiffs 139, 139a
39. Bank check for $55,000 140
40 business card with amount to pay 141
41. Excerpts of Performa designed for Traverse Ridge dev. 142-162

**Some IRS,TREASURY DEPT. FOIA/Privacy Act responses**

42. July 11, 1991 "If you do not agree [to extension of time to
Find documents] you have the right to consider this a denial." 163

43. "16 Sept. 1991…FOIA Appeal…The office of Chief Counsel, Disclosure Litigation Division received your letter… the statutory Period for response expires Oct. 4, 1991" 164
44. "September 26, 1991" "I have reviewed your account and verified that the letters were sent to you as required by law." 165
45. Simons are given some forms relating to tax liens and a Delegation order "forms relating to Levies…. " but not To the individual employees. 166
46. "24 Feb 1992" Dept. of Treas. Appeal response. Both the Ogden Service Center and Salt Lake District Office responded That there were no records responsive to the Simons request Therefore 'there was no denial of records" 167
47. "2 April 1992" the statutory period for appeal has passed. 168
48. "June 23, 1992" Privacy Act appeal response, person must "Specifiy the name and location of the particular system of records"169
49. "30 Jul 1992" Appeal response for FOIA request, "We should point out that I.R.C.§ 6404(b) specifically excludes any taxpayer initiated request for abatement of income taxes. …We have checked our IDRS terminal, and there are no abatements pending for you account for the years you were questioning." 171
50. "Aug 11 1992" "…a search was conducted, but no records responsive to your request were located." 172
51. "Aug 14, 1992" FOIA appeal response telling Simons to contact the Ogden Service Center and no agency records have been withheld. 173
52. "28 Oct 1992" Mrs. Simons' FOIA appeal. "The statutory period for a response has expired….there are ample administrative and judicial procedures and safeguards to review the Service's activities and afford you with due process." [ not without key documents withheld] 174-75
53. "May 11, 1996" the Department of Treasury appeal responds to Mrs. Simons' letter of "October 23, 1991" providing her with redacted Document 176
54. "Oct 22 1996" Appeal response, "Records concerning the processing, assessment, examination, collection and investigation of tax accounts are maintained in the Service Center or District Office in which such actions took place. " [no one states that Records are in Special Procedure function" 177-178
55. "Nov. 7, 1996" IRS service center unsigned FOIA response stating they found no records and they should inquire at the Rocky Mountain District Office. 179

DISTRICT COURT DOCUMENTS

56. Excerpts from the U.S. complaint " On July 25, 1983; March 18, 1985; November 11, 1985; August 20, 1990; September 3, 1990; November 5, 1990; April 15, 1991 and

September 9, 1991 a delegate of the Secretary of Treasury made Assessments against Dan C. Simons and Sally J. Simons for unpaid Income taxes, plus interest, penalties and fees for ..1974"
"10. Despite timely notice and demand for payment" [no timely written notice of assessment and demand for payment issued; no required Notice of Deficiency for supplemental assessments issued ][p.182-183]180-192

57. "March 28, 1995 Judgment and Order" dismissing 1974 as past the statute of limitations, 1982 without prejudice, and finding for the U.S. for '87 for "$1355.00 together with interest and other statutory additions for the Simons' 1987 federal income tax liability." 193-194
[Eventually overturned in 1999 by 10th Cir.]

58. "Oct 3 1995" "Upon the stipulation of the parties, the Record, and there being no outstanding tax liabilities to foreclose the tax liens, and for good cause, the Clerk is ordered to enter judgment as follows:\
"In favor of Dan C. Simons, Sally J. Simons and Harold Mark Simons as trustees of the Dan C. Simons Equity Trust and Jolene J. Smith as trustee of the Charlemagne Trust and against the United States dismissing the United States Complaint as to those defendants. Dated this 13th of Oct., 1995. " approved by DOJ attorney Kirk Lusty. 196

59. JUDGMENT entered by the District Court Clerk Oct. 16, 1995 197
See, P. App. 110 [IRS abates all debt Aug. 7, 1995]

59. May 9, 1996 Notice of Appeal is filed after 60 days of 10th cir.Rule 4(1)(b)198
A mandatory Congressional time bar, ignored by the government/court

60. May 5, 1998 Simons stipulate Trusts will not be an impediment on liens 199-202
[Tenth Circuit issues judgment on appeal reversing statute of limitations District Court dismissal as the form 900 waiver was for a time certain.]

D I S P U T E D T E R M S

61. 20 June 2002 Order states "there is no dispute that each party to this action agreed to the settlement agreement …[EXHIBIT A]"…. "The Court finds that there is no dispute that all necessary conditions have been satisfied to require the $55,000 payment…." 203-05

62. 26 Jul 2002 Government's objection to Simons' proposed Final Order and Judgment as based on the written alleged settlement-denied [p.app. 205] 206-06b

63. Government's typewritten alleged 'acceptance' of the handwritten offer To settle [see 205 and compare], that rewrites the handwritten offer, deletes The 'global' or 'universal' settlement, leaving Plantffs vulnerable to suit.207-208

64. Simons' response to the government's objection to the final order. 209-214

65. Aug 2002 FINAL ORDER AND JUDGMENT ALL claims, 'hereby Completely, now and forever, releases, dismisses, discharges, terminates, And extinguishes, with prejudice, ALL of the Plaintiffs' [government and employees] current and potential, foreseeable or unforeseeable, civil or criminal, known and unknown, claims, issues, allegations of any type whatsoever, in the Plaintiffs' personal or official capacities, as against all the Defendants, associated In any manner with this docketed case. The Plaintiffs will bear their own costs. So signed this 31st day of July, 2002 Judge Dee Benson" 215-216
Nothing in this Order dismisses the Simons' claims that Judge Benson Stated they could challenge.

66. Order to Settle was given from the Bench without an evidentiary hearing On Plaintiffs' Summary Judgment motion and handwritten offer was Signed by Jeffery Snow, who lacked authority to settle. [222] 217-224

67. June 18, 2002 hearing… Jeffery Snow DOJ attorney states the DOJ Agreed to the handwritten settlement, the Court relied upon only his Say so, stated that the Simons' arguments were without merit, And non payment was in bad faith and the Simons manufactured a Story after the fact. [See, Jeff Snow reestablishes debt on Simons' computer Record after offer to settle and without informing the Court of the 1995 225-230 Abatement, the DOJ attorney reinstated through the service center.see p.110-11]