Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT
OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,
vs.
UNITED STATES OF AMERICA, Case No. 06-115
*Defendant*. Judge Susan Braden

---

**PLAINTIFFS' RCFC RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

NOW COME THE PLAINTIFFS, by and through undersigned counsel, under RCFC Rule 56, to move this Court for partial summary judgment, based upon the memorandum of points and authorities attached hereto, and based upon the exhibits as attached to and incorporated into the Amended Complaint.

So Signed this 13th day of July, 2006

______________/s/_________________

Susan Rose, Utah Bar. No. 7985
*Counsel for the Plaintiffs*
9553 S. Indian Ridge Drive
Sandy, Utah 84092
(801) 545-0441
susan_rose@comcast.net

## TABLE OF CONTENTS

**PROPOSED FINDINGS OF FACT** Separate Attached

**QUESTIONS PRESENTED** 1

1. **Did the Government breach a 1983 package agreement contract for three tax years 1972, 1973 and 1974, memorialized in two Tax Court decisions, fully satisfied in accord with the agreement with the Simons' $49, 546.55?**

2. **Did the Government toll the statues of limitation for the Simons seeking redress in this honorable Court?**

3. **Was the Government's filing of a 1992 action in District Court for further collection for year 1974, outside the District Court's statutory jurisdiction, such that all its orders, decrees and judgements are void ab initio?**

4. **Are the Simons entitled to their full damages as requested in the original and amended complaints, as verified by the Simons, due to fraud, concealment, mistake, harassment, bad faith, and all the other Simons claims?**

**STATEMENT OF THE CASE** 1

**JURISDICTION OF THE COURT** 3

**SUMMARY JUDGMENT STANDARD** 5

**COLLATERAL ATTACK UPON A VOID DISTRICT COURT'S 2002 JUDGMENT THAT WAS VIOLATED IN MARCH 14, 2004 BY A FURTHER $4100 BILL FOR 1974 IS LEGALLY SOUND** 6

**Lack of Statutorily-Required written Notice of Assessment prevents further collection- except apparently for the Simons** 7

**Written Notices of Deficiency are to Issue for Supplemental Assessments-Except Apparently for the Simons** 7

**A Form 872 Prevents the IRS from Assessing past a Time Certain-Except apparently for the Simons** 7

**The Government Had a Duty to Disclose Material Information to Citizens it is Privy to Through Contract and by Federal Rules of Civil Procedure- Except apparently for the Simons** 8

**Levies and Liens are Invalid without a Written Notice and Demand -Except Apparently for the Simons** 8

**District Court proceedings to quiet title to a Levy or Lien Cannot Proceed without a Prior Written Notice and Demand, timely Assessment, or for amounts exceeding those settled by the Commissioner (26 USC 7121)- Except Apparently for the Simons** 9

**THE 1983 AGREEMENT FOR THREE INSEPERABLE YEARS WAS A BONA FIDE CONTRACT** 9

**PROOF OF FULL PAYMENT IN SATISFACTION OF AND IN ACCORD WITH THE 1983 AGREEMENT** 11

***Closing of the 1974 account so payment would post in only 1973's account leaving all three years closed to further collection in 1983*** 11

***Intentionally Late Assessment for Year 1974 Should Have Protected the Simons From Further Collection on year 1974*** 12

***A CPA Certified Calculation Accounts for Full Payment of the Entire Three Year Settlement Contract in 1983*** 15

***CPA Bryan Bolander's Analysis of the 1983 Agreement Shows Consistency Throughout with no mention of interest by the IRS*** 16

**TOLLING OF THE STATUTES OF LIMITATION** 16

**SIX CONDITIONS TOLL THE STATUTES OF LIMITATION** 19

***Equitable Tolling Due to Fraud or Concealment of Documents*** 20

**The Analysis of the 1983 Agreement by CPA Bolander** 20

***Fraudulent Claims against the Simons and Concealment of the Documents*** 23

**The Simons' Due Diligence in Obtaining their Records** 25

***Continuing Claims Doctrine*** ***30***

***Equitable Estoppel is Justified to Toll the Statutes for This Court*** **33**

***Lack of Any Fair and Impartial Hearing and Tribunal*** **34**

***The IRS Refusal to Return the Simons the Amounts paid for year 1974 After further billing of the Simons in 2004*** **35**

***Duress Should Toll the Statutes*** **37**

**DAMAGES** **38**

**CONCLUSION** **40**

**ATTACHED APPENDIX** **PGS.1-13**

**TABLE OF APPENDIX**

## TABLE OF AUTHORITIES

**CASES**

*Adickes v. S. H. Kress & Co*., 398 U.S. 144, 157 (1970) 6

*Alliance of Descendants of Texas Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed.Cir.1994). 33

*American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17 -18 (1951); 9

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); 6

*Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992) 4,6,8,10,16,29,34

Awad v. U.S. 301 F.3d 1367, 1372 (Fed. Cir. 2002) 40

Bennett v. Coors Brewing Co. 189 F.3d 1221,1229-1230 (10th Cir. 1999) 32

*Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000) 19,30

*Bowen v. City of New York*, 476 U.S. 467, 481-482 (1986) 19

*Capron v. Van Noorden*, 2 Cranch 126, 127 (1804) 9

*Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1571 (Fed. Cir. 1993) 30

*Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 407-08 (1994). 30

*Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991) 17

*Creppel v. United States,* 41 F.3d 627, 630-31 (Fed. Cir. 1994) 6

*Curtis v. United States*, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960). 6

*Entines v. United States*, 39 Fed. Cl. 673, 680 (1997) 30

*Fafel v. DiPaola*, 399 F.3d 403, 410 (1st Cir. 2005) 7

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947) 33

*Friedman v. United States*, 159 Ct. Cl. 1, 310 F.2d 381 (1963) 31

*Hatter v. United States*, 203 F.3d 795, 797-98 (Fed. Cir. 2000) ( en banc )); 31

*Hector v. United States* [58-1 USTC ¶9372], 255 F.2d 84, 85-86 (1958) *(per curiam)* 16

*Holmberg* v. *Armbrecht*, 327 U.S. 392, 397 (1946) 19

*Hurt v. U. S.* 70 F.3d 1261 (4th Cir. 1995) 4,6,8,10,16,29,34

*Inter-State Detective Bureau, Inc., v. Denver Post, Inc.,* 29 Colo. App. 313, 316, 484 P.2d 131, 133 (1971) 39

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) 30

*Japanese War Notes Claimants Assoc. of the Phillippines, Inc. v. United States*, 178 Ct. Cl. 630, 634, 373 F.2d 356, 358-59 (1967) 30

*Keohane v. Stewart,* 882 P.2d 1293, 1297 (Colo. 1994) 39

*Kurio v. U. S.*, 429 F. Supp. 42, 1970.STX.0000028http://www.versuslaw.com 4,6,8,10,19,20,21

*Lininger v. Knight,* 123 Colo. 213, 221, 226 P.2d 809, 813 (1951). 39

*Lins v. United States*, 231 Ct. Cl. 579, 582, 688 F.2d 784, 786 (1982), cert. denied, 459 U.S. 1147 (1983) 17

*Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir. 1972) 6

*Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884) 9

*Marbury v. Madison*, 5 U.S. 137, 163 (1803) 38

*Mitchell v. United States*, 10 Cl. Ct. 63, 75, as modified, 10 Cl. Ct. 787 (1986) 31

*Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) 6

*Nager Elec. Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 751 (1966), reh'g denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968) 16,17

*Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964) 17

*Portmann v. United States*, 674 F.2d 1155, 1159 (7th Cir.1982). 33

*Ripley v. Comm'r Ripley v. Commissioner*, 103 F.3d 332 (4th Cir.) 1996.C04.43538 <http://www.versuslaw.com>; 103 F.3d 332 ¶¶31,32. 14

*Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329-31 (Fed. Cir. 2003) 37

*Simons v. CIR*, 185 F.3d 875, 84 A.F.T.R.2d 99, 1999.C10.42905 http://www.versuslaw.com 14

*Singleton v. U. S.*, (4th Cir. 1997) http://laws.findlaw.com/4th/961924p.html 7

*Tonnessen v. Denver Publ'g Co.,* 5 P.3d 959, 963 (Colo. App. 2000) 39

United States v. Cook, 494 F.2d 573 (5th Cir. 1974) 2

*United States v. Feinberg* [67-1 USTC ¶9176], 372 F. 2d 352 (3d Cir. 1965), aff'd on rehearing en banc, 372 F. 2d 352, 359 (1967 5

*U.S. v. Simons*, http://www.kscourts.org/ca10/cases/2003/12/02-4201.htm 29

*United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962). 4

**STATUTES**

26 U.S.C. §108. 3, 38

26 U.S.C. §§1311-1314 1

26 U.S.C. 6212, 6213 6,7,11

| | |
|---|---|
| 26 U.S.C. §6215 | 6,11 |
| 26 U.S.C. §6303 | 7 |
| 26 U.S.C. §6321. | 6,8 |
| 26 U.S.C. 6330 | 8 |
| 26 U.S.C. 6331 | 8 |
| 26 U.S.C. §6404 | 10 |
| 26 U.S.C. §6501 | 1,7,8,11 |
| 26 U.S.C. §6501(b)(4). | 7 |
| 26 U.S.C. §6503 | 11 |
| 26 U.S.C. §6601(a) | 2,11 |
| 26 U.S.C. §6601(e) | 16 |
| 26 U.S.C. §6653 | 22 |
| 26 U.S.C. §7121. | 9 |
| 26 U. S. C.§7122. | 5 |
| 26 USC §7452 | 7,11 |
| 28 U.S.C. § 1346(a)(2)) | 3 |
| 28 U.S.C. § 1491 | 4 |
| 28 U.S.C. §2201(a). | 4,5 |
| 28 U.S.C. §2401(a). | 16 |
| 28 U.S.C. §2415 (a) | 17 |
| 28 U.S.C. §2501 | 16 |
| Freedom of Information Act –FOIA | 6,20,25,26,39 |
| Privacy Act | 6,20,25,26, 39 |

Federal Rule of Civil Procedure 26 6

Federal Rule of Appellate Procedure at Rule 4 18

U.S. Con. 5th Amend. 16

**Delegation Orders**

No. 150-25 dated March 8, 1951; No. 60 ¶ 1 effective Nov. 26, 1979 2,7,11

No. 190 effective March 21, 1982 ¶ 2, 2,7,11

**Internal Revenue Service Regulations, Policies and Procedures**

26 CFR 301.7701-9 for 1983 2

IRM 35.10.1.1.2.2 2,7

Rev. Proc. 83-7 15

IRS HANDBOOK 5.1 4.11 16

RCFC 56 5,6

**Tax Court Rule**

Tax Court Rule 155 4

**Treatises**

**Netting of Interest on Tax Overpayments and Underpayments** **3**

**Attached app. pg.7**

1 Corbin §86; 1 Williston §72. 5,18,19

note 15: 28 Am Jur 2d Estoppel and Waiver § 123, p. 785 33

27 ALR Fed, p. 719. and 722 33

Susan Rose, Utah Bar. No. 7985
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
Phone/fax (801) 545-0441

**UNITED STATES COURT**
**OF FEDERAL CLAIMS**

Danny C. Simons and Sally J. Simons

*Plaintiffs*,
vs.
UNITED STATES OF AMERICA, Case No. 06-115
*Defendant*. Judge Susan Braden

---

**MEMORANDUM OF LAW**

**PLAINTIFFS' RCFC RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

NOW COME THE PLAINTIFFS, by and through undersigned counsel, under RCFC Rule 56, to move this Court for partial summary judgment, based upon the attached proposed findings of fact and this memorandum of law as follows:

## QUESTIONS PRESENTED

5. **Did the Government breach a 1983 package agreement contract for three tax years 1972, 1973 and 1974, memorialized in two Tax Court decisions, fully satisfied in accord with the agreement with the Simons' $49, 546.55?**

6. **Did the Government toll the statues of limitation for the Simons seeking redress in this honorable Court?**

7. **Was the Government's filing of a 1992 action in District Court for further collection for year 1974, outside the District Court's statutory jurisdiction, such that all its orders, decrees and judgements are void ab initio?**

8. **Are the Simons entitled to their full damages as requested in the original and amended complaints, as verified by the Simons, due to fraud, concealment, mistake, harassment, bad faith, and all the other Simons claims?**

## STATEMENT OF THE CASE

1. This case involves a package settlement for three years, 1972, 1973, 1974 memorialized in 1983 in two Tax Court decisions, signed by representatives of the United States and the U.S. taxpayer citizens, the Simons, with delegated authority to sign the stipulated decisions entered on April 22, 1983, with identical IRS –drafted underlying work documents, showing all three years were interconnected legally and mathematically by income averaging and reaching into a statutorily closed year, 1972, using mitigation statute provisions 26 U.S.C. 1311-1314. (The only tax code provisions allowing the government to reach into a closed year). The Simons assert that as good citizens, they paid in 1983, $49,546.55 for a 'settlement' of a dispute, and not 'taxes' per se, for all three years. The District Counsel's decision shows the Simons consenting to payment when they could show the amounts were not owed or were reported correctly in later

years, and that delay in settlement was the IRS' fault for not relinquishing 'fraud' claims that lacked evidence to support them criminally or civilly. P. App. pg. 28-29. Baseless criminal claims delayed payment to settle these years civilly at least for years 72 and 73.

2. The Simons assert that the IRS (a) fully closed the 1974 account, (b) they can show how they fully paid for all three years as income averaged to within .07 cents or .001% error of the $49,546.55 paid in 1983; (c) tried to prevent further collections on year 1974, in 1983, and suspended their 1974 account from collections with computer codes that hold notices, that were reversed at the time a national computer policy was implemented directing reversal of litigation suspension codes; (d) concealed their key documents from them until about Feb. 15, 2000, while threatening them administratively in 1988, numerous times with seizure, levies and liens if they did not produce their records, falsely claiming they owed for year 1974, and sign an offer in compromise to extend the statutes of limitation under threats of enforced collection and seizure; (e) issued levies and liens without the statutory prerequisites; (f) usurped the District Court's authority without meeting the statutory prerequisites for District Court jurisdiction, resulting in another payment of $55,000 ; (f) depriving them of TIMELY showing how by concealed papers; (g) billing them again in 2004 for an additional $4100 and then (h) refusing to return all the money they paid and fees and interest by contract and Court order, breached, violated in innumerable ways over 20 yrs. Except for $23.17 based on the Simons refund request.

3. The Simons state that there was no handwritten 2001 Court-declared 'agreement' or 'settlement' for further payment of $55,000, that they paid as ordered in 2002. The District Court *records* show the Department of Justice "DOJ" reworded a key term- 'worldwide'- in rewriting the hand written offer greatly narrowing its scope over that

intended by the Simons, objected to a judgment based on it, it was never signed by a person with delegated authority, and then, (after the Simons failed in appealing it after their full payment), the government once again billed the Simons for an additional $4100 in March, 2004, and then offered $23.17 in a refund to the Simons for violating the 1983 contract. Offering the Simons any money from their form 843 request, acknowledges the government should reimburse them for all the government breaches of its contract with them, and their full expectation damages associated with a continuous chain of breaches.

4. The Simons legal theory is very simple. If they fully paid in 1983 for all three years 1972, 1973 and 1974, then all the collection efforts against them resulted in all their claimed damages, of continual breaches, they document fact by fact.

5. The Simons seek money damages and declaratory relief for continuous breaches, full expectation damages. The Simons claim that further collections may arise for a forgiven presumptively legitimate, but false-claimed debt, upon which they may have to pay more taxes under 26 U.S.C. §108. ***It never ends***.

6. The Simons recognize the government agency is presumed to act correctly. *The government logically can't be right in 1983 and again in 2001.* Either their acts in 1983 was correct and a fully satisfied contract resulted, OR, 2001 later collections based on concealed documents, and not disclosing to them or District Court the government's lack of meeting Court jurisdictional prerequisites is correct.

## JURISDICTION OF THE COURT

7. Under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2)), this Court exclusive jurisdiction over claims against the United States for amounts exceeding $10,000 "founded either upon the Constitution, or any Act of Congress, or any regulation of an

executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort." Id. And "the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." Id. Congress also expressly bars District Courts from using their Declaratory Judgment powers "with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986." 28 U.S.C. 2201(a).

8. When more than $10,000 in damages is claimed, in a contract dispute, the Court of Federal Claims *possesses exclusive jurisdiction* in these cases. 28 U.S.C. § 1491.

9. Agreements comprising tax litigation are 'contracts' and contract rules apply. Here, there are two in question, one in 1983 (P. App. pg. 12-21) and in 2001, (P. App. pg. 130) *United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962). The Simons claim they had a 1983 contract involving $49,546.55 with the United States. Stipulated Tax Court judgments are 'contracts' according to at least the 10th and 4th Circuit Courts. See, *Hurt v. U. S*. 70 F.3d 1261 (4th Cir. 1995) and *Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992), with any ambiguities in the IRS drafted boiler language to be construed against the drafter. Id. *Kurio infra*. Therefore, the 1983 multiple year agreement memorialized in two Tax Court decisions, involving all three tax years, 1972, 1973 and 1974 for an amount of $49, 546.55, is a 'contract' that falls within this Court's exclusive jurisdiction.

10. The Simons also raise another 'contract' issue by claiming they paid $55,000 for a District Court's order, in 2002, not for a settlement with the Department of Justice nor IRS. There was no mutual meeting of the minds or agreement with the Department of Justice or IRS. An acceptance which attempts to restate the terms of an offer [ here the

term 'worldwide' was significantly narrowed by the Department of Justice] must be accurate in every material respect, or no contract will result--an inaccurate restatement can constitute no more than a counteroffer. 1 Corbin §86; 1 Williston §72. The Government is bound to a contract compromising a tax controversy only if the contract was expressly approved by the appropriate Government officials precisely in the manner required by statute, 26 U. S. C. §7122. See, generally, *United States v. Feinberg* [67-1 USTC ¶9176], 372 F. 2d 352 (3d Cir. 1965), aff'd on rehearing en banc, 372 F. 2d 352, 359 (1967). No one with delegated authority signed the 2001 handwritten offer. (P. App. pg. 222). The District Court record shows the Court was aware of a lack of a meeting of the minds, when the District Court declared the handwritten document, an agreement, and proclaimed, "it is not what the Department of Justice wanted. " P. App. pg. 228-229, in violation of the Declaratory judgment restrictions for tax matters. 28 U.S.C. 2201.

11. After the Simons full payment, then failed appeal to the Tenth Circuit, the statutes of limitation ran for the Simons to appeal to the Supreme Court, in February, 2004. In March, 2004 they once again billed the Simons after their 2002 payment of $55,000, for an additional about $4100. When Simons asked file their form 843, asking for a refund of all amounts paid on the 1983 multiple year contract, not taxes, but amounts to satisfy a dispute, and then Court order, the government refused, but for $23.17 that the Simons refused to cash and sent back as in error. Both issues regard alleged contracts by either the Simons or District Court, in 1983 and 2001, involving claims over $10,000.

## SUMMARY JUDGMENT STANDARD

13. RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [[1]] Irrelevant, unsupported factual disputes do not preclude the entry of summary judgment. [[2]]

**COLLATERAL ATTACK UPON A VOID DISTRICT COURT'S 2002 JUDGMENT THAT WAS VIOLATED IN MARCH 14, 2004 BY A FURTHER $4100 BILL FOR 1974 IS LEGALLY SOUND**

14. This Court has authority to vacate another Court's judgment if it was void.

> "A void judgment is to be distinguished from an erroneous one, in that the latter is subject only to direct attack. A void judgment is one which, from its inception, was a complete nullity and without legal effect. . . ..".

Id. (internal marks omitted) (quoting *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir. 1972)). After the Simons received the Feb. 15, 2000 IRS disgorgement of their documents, and had time to review them with tax experts, the government's failed to meet Federal Court prerequisites; (1) a lack of a 26 U.S.C. §6215 written Notice of Assessment; (2) lack of 26 U.S.C. 6212, 6213 Notices of Deficiency for supplemental assessments after 1983; (3) lack of a 26 U.S.C. §6215 timely assessment, lack of prior notices; (4) violation of the government's fiduciary duty and FRCP rule 26, and Freedom of Information Act (FOIA) and Privacy Act duty to disclose to the Simons the whereabouts of and all their records administratively and judicially (*Anthony, Hurt, Kurio, infra*); (5) liens and levies invalid for lack of 26 U.S.C. §6321 *prior* written notice and demand; and (6) The 1992 filing of the Court complaint, with the untrue statements

---

[1] RCFC 56(c); Fed. R. Civ. P. 56(c); see also *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 157 (1970); *Creppel v. United States,* 41 F.3d 627, 630-31 (Fed. Cir. 1994).

[2] *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 247-48; see also *Monon Corp. v. Stoughton Trailers, Inc*., 239 F.3d at 1257; *Curtis v. United States*, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

that the government had provided *timely written* notices and demand, and a certificate or list of assessments, lacking the ZERO assessments on the computer closing the 1974 account on 10-25-83 (P. App. pg. 104), all usurped the District Court's authority against the Simons. P. App. pg. 182-183. "A court without subject-matter jurisdiction may not acquire it by consent of the parties." *Fafel v. DiPaola*, 399 F.3d 403, 410 (1st Cir. 2005).

**Lack of Statutorily-Required written Notice of Assessment prevents further collection- except apparently for the Simons**

15. After a Tax Court stipulated decision, a timely assessment is to be made prior to further collection, 26 U.S.C. 6215, with a written notice of assessment within 60 days thereafter. 26 U.S.C. 6303, 6501. The Simons never received one, the IRS never produced one. Without the form 872, one could not understand the ZERO 1983 assessment closing the Simons account. They did not get that until 2000.

**Written Notices of Deficiency are to Issue for Supplemental Assessments- Except Apparently for the Simons**

16. Supplemental assessments after 1983 provided the Simons with no required 26 U.S.C. 6213 Notices of Deficiency making the assessments invalid. *Singleton v. U. S.*, (4th Cir. 1997) http://laws.findlaw.com/4th/961924p.html.

**A Form 872 Prevents the IRS from Assessing past a Time Certain- Except apparently for the Simons**

17. A form 872 limits the IRS to doing an assessment within a time certain, thereby barring any further assessments and collections after the time certain has run. 26 U.S.C. 6501(b)(4). The 7-25-83 'assessment' on the Simons computer was 'late' by manager directive, with all the money paid in 1983 placed into 1973's account, leaving both closed. P. App. pg. 5, and 58. By the government not giving the Simons their form 872 (P. App. pg. 58) or acknowledging their manager ordered a late assessment for year 1974,

(P. App. pg. 5), the Simons were not protected from further collection on year 1974 after their 1983 payment of $49,546.55 as per a one time 1983 oral collection by Rev. Officer Dal Lawsen on Oct. 21, 1984, without a written notice and demand. 26 U.S.C. §§6330, 6331. Once the time runs on assessments, further collections are barred. 26 U.S.C. §6501. Yet, by carefully denying the existence of any consents for extensions (P. app. pg. 137-138) and not giving the Simons their form 872 or the internal assessment request (id. pg. 5), the government could simply rely on the Court's reliance on the presumption of the agency's correctness in basing claims on the 7-25-83 'assessment' and disregard the 10-24-1983 ZERO assessment, and usurp the District Court's authority.

**The Government Had a Duty to Disclose Material Information to Citizens it is Privy to Through Contract and by Federal Rules of Civil Procedure- Except apparently for the Simons**

18. The government has a fiduciary contractual obligation to deal honestly and forthrightly with those citizens with whom it contracts and Federal Rule of Civil Procedure Rule 26 duty to disclose. See, *Hurt v. U. S.* 70 F.3d 1261 (4th Cir. 1995) and *Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992), *Kurio, infra*. The Simons were unable to meet their 26 U.S.C. 7421 burden, by the government not disclosing the CPA-listed essential documents and form 872 (P. App. pg. 58) until Feb. 2000. P. App. pg. 9.

**Levies and Liens are Invalid without a Written Notice and Demand -Except Apparently for the Simons**

19. Levies and liens are supposed to issue *after* a citizen has a chance to challenge them in a hearing upon PRIOR notice. [[3]] Here there was no *prior* notice of the initial levies in 1988 (P. App. pg. 81-83, 80). There was no prior notice to the 1988 lien. (P. App. pg. 85).

---

[3] 26 U.S.C. 6321. "If any person liable to pay any tax neglects or refuses to pay

**District Court proceedings to quiet title to a Levy or Lien Cannot Proceed without a Prior Written Notice and Demand, timely Assessment, or for amounts exceeding those settled by the Commissioner (26 USC 7121)- Except Apparently for the Simons**

20. Subject matter jurisdiction can be challenged at any time, even the first time on appeal and is non waivable. [[4]] Yet, the District Court when faced with a lack of jurisdictional argument after the Simons obtained their records, avoided this argument by DEMANDING a settlement and threatening the Simons with summary judgment against them and huge costs as would be associated with a frivolous or merit less claim. (P. App. pg. 229-230). In 2002 the only reason there was a debt showing on the IRS computer for the Simons was that the DOJ attorney Jeffery Snow had ordered the IRS to put it there. (P. App. pg. 110-111).

23. For the Simons- Congressional legal protections- all legal prerequisites to suit by the government -apparently do not exist, or - if they do exist, the District Court's acts from their inception are void. There is no in between ground.

**<u>THE 1983 AGREEMENT FOR THREE INSEPARABLE YEARS WAS A BONA FIDE CONTRACT</u>**

24. According to Mr. Bryan Bolander, CPA and current president of the Utah Association of CPA's, there was a single 'package' agreement in 1983 that encompassed three tax years, 1972, 1973 and 1974. (P. App. pg. 6-10). The amounts offered by the Simons in letters offering settlement equate to about $49,588 (P. App. pg. 22-27 at pg.

---

the same <u>after demand</u>, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." Emphasis added.

[4] Lack of jurisdiction may be raised by a party, and must be noticed *sua sponte* by a court, at all points in the litigation, see, e. g., *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17 -18 (1951); *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884); *Capron v. Van Noorden*, 2 Cranch 126, 127 (1804).

27), was eventually accepted by the IRS, about a year later, in a nearly identical amount for $49,546.55, as memorialized in two IRS Tax Court decisions, one for 1972 and 1973, dkt. no. 13016-80, (P. App. pg. 12) and the other for year 1974, dkt. no. 10312-79 (Id. pg. 14). All three years were inseparably interlinked legally and mathematically by the IRS drafted Tax Court rule 155 identical computations showing income averaging between all three years, and reaching into a closed year, 1972, as is allowed by the Mitigation Statute provisions 26 U.S.C. 1311-1314. P. App. pg. 6-10. The CPA notes the IRS drafted documents do not mention interest, not likely an oversight, and a possible result of IRS delay that allows for abatement of interest under 26 U.S.C. 6404. Id. pg. 9-10. Additionally, while the Simons were allowing a 25% omission for year 1973, and increased taxes for $23, 573.00 (P. App. pg. 12), the IRS was also giving up claims on $29,500 worth of Commissions in year 1973, due to later reporting of the income. (P. App. pg. 29). Logically, the interest on the claims given up could be counterbalanced with interest on the claims added, a netting situation impossible to post on the IRS computer. (Attachment pg. 7-8, P. App. pg. 120). The IRS can negotiate any interest it wishes if there has been ministerial error or delay due to the government, or to achieve settlement. P. App. pg. 112 [notes by counsel]. If interest is an ambiguity it is to be construed against the IRS drafter of the documents. *Anthony, Hurt, supra.*

25. Both Tax Court decisions were signed by authorized representatives of the parties, Mr. Jones, being District Counsel and having delegated authority, signed and filed on the same day, while the Tax Court was on circuit in Utah, regarding the same parties, same

issues and amounts as found in the District Counsel's decision and Simons letters. [[5]] None of the IRS documents mention interest, and none mention any changes in the District Counsel's terms and conditions as approved by IRS Appeals, and signed by District Counsel who had delegated authority to sign his own office's decision.

**PROOF OF FULL PAYMENT IN SATISFACTION OF AND IN ACCORD WITH THE 1983 AGREEMENT**

26. The Simons offered four forms of proof of full payment of both Tax Court decisions that were one package 1983 settlement: (1) The closing of years 1972 and 1974 on the computer, leaving only the year 1973 for the check to post to, due to the Computer's inability to net or post 'restricted interest'; (2) A late assessment for year 1974 to close the account and prevent further collections; (3) a CPA-certified by affidavit calculation accounting for full payment to within .07 cents of what was actually paid, for all three years, tax, penalties, and 'restricted interest'; (4) Bryan Bolander, CPA, assessment of the entire 1983 package settlement contract for all three years. (P. App. pg. 6-10) noting no indication of the word 'interest' found anywhere in the IRS drafted documents.

***Closing of the 1974 account so payment would post in only 1973's accoun leaving all three years closed to further collection in 1983***

27. For both Tax Court decisions, the Tax sum total was $40,644. The Penalty total was $2033. This is a sum total of 42, 677.00 . On October 21, 1983, the Simons were told to pay a total of $49, 546.55 (P. App. pg. 141) as Mr. Simons noted on Mr. Lawsen's business card left at his office the day before. Id. Within one working day after Mr. Simons agreement to pay the $49, 546.55, on 10-24-1983, the 1974 computer file was

[5] Delegation Orders No. 150-25 dated March 8, 1951; No. 60 ¶ 1 effective Nov. 26, 1979; 26 CFR 301.7701-9 for 1983; and No. 190 effective March 21, 1982 ¶ 2, also as per 26 USC 7452, IRM 35.10.1.1.2.2 among other grants of authority statutory and regulatory and policy grants of authority.

***closed*** out with a TC 300 audit exam (Attachment pg. 4) and ZERO balance, and a disposal code 01 (Attachment pg. 1b) showing no changes to be made to this tax year, and 'hold code 2 and 3' that holds notices (Attachment pg. 1), and a 'restricted interest' code of TC 340 (Attachment pg. 4), that also holds notices. (Attachment pg. 10[notes by counsel]. See. P. App. pg. 104 for ZERO audit 10-24-83. This closing remained on the 1974 account until at least July 1989 as shown on the computer readout. P. App. pg. 62a. The 1974 read 'one open case' in 1991, years after the 1983 closure. P. App. pg. 62b. 1972 was closed as past the statutes of limitation. P. App. pg. 12.

***Intentionally Late Assessment for Year 1974 Should Have Protected the Simons From Further Collection on year 1974***

28. The IRS computer can not 'net' or input 'restricted interest' or interest that is not 6601(a) full interest all the way back to the date the return was due. (Attachment pg. 7-8), P. App. pg. 120. "Tax Settlements involving statutes not popularly used, or that may conflict with those programmed into the computer, or involving 'restricted' interest, posting of the settlement to the computer is a complete impossibility" (Affidavit of 23 year IRS veteran appeals officer Gail Anger). With 1972's and 1974's account 'closed' with ZERO owing, the master file would automatically credit the only open remaining year, 1973. Attachment pg. 8. One way to ensure no further collections for 1974, and a ZERO balance for 1974. is to do a statutorily required post-Tax Court 26 U.S.C. 6215 assessment [[6]], required as a prerequisite for further collection, after the statutes of

---

[6] 26 U.S.C. 6215: " a) General rule
If the taxpayer files a petition with the Tax Court, the entire amount redetermined as the deficiency by the decision of the Tax Court which has become final shall be assessed and shall be paid upon notice and demand from the Secretary. <u>No part of the amount determined as a deficiency by the Secretary but disallowed as such by the decision of the</u>

limitation have run. 26 U.S.C. 6501. An assessment statute expiration date may be extended by a form 872, until a date certain, as was the case here. P. App. pg. 58.

29. Here the Simons offer three forms of proof of the 7-25-83 assessments being late, and thus barring all future assessments, and collections under 26 U.S.C. §6501- a IRS 1983 protection of the Simons from further future collections. One form is an internal IRS form showing the IRS shows the 'statutory period for assessment expires 7-19-83. The form is a request for a 'quick assessment'. Manager of the requester signed it. It orders the 'assessment' to take place '07-25-83' after the IRS designated 7-19-83 statutory deadline. (P. App. pg. 5)

30. The second form of proof of a late assessment, on 7-25-83, is the form 872 that allowed the IRS an extension of the assessment statute expiration date until April 15, 1979 plus 60 days. (P. App. pg. 58). The Notice of Deficiency was filed April 16, 1979, a Monday after the 15th the last day it could issue. (P. App. 60-62). The Notice of Deficiency freezes collections for 90 days whereby the Simons could file a Tax Court petition to contest the amount. 26 U.S.C. 6503, 6212, 6213. This left 60 days on the form 872. No one has ever disputed that the Simons filed their Tax Court petition within about 3 days left on the 90 day suspension of the Notice of Deficiency. The 3 days plus the 60 days leaves 63 days from the date of the filing in the Tax Court of the stipulated decisions on April 22, 1983 to do an assessment. The Simons affirmatively waived any restrictions on assessment in both Tax Court decisions, P. App. pg. 13, 15, so the government could have assessed immediately. Using a Julian Calendar, 63 days after April 22, 1983 brings the assessment statute expiration date to be about, June 21, 1983.

---

Tax Court which has become final shall be assessed or be collected by levy or by proceeding in court with or without assessment." Emphasis Added.

Over a month earlier than the 7-25-83 assessment date. There is no disagreement within the circuits that under the 872 agreement, contract principles apply and the date certain supercedes the statute limits. *Ripley v. Comm'r Ripley v. Commissioner*, 103 F.3d 332 (4th Cir.) 1996.C04.43538 <http://www.versuslaw.com>; 103 F.3d 332 ¶¶31,32.

31. The third form of proof that 1974 had a late assessment was a IRS highlighted Computer readout for year 1974, obtained by a 2002 subpoena, where the agency admits that **only one** assessment made in 1975, fully paid by the Simons, was timely wherein a notice would issue. (P. App. 100, 109-110). As the Simons' tax expert CPA Bryan Bolander points out, no matter how the $49,546.55 payment for all three years was credited, all three years computers were closed for further collection. (P. App. pg. 10).

32. Significantly, the form 872 (TC 560) extension and Notice of Deficiency (TC 494) (P. App. pg. 103) (Attachment pg.5) were not posted to the Simons computer records. It was absolutely impossible to determine the exact date for assessment statute expiration. After seeking their records through long recognized Freedom of Information Act and Privacy Act methods, IRS misrepresented to the plaintiffs that they had signed no consents for extensions for the statutes of limitation. (P. App.137 ) The best evidence available to the Plaintiffs, at the time, showed a late issued notice of deficiency, that they argued deprived the Tax Court of any jurisdiction. Being pursued for additional amounts for 1974, after a full payment for all three years, (P. App. pg. 71a), never explained to the Simons as to why, the Simons sought to vacate the 1974 Tax Court decision. The Tenth Circuit court ruled an agreement stands without tax court jurisdiction in an unpublished decision. *Simons v. CIR*, 185 F.3d 875, 84 A.F.T.R.2d 99, 1999.C10.42905 http://www.versuslaw.com. Only after the about Feb. 15, 2000 disgorgement of the

Simons records, could they understand the Notice of Deficiency was timely, but the 7-25-83 assessment was not, and intentionally so, by the IRS to protect the Simons from further independent collections on only year 1974.

***A CPA Certified Calculation Accounts for Full Payment of the Entire Three Year Settlement Contract in 1983***

33. As for proof of full payment of this 1983 single 'package' agreement, the Simons produced a CPA certified calculation, by CPA Henry Van Tiendren, showing how the taxes (as per both Tax Court decisions), penalties (from both tax court decisions) added to a year and one month's 'restricted interest' comes to within .07 cents of the $49,546.55 verbally collected by Rev. Officer Dal Lawsen Oct. 21, 1983 (P. App. pg. 141), using Rev. Proc. 83-7 and its eight place factoring table for calculating interest.

34. See. P. App. pg. 53- 56a. The total of Taxes and Penalties was $42, 677.00. The Amount collected one time in 1983 by Revenue Officer Dal Lawsen was $49, 546.55 (P. App. pg. 141). The difference is $6869.55 to be collected for 'restricted interest'. The date of the Simons 'offer' was Jan. 15, 1982. The Date of the IRS work documents was about Feb. 1, 1983. This is about a year and one month difference in time. The Simons are paying interest for the year and a month it took for them to negotiate an agreement, when the IRS admits they could not negotiate with baseless fraud penalties pending (P. App. pg. 28). Using Rev. Proc. 83-7 and its rules and eight place factoring tables (P. App. pg. 54-56a), the Simons come to within .07 cents or are within .001% error between what they paid in interest, 6869.55, and what they calculate they should have paid in interest, $6869.62 cents. P. App. pg. 53. .07 cents or .001% difference. CPA Henry Van Tiendren, by affidavit, verifies the correctness of this calculation and testifies that this error is within acceptable tolerances. (P. App. 52) 23 year veteran ex IRS

Appeal officer Gail Anger attests by affidavit that it would be 'astronomically rare' for the Simons to be able to recalculate and account for how their payment, paid all three years, unless the IRS did it so. (P. App. pg. 121).

**CPA Bryan Bolander's Analysis of the 1983 Agreement Shows Consistency Throughout with No Mention of Interest by the IRS**

36. CPA Bryan Bolander shows that the 1983 agreement tracks through the original returns, District Counsel's decision, IRS drafted Tax Court rule 155 computations and the two Tax Court decision, smoothly. P. App. pg. 6-10. Further, it is his experience that if the IRS wished to collect full interest all the way back to the date of all the returns for all years 1972, 1973 and 1974, the IRS with multiple people preparing the work documents would not have omitted a reference to the statute applying to any interest. (P. App. 16). If interest is an ambiguity, it is construed against the drafter. *Anthony, Hurt*.

**TOLLING OF THE STATUTES OF LIMITATION**

37. The statute of limitations on Tucker Act express or implied contract claims is six years. 28 U.S.C. s 2401(a). For U.S. Con. 5th Amend.Takings claims it is six years by 28 U.S.C. 2501. When the Government filed suit in 1992, the period of limitation for collecting taxes was tolled. See, *Hector v. United States* [58-1 USTC ¶9372], 255 F.2d 84, 85-86 (1958) *(per curiam)* . Equity should apply to the Simons such that until the District Court case that the government relied upon to suspend the statutes for collection ended in 2004, the statutes were equally tolled, until all events occurred fixing the government's liability, that being the governments refusal to refund all money paid for the 1983 agreement and thereafter with interest. *Nager , infra*. The Simons' Complaint was filed on February 15, 2006.

38. However, 28 U.S.C. 2415 (a) mandates that any government claims "founded upon any contract express or implied in law or fact, shall [also] be barred unless the complaint is filed within **six year**s after the right of action accrues. or within one **year** after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later:…" Id. The time is tolled beginning when the citizen 'KNOWS' there has been a legal injury. It is more than mere 'notice' of an injury that is required to start the statutes running if the citizen is unable to articulate the basis for the injury. The statute of limitations for a claim against the United States 'arises' or begins to run when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment . . . .'" [7]Moreover, "[u]nder federal law governing statutes of limitation, a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991). The *final acts* occurring necessitating a full statement of claim occurred when the IRS once again billed the Plaintiffs in March, 2004 for year 1974 in violation of the 2002 District Court ordered decree ( P. App. 215-216 ), for about $4100 dollars (P. App. 139-139a), and then attempted to refund about $23.17 (P. App. 139-139a ), March, 2004 that Plaintiffs returned due to gross error for what was owed to them.

39. Here, 'all events necessary to fix the Government's liability' occurred when the District Court denied the Simons challenge to its jurisdiction on July 31, 2002 (P. App. pg. 215-216), relying on the government's assertions, and denying the Simons' late discovered new evidence, and the Dec. 2003 Tenth Cir. ruling denying relief.

---

[7] *Nager Elec. Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 751 (1966), reh'g denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)); *Lins v. United States*, 231 Ct. Cl. 579, 582, 688 F.2d 784, 786 (1982), cert. denied, 459 U.S. 1147 (1983); *Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964).

40. And prior to the 2002 payment, was the 2000 disgorgement of the Simons' agency file for year 1974, showing key documents had been concealed from the Simons and their tax professionals and the District Court. (P. App. pg. 117-118; 123-125; 126-127).

41. Likewise, another event, fixing the government's liability, occurred, when the DOJ replaced a debt on the IRS computer readout that expired 60 days after the March 28, 1995 final judgment, in 1995 (P. App. pg. 110, Attachment pg. 5a) when the Federal Rules of Appellate Procedure Rule 4, 60 day statute of limitations for government to file a notice of appeal of a March, 1995 judgment in favor of the Simons, ran. P. App. pg. 110-111; 193-194). It was further fixed, when DOJ attorney represented to the District Court that the DOJ had fully accepted a 2001 'handwritten' offer upon which the District Court relied. P. App. pg. 227. The record of the District Court shows the typewritten alleged 'acceptance' of a 'handwritten' offer (P. App. pg. 130, to pay for a 'worldwide' settlement for all claims against everyone (P. app. pg. 221-222), redefined 'worldwide' so as to not apply to all parties and all claims, (P. App. pg. 131, 207-208). By law, no contract could form. *Corbin, Williston, supra* at pg. 5.

42. The District Court stated in regards to any 2001 alleged deal, "it was not what the Department of Justice wanted" (id. pg. 228), and understood that Jeffery Snow's signature on the handwritten offer would not bind the government (P. App. pg. 222), and saw the government's objection to any order based on the 'handwritten' document (P. App. pg. 205-206b), saw the Department of Justice's typewritten rewording of the handwritten offer, narrowing the term 'worldwide' dramatically (P. App. pg. 207-208), the government's objection to any judgment based on a handwritten document (P. App. pg. 209), the Simons response showing they raised their jurisdictional claims and had not

preferred settlement and were merely paying as ordered, (P. App. pg. 209-213), and then the IRS' complete disregard of any alleged 'agreement' or District Court's judgment, by its March, 2004 further billing of the Plaintiffs for $4100 dollars after their obedient $55,000 payment. (P. App. 139-139a) All the foregoing shows a lack of unequivocal acceptance necessary for a ' meeting of the minds'. *Kurio, infra,* Corbin, Williston *supra*. The District Court's finding that "there is no dispute that each party to this action agreed to the settlement agreement "(P. App. pg. 203-205) is simply in error. P. App. pg. 205-206b compare with 219-220, and 205.

**SIX CONDITIONS TOLL THE STATUTES OF LIMITATION**

43. The question then arises as to what conditions 'toll' the statutes of limitation such that a citizen may bring a claim against the government after the six year time frame. There are eight circumstances that will toll the statutes of limitation: (1) when there has been fraud or concealment of information (*Holmberg* v. *Armbrecht*, 327 U.S. 392, 397 (1946)), equitable tolling occurs; (2) the continuing claims doctrine, *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000), (3) when an internal policy, unpublished, is illegal and claimants were not on notice to the policy as part of the cause for their legal injury (*Bowen v. City of New York*, 476 U.S. 467, 481-482 (1986)), (4) equitable estoppel, lack of finality due to the final outcome of the illegal federal litigation such that the government may continue to collect for 1974, (5) the deprivation to the Plaintiffs of any decision, order, or judgment administratively, or in District Court explaining facts and conclusions of law in an *impartial* tribunal as to why, how, or upon what reasoned basis the Simons ever owed any money to the government after their full payment of a

contract with the United States in 1983, and (6) the 2004 refusal of the government to give the Simons anything other than a $23.17 refund, rejected by the Simons.

44. The Simons filed a request over six months ago for a rebate of all the money owed to them by the government under 'contract', not taxes. P. App. pg. 3. The IRS gave the Simons $23.17 refund, and Simons filed here for redress. P. App. pg. 139-139a, 4.

***Equitable Tolling Due to Fraud or Concealment of Documents***
**The Analysis of the 1983 Agreement by CPA Bolander**

45. The Simons, (prior to about February 15, 2000, when they obtained their records), could not prove that the government, in 1983, took steps to prevent further collection on the year 1974 by a late assessment, with management approval, to ensure no further collection on the 1974 account, that was part of a 1983 package agreement for three years, 1972, 1973, and 1974 As with the Kurios, in *Kurio v. U. S.*, 429 F. Supp. 42, 1970.STX.0000028<http://www.versuslaw.com> the Simons original returns were vital and the best evidence, with the District Counsel's decision, as to what occurred in the 1983 settlement agreement. As well noted by Rev. Thurman when he records that he stated to the Simons CPA Dennis Larsen, "…that without evidence the bal due was in error I must proceed with ECA. " (P. App. pg. 71a)

> "The returns sought by plaintiff from the Government were material and relevant because they were the best evidence of the facts on which this issue turned. [ P. App. pgs. 9, 123] They were immediately accessible to all participating IRS and Justice Department personnel, any of whom could have determined their location by computer search in the regional Service Center or the National Computer Center and obtained them by oral request. [P. App. pg. 63, 68]. See Treas. Reg. §§ 301.6103(a)-1(e), -1(h). They were sought by plaintiff through duly ordered, established, and well understood discovery procedures [and FOIA and Privacy Act requests]. Nevertheless, they were not furnished and this increased plaintiff's burden of proving his case beyond that contemplated by the Congress and the courts. In effect, plaintiff was deprived

the opportunity of satisfying his burden of proof on an important part of his case."

*Kurio v. U. S.* , ¶39 [notes by Plaintiffs].

46. Once the government filed its 1992 complaint,

"The Government as a litigant is, of course, subject to the rules of discovery." [citations omitted]. The Government therefore had no right to ignore plaintiff's discovery demands. {P. App. pg. 123-125]. Moreover, as representatives of the Government, all personnel connected with the litigation, including counsel, had an obligation "to be frank and fair and disclose all the facts." [citations omitted].

*Kurio*, ¶37

47. As with *Kurio*, once **"**the mistakes were finally discovered, the Government [and District Court] failed promptly to admit them. The resulting snarl is now before the Court for resolution.*"* *Kurio* ¶ 15.

48. The Simons Tax Expert Bryan Bolander, CPA, and current president of the Utah Association of CPAs, analyzed the Simons 1983 agreement (P. App. pg. 6-11) and found the following documents were ***essential*** for understanding the 1983 agreement: (1) the Tax Court decisions (P. App. pg. 12-16); (2) the original 1974 returns (P. App. pg. 31); (3) the District Counsel's decision (P. App. pg. 28); (4) letters from the Simons legal representative to the IRS and to them offering settlement (P. App. pg. 22,25); (5) the computer readouts for both 1973 and 1974 (P. App. pg. 97, 100); (6) the underlying work documents that were identical for both Tax Court decisions (P. App. pg. 16); (7) the Simons' cashier's check for $49, 546.55 (P. App. pg. 51). See P. App. pg. 9. The Simons also claim the form 872 extension of the Statutes of Limitation for Assessment was essential to knowing that the Simons' 1974 account was not timely assessed (P. App. pg. 58) along with the internal working form showing a late assessment was done intentionally with manager's approval . (P. App. pg. 5). Simons assert there was no timely assessment on 1974 intentionally, due to the IRS computer's inability to net

interest and the IRS' placement of all money for all three years into only year 1973's account, while the IRS was affirmatively closing years 1972, and 1974, such that on the computer all three years would be closed and the Simons protected from future claims.

49. The following documents were never produced until after about Feb. 15, 2000: (1) the original returns, (2) the form 872; (3) the internal late assessment document; (4) the District Counsel's decision. The District Counsel's decision is vital to understanding the Simons were not 'owing taxes', but consenting to payments to settle the dispute. There is some credence to this view, as the District Counsel's decision states for 1972, ' Though the taxpayer would be able to prove that most of the $18, 460.16 in promissory notes was not received that year [1972], he is conceding the non deductibility of those notes for purposes of settlement.' (P. App. pg. 29). For 1973, the District Counsel states, " The respondent agrees to reduce the dollar amount for commissions, received by the petition in 1973 by $29, 500.00. The petition was able to show in the criminal case that $21,500.00 of this amount allegedly received in 1973 was properly reported in subsequent years. It is highly unlikely that the government could now prove that this $211,500.00 should be included in the commission income for 1973. There is also an $8000 decrease agreed to by the Appeals Officer in his Supporting Statement. In addition, the petitioner has consented to the negligence penalty under 6653(a)." (id.) For 1974, the Simons consented to a minor negligence penalty and the changes in taxes on form 886-A (P. App. pg. 17) as referenced in the District Counsel's Decision (P. App. pg. 30, is only $1647. Notably, the form 5278 as drafted by the IRS for the Tax Court's Rule 155 computation, shows it is a 'settlement' computation. (P. App. pg. 17).

50. The CPA reviewing the agreement could understand and track through the amounts and numbers to verify the actual agreement agreed with offers and acceptance and finally payment – **only**- with this District Counsel's Decision, and the Original returns, and letters of offer of settlement for a 'package' agreement inseparable by year, and the IRS underlying work documents that. (P. App. pg. 8-9). All the puzzle pieces were necessary to show the agreement and how interest was abated, or intentionally not included in the deliberations, or was reduced by trade offs between the IRS claims the Simons' owed, and the IRS relinquishing about $29, 500 in claims against the Simons. Here, the CPA found all the numbers and issues track through, and the IRS never mentioned interest in any of their documents, not likely to be an oversight. P. App. pg. 29. These documents also show the Simons were consenting to amounts either reported later, or not received in the year the IRS claimed, and to allowing the government to reach into a stat closed year, and consenting to a negligence penalty, for 'purposes of settlement.' P. App. pg. 27-29. No evidence showed how the Simons were paying 'taxes', so much as money to resolve a dispute. P. App. pg. 9-10.

***Fraudulent claims against the Simons and Concealment of the Documents***

51. Revenue Officer Don Thurman had minimally the original returns and District Counsel's decision in 1988. Revenue Officer notes on 6-18-88 "Also recd Orig. of 7412 return- 1 ½ inches thick –copy & return later- Sent to RO Aide to copy." (P. App. pg. 68). On 7-11-88 the Rev. Officer notes show "Return copied- Info shows case went to tax court & District Council agreed to settle by clearance of major penalties & minor tax changes. Apparently 1972 & 1973 are closed satisfied. Appears to be no open issues on 1974". (P. App. pg. 68). Rev. Officer Thurman did not give these documents to the

Simons Tax Professionals, while affirmatively asserting the Simons owed for tax year 1974, as shown by the following:

a. 8/18/88 "Warned of ECA if not resolved levy, seizure, summons". (P. Am. Complt. Ap. 70)

a. 8/17/88 "Warned of ECA …) id.

b. 9/1/88 'Told him I will proceed with ECA, levy summons, etc." Id. at pg. 71a

c. 9/8/88 "…Dennis Larsen chewed on my ear for a long time with all the reasons why I shouldn't take ECA on assets or summons… told him without any evidence bal due was in error I must proceed with ECA" . Id.

d. 11/21/88 "Warned of possible suit or other enforcement…" Id. pg. 72)

e. 1/12/89 "…. Otherwise I proceed with ECA" Id. pg. 73

f. The IRS had levied all the Simons' bank accounts on about 10/18/88 (P. Am. Complt. Ap. 81-84 without a PRIOR notice of levy issued 1/10/89 (P. Am. Complt. Ap. 80).

52. The Revenue Officer knew and understood that without the Simons evidence of the IRS being in error, the Simons could not prove the IRS was in error. P. App. pg. 71a. Department of Justice Attorney Kirk Lusty who filed the 1992 complaint for collection of the year 1974, also had access to the Simons records and did not produce their original returns, any notices of assessment. P. App. pg. 63, 123, 125. And Rev. Officer Thurman notes a meeting where 'Dal sd, could do easily [collections] on IMF'. (P. App. pg. 76). If the withheld documents did not show the government in error, then there would have been no harm in releasing them.

## The Simons' Due Diligence in Obtaining their Records

53. The Simons previous CPA at the time in 1983 and again in 1988, Dennis Larsen states by affidavit that he asked for the history of the account and never received it (P. App. pg. 118) and that he met with the Problems Resolution person and that he "received no information as to what code sections or regulations were being used for their collection effort, why there was a five year silence of no collections after payment for the settlement amount, or documents from the IRS. … Every attempt was consciously made to provide Revenue Officer Don Thurman with information he needed. " P. App. pg. 118. The Simons letter to Rev. Officer Don Thurman likewise shows his belief that Mr. Thurman had no documents and he was trying to provide Mr. Thurman with what Mr. Thurman was demanding. (P. App. pg. 79) The Simons previous counsel, Patricia White, current dean of the Sandra Day O'Connor School of Law at Arizona State University, likewise attests by affidavit that she asked for the original and amended returns for 1972, 1973 and 1974, and written notices of assessment to no avail. "Throughout the period during which Affiant represented Mr. Simons, Affiant was never able to determine from any document which she examined what the underlying substantive tax issues were which led to the determination of deficiency assessed against the Taxpayer. " P. App. pg. 123, 125. Current counsel attests by affidavit that the original returns, proof of a late assessment for tax year 1974, District Counsel's decision was not received until after about Feb. 15, 2000 as a result of a FOIA/Privacy Act request to Special Procedures function of the IRS. (P. App. pg. 127, 128). After the box of documents where the IRS was disgorging the Simons' administrative file was received, tax experts reviewed the file, taking additional time to understand the meaning of the documents. Id.

54. Additionally, the Simons made numerous FOIA and Privacy Act requests. (P. App. pg. 163-179). It is evident from the record they produced that they were misled in to believing (a) there were no extensions signed by them. Compare P. App. pg. 137-138, with 58. (b) their were no responsive records in either the Service Center or District Office (Id. pg. 167), (c) they requested their record under the wrong statute, (Id. pg. 169), (d) and were told that 26 U.S.C. 6404 expressly prohibits any taxpayer initiated requests for abatement and on the Computer there was no evidence of any requests for abatement pending for 1974, (Id. pg. 171), (e) and the Problems Resolution person, Revenue Officers, DOJ attorneys, IRS offices and service centers, all failed to inform the Simons to look in Special Procedure function. (P. App. pgs. 117-118, 122-129, and163-179.) Special Procedures function was not listed on public IRS organization charts.

55. Only after Feb. 15, 2000 could the Simons and Tax Professionals understand fully what documents were withheld, and that the IMF computer readout was defective, and that the certificate of assessment (required under 26 U.S.C. 6215) provided in a 1992 District Court action, P. App. pg. 182-183, a legal gateway to the Courts, begins with a 7-25-1983 statutorily late assessment, due to the lack of the posting of a form 872 extension TC 560 on the computer and lack of production of the form 872 under FOIA/Privacy Act or in discovery, along with the necessary and essential original returns, and district counsel's decision explaining the deal. Attachment pg. 5, 9.

56. Administratively and in District Court, the IRS had a fiduciary duty to deal honestly with its citizens (*Anthony, supra*) and to produce all material documents under Federal Rules of Civil Procedure at Rule 26. *Kurio, supra.*

57. The Certificate of Assessment in the District Court pleading also misrepresented ALL the assessments by deleting the ZERO assessment on 1974's account, posted one working day after the Simons were told what to pay for all three years, closing 1974. (P. App. pg. 141, 183). In all the documents produced in any manner by the IRS there has NEVER been produced a single written notice and demand for payment for any 1983 assessment and supplemental interest assessments of the three tax years. (P. App. pg. 123, 125). Mr. Thurman records "Dal sd- could do on IMF easily". In other words, the defective computer readout could be used for collections rather than the records, that Rev. Officer Thurman had, copied, dis not disclose, along with other personnel, beginning in June of 1988.(P.App.pg. 68)

58. Concealment, purposeful or negligently, also occurred by not posting key transactions to the Simons' computer master file, thereby making it defective. Missing from the Master File are the codes for the Notice of Deficiency, TC 494, the signed extension of the statutes of limitation TC 560, the 1988 levies and liens, TC 582, such that Tax Professionals reviewing the Computer readout would not know precisely what was happening to the Simons administratively. (See P. App. pg. 100-109) . Attachment pg. 4-5. According to the GAO, without these codes, and corresponding Document Locator Number, the Simons could not request their production from the IRS offices. (P. App. pg. 116, 129). Notably, finally on March 1, 2002, the IRS admits that there is only one notice issuance date, that being in 1975, for which the Simons promptly paid. (P App. pg. 100, 109, 110) . Hold codes through out the 1974 computer readout hold notices, (id. ) (attachment pg. 1). Restricted interest codes TC 340 throughout the 1974 account likewise hold notices. (Id.) (attachment 4, 10).

59. After this contract was fully paid in 1983, the government pursued collection on only year 1974 administratively beginning in about 1988 as shown by the notations of Revenue Officer Don Thurman. (P. App. pg. 68-74). This administrative process resulted in levies and liens for year 1974 beginning about 1988 (P. Ap. 81-95). In 1992, the government filed suit in U.S. District to quiet title to the Simons property to collect on year 1974. (P. App. pg. 180-192). On March 21, 2001 the District Court ordered the Simons to offer to pay for another settlement. (P. App. pg. 219-220). The Simons complied and a handwritten 'offer' to settle was drafted partly by the IRS and partly by Simons representative Mr. Rappapport. It was signed by Justice Department attorney Jefferey Snow, and Susan Schildmeyer and Dan Simons. (P. App. pg. 130, 205). The DOJ attorney Snow advised the Court he had no delegated authority to bind the government, and the 'handwritten' offer's intent was "All claims against everybody are to go away." P. App. pg. 221-222.

60. The Department of Justice redefined the word 'worldwide' as for settlement (P. App. pg. 207-208), that would exclude past, present and future potential claims of the government employees 'Thurman, Lusty, Lawsen, etc" (P. App. pg. 205). In otherwords the 'all' claims against 'everybody' would not go away under the DOJ's typewritten alleged 'acceptance'. The Simons opted for a hearing. The District Court 'declared' the handwritten offer an 'agreement' (P. App. pg. 228), based on Jeffery Snow saying the doj had fully accepted it. (Id. at 228-230). The Court ordered the Simons to pay the IRS an additional $55,000 to resolve the suit. (P. App. pg. 228). On June 24, 2002, the Simons paid the IRS $55,000 stating on the face of the check, "as ordered by the U.S. District Court for civil case 2:92 cv 1071" and did not state the payment was for a 'settlement' or

for 'taxes'. The District Court issued an order dismissing all the Government's claims, including those of its employees, against the DOJ's objection. (P. app. pg. 206, 215-216). The Simons then appealed the order to no avail. *U.S. v. Simons*, http://www.kscourts.org/ca10/cases/2003/12/02-4201.htm

61. After the time for the Simons to appeal their case to the U.S. Supreme Court lapsed, in March 2004, the IRS once again billed the Simons for an additional about $4100 in penalties for year 1974, in disregard of the order. (P. App. pg. 139-139a). The Simons asked for a refund of the moneys paid by contract on the 1983 3 yr. Multiple year contract and all moneys paid for year 1974 with interest. (P. App. pg. 3-4b). The government provided the Simons with a refund of about $23.17 on Oct. 24, 2004. (P. App. pg. 139-139a). The Simons claim there was no 'contract' formed in 2001, and could not be, as there had already been full satisfaction and accord, no timely assessments for year 1974, no written notices and demands for assessments, no prior issued written notices of levy and liens for year 1974 (prior to the actual levies and liens). All the District Court's acts were void, as all the statutory prerequisites of to the 1992 filing of suit were absent.

62. The Plaintiffs' expert CPA shows that the amounts all track through the district counsel's decision, and Tax Court stipulated decisions and their underlying IRS work documents. None of these documents mention the 'interest', a similar ambiguity found in *Hurt* and *Anthony*, *supra*. The doctrine of equitable tolling, only applies, for example, when the claimant has (1) actively pursued his judicial remedies but filed a defective pleading during the statutory period, (2) been induced by fraud by his opponent's conduct into allowing the filing date to expire, or (3) missed the filing date due to the

government's concealment of the facts. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Based upon the concealment of the Simons key documents as identified as essential by their CPA Bryan Bolander (P. App. pg. 9), the Simons CPA Dennis Larsen, previous attorney Patricia White, and current counsel, all agree they had no ability to understand the basis, factually or legally, for IRS continued collections to meet the Simons burden of showing the government was in error. (P. App. pg. 118-120, 122-125, 126-129). 23 year veteran IRS Appeals Officer Gail Anger states any computer readout showing ZERO owing then tens of thousands of dollars owing, is unreliable for anything, making all the Simons absolutely essential for understanding their legal rights, and to give 'rise' to their claims. (P. App. pg. 121).

63. Based upon the foregoing, as an equitable matter, this Court has authority to toll the statute of limitations where the facts giving rise to a claim were either inherently unknowable or intentionally concealed at the accrual date. {Here until at least Feb. 15, 2000 and after for reviewing the voluminous IRS disgorged documents]. **[[8]]**

**Continuing Claims Doctrine**

64. The Simons can be compensated under the continuing claims doctrine. "The continuing claims doctrine has been applied when the government owes a continuing duty to the plaintiffs." *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000). Under this theory, each breach of the Simons contractual duty to forebear collections upon payment in 1983, gives rise to a separate cause of action, and the Simons have

[8] See, e.g., *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1571 (Fed. Cir. 1993) (quoting *Japanese War Notes Claimants Assoc. of the Phillippines, Inc. v. United States*, 178 Ct. Cl. 630, 634, 373 F.2d 356, 358-59 (1967)); accord *Entines v. United States*, 39 Fed. Cl. 673, 680 (1997); *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 407-08 (1994).

claims arising for any breaches that occurred within the statute of limitations period.[9] Therefore, a continuing claim exists in cases where the defendant owes the plaintiff an ever-present duty, the nonperformance of which would give rise to a series of actionable breaches, see *Mitchell,* 10 Cl. Ct. at 789. *See Friedman v. United States*, 159 Ct. Cl. 1, 310 F.2d 381 (1963). The court in *Friedman* held that the plaintiff could assert a new claim each time the Government improperly denied her benefits. See id. 159 Ct. Cl. at 7-8, 310 F.2d. at 385. Here, that is every day after about June 1988.

65. Here, in Nov. 1983, the Simons paid the government $49,546.55. (P. App. pg. 51). The Simons have shown how that was full payment for three interlocked and income averaged tax years of 1972, 1973, and 1974, *supra*. Within six years of this payment, the IRS issued levies (P. App. pg. 81-83), issued liens (P. App. pg. 85), demanded the Simons sign an offer in compromise to toll the statutes for collections (because the IRS was not disclosing the 1983 assessment was late or disclosing the Simons records) or face Enforced Collection Actions of seizure, levies and liens, (P. App. pg. 70, 71a, and 72). The Simons meticulously show this Court the actions of the government from 1988 until their filing of the original complaint here is one of false representations they owed more on 1974, concealed documents the government had access to all along, that the representative knew were false or there would be no harm in disclosing the documents, that the Simons did not understand but could not prove or explain, and that the government intended the Simons and the District Court to act upon, and that damaged the Simons. *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229-30 (10th Cir. 1999). The

[9] See id. (citing *Hatter v. United States*, 203 F.3d 795, 797-98 (Fed. Cir. 2000) ( en banc )); see also *Mitchell v. United States*, 10 Cl. Ct. 63, 75, as modified, 10 Cl. Ct. 787 (1986).

IRS and DOJ actions, without documents to show they were without foundation, constituted separate individual breaches of the duty of the government to forebear collection, separate acts of fraud in violation of the government's duty of fidelity ongoing to this day, and are acts that should, in fairness, toll the statutes of limitation, and void any alleged 2001 'contract', and provide for full expectation damages.

***The Service Center Replacement Policy was Never Published and was Issued in 1984, and the Changes of the Policy show up on the Simons 1974 account in 1984***

66. If a policy is not published and effects a citizen's rights, the citizen is without information as to how to defeat the agencies' decisions, making the agencies' actions invalid as the policy is unhinged from any statutory grants of authority. *Bowen v. City of New York*, 476 U.S. 467, 481-482 (1986)). Invalid unknown policies can equitably toll the statutes of limitation. The IRS code provides that on closed accounts, 26 U.S.C. 7421, the IRS is not to collect any more money than that to which it agreed. The IRS computer is an essential element in collections. *Kurio*, supra, generally. When a TC 520 litigation freeze, with a –W freeze (P. App. pg. 102 upper right) and closing codes 85 (P. App. pg. 104) are on the computer of an individual, collection freezes. Such was the case for the Simons computer on 9-15-1983 within less than 60 days after the 7-25-1983 late assessment, that would hold any assessment notices automatically generated 60 days later, and collections on the 1974 account cease as outside 6501's limitation. ( Attachment 1a and 5).

67. In 1984, the IRS adopted the Service Center Replacement System Phase III implementation policy. (Attachment pg. 9-13).. The Service Center Replacement System policy, essentially with a flip of a switch, unsuspended all accounts with a TC 520 and closing code 85, by having personnel post a TC 521 or 520 reversal. Attachment pg. 5,

and 13. On 12-31-1984, a TC 521 was posted to the Simons account and to all accounts like theirs nationally. Within about 3.5 months, on 3/18/1985, the IRS posted a restricted interest supplemental 'assessment' for $6332.07 in interest for year 1974, again without a notice due to the freeze codes and hold codes on the account, and despite the TC 300 Oct. 24, 1983 closing of the account. This policy was never published in the Federal Register. Without notice as to how the Simons accounts were credited, without immediate notice of any alleged lack of full payment, when the Simons tax attorney and perhaps the IRS personnel working on the 1983 settlement were available, the Simons were deprived of their rights to challenge the policy. The policy was essentially buried, so no one, unless they were familiar with IRS closing procedures and litigation suspension procedures, could object, effectively concealing the agency's actions. Without posting on the federal register, the Simons can not be presumed to know of the policy or how it would effect their account, Tax Professionals could provide no public response, and the Simons would have no idea of their injury with the hold codes holding their notices, IRS management could be misled to further collect. *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994).

***Equitable Estoppel is Justified to Toll the Statutes for This Court***

68. Generally, it is asserted that there can be no estoppel against a government acting in its sovereign capacity. Contracts waive that sovereignty . [[10]]

---

[10] "Estoppel may be asserted against the government in the performance of a proprietary, as distinguished from a governmental, function" 27 ALR Fed, p. 719. and 722. Also: "A state may be held estopped when acting in a proprietary or contractual capacity" (see note 15: 28 Am Jur 2d Estoppel and Waiver § 123, p. 785).
*See, generally, Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947). *Portmann v. United States*, 674 F.2d 1155, 1159 (7th Cir.1982).

69. There is no doubt that here the 1983 agreement to settle a dispute with the government was a 'contract'. *Hurt, Anthony, supra.* There are strong indications the Simons were paying the government in 1983 to settle, not for 'taxes' per se. P. App. pg. 8-10, 28-29. A governmental entity is like any other party to a contract, when it voluntarily puts itself in a position of a private company. The government was seeking to settle the Simons case primarily for its own benefit, as it could not prove its claims. Equitably, it is only fair that by such acts it also relinquishes its immunity form estoppel. *Portmann, supra*. Since the District Court 2002 Order declaring an 'agreement', the government can conceivably continue collections on the Simons for tax year 1974 by declaring administratively that there was a forgiven debt with a settlement, and the forgiven debt is taxable under 26 U.S.C. 108. Also, the IRS' own March 2004 billing of the Simons, demonstrates the IRS' determination to continue to seek money from the Simons. They do not deny that 26 U.S.C. 108 might apply. If the IRS seeks to use 26 U.S.C. 108, collections can conceivably continue for 10 years after the 2002 judgment.

70. Fairness and justice, the kingpins of equitable estoppel, argue for this Court to toll the statutes of limitation, accept the case and declare the 1983 agreement a 'contract' that was fully paid, thus judicially and equitably estopping further collections.

***Lack of Any Fair and Impartial Hearing and Tribunal***

71. Due to lack of any prior notice and demand for payment, the Simons could not challenge their levies and liens administratively. However, even if they could, as Rev. Officer Thurman reasoned, " without evidence the bal due is in error" the Simons could not prove the government amounts to be in error since Rev. Officer Thurman was not giving the Simons or their Tax Professionals the Simons key documents. In District

Court, the complaint in 1992 was brought upon a complete fantasy that any amounts were owed for year 1974. However, IRS Special Procedures function and Mr. Lusty at all times had full access to the Simons records in Court with an obligation to produce. *Kurio, supra.* Nevertheless, material information was not forthcoming until 2000. After Simons tax experts reviewed the documents and case issues, the District Court refused to look back into the 1983 transactions and ruled in complete reliance on the government. (P.App. pg. 230). All the Simons ever wanted was a fair hearing with their own records to be able to explain what really happened and obtain redress for their injuries.

72. It is of no small moment that for a quarter of a century the Simons, paying their taxes and meeting their government obligations, not criminals, have been labeled in the worst way on the Public records of this Nation by their government without reason, without evidence, without any proof whatsoever that they did not fully pay their obligations quickly and forthrightly in 1983. A heritage for their children and grandchildren that holds them in a false light. They can not, and could not, clear their names in any hearings. Equity and fairness call for tolling of statutes to allow the Simons to present their contract claims in the only Court with exclusive jurisdiction to hear them.

***The IRS Refusal to Return the Simons the Amounts paid for year 1974 After Further Billing of the Simons in 2004***

73. The Simons have never claimed that they paid 'taxes' so much as amounts for settlement. The District Counsel's decision bears this out to a degree by stating repeatedly that the IRS can't do this or that, but the Simons consent to this or that payment, the IRS is unable to prove… the Simons consent to this for purposes of settlement. P. App. Pg. 28-30. In March, 2004 the Simons submitted a form 843 for

refund or abatement, but for contract claims. The Simons were given a $23.17 refund that the Simons returned as being in error. No one disputes these facts.

74. Stopping further collection under 26 U.S.C. §108 stops with this Court. No other Court has jurisdiction over contracts, alleged contracts, in excess of $10,000.

75. Taking jurisdiction to stop further government actions is fair as the Simons have endured by nearly a quarter of a century of almost uninterrupted collection in Tax Court, administratively, in District Court, with liens, levies, threats of seizure of their home and property if they didn't sign an offer in compromise, lack of ability to protect themselves with legitimate records that initiate the citizen's protections and requirements of notice and an administrative hearing, a Rev. Officer conspiring with another person to collect using only the defective computer readout, the tainting of the Simons' financial reputation with their only bad credit,… IRS levies and liens, Federal Court proceedings without the government being required to meet their prerequisites or proving they had. (P. App. Pg. 81-95). Mr. Simons was sorely damaged by the IRS baseless criminal trial. (P. App. pg. 86). But to not be able to recover during the times in question due to the IRS withholding their documents until they received their records in about Feb. 15, 2000, and continuing to ruin their credit and impair them professionally, and lack of anyone enforcing Congressional protections for them, and fear of seizure of their homes and property with armed agents, is the duress the Simons were under when a Court ORDERED them by threat to pay the $55,000. The Simons understood *de facto* no matter the facts and law, they didn't apply in reality to them. The District Court declared there was a 2001 handwritten agreement, an alleged contract, for over $10,000. This Court's authority is exclusive.

***Duress Should Toll the Statutes***

**76.** When the District Court threatened summary judgment and payment exceeding $55,000 amidst charges they were being 'frivolous' and 'merit less' that may have made them liable for all the governments ten years of litigation costs, and the Court blamed them for a 'feud' with the government that was prosecuting them relentlessly (P. App. pg. 227-230), and the Simons were well aware that the government was acting outside its authorities, outside the Court's jurisdiction, and no one was going to enforce laws to protect them, the Simons capitulated their will to the District Court's and paid $55,000 as ordered, but as the Court records show, was not for a true 'agreement' with the DOJ. *See generally Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329-31 (Fed. Cir. 2003)

77. It is evident the long delay in finding the Simons documents prejudiced a Court faced with wiping out over ten years of litigation history it was refusing to do base on a complete lack of jurisdiction. The Article III Court had no jurisdiction over contracts and the Simons claims for damages. However, the Simons knew they had just been pursued by the IRS administratively and then judicially without the prerequisites for doing so being met by the government, so the law at this point, meant nothing. The District Court ordered an offer be made (P. App. pg. 218-19), and then threatened the Simons if they did not pay (228-230). Duress is when a person has no alternative but to obey. **Not one Congressional protection was applied to the Simons administratively or in the District Court.** Payment as ordered was the only way choice available for possible protection from further government billing, and it did not work. (P. App.pg. 138-141). Unless this Court takes the case, 26 U.S.C. §108 may result in further billing. The

government may claim the District Court legitimized a false debt for 1974, unless the District Court orders are declared void and no contract was formed.

## DAMAGES

77a. As early as 1803 the U. S. Supreme Court found

> "…every right, when withheld, must have a remedy, and every injury its proper redress.' [particularly with U.S. contractual relations].
> The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. "

*Marbury v. Madison*, 5 U.S. 137, 163 (1803)

78. Based on all the foregoing facts and the proposed findings of fact, Mr. Simons' notarized verification of the Complaint, applicable to the amended complaint identical claims, is an affidavit of damages ***as stipulated to here***. Amended Complaint Paragraphs 63- 261, and shown in and by the pro forma of Traverse Ridge (P. Am. Complt. Ap. 145-147). The Simons hope for a separate hearing on damages alone.

a. The Simons had property interests in their properties, in their bank accounts, in Mr. Simons' business reputation he had worked to build for over 30 years, in the 1983 contract itself for which they fully paid, in their business' goodwill, all destroyed or seriously compromised by the breaches of the 1983 settlement agreement, for years.

b. The Simons were likewise deprived of their youthful vigor, the draining of time and money, needless worry, stress to the entire family and wife of Mr. Simons, impairment of Mr. Simons' ability to choose his profession and freely work in that profession without government interference, and deprived of years of what would have been peace of mind and the financial security they fully expected after 1983.

c. The Simons were deprived of their fiduciary relationship with their government, any fair and timely due process, deprived of business relations, property, by concealment of the truth in their records from them and from the District Court. All the breaches of this duty, ongoing, justifies full expectation damages. The Simons FOIA/Privacy Act requests, contact with the Problems Resolution person, letters to the Service Center and filing the form 843 show the Simons desire to mitigate their circumstances prior to bringing this suit to stop further collections and obtain full redress.

d. Each day the liens and levies on their bank accounts and properties were not released and further collection sought, with or without a formal recorded lien or levy, is a new claim, that can be calculated easily, as a daily charge for each bank account and each property they owned, including fees for impairment of his ability to freely use his real estate professional license, experience, professional contacts, career accoutrements.

e. The levies and liens defamed the Simons when he sat on boards of financial institutions. Levies and liens are some of the most defamatory statements to be made about a businessman involved heavily in Real Estate development and commerce, who depends upon his credit to obtain capital loans. [[11]] Here, the previous baseless criminal claims against the Simons took a mighty toll in one of Utah's premier top real estate brokerage houses. (P. App. pg. 96). To charge the Simons with civil fraud, not release a

[11] Defamation is a communication that holds an individual up to contempt or ridicule and causes injury or damage. *Keohane v. Stewart,* 882 P.2d 1293, 1297 (Colo. 1994). The defamatory statement need only prejudice the plaintiff in the eyes of a substantial and respectable minority of the community. *Tonnessen v. Denver Publ'g Co.,* 5 P.3d 959, 963 (Colo. App. 2000). A finding that statements were defamatory must be predicated on the context of the entire story and the common meaning of the words used. *Tonnessen v. Denver Publ'g Co., supra,* 5 P.3d at 963. Defamation per se is actionable without proof of special damages. *Inter-State Detective Bureau, Inc., v. Denver Post, Inc.,* 29 Colo. App. 313, 316, 484 P.2d 131, 133 (1971). Such a statement must be, on its face and without extrinsic proof, unmistakably recognized as injurious and specifically directed at the plaintiff. *Lininger v. Knight,* 123 Colo. 213, 221, 226 P.2d 809, 813 (1951).

lien for year 1975 until the Simons 'cooperated' and agreed to settle the three years, (P. App. pg. 136-136a), and after full payment in 1983, then lien and levy property without an available formal administrative hearing or opportunity for a hearing, prior to the liens and levy, makes them doubly onerous, and with records being concealed, as absolutely necessary for their defense when the computer record is in error (P. App. pg. 120-121), triply burdensome- All torts stemming from breaches of the 1983 contract. **[[12]]**

h. Mr. Simons had the professional acumen, contacts, certifications and licenses, to develop and had taken physical steps to develop Traverse Ridge. (P. App. pg. 142). The Simons assert their lost profits and damages to be in excess of about $42 million dollars.

**CONCLUSION**

Based on the foregoing, Simons pray that this Court to grant them Summary Judgment as to the government's liability, with exact damages to be determined in a hearing. Their circumstances are extraordinary. The record shows they made numerous attempts to mitigate the lack of applications of legal protections to them, and appear vulnerable to further collections that may occur as late as ten years from now, to them or their estate. The Simons also pray for any and all other relief as the Court may find to be fair in equity and just under the law.

So Signed this 13th day of July, 2006

____________/s/______________________
Susan Rose, Counsel for the Plaintiffs (Utah Bar No. 7985)
9553 South Indian Ridge Dr. Sandy, Utah 84092

---

[12] See *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002) ("It is well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the United States Court of Federal Claims to the extent that damages exceed $10,000.").

A true and correct copy of the foregoing Summary Judgment Motion with Proposed Findings of Fact, Memorandum of Law, and Attached Appendix of attachments, and table of the Appendix, is being mailed to opposing Counsel

Mr. Michael O'Connell
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington, D. C. 20530

_________/s/________________________

Susan Rose, Counsel for the Simons

## ATTACHMENTS TO THE SUMMARY JUDGMENT MEMORANDUM

# ADP and IDRS Information

# 2003

Department of the Treasury
**Internal Revenue Service**
Document 6209 (Rev. 7-2003)
Cat No. 61462O

**(5) Hold Codes**

Use this code with TC 29X or TC 30X (Doc Code 54 or 47) when it is desired to prevent or delay the issuance of a refund and/or notice, such as when a particular adjustment action is cycled, or when a correction is being made to an account without the taxpayer's knowledge. Valid codes are:

| Code | Action |
|---|---|
| 0 | No Hold Code |
| 1 | If net module balance after posting is credit, holds credit until: Doc. Code 24 or 34 posts, TC 820 or 830 posts, TC 29X or 30X posts, Doc. Code 51 with secondary TC 300 posts, or total module balance becomes zero or debit. Set — K freeze. |
| 2 | Same as "1" but holds notice and credit. |
| 3 | prevents the issuance of the adjustment notice for the adjustment transaction on which it is entered. It does not prevent the issuance of any other notice. |
| 4 | Same as "1" except that a notice will not be issued at any time. MFT 61 and 63 only: suppresses CP243 |
| 5 | MFT 61, 63 only: suppresses CP 243. If both hold Codes 4 and 5 should be used, use hold Code 4. |

**(6) Priority Codes**

These codes must be used in order to post adjustments (Doc Code 47 or 54) to the Master File when certain module conditions exist. Failure to use the priority code when specified will cause the transactions to unpost, causing erroneous notices, refunding or billing especially in cases where multiple adjustments and/or credit transfers are being processed. If an adjustment needs a priority code it may indicate that Collection, Examination, or Statute should be consulted. It may also question the validity of a tax abatement, i.e. an abatement of tax on a return with a Collection Field Function Secured Return Code, no math error code, and the module is in Status 60 is questionable insofar as the return-

**Any line marked with # is for official use only**

| Freeze Code | File | Freeze Condition and Explanation | Freeze Release |
|---|---|---|---|
| W— | I/B/A | The claim pending freeze is set when a TC 470 is posted to a balance due module. The freeze is also set on IMF with TC 840 (if TC 150 without CCC "O" is present and no 29X/30X is present) or TC 976/977. No closing code or CC 90 prevents offset in. Module freeze. BMF MFT 02 only: releases in 52 weeks or TC 472 CC 98, or TC 295, or when total module balance is zero or credit. | See 470 Closing Code Chart in Chapter 11. BMF: MFT 02 only TC 470 CC 98 carry back claim received. Prohibits offsets. |
| —W | I/B/A | The litigation pending freeze is set by TC 520 with the appropriate closing code. TC 520 with CC 70, 84, 75-81, suspends running of the CSED unless a TC 550, TC 552 or TC 522 is posted with a later transaction date. Refunds/offsets and credit elects are frozen except under certain conditions (See Section 11.08(6)). | TC 521/522 with the appropriate closing code. Also, reestablish CSED on Chapter XI cases, after plan confirmation by inputting confirmation date with appropriate TC. |
| —X | I/B/A/ | (1)TC 150 coded '0' without a TC 840 already posted. (2)TC 840 (except B.S. 9XX with Julian date less than 400) if no TC 150 present. (3)TC 840 (except B.S. 9XX with Julian date less than 400) if TC 150 without CCC "O" provided module balance is debit. (4)Module contains overpayment but contains CCC "L' or "W' without second name line in the entity. (5)(IMF) A taxpayer claims an overpayment of estimated tax credit of XXXXX or more. (6)TC 840 posts to MFT 13 module creating a debit balance. XXXXXXXXX # | (1)(4)(5) TC 840. (1)(5) TC 29X with priority code 8. (2) TC 150 or 841 equal to TC 840. (3) TC 29X with priority code 8 (except B.S. 2XX IMF); TC 30X with priority code 8; status 22, 24, 26 or 60; module balance becomes zero or credit; 20 cycles (IMF) or 20 cycles (BMF) have elapsed. (6) a) module balance becomes zero or credit, or b) subsequent posting of TC 29X/30X (TC 241) with priority code 8 |
| X— | A | The manual assessment freeze is set when a module is in credit status and a CCC "X" is present. | When net module balance becomes zero or debit. |
| X— | I | Million Dollar Refund Freeze. Restricts offset. | Module balance becomes zero or debit or with posting of a TC 840. |

**Any line marked with # is for official use only**

100

## 7 *Disposal Codes*

These two digit codes are used to indicate the disposition of an examination. The codes are assigned by the Examination Division.

Disposal Codes 01 through 04 and 07 through 13, pertain to examined returns.

Disposal Codes 03, 04 and 07 through 13 are used when an adjustment is proposed/processed to change:

(a) Tax, penalties, or refundable credits for taxable returns.

(b) Income/loss or special allocation items for non-taxable returns.

Disposal Codes 01 and 02 are used when no adjustments are proposed/processed to any type of return. Item 41 is required on all IMF cases with Disposal Code 01 and 02.

Disposal Codes 20 through 99 pertain to non-examined returns.

Disposal Codes 03, 04, 08, 09, 10, 12 and 13 are valid for partial assessments.

**(1) Examined Disposal Codes**

01 **No-change with Adjustments**— Applies to non-change examined returns (even if a 30-day or 90-day letter was issued) if there is an adjustment to the tax base data such as income or deduction items but no change in tax liability or refundable credits. The following are examples of no-change with adjustment examinations:

Delinquent returns secured by the examiner and forwarded to the campus for processing. This includes delinquent return pickups that result in a zero tax liability.

Claims disallowed in full.

Income tax examination when taxpayers are issued an examination report Form 4549 and Letter 1156 (DO/IO), or Form 1902 when "Other" is checked on the reverse of Form 4700 (See IRMs 4.10.7 and 4.10.8).

Estate or gift tax cases when offsetting adjustments result in no change in tax liability. This includes gift tax cases when Letter 942 (C/DO) is issued to taxpayers (see IRM 4.10.9).

Excise, trusts and estates, or employment tax cases when offsetting adjustments to tax base data and/or credits result in no change in tax liability.

Disqualified 1120 DISC/IC-DISC election.

02 **No change**— Applies to Examination which do not necessitate the issuance of a report because there were no adjustments or no changes in tax liability (or proposed tax changes fell below the tolerance level in LEM IV) to:

Tax, penalties, or refundable credits for taxable returns

Income/loss or special allocation items for non-taxable returns. Form 4700, Examination Planning and Workpaper, should have Letter 590 checked.

03 **Agreed**— Applies only to returns if an agreement is received prior to the issuance of a 30-day or 60-day letter. Also applies to claims allowed in full and agreed claims partially allowed.

04 **Agreed**— Applies only to returns if an agreement is received after the issuance of a 30-day or 60-day letter. Office Audit (Org 2XXX), should use DC 03/not DC 04.

07 **Appealed**— Returns closed to Appeals before issuance of a 90-day letter, FPAA or FSAA.

**Any line marked with # is for official use only**

# Transaction Pocket Guide

I = IMF
B = BMF
E = EPMF
A = IRAF
P = PMF
N = NMF
* = Computer Generated
# = TC posts to NMF only
N/A = Not added to NMF when transferre
D = Debit
C = Credit

Department of the Treasury
**Internal Revenue Service**
Document 10978 (2/99)
Catalog Number 27288Q

2

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 150* | | I/B/E/A /P/N | D | Tax Assessment-Return |
| 150* | | I/A | | Entity Created by TC150 |
| 151 | | E/A | | Reversal of TC 150 or 154 EPMF IRAF-Report Suppression |
| 152* | | I/A | | Entity Updated by TC150 |
| 154 | | E | | Posting of Form 5330 Tax Data |
| 155 | | E | | Form 5500 Sched. B |
| 156 | | E | | EPMF Second Letter |
| 157* | | B | | Schedule A |
| 159 | | I | | Settlement Data |
| 160 | | I/B/A/ N | D | Manually Computed Delinquency Penalty |
| 161 | | I/B/A/ N | C | Abate Delinquency Penalty |
| 162 | | I/B/A | | Failure to File Penalty Restriction Deletion |
| 166* | | I/B/A | D | Delinquency Penalty |
| 167* | | I/B/A | C | Abate Delinquency Penalty |
| 170 | | I/B/N | D | ES Tax Penalty |
| 171 | | I/B/N | C | Abate ES Tax Penalty |
| 176* | | I/B | D | Generate ES Tax Penalty |
| 177* | | I/B | C | Abate Generated ES Tax Penalty |
| 180 | | B/N | D | Deposit Penalty (FTD) |
| 181 | | B/N | C | Abate Deposit Penalty (FTD) |
| 186* | 180 | B | D | Generated Deposit Penalty (FTD) |
| 187* | 181 | B | C | Abate Deposit Penalty (FTD) |
| 190 | 340 | I/B/A | D | Manually Assessed Interest Transferred In (See TC 370) |
| 191 | 341 | I/B/A | C | Abate Assessed Interest-Transferred In (See TC 370) |

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 196* | 340 | I/B/A | D | Generated Assessed Interest |
| 197* | 341 | I/B/A | C | Abate Assessed Interest |
| 200 | | I/A/N | D | Identification Number Penalty |
| 201 | | I/A/N | C | Abate TC 200 |
| 234 | | B/N | D | Manual Daily Delinquency Penalty |
| 235 | | B/N | C | Abate TC 234/238 |
| 238* | 234 | B | D | Generated Daily Delinquency Penalty |
| 239* | 235 | B | C | Abate Daily Delinquency Penalty |
| 240 | | I/B/A/ N | D | Miscellaneous Penalty |
| 241 | | I/B/A/ N | C | Abate Misc. Penalty |
| 246* | 240 | B | D | Form 1065 - Missing Information |
| 247 | | B | C | Abates TC 246 |
| 270 | | I/B/A/ N | D | Failure to Pay Tax Penalty (Manual) |
| 271 | | I/B/A/ N | C | Abate FTP Tax Penalty (Manual) |
| 272 | | I/B/A | | FTP Tax Pen. Restrict Deletion |
| 276* | 270 | I/B/A | D | FTP Tax Penalty |
| 277* | 271 | I/B/A | C | Abate FTP Tax Penalty |
| 280 | | I/B/A/ N | D | Bad Check Penalty |
| 281 | | I/B/A/ N | C | Abate Bad Check Penalty |
| 286* | 280 | I/B/A | D | Generated Bad Check Penalty |
| 287 | | B | C | Abatement of Bad Check Penalty |
| 290 | | I/B/A/ N | D | Additional Tax Assessment |
| 291 | | I/B/A/ N | C | Abate Prior Tax Assessment |
| 294 | 290 | I/B | D | Adjusts TC 295 or 305 |
| 295 | 291 | I/B | C | Tax decrease with int. date |

3

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 298 | 290 | I/B | D | Additional Assess with Int. Date |
| 299 | 291 | I/B | C | Abate Prior Tax with Int. Date |
| 300 | | I/B/A/N | D | Examination Tax Assessment |
| 301 | | I/B/A/N | C | Abate Prior Tax Assessment |
| 304 | 300 | I/B | D | Examination Adjust TC 305 or 295 |
| 305 | 301 | I/B | C | Exam tax decrease with int. date |
| 308 | 300 | I/B | D | Additional Tax Assess with Int. Date |
| 309 | 301 | I/B | C | Abate TC 308 |
| 310 | | I/N | D | Penalty - Failure to Report Income from Tips |
| 311 | | I/N | C | Abate TC 310 |
| 320 | | I/B/A/N | D | Fraud Penalty |
| 321 | | I/B/A/N | C | Abate Fraud Penalty |
| 336* | | I/B/A | D | Interest Assessment |
| 337* | | I/B/A | C | Abate Assessed Interest |
| 340 | | I/B/A/N | D | Restrict Interest Assessment |
| 341 | | I/B/A/N | C | Restricted Interest Abatement |
| 342 | | I/B/A | | Interest Restricted Deletion |
| 350 | | I/B/A/N | D | Negligence Penalty |
| 351 | | I/B/A/N | C | Abate Negligence Penalty |
| 360 | | I/B/A/N | D | Fees and Collection Costs |
| 361 | | I/B/A/N | C | Abate Fees and Collection Costs |
| 370 | N/A | I/B/A | D | Account Transfer-in |
| 380 | N/A | I/B/A | D | Overpayment cleared manually under $1 |
| 386* | N/A | I/B/A | D | Overpayment cleared under $1 |

| MF TC Code | From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 388* | N/A | I/B/A | D | Statute Expiration Clearance to Zero Balance & Removal |
| 389* | N/A | I/B | C | Reversal of Statute Expiration |
| 400 | | I/B/A/N | C | Account Transfer-out |
| 402 | | I/B/A/N | D | Account Re-Transferred-in |
| 420 | N/A | I/B/E | | Examination Indicator |
| 421 | N/A | I/B/E/A | | Reverse Examination Indicator |
| 424 | N/A | I/B/E | | Examination Request Indicator |
| 425* | | I | | Reversed TC 424 |
| 427 | | B | | Requests Returns from SERFE File or SEPRE File |
| 428* | | I/B/E | | Examination of Appeals Case Transfer |
| 429 | | I/B | | Request AIMS Update from MF |
| 430 | | I/N | C | Estimated Tax Declaration |
| 430* | | I | | Entity Created by TC 430 |
| 431* | | I | | Nullification of Estimated Tax |
| 432* | | I/A | | Entity Updated by 430 |
| 446* | | I/B/A/E | | Merged Transaction Assessment Indicator |
| 450 | | I/B/A | D | Transferee Liability |
| 451 | | I/B/A | C | Reversal of TC 450 |
| 459* | | B | | Prior Quarter Liability |
| 460 | | I/B/A/E/P | | Extension of Time for Filing |
| 462 | | I/B/A/E | | Correction of TC 460 |
| 463 | | I/B | | Waiver to File on Mag Tape |
| 464 | | I/B | | Reversal of TC 463 |
| 470 | | I/B/A/N | | TP Claim Pending |
| 471 | | I/B/A/N | | Reversal of TC Claim Pending |

4

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 598 | | I/B/E | | Satisfying Transaction-Shelved |
| 599 | | I/B/E | | Taxable Return Secured |
| 600 | 606 | I/B | C | Underpayment Cleared Manually Under $5 |
| 604 | | B/I | | Assessed Debit Cleared |
| 605 | | B/I | | Generated Reversal of TC 604 |
| 606* | | I/B/A/N | C | Underpayment Cleared Under $5 |
| 607* | | I/B/A/N | D | Reversal of Underpayment Cleared |
| 608* | | I/B/A/N | C | Statute Expiration Clearance |
| 609* | | I/B/A/N | D | Reverse Statute Expir. Clearance |
| 610 | | I/B/N | C | Remittance With Return |
| 611 | | I/B/N | D | Bad Check With Return |
| 612 | | I/B/N | D | Correction of TC 610 Processed In error |
| 620 | 670 | B | C | Initial Installment Payment |
| 621 | 671 | B | D | Bad Ck for Installment Payment |
| 622 | 672 | B | D | Correction of 620 Processed in Error |
| 630 | 800 | I/B | C | Manual Application of Appropriation money |
| 632 | 802 | I/B | D | Reversal of Manual Application of Appropriation Money |
| 636* | 800 | I/B | C | Separate Appropriations Refundable Credit |
| 637* | 802 | I/B | D | Reversal of Separate Appropriation Refundable Credit |
| 640 | | I/B/A/N | C | Advanced Payment of Determined Deficiency |
| 641 | | I/B/A/N | D | Bad Check on Advanced Payment |
| 642 | | I/B/A/N | D | Correction of TC 640 Processed In error |

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 650 | | B/N | C | Federal Tax Deposit (FTD) |
| 651 | | B/N | D | Invalid FTD (Bad Check) |
| 652 | | B/N | D | Correction of TC 650 Processed In error |
| 660 | 430 | B | C | FTD |
| 660 | 430 | I/B | C | Estimated Tax Payment |
| 661 | | I/B/N | D | ES or FTD Bad Check |
| 662 | | I/B/N | D | Correction of TC 660 Processed in error |
| 666* | 700 | I | C | ES Credit Transfer-In |
| 667* | 820 | I | D | ES Debit Transfer-Out |
| 670 | | I/B/A/N | C | Subsequent Payment |
| 671 | | I/B/A/N | D | Bad CK-subsequent Payment |
| 672 | | I/B/A/N | D | Correction of 670 Processed in Error |
| 678 | 670 | B | C | Credit for Treasury Bond |
| 679 | 672 | B | D | Reversed TC 678 |
| 680 | | I/B/A/N | C | Designated Interest Payment |
| 681 | | I/B/A/N | D | Bad Check Interest Payment |
| 682 | | I/B/A/N | D | Correction of 680 Processed in Error |
| 690 | | I/B/N | C | Designated Penalty Payment |
| 691 | | I/B/N | D | Bad Check Designated Penalty |
| 692 | | I/B/N | D | TC 690 Error Correction |
| 694 | | I/B/A/N | C | Designated Payment of Fees and Collection Costs |
| 695 | | I/B/A/N | D | Reverses TC 694 |
| 700 | | I/B/A/N | C | Credit Applied |
| 701 | 702 | I/B | D | Reverse TC 706 |
| 702 | | I/B/A/N | D | TC 700 Error Correction |

5

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 598 | | I/B/E | | Satisfying Transaction-Shelved |
| 599 | | I/B/E | | Taxable Return Secured |
| 600 | 606 | I/B | C | Underpayment Cleared Manually Under $5 |
| 604 | | B/I | | Assessed Debit Cleared |
| 605 | | B/I | | Generated Reversal of TC 604 |
| 606* | | I/B/A/N | C | Underpayment Cleared Under $5 |
| 607* | | I/B/A/N | D | Reversal of Underpayment Cleared |
| 608* | | I/B/A/N | C | Statute Expiration Clearance |
| 609* | | I/B/A/N | D | Reverse Statute Expir. Clearance |
| 610 | | I/B/N | C | Remittance With Return |
| 611 | | I/B/N | D | Bad Check With Return |
| 612 | | I/B/N | D | Correction of TC 610 Processed In error |
| 620 | 670 | B | C | Initial Installment Payment |
| 621 | 671 | B | D | Bad Ck for Installment Payment |
| 622 | 672 | B | D | Correction of 620 Processed in Error |
| 630 | 800 | I/B | C | Manual Application of Appropriation money |
| 632 | 602 | I/B | D | Reversal of Manual Application of Appropriation Money |
| 636* | 800 | I/B | C | Separate Appropriations Refundable Credit |
| 637* | 802 | I/B | D | Reversal of Separate Appropriation Refundable Credit |
| 640 | | I/B/A/N | C | Advanced Payment of Determined Deficiency |
| 641 | | I/B/A/N | D | Bad Check on Advanced Payment |
| 642 | | I/B/A/N | D | Correction of TC 640 Processed In error |

| MF TC Code | Convert From MF To NMF | File | D/C | Title |
|---|---|---|---|---|
| 650 | | B/N | C | Federal Tax Deposit (FTD) |
| 651 | | B/N | D | Invalid FTD (Bad Check) |
| 652 | | B/N | D | Correction of TC 650 Processed In error |
| 660 | 430 | B | C | FTD |
| 660 | 490 | I/B | C | Estimated Tax Payment |
| 661 | | I/B/N | D | ES or FTD Bad Check |
| 662 | | I/B/N | D | Correction of TC 660 Processed in error |
| 666* | 700 | I | C | ES Credit Transfer-In |
| 667* | 820 | I | D | ES Debit Transfer-Out |
| 670 | | I/B/A/N | C | Subsequent Payment |
| 671 | | I/B/A/N | D | Bad CK-subsequent Payment |
| 672 | | I/B/A/N | D | Correction of 670 Processed in Error |
| 678 | 670 | B | C | Credit for Treasury Bond |
| 679 | 672 | B | D | Reversed TC 678 |
| 680 | | I/B/A/N | C | Designated Interest Payment |
| 681 | | I/B/A/N | D | Bad Check Interest Payment |
| 682 | | I/B/A/N | D | Correction of 680 Processed in Error |
| 690 | | I/B/N | C | Designated Penalty Payment |
| 691 | | I/B/N | D | Bad Check Designated Penalty |
| 692 | | I/B/N | D | TC 690 Error Correction |
| 694 | | I/B/A/N | C | Designated Payment of Fees and Collection Costs |
| 695 | | I/B/A/N | D | Reverses TC 694 |
| 700 | | I/B/A/N | C | Credit Applied |
| 701 | 702 | I/B | D | Reverse TC 706 |
| 702 | | I/B/A/N | D | TC 700 Error Correction |

5A

Report to the Congress on

# NETTING OF INTEREST ON TAX OVERPAYMENTS AND UNDERPAYMENTS

Department of the Treasury
Office of Tax Policy

April 1997

6

PERIOD.--Such interest shall be allowed and paid as follows:

(1) CREDITS.--In the case of a credit, from the date of the overpayment to the due date of the amount against which the credit is taken.

(2) REFUNDS.--In the case of a refund, from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days.

Interest running in either direction has, since 1982, been compounded daily. IRC § 6622(a).

The running of interest in either direction can be suspended for various reasons. For example, if the Commissioner makes notice and demand for the payment of taxes, and the tax is paid within 21 calendar days after the date of the notice and demand (10 business days if the amount due exceeds $100,000), then interest is not imposed for the period after the date of the notice and demand. IRC § 6601(e)(3) (as amended by TBOR 2). Similarly, the Government is not liable to the taxpayer for interest on an overpayment if the overpayment is refunded or credited within 45 days after the due date for filing the return of such tax, or if the Government otherwise pays a taxpayer's claim for refund within 45 days after it is filed. IRC §§ 6611(e)(1), (e)(2).

Interest computations can be substantially complicated by the presence of carryover tax attributes from another tax year. For example, if a net operating loss deduction is carried back to a tax year pursuant to section 172, or a credit is carried back pursuant to section 39, interest on a resulting overpayment in the carryback year will generally not begin to run until the due date of the return for the credit or loss year. IRC § 6611(f). Likewise, if an underpayment for one tax year is reduced due to such a carryback from another year, interest is still due on the full underpayment amount up through the due date of the return for the credit or loss year and on the reduced underpayment amount only after that date. IRC § 6601(d).

Certain interest is statutorily prohibited or is limited to specific time periods as a matter of law. These "restricted interest" computations can be particularly complex for large corporate taxpayers, which commonly have multiple carrybacks and carryovers of different credits and deductions over any given period of years and are subject to multi-year audits. As will be discussed in more detail below, the IRS does not have the capability to perform all restricted interest computations automatically on its Master File system. Instead, many of these complex calculations must be performed manually (i.e., using stand-alone computer or calculator systems with data manually inputted).

**IRS administration of these rules before 1986**

As noted above, section 6402(a) of the Code permits the IRS to credit a taxpayer's overpayment of one tax liability against a liability for another tax. The Treasury Regulations have long provided for the crediting of overpayments against underpayments in accordance with this provision. The pertinent regulation, Treas. Reg. § 301.6402-1, provides:

The technician performs the analysis using a transcript of the taxpayer's account and the report of any adjustments that are being, or have been, made. Data from those sources that are needed for the interest computation are input into a separate computer program that is not part of the IRS's Master File system for tracking taxpayer accounts. Technicians be familiar not only with the interest rules in the Code, regulations, and Internal Revenue Manual, but also with the nuances of the Master File, the IRS's Non-Master File system, and the stand-alone interest computation computer programs. After the calculations are performed off-line, the net interest amount is entered as a separate adjustment on the taxpayer's Master File account. Because of the special conditions that required manual interest computations in the first place, a special code is entered with the net interest adjustment to prevent the computer from erroneously making automatic adjustments to that account in the future. Thereafter, any future interest computations that involve that tax year must also be performed manually.

***Offsetting***

Offsetting arises whenever an overpayment is determined with respect to one tax year (or liability) and may be applied to an outstanding liability for another year pursuant to section 6402(a). As discussed above, there is a special interest computation rule for such situations, section 6601(f) of the Code. As this rule operates, if an overpayment is actually applied against an underpayment, interest is calculated only on the net outstanding balance for the period (and amount) of the overlap. In effect, therefore, both the underpayment and overpayment interest rates for the overlapping period and offsetting amount are zero. Interest is charged (or paid) only on the net balance.

By law, an offsetting situation involves at least two unsettled tax accounts, one an overpayment and one an underpayment. As with annual interest netting, offsetting is performed both systemically by the IRS computers and manually by technicians. The Master File is programmed to search for outstanding liabilities (tax-due accounts) for the same taxpayer whenever it shows a credit (overpayment) available for that taxpayer. This search is performed every time an overpayment arises, whether for individual or business taxpayers, literally millions of times each year.

Whenever an offset can be systemically performed, the Master File system also computes the appropriate interest on all the affected accounts, in accordance with the special rule of section 6601(f). The taxpayer in such a situation will receive a statement explaining the adjustments, including the interest computation. Again, in such situations, the interest computations do not require any manual calculation or additional resources, and the computations are routinely accurate and reliable based on the information on record.

However, there are frequently conditions under which an offset cannot be systemically performed. Many of these conditions relate to the same kinds of legal issues that prevent automatic annual netting, such as the applicability of restricted interest rules with special interest starting and ending dates. Other situations include the bankruptcy of the taxpayer or statutes of limitations that are about to expire. Offsetting frequently arises in extremely complex cases involving multi-year audits for large corporations. In such cases there may be numerous adjustments to each account, some issues that are agreed and others that are unagreed, partial tax payments or refunds, and many resulting periods of overlapping indebtedness. These cases, which present the greatest challenges in calculating interest, almost always involve one or more of the conditions that require the calculations to be done manually rather than by the computer system.

Although offsetting interest computations use essentially the same procedures that were described above for annual interest netting, there are additional layers of complexity at each step due to the fact that more tax periods and transactions are at issue. Simply performing the analysis requires a sophisticated understanding of all the adjustments that may be made to the taxpayer's account under the Code, such as the carryforward and carryback rules and the restricted interest rules, as well as familiarity with the IRS's various computer systems. The analysis and computations in offsetting cases are thus usually performed by GS-8 and GS-9 technicians who are assigned the most complex interest calculations. Performing offsetting interest calculations can take a significant amount of time for even the best-trained IRS personnel. Gathering the data, performing the necessary legal and computational analysis, and 4

6G-290

# Manual Supplement

Department of the Treasury
Internal Revenue Service

August 7, 1984

Balance notices

Expiration Date: August 7, 1986
Implementation Date: (See Section 2)

## Service Center Replacement System (SCRS) Phase III Implementation

### Section 1. Purpose

This Supplement contains general information, implementation dates and instructions for the Service Center Collection Branch (SCCB) to use during and after implementation of the Collection SCRS computer programs. These instructions will supplement and/or supersede existing instructions in the Manual for processing SCCB work.

### Section 2. Scope

SCRS Phase III program implementation is scheduled to be piloted in the Memphis Service Center beginning August 7, 1984, and will be effective in all other service centers when Phase III SCRS is implemented nationwide. The information and procedures in this Supplement will be effective in the service center when the new programs are implemented. During the pilot period, Memphis Service Center will have to refer to both this supplement and the manual for procedural guidance. Each procedural section in this supplement references a section in the Manual which is superseded. Complete procedures are included in the Supplement section for the superseded Manual reference. For nationwide implementation all service centers will refer to both this supplement and the manual until these procedures are incorporated in the manual.

### Section 3. General

.01 Several significant changes will take place when the new programs are implemented. The most significant changes are shown below.

1 The IDRS balance due notices (Forms 3967(c), 4968, 4840, 4873 and their Spanish versions) will be replaced by new Forms (8124/8124SP, 8125/8125SP and 8126/8126SP). NMF balance due notices will continue to be generated on the old forms.

2 The capability will be available on IDRS to input a taxpayer's home or other telephone number to the Taxpayer Information File (TIF) when processing balance due or return delinquency cases. The telephone number will post to the TIF, be available for research through terminal inquiry, and carry over to the Automated Collection System (ACS) if the case goes to Taxpayer Delinquent Account (TDA) or Taxpayer Delinquency Investigation (TDI) status. When appropriate, SCCB personnel should input telephone numbers provided by the taxpayer to IDRS.

3 The Taxpayer Delinquency Investigation Notice File (TDINF) will be eliminated and all return delinquency notice and TDI information will be present on the TIF. The Delinquency Investigation Research File (DIRF) will also be eliminated and return delinquency notice research can be performed through command code TDINQ.

4 Most balance due modules will receive a systemically generated IDRS fourth notice to meet the certified mail requirements. This will include cases that are now accelerated to TDA because of certain primary codes or via input of a status 22 request. The TDA will be delayed until four weeks after the fourth notice is issued. Cases that now accelerate to TDA because of input of STAUP 51 (undelivered mail) will also have a fourth notice issued prior to TDA issuance. This notice will be coded with the literal (UNDL) to identify the notice should it also be returned undelivered. No action is needed on undelivered notices with this coding. Refer to Attachments 1 and 2 for the revised notice and TDA issuance criteria.

5 TDI requests (Form 4884) can be input through IDRS via Command Code TDIRQ instead of the Direct Data Entry System (DDES). This will expedite processing of these cases. IMF requests have a prerequisite of a TC 474

Distribution:
IRM 5(16)00

IR Manual

9

9

input to the module before the request is input through TDIRQ.

6 TDI or return delinquency notice transfers out of the Memphis Service Center will not be possible until all other centers are operating under the new SCRS programs. Location code and address changes may be input to IDRS; however, the account will remain on the Memphis data base until nationwide implementation, at which time the account will transfer to the new center.

7 Return delinquency cases will no longer accelerate to TDI if a TC 148 code is present (Primary Codes Q, P, W, E, T, U, N, S, or L). A fourth notice will be issued followed by a TDI four weeks later. Refer to Attachments 3 and 4 for the revised notice and TDI issuance criteria.

## Section 4. Balance Due General
(Supersedes 5(18)22.21)

.01 The IDRS Review Notice Register will be run on Sunday nights and all notices appearing on the listing will be sequenced at the front of the batch. A daily register will be run each night after that listing notices that have had pending transactions that day. Notices could appear on the register for other reasons also.

.02 The register is produced by IDRS file analysis during the weekend update prior to the date on which notices must be processed for mailing.

.03 Notice records on the register are printed in the same sort sequence, by sequence number as the notices to facilitate pulling the notices. Totals for each type of notice issued and the total selected are printed at the end of the register.

* .04 Notices are selected if one of the conditions listed below is found. One Selection Category Code will be listed in the CATEGORY Register column for each type of condition found for the notice module.

1 Tax module status change from status 20, 21, 56, 58 or 64 (2nd/3rd/4th default notice * statuses), by input of IDRS Command Code or pending a status change transaction code. Example: 47 STATUS UPDATE.

2 The tax module has an open IDRS case control, opened before the notice was generated. Example: 18606021 IRRQ AB.

3 Tax module contains a TC 840 transaction not followed by a subsequent TC 846, 29x or 30x transaction. Example: MANUAL REFUND.

4 Tax account has a service center reject payment credit transaction pended to the entity module (TC 610, 620, 640, 660, 660, 670, 680, 690 or 694 with amount greater than .00–). Example: REJ 640 CY 8241.

5 A condition within the account prevents * a computer generated interest and/or FTP Penalty computations. Example: INT/FTP RESTRICT.

* 340 rest/int. holds notices pg 4 attachment

6 The accrued Interest in the module is greater than $100,000. Example "CHECK INTST".

7 The accrued FTP Penalty in the module is greater than $100,000. Example "CHECK FTP".

8 The assessed module balance is greater than $10,000,000.00. Example: "CHECK AMOUNT".

9 Tax module contains a TC 914 (TC 914 or 918 posted to another module) transaction code.

10 Tax module contains a TC 534 (poten-
tial statute expiration) transaction code.

.05 The notices will be reviewed for opera-
tional errors; incomplete or incorrect name and address data, incomplete or incorrect zip code data, erroneous or extraneous data, outra-
geous amounts, etc. Research accounts and retype notices with corrected data. Notify the IDRS Control Staff if the account must be corrected on the IDRS file.

.06 At minimum, review at least ten of each type of notice generated from each file (IMF/BMF). Notify IDRS Control Staff if systemic error may have affected all notices of one type from one or more files.

.07 Accounts are subjected to register analy-
sis only if a notice is present on the IDRS Notice tape. Error conditions may be encountered which prevent analysis of a notice module, in which case the notice will be listed on the register with one of the following error category codes: NO ACCOUNT; NO TAX MODULE; NO IDRS STATUS; NO TC 150; NO ANF NOTICE; LENGTH ERROR; READ ERROR; REALTIME RESERVE; "OTHER ERROR".

.08 Research the notice module on IDRS. If the module is found and all appears to be in order, determine if any of the conditions for selection are met and take appropriate action if necessary. If conditions are not found, release the notice. Also, notify the IDRS Control Staff so that action may be taken to identify the problem with register analysis.



10

.09 If the notice module is not found on IDRS, or the module has no IDRS status or no TC 150, IMMEDIATELY contact the IDRS control Staff before taking further action or releasing the notice.

.10 Other functions will determine that a notice which generated may be incorrect and should be corrected or deleted. Upon notification, the notice should be pulled for necessary action. If a freeze is required, determine and input the number of cycles needed.

## Section 5. Processing Notices with "Centralized Authorization File" Indicators

(Supersedes 5(18)22.22)

.01 "Centralized Authorization File" indicator consists of two digits. These digits identify the last service center which input the indicator to the master file. The literal "CAF" will appear if there is a power of attorney in the Centralized Authorization File.

.02 Balance due notices with these indicators are sorted by the computer in front of all other notices with the same CP number for each file (IMF, BMF, IRAF).

.03 After reviewing the notices with a CAF indicator, photocopy the notice. Research photocopies of notices with a CAF indicator on IDRS to determine the name and address of the representative.

.04 In cases where the indicator on the notice is for another service center, the photocopy of the notice will be forwarded to the correspondence function in the proper service center.

.05 If IDRS indicates code N (representative receives notices), annotate the representative's name and address beneath the taxpayer's First nameline on the notice. In some cases two representatives may receive copies of notices.

.06 If IDRS indicates the Power of Attorney is for a blind trust, annotate the representative's name and address on the original notice. Do not send any notice (502, 503, 504) to a taxpayer involved in a blind trust.

.07 With the implementation of Phase III of SCRS a duplicate notice will be printed for those taxpayers with a POA on file that will reflect the representative's name and address. If the taxpayer's records on CAF indicated a POA was filed but there is not address for the representative, the duplicate notice will show the first name line of the taxpayer and an "*" at the beginning of the second name line and the remainder of this field is blank. Research IDRS and enter the representatives name and address on an envelope; insert the duplicate notice in the envelope for mailing to the representative. If a representative is not found on CAF, destroy the duplicate notice.

.08 Route all completed notices for mailing.

## Section 6. IDRS Review Notice Procedures

(Supersedes 5(18)22.23)

.01 Upon receipt of the IDRS Review Notice Register, research the notice tax modules on IDRS to determine if the notice should be modified or voided. Note: For all notices on the register, the purge indicator following the notice number in the IDRS Tax Module Notice History Section (normally zero) will have been changed to a two(2).

1 If the tax module status has been changed, void the notice if the new status is other than 50.

2 If the account has a reject (RJ) status pending payment credit, destroy the notice.

3 For notices selected under the Manual Refund category, determine if the current debit balance was created by a manual refund (TC 840). If so, assure that associated abatement or credit transactions have pended or posted and that no erroneous refund situation exists.

a If abatement and/or credit transfer has been initiated but did not pend to the module before the notice was issued, void the notice and freeze the module for one cycle to the same notice status.

b If erroneous action was taken to resolve the balance due (abatement not made, credits not transferred), initiate a request for corrective adjustment on IDRS. Void the notice and input a freeze for three cycles.

c If an erroneous refund situation exists, prepare Form 1725 (Routing Slip) to initiate erroneous refund recovery case per IRM 3(15)60, 3(15)(128)0, 3(15)(148)0 and 3(17)(42)0. Void the notice and input a freeze for 15 cycles.

d when preparing Form 1725, attach the voided notice and note freeze action. If corrective action or refund recovery case has already been initiated, void notice, freeze module, and forward notice to case assignee with these actions noted.

4 During the review process, if it is noted that a transaction has pended to the tax module



11

since the notice was generated, first determine if the notice should be voided for any reason other than change in the module balance. If the IDRS module balance has changed since the notice was generated, void the notice even if not full paid. If the notice is voided and is a final notice input a freeze for three cycles for the same notice.

a If there is a pending abatement of tax, penalty or interest (note effect of TC 180/170 as in (a) above), void the notice. If there will still be a balance due after adjustment and notice is a final notice, input a freeze for three cycles and for the same notice. TREAT ALL PN 977 AND IMF PN 976 AS PENDING ABATEMENT.

b If the pending transaction is an unpostable, obtain the DLN and research in Unpostable or Nullified Unpostable function to assure transaction is to be posted to the module before modifying or voiding the notice because of the transaction. Freeze the module for the number of cycles required to correct and request the same notice.

c If the notice is a Notice of Past Due Installment Payments, review all notices for the entity, rather than only the module listed on the register and determine if the payment agreement should be reinstated.

5 If the tax module has an open IDRS case control assigned to the SCCB or the Adjustment function, contact the tax examiner to determine if the notice should be issued. Input a freeze if the notice is to be voided.

a if the tax examiner cannot be contacted, analyze the tax module condition, taking into account all historical information available on IDRS. If the notice is to be voided, input the freeze.

b at the option of the Service Center Collection Branch Chief, other functional areas that establish control bases may be contacted if deemed appropriate, and IDRS prints of the controlled modules may be retained.

c periodically, conduct a review of all functional areas that establish open control bases that are reflected on the IDRS Review Notice Register and determine if there are any problem areas.

6 For notices selected under the category INT/FPT RESTRICT, manually compute to the second Monday following the date on the notice the amount of accrued interest (if there is a TC 340 in the module) or the amount of failure to pay tax penalty (if there is a TC 270 in the module). Type these accruals in the appropriate spaces on the notice and show the Total Amount Due. Assess these accruals via input of TC 340 (for interest) and/or TC 270 (for failure to pay tax penalty).

7 For notices selected under the categories CHECK INTST, CHECK FTP or CHECK AMOUNT, research the module on IDRS. If the module is found and all appears to be in order, release the notice.

8 For notices where a TC 534 is present, research IDRS to determine if the statute for expiration has expired on any portion of the balance due. Input TC 534 for the expired amount (this may be zero). Correct the notice when a portion to the balance has expired.

9 For notices where a TC 914 is present (TC 914 or 916 posted to another module) contact the Special Procedures function to determine if the notice should be mailed. Special Procedures will contact the agent responsible for the open case and advise SCCB of the appropriate action to take.

10 For notices selected under multiple categories, take all categories into account. Selection sequence is: Status Change; Manual Refund; Restricted Interest and FTP Penalty; Reject Payment; Case Control.

.02 If it is not possible to make a determination or retype the notice in time for normal mail operations, input a freeze for one cycle to the same notice status.

## Section 7. Continuous Wage Levy (668–W)

(Supersedes 5(18)23,67)

.01 Receive entire case file, including the TDA and Form 668, part 7 if filed, via Form 3210. Both the TDA and Form 3210 will be noted "Continuous Levy IA."

.02 Load on IDRS as an agreement using locator number 0009 and suppress the payment reminder notice. Also suppress the default notice. Compute the projected balance due using a proposed payment amount (amount to be received monthly based on levy payments already received) to determine the full payment cycle. Input a review date at least one month prior to the full pay cycle. However, if the account will be full paid within the next month, send Form 668A (Conditional Release) to advise employer of the remaining balance due. Treat levy source(s) and other information



12

.08 Receive Questionable W–4 transcripts for "NO IMF ENTITY" and "NO TIN" cases. Prepare Form 4884 with selection code 84 and return the transcript to the Questionable W–4 Transcript Suspense File.

## Section 22. Transcript Analysis

(Supersedes 5(18)67.2)

.01 Reason Code 38—A freeze or hold condition is present in the module. See LEM 3(27)(68)0 for freeze codes. Analyze the transcript to determine the freeze condition.

1 If a TC 480 is present, and the offer is still pending, destroy the Diag Q Transcript. If TC 480 is present and no offer is pending, reverse TC 480 using appropriate transaction code.

2 If a TC 780 is present, check with the offer technician to see if all required actions have been taken by input of a TO 788. If required actions have not been taken, destroy the Diag Q Transcript.

3 If a TC 470 with CC 99 is present, determine from the filing requirements if the entity is a government agency or instrumentality. If the entity is not a government agency or instrumentality, research and/or contact Collection Office function to determine if the module should remain frozen. If the freeze condition should be released, or if unable to determine, input TC 472 with CC 99. If the entity is a government agency or instrumentality and the Diag Q Transcript is type 1–5, destory the transcript with no action. If the Diag Q Transcript is type 6–9, input TC 472 with CC 99.

520 holds notices

[ 4 If a TC 520 is present, and the CC is other than 72, 73 or 74, contact Special Procedures function for disposition of case.

a If the case is open and the CC is 71, 72, 73, 74 determine if the CSED should be extended. If the case is closed or SPI has no record of the case and the CC is other than 72, 73, 74, input TC 521.

b On CC 76 cases contact District Counsel for disposition. If District Counsel has no record of the case input TC 521.

c If the CC is 72, or 74 research the AIMS file. If the status code is 90 (closed) and a TC 421 is in the module input TC 521.]

d If AIMS show no data for the module of the Diag Q transcript but shows other related modules, input TC 521 to the transcript module and refer the open TC 420 module to the Examination function.

e If no data on AIMS and SPI has no record of the case route the transcript on Form 3210 to the Appeals function or District Counsel for disposition. On appeal cases write full name on the transcript.

f If the case is an Active Appeals Case on AIMS (status 80–89) add history item to IDRS showing active case. If Appeals function and/or District Counsel has no record of the case, input TC 521.

g If the module shows a credit balance and a TC 520 freeze is in another module, process as in .014 above. If the module shows a credit balance and is in status 06, process in accordance with procedures in IRM 5(18)37.(18).

.02 Reason Code 56–BMF and IMF. Module contains a settled return, not 53'd, CC not equal to 01–09, has at least one unexpired CSED, and MF status is 13, 14, 19, 20 or 21 and IDRS status is not 23 or 99.

1 If the IDRS status is 53 caused by input of a TC 530 or the IDRS status is 60 or 64 (installment agreement), destroy these transcripts with no action.

2 If the IDRS status is 89 caused by input of TC 470 with closing code 90 or 98 or if status is 47 caused by the input of a TC 470 input TC 472 to release the freeze.

3 If the IDRS status is 48, caused by input of STAUP and if the module did not update because of a freeze condition, see IRM 5(18)67.1:(2)(a). Release freeze or route to functional area responsible for releasing freeze. If the module is within 6 months of the CSED destroy the transcript.

4 If the Diag Q Transcript is a type C and the IDRS status is 19–89 (Except 23, 29 or 53), the CSED has expired. Examine the transcript. If the data is invalid, notify the IDRS Control function. If the data is valid process as in .03.

.03 Reason Code 58—The tax module contains a settled return and the MF status is 22, 26, 58 or 60, is not 53'd and the module has at least one expired CSED. Process as in .021 and .022 above. If the Diag Q Transcript is a Type C, and shows an open control base route the transcript to functional area with the open control base. If it is in other than notice status, forward the transcript to the ARC (Collection) on Form 1725, Routing Slip, for information and any action deemed necessary. If no control data is available or the module is in notice status process in accordance with procedures in IRM 5(18)23.1.



13

13

## APPENDIX LIST OF EXHIBITS


| | | |
|---|---|---|
| 1. | Power of Attorney | 1-2 |
| 2. | Form 843 | 3-4b |
| 3. | Form 2859 showing manager supervised late assessment | 5 |
| 4. | Analysis of Danny C. and Sally J. Simons 1974 Tax Court Stipulated Agreement by expert CPA | 6-11 |
| 5. | Stipulated Tax Court decision of April 22, 1983 For years 1972, 1973 | 12 |
| 6. | Stipulated Tax Court decision of April 22, 1983 For year 1974 | 14 |
| 7. | IRS-drafted underlying work documents for Both stipulated Decisions | 16 |
| 8. | Letter of January 11, 1982 | 22 |
| 9. | Letter of January 15, 1982 | 25 |
| 10. | District Counsel's Decision | 28 |
| 11. | 1974 Original return | 31 |
| 12. | 1983 Cashier's Check for $49,546.55 | 51 |
| 13. | CPA certified Calculation as to how the $49,546.55 Fully satisfied all three tax years 1972, 1973, 1974 | 52 |
| 14. | FORM 872 to extend time for 1974 assessment to a A time certain | 57-59 |
| 15. | Notice of Deficiency for year 1974 | 60-62 |
| 16. | Computer readout showing year 1974 'closed' "27 Jul 1989" | 62a |
| 17. | Computer readout showing 1974 "one open case" 8 Aug. 1991" | 62b |
| 18. | Fax of Kirk Lusty to Special Procedures function Dated 14 Nov. 1996 showing he knew where the Plaintiffs records were | 63 |
| 19. | Attorney Trish White's Settlement document faxed To Special Procedures function by Kirk Lusty | 64-66a |
| 20. | Calculation of IRS Personnel for 6-15-96 for year 1974 When all debt had been abated on the IRS computer Account for 1974 in 1995, faxed by Kirk Lusty to SPf | 67 |
| 21. | Revenue Officer notes showing: | |
| | a. 7/11/88 obtained original records and copied showing settlement for all three years "Appears no open issues on 1974" | |
| | b. states 'tp appears wealthy & paying little or no tax" | 68 |
| | c. consistent threats of liens, seizure, levies and seeking records to give Thurman | 69-74 |
| 22. | Thurman's Red Lion notes memorializing conversation With 'Dal' as to how collection is easier on the IMF | 75-76 |
| 23. | Revenue Officer Taylor notes that the Problems Resolution Person said she would do nothing | 77 |
| 24. | 12/20/88 letter to Don Thurman regarding looking for records from Dan Simons | 79 |

| | | |
|---|---|---|
| 24. | 1/10/89 Notice of intent to levy issued after the levies | 80 |
| 25. | 10/18/88 Levies predating the Notice | 81-83 |
| 26. | Liens on the Simons' properties | 85-95 |
| 27. | Letter to Parker Nielson from Dan Simons documenting The immediate harm of the 1979 criminal indictment | 96 |
| 28. | 1973 IMF computer readout showing posting of entire 1983 payment with full interest 11/8/83 | 97-99 |
| 29. | March 1, 2002 letter from Department of Treasury Including a highlighted IMF for 1974 Verifying the only timely assessment with written Notice was 10/6/1975 as highlighted by the Treasury Department | 100-109 |
| 30. | Service Center records showing that a debt for 1974 Abated was replaced on 7-20-1001 by Department Of Justice Attorney Snow's orders | 110-111 |
| 31. | POLICIES OF IRS | |
| | a. 8.7/1.1.2 defining interest | 112 |
| | b. 35.10.7 interest on stipulated decisions | 113-114 |
| | c. GAO dln numbers and dln files | 115-116 |
| 32. | Affidavits | |
| | a. CPA Dennis Larsen as to how he was Requested records and were not given any | 117-118 |
| | b. Ex Appeals Officer Gail Anger | 119-122 |
| | c. Attorney Patricia White | 123-124 |
| 33. | Attorney White's written request for documents in Litigation in District Court | 125 |
| 34. | Affidavit of Susan Rose | 126-129 |
| 34. | March 21, 2001 handwritten offer to settle | 130 |
| 34. | Letter from the Department of Justice That rewords the Plaintiffs' offer and does not Mirror the offer | 131-132 |
| 35. | Service Center Replacement System Policy | 133-135 |
| 35. | Lien for year 1975 that IRS refused to remove Unless Plaintiffs cooperated in settlement | 136 |
| | Removed Aug. 1982 after offer of settlement | |
| 36 | letter stating no extensions had been signed by the Plaintiffs | 137-138 |
| 37. | March 2004 billing of the plaintiffs | 139, 139a |
| 39. | Bank check for $55,000 | 140 |
| 40 | business card with amount to pay | 141 |
| 41. | Excerpts of Performa designed for Traverse Ridge dev. | 142-162 |

**Some IRS,TREASURY DEPT. FOIA/Privacy Act responses**

| | | |
|---|---|---|
| 42. | July 11, 1991 "If you do not agree [to extension of time to Find documents] you have the right to consider this a denial." | 163 |

43. "16 Sept. 1991…FOIA Appeal…The office of Chief Counsel, Disclosure Litigation Division received your letter… the statutory Period for response expires Oct. 4, 1991" 164

44. "September 26, 1991" "I have reviewed your account and verified that the letters were sent to you as required by law." 165

45. Simons are given some forms relating to tax liens and a Delegation order "forms relating to Levies…. " but not To the individual employees. 166

46. "24 Feb 1992" Dept. of Treas. Appeal response. Both the Ogden Service Center and Salt Lake District Office responded That there were no records responsive to the Simons request Therefore 'there was no denial of records" 167

47. "2 April 1992" the statutory period for appeal has passed. 168

48. "June 23, 1992" Privacy Act appeal response, person must "Specifiy the name and location of the particular system of records"169

49. "30 Jul 1992" Appeal response for FOIA request, "We should point out that I.R.C.§ 6404(b) specifically excludes any taxpayer initiated request for abatement of income taxes. …We have checked our IDRS terminal, and there are no abatements pending for you account for the years you were questioning." 171

50. "Aug 11 1992" "…a search was conducted, but no records responsive to your request were located." 172

51. "Aug 14, 1992" FOIA appeal response telling Simons to contact the Ogden Service Center and no agency records have been withheld. 173

52. "28 Oct 1992" Mrs. Simons' FOIA appeal. "The statutory period for a response has expired….there are ample administrative and judicial procedures and safeguards to review the Service's activities and afford you with due process." [ not without key documents withheld] 174-75

53. "May 11, 1996" the Department of Treasury appeal responds to Mrs. Simons' letter of "October 23, 1991" providing her with redacted Document 176

54. "Oct 22 1996" Appeal response, "Records concerning the processing, assessment, examination, collection and investigation of tax accounts are maintained in the Service Center or District Office in which such actions took place. " [no one states that Records are in Special Procedure function" 177-178

55. "Nov. 7, 1996" IRS service center unsigned FOIA response stating they found no records and they should inquire at the Rocky Mountain District Office. 179


DISTRICT COURT DOCUMENTS


56. Excerpts from the U.S. complaint " On July 25, 1983; March 18, 1985; November 11, 1985; August 20, 1990; September 3, 1990; November 5, 1990; April 15, 1991 and

September 9, 1991 a delegate of the Secretary of Treasury made Assessments against Dan C. Simons and Sally J. Simons for unpaid Income taxes, plus interest, penalties and fees for ..1974"
"10. Despite timely notice and demand for payment" [no timely written notice of assessment and demand for payment issued; no required Notice of Deficiency for supplemental assessments issued ][p.182-183]180-192

57. "March 28, 1995 Judgment and Order" dismissing 1974 as past the statute of limitations, 1982 without prejudice, and finding for the U.S. for '87 for "$1355.00 together with interest and other statutory additions for the Simons' 1987 federal income tax liability." 193-194
[Eventually overturned in 1999 by 10th Cir.]

58. "Oct 3 1995" "Upon the stipulation of the parties, the Record, and there being no outstanding tax liabilities to foreclose the tax liens, and for good cause, the Clerk is ordered to enter judgment as follows:\
"In favor of Dan C. Simons, Sally J. Simons and Harold Mark Simons as trustees of the Dan C. Simons Equity Trust and Jolene J. Smith as trustee of the Charlemagne Trust and against the United States dismissing the United States Complaint as to those defendants. Dated this 13th of Oct., 1995. " approved by DOJ attorney Kirk Lusty. 196

59. JUDGMENT entered by the District Court Clerk Oct. 16, 1995 197
See, P. App. 110 [IRS abates all debt Aug. 7, 1995]

59. May 9, 1996 Notice of Appeal is filed after 60 days of 10th cir.Rule 4(1)(b)198
A mandatory Congressional time bar, ignored by the government/court

60. May 5, 1998 Simons stipulate Trusts will not be an impediment on liens 199-202
[Tenth Circuit issues judgment on appeal reversing statute of limitations District Court dismissal as the form 900 waiver was for a time certain.]

DISPUTED TERMS

61. 20 June 2002 Order states "there is no dispute that each party to this action agreed to the settlement agreement …[EXHIBIT A]"…. "The Court finds that there is no dispute that all necessary conditions have been satisfied to require the $55,000 payment…." 203-05

62. 26 Jul 2002 Government's objection to Simons' proposed Final Order and Judgment as based on the written alleged settlement-denied [p.app. 205] 206-06b

63. Government's typewritten alleged 'acceptance' of the handwritten offer To settle [see 205 and compare], that rewrites the handwritten offer, deletes The 'global' or 'universal' settlement, leaving Plantffs vulnerable to suit.207-208

64. Simons' response to the government's objection to the final order. 209-214

65. Aug 2002 FINAL ORDER AND JUDGMENT ALL claims, 'hereby Completely, now and forever, releases, dismisses, discharges, terminates, And extinguishes, with prejudice, ALL of the Plaintiffs' [government and employees] current and potential, foreseeable or unforeseeable, civil or criminal, known and unknown, claims, issues, allegations of any type whatsoever, in the Plaintiffs' personal or official capacities, as against all the Defendants, associated In any manner with this docketed case. The Plaintiffs will bear their own costs. So signed this 31st day of July, 2002 Judge Dee Benson" 215-216
Nothing in this Order dismisses the Simons' claims that Judge Benson Stated they could challenge.

66. Order to Settle was given from the Bench without an evidentiary hearing On Plaintiffs' Summary Judgment motion and handwritten offer was Signed by Jeffery Snow, who lacked authority to settle. [222] 217-224

67. June 18, 2002 hearing… Jeffery Snow DOJ attorney states the DOJ Agreed to the handwritten settlement, the Court relied upon only his Say so, stated that the Simons' arguments were without merit, And non payment was in bad faith and the Simons manufactured a Story after the fact. [See, Jeff Snow reestablishes debt on Simons' computer Record after offer to settle and without informing the Court of the 1995 225-230 Abatement, the DOJ attorney reinstated through the service center.see p.110-11]